C65AAFRA1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    PATRICIA FRANCOIS,
3                 Plaintiff,

4          v.                              09CV3275(KBF)

5   MATTHEW MAZER and SHERYL SHADE,
                  Defendants.
6   ------------------------------x

7                                    New York, N.Y.
                                     June 5, 2012
8                                    9:05 a.m.
    Before:
9
                    HON. KATHERINE B. FORREST
10
                                     District Judge
11
                        APPEARANCES
12
    GIBSON DUNN & CRUTCHER
13       Attorneys for Plaintiff
    JENNIFER H. REARDEN
14  JASON MYATT
    MATTHEW KNOX
15  RACHEL LAVERY
    SEEMA GUPTA
16  ILISSA SAMPLIN
    JENNIFER MACAULEY
17
    ROSENBAUM & ROSENBAUM
18       Attorneys for Defendants
    GEORGE DAVID ROSENBAUM
19  NATHALIE TREPELKOVA

20

21

22

23

24

25

C65AAFRA1                      Trial

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.  Be seated.  Thank

3    you.

4          COURTROOM DEPUTY:  Continuation of the matter now on

5    trial, Francois versus Mazer.

6          Counsel, please state your names for the record.

7          MS. REARDEN:  Good morning, your Honor.

8          Jennifer Rearden, for plaintiff Patricia Francois.

9    And with me is Jason Myatt and other colleagues.

10         THE COURT:  Is that Seema Gupta?

11         MS. REARDEN:  Yes.

12         THE COURT:  I like to have people at counsel table on

13   the list, okay.

14         MR. ROSENBAUM:  George Rosenbaum, of Rosenbaum &

15   Rosenbaum.  Next to me is Nathalie Trepelkova.

16         THE COURT:  This morning I had an epiphany and I got

17   her name right.

18         MR. ROSENBAUM:  And Mr. and Mrs.~ Mazer.

19         THE COURT:  Good morning, all.  I wanted to make sure

20   we were all on the same page about some housekeeping matters.

21         One, does anybody have any idea whether there's any

22   kind of protest that is expected today?  No.  Okay.  We're

23   going to be monitoring the outside through our CSOs, our court

24   security officers.  And if there is no one, we're not going to

25   put any special procedures in place for the entrance and exit

C65AAFRA1                          Trial

1    of the jurors.

2              Yesterday I raised three causes of action that were

3    asserted by the plaintiff.  I had suggested that they are

4    duplicative of other causes of action in terms of the relief

5    sought.  And in any event, they weren't properly asserted.

6    That was the 191 claim under New York Labor Law, the negligent

7    infliction of emotional distress associated with an intentional

8    tort and then the promissory estoppel associated with breach of

9    contract which is also subsumed in quantum meruit claim as

10   well.

11             Have you have you had an opportunity to think about

12   those?

13             MR. MYATT:  Your Honor, we have had an opportunity

14   this think about those.  We have not had an opportunity to

15   formalize our thinking with your client but we are happy to do

16   that at break and at the risk of speaking out of turn, I think

17   that we'll end up where you'd like us to end.

18             THE COURT:  I think that you may have step out of the

19   courtroom for a few moments, Ms. Francois, yesterday.  The

20   issue here is that the Court is of the view that as a matter of

21   law these should not be pled in the complaint that they're

22   duplicative of other claims.  So when we're putting together

23   the jury charge it's important the jury not be confused by

24   things that are simply redundantly.  I am prepared unless

25   somebody makes argument and presents some legal authority to

C65AAFRA1                    Trial

1    the contrary to dismiss these myself sua sponte.  It leaves the

2    breach of contract, the quantum meruit, the intentional

3    infliction of emotional distress, it leaves all of the other

4    claims.  It just would dismiss these.  Let's confer after the

5    lunch break and see whether or not we can resolve that, okay.

6            MR. MYATT:  Yes, your Honor.

7            THE COURT:  Let me ask about the status of the search

8    of Ms. Francois' premises for the documents which were raised

9    yesterday during cross-examination.

10           MS. REARDEN:  Yes, your Honor.  Ms. Francois went home

11   last night after the proceedings.  We sent a lawyer with her to

12   conduct the search.  They went through each room in the

13   apartment, really went into every corner including the

14   bathroom.  Found a limited collection of documents in one area.

15   We went through all those documents and all of them we compared

16   with our production and found an exact match for each one

17   except for a single piece of paper which looks like an

18   anticipatory schedule for a particular week in the plaintiff's

19   employment with the defendants.  We did not find a match for

20   that in any of our production.

21           THE COURT:  Have you provided that to Mr. Rosenbaum?

22           MS. REARDEN:  No, your Honor.  We'll do that now.

23           THE COURT:  Okay.  Do you want to have a copy.

24           MS. TREPELKOVA:  Yes.

25           MR. ROSENBAUM:  We were asking for the other papers

C65AAFRA1                          Trial

1    that they found.

2             THE COURT:  Are they in the apartment still, those

3    other copies or does your office happen to have the copies?

4             MR. MYATT:  Your Honor, we have the originals of the

5    documents that related to scheduling because those were of

6    particular importance to the conversation yesterday.  I have

7    them right here.  The other documents we did not bring.

8             THE COURT:  Understood.  What you are suggesting?

9    What you are stating is that in that envelope are the ones for

10   which you have found exact duplicates in the production.

11            MS. REARDEN:  Yes.

12            MR. MYATT:  The original of this document.

13            THE COURT:  Except for the one that you have now

14   produced to Mr. Rosenbaum which is the new document.

15            MR. MYATT:  Yes.

16            THE COURT:  Can you please give that envelope to

17   Ms. Trepelkova.  She will then review it, assure herself and

18   then hand the envelope back.  That will, I believe, take care

19   of the issues.

20            Mr. Rosenbaum, you are entitled to go into on

21   cross-examination these matters if you see so fit.

22            MR. ROSENBAUM:  Thank you, your Honor.

23            THE COURT:  Okay.  That's that.

24            Proposed verdict forms.  I know we had a busy day

25   yesterday.  What are people's thoughts as to when they are

1    going to provide me with their proposed verdict forms?  I will

2    tell you by the way so there is no mistake as to my intention,

3    I am probably not going to use your proposed verdict form but I

4    do want to have it because I want to see whether or not there's

5    something in there that I am missing that you've, maybe you've

6    done it in a better way this does happen and what your

7    envisioning as the breakdown.  Let me give you an example.

8          The FLSA in New York Labor Law have different

9    requirements with respect to the maintaining of records and

10   what the burdens are.  We could separate those out.  Keep those

11   together.  Assault and battery have different elements.  There

12   is answer assault where there's no touching required, just

13   yelling.  There's battery where touching is required.  There's

14   also intentional infliction of emotional distress which is

15   related to both of those.

16         Right now our intent is to separately require a

17   checking a box for assault, check, battery, check, and then

18   intentional infliction of emotional distress, one blank.  As

19   opposed to intention infliction of emotional distress for each

20   because it's been charged as a single count.  So in other

21   words, you could, the plaintiffs could achieve an intentional

22   infliction of emotional distress with no battery.  They could

23   achieve an intentional infliction of emotional distress simply

24   based on the assault.  That's the way it's pled.  But that's

25   the kind of thing that I'd like to have your input on in case

C65AAFRA1                    Trial

1    you disagree.

2           Similarly, there will be a line for compensatory

3    damages for the torts, the assault the battery separately and

4    then punitive damages as a group.  That's what I am currently

5    envisioning.  And as you know the punitives can be really

6    anything.  The compensatory could be a dollar and the punitives

7    could be sky high.  That's just the way the world works.  And

8    that is separate from the damages on the FLSA and the New York

9    Labor Law claims which would be taken separately.  Spread of

10   hours would be separated from the overtime claim.  And those

11   would be separated again by years because the New York Labor

12   Law allows for six years back.  And the FLSA allows for two

13   years plus one.

14          Those are the kinds of things we're thinking about and

15   I want to get your input because if you visualize it

16   differently I want to know.  And then we'll have

17   discussion/argument on why you believe your version is more

18   appropriate than my version and we'll give you our version of

19   course.

20          Okay.  So with all of that said, as a preliminary,

21   when can I get your draft verdict form?  And let me make a

22   suggestion as to timing.  I'd like to have them tomorrow by

23   noon, no later than tomorrow by noon.

24          MR. ROSENBAUM:  Your Honor, that may be a little

25   difficult for my office because after court today we are going

C65AAFRA1                    Trial

 1   to have a deposition about an hour.

 2              THE COURT:  Oh, today is the day?

 3              MR. ROSENBAUM:  Yeah.  And that may be very burdensome

 4   because we don't have a staff of hundreds.

 5              THE COURT:  All right.  Well, why don't we do this?

 6   You'll have the advantage of seeing ours and the plaintiff's

 7   and you can present your own.  Of course, the counterclaims

 8   will be included on ours and then you'd be included on the

 9   plaintiff's as well in terms of how people visualize this

10   coming through.  You can then decide if you accept the Court's

11   or the plaintiff's or some combination where you want to pick

12   and choose and not do your own.  But I do want your input so

13   that you can have the opportunity to say, no, it should be done

14   in a different way than the Court is fashioning it.

15              MR. ROSENBAUM:  Thank you.

16              THE COURT:  Because it can make a big difference in

17   terms how the jury returns its verdict, as you all know.

18              One of my now new favorite topics, pace.  Pace.

19   Speed.  So I want to just reiterate that we're going to pick up

20   the pace today consistent with the parties' making whatever

21   record they deem appropriate and necessary to prove their

22   defenses, prove their affirmative claims and the counterclaims

23   and defenses thereto.

24              So are the witnesses which the plaintiffs have given

25   me yesterday and said in open court yesterday were the likely

C65AAFRA1                    Trial

1   witnesses still the likely witnesses?

2          MR. MYATT:  Yes, your Honor.

3          THE COURT:  Okay.  So I had on my list -- and I don't

4   think I'll get that pronunciations quite correct.  Vuelvas,

5   Beriguette?

6          MR. MYATT:  Not sure.

7          THE COURT:  Is that next?  Ayende, Gonzalez,

8   Green-Armytage, Hertzberg and then the police officer

9   Ms. Wuttke.  Then I have Mr. Mazer, Mrs.~ Mazer, Shade Mazer,

10  Dr. Lombardi, Sylvie Alexander Peter Kormann and Steven Vogas

11  as the defense witnesses.

12         MR. ROSENBAUM:  Yes, your Honor.

13         THE COURT:  Okay.  All right.  So are there any other

14  witness that have either come on the list or fallen off?  No.

15  All right.  So to the extent possible move the witnesses who

16  can be moved along.  I will put you on a clock at some point

17  but I don't want to put you on a clock if I don't have to put

18  you on a clock.

19         Okay.  Is there anything else that you folks want to

20  raise?

21         MR. MYATT:  One issue, your Honor.  It's been brought

22  to my attention that in doing the initial presentation of the

23  claims to the jury yesterday, it may have appeared that the

24  defendants still have their emotional distress claims which had

25  been voluntarily dismissed in this case.

C65AAFRA1                    Trial

1          THE COURT:  The intentional infliction of emotional

2    distress was voluntarily dismissed?

3          MR. MYATT:  Yes.

4          THE COURT:  I am sorry.  That's my mistake.  I raised

5    that.  I had overlooked that dismissal.  It's actually also in

6    our charges, so thank you.  I will correct that through a very

7    soft statement that sometimes things change in terms of the way

8    things are pled in complaints and the defendants are no longer

9    seeking in their counterclaims intentional infliction of

10   emotional distress.  They are seeking counterclaims for assault

11   and for battery.

12         The negligence is -- actually, I should say for the

13   negligence claim is the same thing Mr. Rosenbaum as for -- but

14   I have been speaking with Ms. Rearden about for an intentional

15   tort.  You can't get a negligent intentional infliction of

16   emotional distress.

17         MS. TREPELKOVA:  That was dismissed as well.

18         THE COURT:  So you've got two counterclaims left,

19   assault and battery.  And I will clarify that very softly to

20   the jury if it's acceptable to all parties.

21         MR. ROSENBAUM:  One matter please, your Honor?  I

22   spoke to counsel earlier with reference to the medical records

23   and hospital records.  I would like to put them into evidence

24   at this point but without publishing them to the jury for the

25   following reason.  There is in those records statements

C65AAFRA1                    Trial

1    allegedly made by the plaintiff which is not necessary for

2    diagnosis and treatment such as, my employer hit me, or

3    something like that.  It may come in later on if they bring

4    someone in to say that it was actually told them and whatever

5    it may be.  But as of this moment without having a party saying

6    from the hospital record itself it cannot be put in as a

7    statement for purposes of diagnosis and treatment, in other

8    words --

9              THE COURT:  I get the point.  Who is going to be the

10   custodian of records to put those in?  Is there going to be a

11   treating physician or the treating individual?

12             MR. ROSENBAUM:  I don't know --

13             THE COURT:  The maker of the note?

14             MR. ROSENBAUM:  The maker of the note has to be there

15   in order to get the verbiage in.

16             THE COURT:  I agree with that.  Who is going to be

17   putting these records in?

18             MR. MYATT:  Which records are --

19             THE COURT:  The ones that say "my employer hit me".

20             MR. ROSENBAUM:  Both hospitals.

21             MR. MYATT:  The Roosevelt record will be brought in by

22   the attending physician at --

23             THE COURT:  Who actually wrote the notes?

24             MR. MYATT:  Yes.

25             THE COURT:  Present tense impression the words "my

C65AAFRA1                    Trial

1    employer hit me" would come in if that's the person who is

2    going to put them in.  If they were going to come in simply as

3    custodian of records I would agree with you but if the

4    individual who wrote them down was contemporaneously or shortly

5    thereafter taking those notes, the handwriting comes in even in

6    he doesn't recall it as present tense impression.  It's not

7    hearsay.  It comes in for the truth.

8              MR. ROSENBAUM:  I don't know if that's what the person

9    will say but subject to that --

10             THE COURT:  Subject to connection.

11             MR. ROSENBAUM:  My point is that prior to them coming

12   in I have to have the records to cross-examine Ms. Francois as

13   to her complaints.

14             THE COURT:  Do you not have those produced to you?

15             MR. ROSENBAUM:  They have been produced but they are

16   not in evidence.

17             THE COURT:  You can use them on cross-examination

18   without having them in evidence.  You just can't publish them

19   to the jury.  In other words, if you want to say to,

20   Ms. Francois, you've testified about X, Y and Z but isn't it

21   true that when you went to the emergency room they only found

22   "X"?  If she says, no, that's not true, you can say, well, let

23   me show you these records and you'll take it from there.  She

24   may or may never have seen the record before, you know.

25             MR. ROSENBAUM:  Thank you, judge.

C65AAFRA1                    Trial

1           THE COURT:  Okay.  They would not however be shown to

2   the jury nor read from in connection with that.  You just say,

3   do these refresh your recollection?

4           MR. ROSENBAUM:  And she'll say --

5           THE COURT:  She'll say whatever she says.  But if it's

6   the physician then you'll be able to use them affirmatively.

7   Who is the individual?

8           MR. MYATT:  Your Honor, that's doctor --

9           THE COURT:  How do you spell it?  I have

10  B-I-A-N-C-O-F --

11          MS. TREPELKOVA:  B-L-A-N-C-A --

12          THE COURT:  B-L-A-N-K-O-F-L-E-R.

13          MS. TREPELKOVA:  There's no "K".  B-L-A-N-C-A-F-L-O-R.

14          THE COURT:  Thank you.  So the second witness who will

15  be called for the attending witness who will put those notes

16  in, okay.  He can testify as to all of his handwriting.  Is it

17  a man or a woman?  Do you know?

18          MR. MYATT:  It's a man.

19          THE COURT:  All right.  Is there anything else that

20  the partys wanted to raise before we start?  Okay.  Well, we

21  will recommence at 9:30.  We're waiting on two jurors.  It's

22  not unusual.  They're coming in, several are, from outside of

23  the city, so we'll start hopefully around 9:30.

24          And, Ms. Francois, you'll go back on the stand at

25  about 9:30 just before we start and we'll proceed from there.

C65AAFRA1                      Trial

1    All right.

2                Thank you.  We'll take a break until then.

3                (Recess)

4                THE COURT:  All right.  Thank you.  Ms. Francois, now

5    I'll give you the time to come on over here.  When she is

6    positioned, Joe, why don't you bring out the jury.

7                (Pause)

8                (Jury present)

9                THE COURT:  All right.  Let's all be seated.  I see

10   only one of you has a cup of coffee and I had a jury trial not

11   too long ago where over the course of the trial the cups kept

12   getting bigger and bigger until finally it was as big as

13   Starbucks could possibly go with the caffeine involved.

14               I have one issue I want to raise with you before we

15   continue with the witness which was yesterday I made a mistake.

16   When I was describing the claims that were brought by the

17   defendants, the counterclaims, I described them as assault,

18   battery and the intentional infliction of emotional distress.

19   In fact when this case was transferred to me, which it was, the

20   intentional infliction of emotional distress claim had already

21   been voluntarily dismissed.  So that claim is not part of the

22   case.  It was dropped some time ago.  There are lots of reasons

23   why things get dropped that you shouldn't concern yourself with

24   but it would be my mistake to have mentioned it.

25               There is a counterclaim for assault and battery by

C65AAFRA1                    Trial

1   Mr. Mazer but there's no claim for intentional infliction of

2   emotional distress by Mr. Mazer.  There is by the plaintiff.

3   Okay.

4          All right.  Now we will continue with the

5   cross-examination of Ms. Francois.

6          And, Ms. Francois, I want to remind that you you are

7   still under oath from yesterday.

8          All right.  Mr. Rosenbaum.

9          MR. ROSENBAUM:  Thank you, your Honor.

10  CROSS-EXAMINATION

11  BY MR. ROSENBAUM:

12  Q.  Good morning, Ms. Francois.

13  A.  Good morning.

14  Q.  Ms. Francois, you went to the hospital on December 18, 2008

15  after the incident, is that correct?

16  A.  Yes, sir.

17  Q.  And about what time did you get to the hospital?

18  A.  Like I said it could be after nine o'clock.

19  Q.  And was there a long wait at the hospital to be treated?

20  A.  I beg your pardon, sir?

21  Q.  Was there a long wait in the hospital to be treated?

22  A.  I waited a while.

23  Q.  Okay.  And did you tell the hospital that your back was

24  injured?

25  A.  No, I didn't.

C65AAFRA1                              Francois - Cross

1   Q.  Did you tell the hospital that any parts of your body were

2   injured other than your hand and face?

3   A.  No, sir.

4   Q.  And did the hospital -- we're speaking now about Roosevelt

5   Hospital, correct?

6   A.  Yes, sir.

7   Q.  And did the Roosevelt Hospital give you a diagnosis as to

8   what your injuries were?

9   A.  An abrasion to my face.

10  Q.  Are you sure about that?

11  A.  Yes, sir.

12  Q.  Is it a fact that they your primary diagnosis was an injury

13  to your hand?

14  A.  Both my face and my hand, sir.

15  Q.  Are you -- did you review the hospital record?

16  A.  It's been a while, sir.

17  Q.  Have you ever reviewed the hospital record from Roosevelt

18  Hospital?

19  A.  Yes, sir.

20  Q.  And is it your testimony that there was a diagnosis of an

21  injury to your hand and your eye?

22  A.  Yes, sir.

23  Q.  And what was the primary diagnosis?

24  A.  To what, sir?

25  Q.  Sorry?

C65AAFRA1                          Francois - Cross

1    A.  What you are referring to?

2    Q.  What was the primary diagnosis?  They have primary

3    diagnosis and secondary diagnosis.  Did you see that in the

4    hospital record?

5    A.  Sir, I don't remember right now but I do remember my face

6    had an abrasion.

7    Q.  If I tell you that the primary diagnosis was hand injury

8    would that refresh --

9    A.  Sir --

10   Q.  Excuse me.  Would that refresh your recollection?

11   A.  Sir, I mentioned both my hands and my face.

12   Q.  I am speaking about diagnosis.  You know --

13          MR. ROSENBAUM:  I am sorry, judge.  I thought that was

14   off.

15          (Pause)

16          MR. ROSENBAUM:  I apologize.

17   Q.  Do you know what the word "diagnosis" means?

18   A.  Sir, yes, but I don't remember what the diagnose but I

19   know --

20   Q.  Please, just answer my question, please.  Do you know what

21   the word "diagnosis" means?

22   A.  Yes, sir.

23   Q.  What does it mean?

24   A.  It refers to what happened through a injury.

25   Q.  Okay.  And would it refresh your recollection that there

C65AAFRA1                          Francois - Cross

 1   was a primary diagnosis of injury to hand?

 2   A.  Yes, sir.

 3           MS. REARDEN:  Objection.

 4   Q.  When it came to a second diagnosis there was none, do you

 5   recall that?

 6   A.  Sir, I don't understand what you mean.

 7   Q.  There's primary diagnosis and there's also a secondary

 8   diagnosis.  Do you recall that?

 9   A.  Sir, I don't understand what you mean.

10   Q.  Did you ever see in the diagnosis part of the hospital

11   record in the diagnosis part that you had an injury to your

12   eye, yes or no?

13   A.  Yes, sir.  I have photos to reflect that.

14   Q.  I am sorry?

15   A.  I do have photos to reflect it the injury I had on my face

16   an my hands.

17   Q.  Did it have any indication of an injury to your eye?

18   A.  Sir, I just mentioned I do have photos reflecting the

19   injury on my face and on my hands.

20   Q.  Yes or no --

21           THE COURT:  I think that there's maybe a

22   misunderstanding of the question.  The question that counsel is

23   asking you relates to the actual hospital records that were

24   created in the hospital.  And he is asking you first, did you

25   ever review those hospital records themselves -- and then also

C65AAFRA1                        Francois - Cross

1    and I think you testified that you had at some point -- he's

2    asking you do you know whether those hospital records reflected

3    something called a "primary diagnosis" and a "secondary

4    diagnosis".  Do you know or do you recall ever seeing those

5    terms?

6              THE WITNESS:  Judge, I don't understand.

7              THE COURT:  Okay.  All right.  Counsel, so perhaps

8    there's a better witness who wrote the documents that you can

9    ask about that.

10   BY MR. ROSENBAUM:

11   Q.  Did the doctors at Roosevelt -- St. Lukes Roosevelt

12   Hospital make an appointment with you to come back to the

13   hospital?

14   A.  Yes.

15   Q.  When was the appointment for?

16   A.  I don't remember the date.

17   Q.  Did they give you a slip for that appointment?

18   A.  Yes.

19   Q.  Do you know where that slip is?

20   A.  No.

21   Q.  And you don't know how many days after you were supposed to

22   go back to the hospital?

23   A.  It was a couple of days.

24   Q.  And did you go?

25   A.  Yes.

C65AAFRA1                         Francois - Cross

1   Q.  Is it your testimony you went back to St. Lukes Hospital a

2   second time?

3   A.  Yes.

4   Q.  When was that?

5   A.  Sir, I don't remember right now.

6   Q.  What did they do for you at St. Lukes the second time?

7   A.  I was referred to a counselor.

8   Q.  Were you referred to a social worker the first time because

9   you asked, you wanted to speak to a social worker?

10  A.  I did not ask because I wasn't aware that a social worker

11  would have been involved.

12  Q.  So it's your testimony that you went back a second time and

13  they told you, and you wanted to see a social worker?

14  A.  Yes, sir.

15  Q.  Did you see a social worker?

16  A.  Yes, sir.

17  Q.  What's his or her name?

18  A.  Sir, I don't remember right now.

19  Q.  Where was his or her office?

20  A.  Sir, I don't remember.

21  Q.  Was it a man or a woman?

22  A.  It was a woman.

23  Q.  You have no idea where you went to see her?

24  A.  Sir, it was in the vicinity of Roosevelt Hospital.

25  Q.  And how long did you stay with her?

C65AAFRA1                         Francois - Cross

1   A.  Sir, I don't remember the exact amount of time that we

2   spent together.

3   Q.  After you spoke to the first time, this person whose name

4   you don't know, am I correct you don't know her name?

5   A.  Yes, sir.  I didn't memorize it.

6   Q.  Did you go back to her a second time?

7   A.  No, sir.

8   Q.  Did you ask if she wants you to come back a second time?

9   A.  Yes, sir.

10  Q.  But you didn't go back because you didn't feel you had to

11  go back, isn't that correct?

12  A.  My financial stability didn't allow me to, sir.

13  Q.  Your what?

14  A.  Financial stability at the point in time.

15  Q.  Did you have enough money to go there the first time to St.

16  Lukes?

17  A.  Yes, sir.

18  Q.  And the second time?

19  A.  Yes, sir.

20  Q.  And how much did this lady charge you for a visit to her?

21  A.  Sir, I wasn't charged for any visit for anything.

22  Q.  So why was there a financial problem for you to go back to

23  see her?

24  A.  To get from one point to another point, sir.

25  Q.  Sorry, ma'am?

C65AAFRA1                          Francois - Cross

1    A.  To get from one point to another point.

2    Q.  You had no means of travel, is that your testimony?

3    A.  Yes, sir.

4    Q.  You had no money to get into a car or -- sorry -- into the

5    train to get up to her office?

6    A.  No, sir.

7    Q.  You were penniless?

8    A.  At that point, sir.

9    Q.  You couldn't get any money, borrow any money to go to her,

10   is that your testimony?

11   A.  Any money I had at that point in time was to accumulate to

12   pay rent and other bills, sir.

13   Q.  What other bills were more important than to go see the

14   doctor?

15   A.  Pay my rent, sir.  Keeping a roof over my head.

16   Q.  Didn't you have a Metro card?

17   A.  I didn't have one at that time.

18   Q.  Is it your testimony that you didn't have a Metro card in

19   December of 2008?  Is that your testimony?

20           MS. REARDEN:  Objection.

21           THE COURT:  Sustained.  To the extent that you are

22   talking about now -- why don't you be specific as to the

23   timeframe as to when she was going to the doctor and then match

24   it.

25   BY MR. ROSENBAUM:

C65AAFRA1                           Francois - Cross

1    Q.  I thought you said you went to the doctor -- maybe I'm

2    wrong -- a few days after you were at hospital, is that

3    correct?

4    A.  Yes, sir.

5    Q.  Would that still be in December of 2008?

6    A.  Not the following appointment.

7    Q.  I'm sorry?

8    A.  Not the following eye appointment.

9    Q.  When was the appointment the second appointment to the

10   doctor?

11   A.  I don't remember the date.

12   Q.  Was it in 2008 or 2009?

13   A.  I believe it was in 2009.

14   Q.  When in 2009?

15   A.  I don't remember the date, sir.

16   Q.  How long was your Metro card good for?

17   A.  Which Metro card, sir?

18   Q.  The one that you had, the last one that you had?

19   A.  The last one that I had expired the Friday after the

20   incident.

21   Q.  Was that a monthly Metro card?

22   A.  A weekly Metro card.

23   Q.  All right.  Now, didn't you go to another hospital, Kings

24   County?

25   A.  Yes, sir.

C65AAFRA1                          Francois - Cross

1    Q.  When did you go to Kings County?

2    A.  The following week, sir.

3    Q.  How did you get money to pay for that?

4    A.  It's walking distance from where I live.

5    Q.  And what were your complaints in Kings County?

6    A.  Sir, I went to see an ophthalmologist.

7    Q.  And did the ophthalmologist give you a diagnosis?

8    A.  They tested my eyes, sir.

9    Q.  Did the doctor give you a diagnosis with reference to the

10   injury allegedly in this case?

11   A.  Sir --

12   Q.  "Yes" or "no" or "I don't remember"?

13   A.  I don't remember, sir.

14   Q.  Did you have to buy glasses?

15   A.  Yes, sir.

16   Q.  Where did you get the money?

17   A.  Part-time job, sir.

18   Q.  I am sorry?

19   A.  By doing little part-time jobs, sir.

20   Q.  Did you have a part-time job in January of 2009?

21   A.  Sir, I thank you for reminding me.  Yes, I did had a

22   part-time job in 2009 from January to June.

23   Q.  I reminded you or someone else told you that you had it?

24   A.  No.  You reminded me, yesterday.

25   Q.  So without my reminding you -- you testified before I

C65AAFRA1                          Francois - Cross

1    reminded you --

2    A.  Yes, sir.

3    Q.  -- that you didn't work from January to June of 2009,

4    correct?

5    A.  Yes, sir.

6    Q.  But when I read the deposition that you said that you

7    worked from January to June 2009, that reminded you?

8    A.  Yes, sir.

9    Q.  Why didn't you tell the jury or -- excuse me -- why didn't

10   you answer my question whether or not you were working from

11   January to June of 2009 by saying "I don't know" or "I don't

12   remember"?  Why didn't you answer it that way?

13   A.  Sir, I don't remember at that point in time, sir.

14   Q.  Did you speak to your lawyer about your testimony before

15   yesterday and today?

16   A.  No, sir.

17   Q.  Did a lawyer accompany you to your house last night?

18   A.  Yes, sir.

19   Q.  And did you discuss the case with that lawyer?

20   A.  We did not discuss anything, sir.

21   Q.  When did you get that job in January of 2009?

22   A.  It was with a word from a friend in the first week of

23   January.

24   Q.  Who was the friend?

25   A.  Ms. Christine Louis.

C65AAFRA1                         Francois - Cross

1   Q.  And she -- is she a member of the Domestic Workers United?

2   A.  Yes, she is.

3   Q.  And who is this person you worked for?

4   A.  Her name is Sue Gatto.

5   Q.  And you were able to work for six months with her?

6   A.  Part-time, yes, sir.

7   Q.  You testified yesterday that you are too much, involved in

8   too many mental issues that prevented you from working, do you

9   recall that?

10  A.  Sir, it did not prevented me from working.  I did both

11  things around same timeframe, recuperate, as well.  Like I

12  said, I had to pay my rent.

13  Q.  You told the jury yesterday that you were unable to work

14  from January to June until I reminded you that you were but you

15  gave a reason for the jury yesterday that you were unable to

16  work because of mental stress.  Do you remember telling these

17  folks that?

18  A.  Yes.

19  Q.  Do you recall -- do you remember telling them, yes or no?

20  A.  Yes.

21  Q.  But that was not the truth was it?

22  A.  That was the truth.

23  Q.  Well, are you --

24  A.  That was the truth.

25  Q.  Excuse me?

C65AAFRA1                    Francois - Cross

1   A.  I suffered mental stress.

2   Q.  Excuse me, please.  Excuse me.  Are you suggesting that

3   when you told the jury yesterday that you were unable to work

4   from January to June because of mental stress, was that the

5   truth or not the truth?

6   A.  Sir, that was the truth.

7   Q.  Did you intend to leave the impression to that jury that

8   you were unable to work from January to June of 2006?  That's

9   what you were doing, right?

10          THE COURT:  I think you've got the year wrong.

11  Q.  I am sorry.  January 2009.  I am sorry.

12  A.  Sir, repeat your question, please.

13  Q.  Were you trying to impress this jury that you were unable

14  to work from January to June 2009 because of mental distress?

15  A.  I am not trying to impression anybody.

16  Q.  So why did you say that?

17  A.  Sir, still presently right now I am going to chemo

18  treatment and --

19          MR. ROSENBAUM:  May I approach?

20          THE COURT:  Let's -- you don't have to approach.  The

21  jury will disregard any other medical conditions that are

22  unrelated to this particular action and the witness will try

23  to, she can give an answer you've asked her to explain what she

24  was saying yesterday versus what she said today.  She can give

25  that but don't refer to other medical conditions unrelated to

C65AAFRA1                       Francois - Cross

1    what happened, apart from saying you may have had another

2    medical condition.  That you can certainly say.  Why don't you

3    go ahead and provide the answer.  You were going to explain

4    yesterday and today.

5    A.  Well, the reason was when I explained that presently right

6    now I am going to chemo and it affect my memory.

7            MR. ROSENBAUM:  Your Honor?

8            THE COURT:  I don't think the witness understood my

9    instruction.

10           What I want you to do, the jury will disregard any

11   statements related to other medical conditions.

12           THE WITNESS:  Okay.

13           THE COURT:  Don't talk about treatment or anything

14   else relating to any other medical conditions.  Do you

15   understand that?

16           THE WITNESS:  Okay.

17           THE COURT:  Do you know the word that I am talking

18   about not to use again, right?

19           THE WITNESS:  Yes.

20           MR. ROSENBAUM:  May I please, your Honor, have a

21   sidebar, please?

22           THE COURT:  I think we've taken care of it.  If you

23   insist we'll have a sidebar okay.  Come on.

24           (Continued on next page)

25

C65AAFRA1                          Francois – Cross

1            (Sidebar)

2            MR. ROSENBAUM:  If your Honor please, I know very well

3    that this jury has heard that she's going through chemo and

4    etc., so everything she is saying now she has planted in that

5    jury a degree of sympathy.  Your Honor has been very careful

6    and properly so to make certain that I don't ask questions with

7    respect to things which may be prejudicial what has happened.

8    Now they will go into that jury room and probably say, well,

9    she couldn't remember this or that because of chemo.  That,

10   your Honor, I think is an appropriate and I'm going to ask that

11   this jury be disbanded because of a mistrial that is -- bad

12   statements to made before this jury and I think it's horrible.

13           THE COURT:  Okay.  The application for a mistrial is

14   denied.  The Court's given an appropriate cautionary

15   instruction.  The Court will actually strike that testimony now

16   to insure that it's not part of the record when the record is

17   read back.  The Court will also give an appropriate jury

18   instruction upon charging the jury which will remind the jury

19   that it must in its deliberations disregard stricken testimony.

20   We are too far down the road to have a mistrial at this point.

21   And in light of those cautionary instructions we can,

22   certainly, proceed.  There's lots of case law that would apply

23   on this.

24           MR. ROSENBAUM:  Respectfully except, your Honor.

25           MR. MYATT:  Part of problem we have here is that

C65AAFRA1                        Francois - Cross

1    Mr. Rosenbaum has asked -- is trying -- has asked why her
2    recollection may be different.  At the risk of trying to read
3    my client's mind, she had a chemotherapy treatment on Friday
4    and I think the problem is she's trying to explain that her
5    current medical condition is the reason why her recollection
6    may not be what Mr. Rosenbaum is saying it should be.
7              THE COURT:  All right.  Well, if I -- I don't want to
8    speculate on whether or not that is or is not the case.  I
9    think you should investigate the facts relating to that and
10   whether or not that is true.  You ought to confer with the
11   treating physician as to whether or not that could be the case
12   based upon the type of medication that she received and then if
13   you want to bring it up on redirect, if this witness is still
14   on or you can recall her and bring out the memory issue but
15   there has to be a lot of preliminary work done before you can
16   go there.
17             MR. ROSENBAUM:  Your Honor, this puts me at a little
18   disadvantage because if I start to question her ability to
19   remember and it's part of my issue of credibility she is going
20   to say the same thing.  That's the problem.
21             THE COURT:  It turns out that I didn't know she had
22   had chemo.
23             MR. ROSENBAUM:  Neither did I.
24             THE COURT:  I don't know what the effects of chemo is
25   If one of the effects is a memory loss that is something that

C65AAFRA1                    Francois - Cross

1    you should walk cautiously around and I must say I also think

2    we're done with the recollection of this witness.  That's what

3    I mean about picking up the pace.  You've well and truly

4    hammered her recollection so I think that going on to some

5    other issues might be a better place to spend time.

6              MR. ROSENBAUM:  Even to go back to the incident itself

7    as to recollection, judge.  And as far as chemotherapy is

8    concerned my wife went through it.  It has nothing to do

9    with --

10             THE COURT:  Well, I am not a medical doctor.

11             MR. ROSENBAUM:  Neither am I but I have a very serious

12   problem now because if I go back to speak of the incident of

13   December 28.

14             MS. TREPELKOVA:  "18".

15             MR. ROSENBAUM:  I'm sorry.  December 18, 2008 stuck in

16   that jury's mind is chemo, I have a problem with that.

17             THE COURT:  I understand.  I have given them

18   cautionary instruction.  I will strike the testimony and give a

19   cautionary charge that's sufficient under the charge.

20             MR. ROSENBAUM:  Your Honor, how can I approach this

21   person now by saying "do you remember"?

22             THE COURT:  I would do it very carefully.

23             MR. ROSENBAUM:  Why should I be handcuff?

24             THE COURT:  Because you have been told right now that

25   she might have a medical condition --

C65AAFRA1                    Francois - Cross

 1              MR. ROSENBAUM:  Then it shouldn't be on trial now

 2     because it's eliminating me from the opportunity to effectively

 3     cross-examination her on her recall because she has an escape

 4     method today of this chemo.

 5              MS. TREPELKOVA:  That questions everything she said on

 6     direct-examination.

 7              MR. ROSENBAUM:  It's a serious issue.

 8              THE COURT:  Then you can take it.  I am not going to

 9     take this right now and this is something that you folks should

10     have dealt with before.  If her memory is such that she can't

11     be on trial right nows it's something else.  I have seen

12     nothing based upon the demeanor of that witness and her ability

13     to --

14              MS. REARDEN:  Not anything that we were told that she

15     was having any kind of memory issue --

16              MR. ROSENBAUM:  That --

17              MS. REARDEN:  We were not aware of any kind of memory

18     issue relating to the treatment.

19              THE COURT:  I believe based upon the demeanor of this

20     witness that there is no lack of competency to proceed to trial

21     at this time.  I understand your position with which you

22     disagree regarding my denial of the application for a mistrial

23     but I am denying it and I'll give the instruction as I

24     indicated.

25              MR. ROSENBAUM:  Not to be argumentive with the Court.

C65AAFRA1                         Francois - Cross

1    That's not my way of doing things.  How do I question her

2    credibility or recall about the incident?  How can I then --

3             THE COURT:  Well, you've go into what happened in

4    terms of who was in the room on the 18th.  That's very

5    different than asking her what she said two hours before when

6    she's talking about her lack of recall yesterday it was a short

7    term memory versus long term memory issues.  You've also

8    hammered her credibility already on her lack of memory and

9    inconsistency.  You've done a very good job of that.

10            MR. ROSENBAUM:  Thank you, judge.  But at this moment

11   I am stuck because I don't know which way to turn.  I really

12   don't because am I now forced to cross-examine a person who is

13   taking chemo?  I look like an ogre at that point.

14            THE COURT:  You take the witnesses as they come.  I

15   mean she comes with whatever she comes with.  I am having the

16   jury disregard her current medical conditions.  We have to

17   proceed.

18            (In Open Court)

19            (Continued on next page)

20

21

22

23

24

25

C654FRA2                    Francois – cross

1           (In open court)

2           THE COURT:  Before you proceed Mr. Rosenbaum, let me

3    just tell the jury that in addition to disregarding the

4    testimony regarding another condition, I am going to strike the

5    reference to treatment relating to any unrelated condition.

6    That testimony which I won't repeat will be stricken from the

7    record so it won't be there in the record if testimony later is

8    reread.  You may proceed.

9    BY MR. ROSENBAUM:

10   Q.  Ms. Francois, if you don't recall something, please don't

11   guess, OK?

12   A.  Yes, sir.

13   Q.  Are you able to testify now?

14   A.  Yes, sir.

15   Q.  No problem?

16   A.  No, sir.

17   Q.  Your mind is clear?

18   A.  I feel all right, sir.

19   Q.  Is your mind clear at this point?

20   A.  What do you mean, sir?

21   Q.  That you have ability to recall?

22   A.  It's not everything I will remember, sir.

23           THE COURT:  Mr. Rosenbaum, you can move on.  Thank

24   you.

25   Q.  Do you remember going to Kings County Hospital with respect

C654FRA2                          Francois - cross

1    to the alleged injury you had when this happened on December

2    18, 2008?

3    A.   Yes, I did go to Kings County Hospital.

4    Q.   When you went to Kings County Hospital, what were your

5    complaints with reference to injuries, if you remember?

6    A.   When I went to Kings County, I went to see Dr. Daniels

7    about a different complaint.

8    Q.   About what?

9    A.   A different complaint, but when she saw me she referred me

10   to ophthalmologist.

11   Q.   Did you make any complaints to the doctor about your hand

12   at Kings County when you went there the first time?

13   A.   Sir, I did not go for my hand.

14   Q.   You went there for your eye?

15   A.   It was a different issue at that point in time.

16   Q.   A different issue, what?

17   A.   Besides my hand and my face.

18   Q.   So, you had an issue with your eye; is that your testimony?

19   A.   Mr. Rosenbaum, I went for a different issue; if you would

20   like me to mention it, I will.

21          THE COURT:  Let me I think just clarify the testimony

22   as I have heard it.  If people disagree, let me know.  As I

23   understand the witness, she said she went to Kings County

24   Hospital for one particular medical condition.  While she was

25   there she was referred to an ophthalmologist.  She has related

C654FRA2                           Francois - cross

1    the visit to the ophthalmologist to the incident on December

2    18.

3              Is that correct?

4              THE WITNESS:  Yes.

5              THE COURT:  Pick it up from there.

6    Q.  You went to the ophthalmologist?

7    A.  Yes, sir.

8    Q.  Did you have the eye issue, was that a new issue that you

9    had?

10   A.  An issue before I had the injury.

11   Q.  You had an issue with the eye before you had the injury?

12   A.  Sir, what do you mean; I don't understand what you are

13   saying.

14   Q.  Why did you go to the eye doctor?

15   A.  Because of the abrasion on my eye.

16   Q.  You are saying that was caused by the incident of December

17   18?

18   A.  What was?

19   Q.  The abrasion to your eye?

20   A.  Yes.

21   Q.  What was the date you went to Kings County Hospital?

22   A.  Sir, I don't remember.

23   Q.  Did you tell anyone before you went to Kings County

24   Hospital that you had a problem with your eye, any medical

25   facility?

C654FRA2                          Francois - cross

1    A.  Roosevelt Hospital.

2    Q.  Ma'am, what did you say?

3    A.  Roosevelt Hospital.

4    Q.  Did you see anything in the Roosevelt Hospital records that

5    related to your eye?

6    A.  Sir, I don't understand what you are asking me.

7    Q.  Did you look, you said you reviewed the Roosevelt Hospital

8    records.  My question is did you see anything in those records

9    that addresses the problem in your eye?

10   A.  The abrasion, I remember an abrasion.

11   Q.  What is an abrasion?

12   A.  Bruising and swelling.

13   Q.  Did you indicate to them at St. Luke's Roosevelt Hospital

14   that you had an eye problem?

15   A.  I didn't have to indicate; it was visible.

16   Q.  Did you tell anybody at Roosevelt Hospital that your eye

17   function that you had a problem being able to see at that

18   point?

19   A.  I don't remember, sir.

20   Q.  Then you went to see some doctor that's referred to you

21   from Kings County Hospital?

22   A.  Yes, sir.

23   Q.  When did you see that doctor for the first time?

24   A.  I don't remember the exact date, sir.

25   Q.  Was it during the month of March, February?

C654FRA2                          Francois - cross

1  A.  I do not remember.

2  Q.  Was it within six months of the incident?

3  A.  Sir, I don't remember.

4  Q.  Was it a year after?

5  A.  Sir, I don't remember.

6  Q.  Is that eye giving you pain during all that time?

7  A.  Some blurriness in my eye, sir.

8  Q.  You don't remember when you saw this doctor for blurriness,

9  is that correct?

10 A.  Yes, sir.

11 Q.  However, you were able to work, correct?

12 A.  Yes, sir.

13 Q.  You were able to have social functions, correct?

14 A.  What do you mean, sir.

15 Q.  Working with Domestic Workers United, you were active

16 during that period of time with them?

17 A.  I had to do my best to do what I can, sir.

18 Q.  Please answer my question; I don't mean to be rude, but we

19 have to move along.  You worked with Domestic Workers United,

20 correct?

21 A.  I did not work with Domestic Workers United.

22 Q.  You went to the meetings?

23 A.  Yes, I did.

24 Q.  You went on demonstrations with them?

25        THE COURT:  Sustained.

C654FRA2                          Francois - cross

1    Q.  Other than going to Roosevelt St. Luke's twice as you said

2    and going to this ophthalmologist where we don't know when you

3    went, did you go to any other medical care for this injury in

4    this case?

5    A.  No.

6    Q.  You said you didn't go back to the hospital because you

7    didn't have the fare to go to the hospital, is that correct?

8    A.  Yes, sir.

9    Q.  At that point in time, I reminded you that you were

10   working, correct?

11   A.  Yes, sir.

12   Q.  You couldn't get any fare money to go to the hospital?

13   A.  As I mentioned, every penny I had to accumulate it to pay

14   my rent, sir.

15   Q.  Ms. Francois, from December 18, 2008 until the present

16   time, did you have any other jobs other than the job you said

17   from January 2009 to June 2009, any other jobs?

18   A.  Part-time, like a day here and a day there, not a

19   consistent job.

20   Q.  How many days did you work between December 2008 to the

21   present time, part-time jobs?

22   A.  I didn't count the days, sir.

23   Q.  Was it more than 100 days?

24   A.  I don't remember; I wasn't keeping count of the days.

25   Q.  Do you remember any specific person who you worked for

C654FRA2                          Francois - cross

1    between 2008, I will say January 2009 to now, we are in June

2    2012, three years, three and a half years almost, if I add

3    myself right, how many part-time jobs did you have?

4    A.  Sir, I didn't keep count of it because, like I said, it's

5    not like a consistent job, it's like a day here, probably this

6    week and probably the next 2 weeks, but I did not keep count on

7    the amount of days I work.

8    Q.  Do you remember any person that you worked for?

9    A.  What do you want?

10   Q.  The name and address.

11   A.  Sir, I cannot give you anybody name and address without

12   letting them know or asking them.

13   Q.  I am sorry?

14   A.  I don't believe I should give anybody name and address

15   without asking them if I can.

16   Q.  Is there a reason why you can't give those addresses;

17   what's the problem with that.  You gave the address of the

18   person from January to June 2009 why.  Can't you give us names

19   of people you worked for?

20   A.  That was a consistent part-time job.  I don't see any

21   reason to involve anybody else within what's going on here.

22   Q.  Aren't you asking for loss of income during those periods

23   of time?

24   A.  During which periods of time?

25   Q.  From December 2008 to today.

C654FRA2                          Francois - cross

1    A.  Sir, I don't understand your question.

2    Q.  In your claim, aren't you claiming that you lost money

3    because you were fired in December 2008 and were unable to work

4    since then?

5    A.  Sir, I don't know how to answer your question.

6    Q.  OK.  Is there a reasonable reason why you can't give us

7    names and times, that you don't want to give us that

8    information to us?

9          THE COURT:  That's a different; that's names and

10   times.  Why don't we do it this way.  If the witness is more

11   comfortable giving the last name of any individuals who she

12   remembers, if she remembers any.  Then you can separately ask

13   about the time periods relating to those names you can do that,

14   if she recalls.

15   Q.  Give me the last name of a person you remember.

16   A.  I don't remember right now; it's been a while since I work

17   with anybody.

18   Q.  Did you file a claim for disability insurance?

19   A.  No, sir.

20   Q.  Did you file a claim for workers compensation?

21   A.  No, sir.

22   Q.  Did you go for public assistance?

23   A.  No, sir.

24          THE COURT:  Proceed cautiously in this area.

25          MR. ROSENBAUM:  I am finished with that part.

C654FRA2                       Francois - cross

1              THE COURT:  Hold on.  I am going to ask the jury to

2    disregard the testimony and the questions relating to whether

3    or not this particular witness filed a claim for, I take it,

4    federal disability, federal Social Security disability, and

5    workers compensation insurance.  So I am going to ask you to

6    disregard the questions and answers.  Also that will be

7    stricken from the transcript.

8    Q.  Did you have any source of income?

9    A.  From when are you talking about, sir?

10   Q.  From December 18, 2008 to date?

11   A.  Like I mentioned before, I did a part-time job, after that

12   doing a little day here and a little day there; plus I have

13   friends who helped me out.

14   Q.  You said you had to pay your rent, correct?

15   A.  Yes.

16   Q.  How much is your rent each month?

17   A.  Sir, I don't think I should mention how much my rent is to

18   you.

19              THE COURT:  Just because we have been with this

20   witness for quite some time and we talked about moving things

21   along, I am not sure this is a fruitful area for you to pursue.

22   There are other areas you may want to go into.  It's not

23   relevant.

24   Q.  Ms. Francois, is it your testimony that you didn't work but

25   you got assistance from people for two and a half, three and a

C654FRA2                         Francois - cross

1   half years?

2   A.  Yes, sir.

3            MS. REARDEN:  Objection.

4            THE COURT:  Overruled.

5   Q.  Do you know what your monthly budget is to survive between

6   all your expenses?

7   A.  I don't have the exact total right now, sir.

8   Q.  How about approximate total?

9   A.  Not even approximate.

10  Q.  Is it any one person or group that gave you a substantial

11  sum of money periodically?

12           THE COURT:  Sustained; irrelevant.

13  Q.  Is it your testimony that you were able to live because of

14  people giving you money; is that your testimony?

15  A.  Helping me out along the way, sir, yes.

16  Q.  Did you get a check from a significant other?

17           MS. REARDEN:  Objection.

18           THE COURT:  Sustained.  We went through this; it was

19  the subject of some communication I am sure you recall.  Move

20  on to your next topic.

21  Q.  Ms. Francois.

22  A.  Yes, sir.

23  Q.  In the year 2008 -- withdrawn.  In September 2008, did you

24  have an agreement with Mrs. Mazer as to how many hours a week

25  you would work?

C654FRA2                         Francois – cross

1    A.  Sir, I don't remember.

2    Q.  You don't remember having an agreement that you would work

3    a certain amount of hours?

4    A.  Sir, I don't remember.

5    Q.  Did you testify yesterday about how many hours of work you

6    worked from 2006 to 2008, what your arrangements were; do you

7    recall that?

8    A.  Sir, I still don't remember.

9    Q.  Did you and Ms. Mazer agree that you would work 40 hours a

10   week during the period of September to December of 2008?

11   A.  It varied, sir.

12   Q.  I am talking about the agreement; was there an agreement

13   between you and Ms. Mazer as to the amount of hours, forget the

14   dates, amount of hours you were to work each week to obtain

15   $400 salary a week?

16   A.  Sir --

17   Q.  Yes, no, or I don't know?

18   A.  I don't know.

19   Q.  Do you recall in 2008 the hours you worked on Monday of

20   each week?

21   A.  It varied.

22   Q.  Didn't Shade, the girl, have a specific program each day of

23   school and after-school activities in 2008?

24   A.  I know she had gymnastics; I know she had ballet.

25   Q.  What time would you pick up Shade from school if you

C654FRA2                         Francois - cross

1    remember on the Mondays in the fall of 2008?

2    A.  3:00.

3    Q.  Would you pick up Shade every day in the fall of 2008 at

4    3:00?

5    A.  That's the time school over, yes, sir.

6    Q.  Pardon me?

7    A.  Yes, sir.

8    Q.  What were the last hours of gym, when was she finished with

9    gym?  Don't guess; if you don't know you don't know.

10   A.  7:30 to 8:00.

11   Q.  Then you would take -- and she had gym three times a week?

12   A.  Yes, sir.

13   Q.  At 8:00 would you take Shade back to the house, correct?

14   A.  Yes.

15   Q.  Isn't it a fact when you drop her off, it would be about

16   8:30 or thereabouts, is that correct?

17   A.  8:30 to 9:00.

18   Q.  The Mazers were home at that point?

19   A.  Yes, sir.

20   Q.  Then you would go home?

21   A.  I gave her a bath before I leave to go home.

22   Q.  Is it your testimony that Mrs. Mazer would not bathe the

23   child; you would bathe the child?

24   A.  Sometimes, sir.

25   Q.  Sometimes she would bathe it?

C654FRA2                          Francois - cross

1   A.  Yes, but most of the time I do.

2   Q.  Is it your testimony Mrs. Mazer let you bathe the child

3   when she was home?

4   A.  Yes, sir.

5          MS. REARDEN:  Objection.

6          THE COURT:  Overruled.  We have been over this I think

7   yesterday on cross-examination.

8   Q.  What time would you leave the house at the latest?

9   A.  Between 9:30 to 10:00.

10  Q.  Would you have to sign a sign-out book at the Mazer

11  residence building they lived in?

12  A.  Sometimes.

13  Q.  Wasn't it your obligation to sign out when you left the

14  building?

15  A.  I had no obligation to sign anything, sir.

16  Q.  Was there a doorman?

17  A.  Yes, sir.

18  Q.  Was there a sign-in book and a sign-out book?

19  A.  Sir, that was new to me.

20  Q.  Excuse me?

21         THE COURT:  She can answer this question.  You asked

22  her was there and she is telling you when there was.

23  A.  Sir, I never had to sign any book.  That was new to me.

24  Like I said, sometimes I did and sometimes I didn't.

25  Q.  Was the doorperson, the doorman, was he signing you in or

C654FRA2                         Francois - cross

1   out or note that when you were leaving?

2   A.  I don't know what the doorman had to do.

3   Q.  Gym was Monday, Wednesday, Friday; how about Tuesday, what

4   was the schedule for Tuesday?

5   A.  Sir, I don't remember.

6   Q.  Does it refresh your recollection there was no afterschool

7   activities at that time?

8   A.  Sir, I don't remember.

9   Q.  If there were none where would you take Shade?

10          MS. REARDEN:  Objection.

11  Q.  If you remember?

12          THE COURT:  Sustained.  Do you want to ask about

13  physically, ask about something specific as opposed to if.

14  Q.  Did you have any schedule for her at that point?

15  A.  Probably a play date.

16  Q.  Same thing on Thursday?

17  A.  Sir, I don't remember.

18  Q.  Let me go please from September 2007 up to June 2008,

19  excluding the summer months.  Did you have any agreement with

20  Ms. Mazer as to what your hours of work would be during that

21  period of time, how many hours a week you would work during

22  that period of time?

23  A.  I don't remember, sir.

24  Q.  You have no notes, no recollection?

25  A.  I may have but I don't remember it right now.

C654FRA2                          Francois - cross

1   Q.   You don't remember the agreement that you had with

2   Ms. Mazer; is that your testimony?

3   A.   Yes, sir.

4   Q.   There was an agreement but you don't know the details; you

5   don't remember the details, is that correct?

6   A.   I don't remember.

7   Q.   But there was an agreement?

8   A.   I am not sure.

9   Q.   Just to be certain, you do not remember what the agreement

10  was between you and Ms. Mazer from September of 2008, I am

11  sorry, from September 2007 to June 2008, correct?

12  A.   Sir, I am not sure about it, sir.

13  Q.   Did you have an agreement with Ms. Mazer from June, I am

14  sorry, from September 2006 to June 2007 as to how many hours of

15  work you would have each week?

16  A.   It varied, sir, it varied.

17  Q.   Was there an agreement with her as to how many hours you

18  would work for her?

19  A.   Even if there was my hours always varied.

20  Q.   Let's start with the agreement; do you recall if there was

21  an agreement, yes or no?

22  A.   No, I don't recall.

23  Q.   In fact, if I asked you from the very day you started in

24  2002 I think it was, other than summer vacations, would you

25  have any recollection as to the agreement of hours you had with

C654FRA2                        Francois - cross

1   her for those years?

2              MS. REARDEN:  Objection.

3              THE COURT:  Overruled.  You may answer.

4   A.  Sir, I started working from 9:30 to 7:30, 50 hours a week,

5   $500 a week.  That's the agreement I had with her, plus having

6   a week vacation in summer and a week vacation in December.

7   That's the agreement I started out with with Ms. Mazer.

8   Q.  First year, that's back in 2002; how about in 2003?

9   A.  That went the same way.

10  Q.  2004?

11  A.  The hours varied.

12  Q.  There was a new agreement, correct?

13  A.  No agreement, just the hours varied, hours changed.

14  Q.  Is that the time Shade started to go to either preschool or

15  nursery school.

16  A.  That's why I am saying it varied, the hours changed.

17  Q.  Whatever the hours were, my question is, there was an

18  agreement as to how many hours a week you would work in 2004,

19  simple question?

20  A.  I didn't have a different agreement from the first

21  agreement.

22             THE COURT:  Mr. Rosenbaum, at this point in time I

23  think we can say there is 20 minutes left for you on cross of

24  this witness, then we should move on, unless there is something

25  really extraordinary that requires us to go beyond another 20

C654FRA2                           Francois - cross

1   minutes.  Pick your best points.

2              MR. ROSENBAUM:  I can't finish in 20 minutes; I will

3   move to a different topic, move as fast as I can.

4   Q.  Did you have arrangements with Shade, secrets?

5              MS. REARDEN:  Objection.

6              THE COURT:  That's overruled.  The jury will disregard

7   that statement.  It will be struck from the record.  Don't use

8   that word.

9   Q.  Did you have any --

10             THE COURT:  If you want clarification, come over to be

11  sure we get this right.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

C654FRA2                           Francois - cross

1              (At the sidebar)

2              THE COURT:  Going back to our discussion on this

3      yesterday, the court made the following ruling that it would

4      allow four areas of topics for credibility purposes, not for

5      purposes of putting the witness on trial for how she conducted

6      herself in terms of whether she told secrets to the child.  You

7      can ask whether or not had she known of these four incidents,

8      things like them, would she have fired her for them,

9      Mrs. Mazer.

10              The four, so you are clear, were the time she was left

11     alone in the apartment in Brooklyn, the second time she was

12     left alone in the hallway or apartment in Brooklyn for 20

13     minutes watching TV, playing the radio, bucking bronco.  Your

14     last one is whether or not there was a play date for Chelsea

15     Piers incident where the mother had to be called to pick up the

16     child.

17              We are not going to call them secrets.  You can just

18     say you testified that among your duties and responsibilities

19     was keeping the child secure, doing the following things, isn't

20     it the case that.  It goes to contradicting her testimony about

21     keeping her secure, whatever you want to do with this.

22              Does that make sense.

23              MR. ROSENBAUM:  OK.

24              (Continued on next page)

25

C654FRA2                          Francois - cross

1           (In open court)

2     BY MR. ROSENBAUM:

3     Q.   Do you recall yesterday that you stated what your

4     obligations were in taking care of Shade; do you recall that?

5     A.   Yes, sir.

6     Q.   Could you please again tell us what those obligation were.

7     A.   Making sure that she is fed, kept clean, picking her up

8     from school, taking her to her activities, taking her on play

9     dates, taking her to the zoo, the museum.

10    Q.   Also for safety?

11    A.   Very much her safety.

12    Q.   In fact, that was the prime issue?

13    A.   Very much so.

14    Q.   Did you at one point take Shade to your home without

15    telling the Mazers?

16    A.   Yes, sir.

17    Q.   When was that done?

18    A.   I don't remember the day and time, sir.

19    Q.   You took Shade to your home in Brooklyn in the morning,

20    correct?

21    A.   Yes, sir.

22    Q.   You forgot to tell Ms. Mazer you were going to go to

23    Brooklyn, is that correct, with her daughter, correct?

24    A.   Yes, sir.

25    Q.   What did you do in Brooklyn when you took Shade with you?

C654FRA2                         Francois - cross

1   A.  I needed to go to the post office; that's what took me to

2   Brooklyn.

3   Q.  Then you brought Shade back home, is that correct?

4   A.  Yes, sir.

5   Q.  Did you take her to your apartment that day?

6   A.  Yes, sir.

7   Q.  Did you leave her alone that day in the apartment?

8   A.  I would never do such a thing, sir.

9   Q.  Did you leave her alone in your apartment that day?

10  A.  No, sir.

11  Q.  Then you came back to Brooklyn, correct -- you came back to

12  New York, I am sorry, correct?

13  A.  Yes, sir.

14  Q.  Later that day you spoke with Mrs. Mazer, correct?

15  A.  Yes, sir.

16  Q.  You didn't tell her about taking the child to Brooklyn, is

17  that correct?

18  A.  Yes, sir.

19  Q.  Is there a reason why you didn't tell her?

20  A.  It wasn't any harm done; I didn't think she was in harm's

21  way.  It's just that I needed to go to the post office.  We had

22  a time break so I made use of it.

23  Q.  Isn't it a fact that Shade told her mother?

24  A.  Yes, sir.

25  Q.  Ms. Mazer confronted you?

C654FRA2                          Francois - cross

1   A.  Yes, she did.

2   Q.  What did she say to you?

3          THE COURT:  No reason to go into all of this.  Move on

4   to the next one.

5   Q.  Did she tell you not to do that again?

6          MS. REARDEN:  Objection.

7          THE COURT:  Overruled.  That I will allow.

8   A.  I did apologize and told her I would never do it again.

9   Q.  Isn't it a fact you took Shade back a second time?

10  A.  No, I didn't.

11  Q.  You never took Shade back to your apartment any time

12  thereafter?

13  A.  No, sir.

14  Q.  Shade is a truthful person as far as you know, correct?

15         MS. REARDEN:  Objection.

16         THE COURT:  Based on what she knows; overruled.

17  Q.  You can answer.

18  A.  Sir, I cannot tell you that right now, sir.

19  Q.  Didn't you take Shade back a second time and left her in

20  the apartment alone?

21  A.  Sir, I would never do such a thing, no.

22  Q.  Yes or no, please?

23  A.  No, no, no.

24  Q.  If Shade testifies that you left her in the apartment alone

25  to watch TV, she would not be telling the truth?

C654FRA2                          Francois - cross

1    A.  No, she would not be telling the truth.

2              MS. REARDEN:  Objection.

3              THE COURT:  Overruled.

4    Q.  Didn't you go back a third time with Shade and you left

5    Shade in the hallway of the apartment and you went inside your

6    neighbor's apartment and left Shade alone with other children;

7    do you remember that?

8    A.  Sir, I did not take her back a second time to the

9    apartment; I did not take her back a third time.

10   Q.  Do you think Shade was a credible person?

11   A.  I don't know what's in Shade mind.

12   Q.  Was she a credible person as far as you knew her?

13             THE COURT:  Back when she knew her at the time versus

14   today.

15   Q.  Up to 2008?

16   A.  Sometimes.

17   Q.  Sometimes she was not credible?

18   A.  Sometimes.

19   Q.  Page 95, line 9, can you read that.  This was back in June

20   14, 2011.  This was testimony under oath; you promised to tell

21   the truth, correct?

22   A.  Yes.

23   Q.  Do you recall being asked this question:

24   "Q.  Did you find Shade to be a -- when you would be with

25   Shade, was she a credible person when she would speak with you,

C654FRA2                         Francois - cross

1   tell the truth?

2   "A.  Yes."

3           Do you recall being asked that question and giving

4   that answer?

5   A.  Yes.

6   Q.  Next question:

7   "Q.  She was very honorable to you?

8   "A.  Yes."

9   A.  Yes.

10  "Q.  And you found her to be a truthful young lady.  Did you

11  ever find her in a lie?

12  "A.  I can't say, I cannot say because I always tell her to

13  speak the truth."

14          That's what you thought?

15  A.  This is why I said sometimes.

16  Q.  Do you recall any time when she lied to you?

17  A.  Not right now.

18  Q.  Did there come a time when -- do you remember in March 7,

19  2005 you were playing with Shade in the apartment and at which

20  point she was injured while playing with you?

21  A.  I can't remember Shade being injured while I was playing

22  with Shade.

23  Q.  Do you recall that she was playing like bunco on your back

24  and you compelled her into a radiator and she cut her chin; do

25  you recall that?

C654FRA2                         Francois - cross

1    A.  Shade never had an injury around me, sir.

2    Q.  Is it your testimony that she didn't cut her chin any time

3    when you were playing with her and the parents weren't home; is

4    that your testimony?

5    A.  Sir, I don't remember.

6    Q.  Don't you remember she was bleeding before her mother came

7    home?

8    A.  Sir, I don't remember.

9    Q.  If Shade testified that she was hurt by playing bunco or

10   bronco, whatever the terminology is, and she was compelled off

11   your back and hit the radiator, she would not be telling

12   something that was true?

13               MS. REARDEN:  Objection.

14               THE COURT:  Overruled.

15   A.  Sir, Shade room don't have, I can't remember seeing a

16   radiator in Shade room.

17   Q.  Did she ever have an accident hitting something?

18   A.  Sir, I don't remember.

19   Q.  Do you remember when Mrs. Mazer came home, she saw the scar

20   or the cut; you don't remember that at all?

21   A.  Sir, if something did happen it was an accident, it wasn't

22   anything purposefully done, but I don't recall.

23   Q.  I am not saying it was necessarily intentional; if you

24   don't recall you don't recall.

25   A.  I don't recall.

C654FRA2                     Francois - cross

1   Q.  Do you remember Ms. Mazer calling the doctor at that point?

2   A.  No, sir.

3   Q.  Isn't it a fact that Shade has a scar?

4          THE COURT:  We talked about this yesterday and we were

5   not going to go there.  So, you can ask the child or you can

6   ask the mother.  Subject of another ruling.  The jury will

7   disregard that question.

8   Q.  One of your duties was to take the child on play dates, is

9   that correct?

10  A.  Yes, sir.

11  Q.  Were there times that you would not take her to the play

12  dates that she had?

13  A.  If we do have a play date we surely go on that play date.

14  Q.  Is it your testimony you always took her on play dates; is

15  that your testimony?

16  A.  Once we have a play date we always go on that play date.

17  Q.  If Ms. Shade testified differently she would not be telling

18  the truth?

19  A.  No, she wouldn't be because she enjoyed being with her

20  friends.

21  Q.  If Ms. Shade knew that you took the child, it gets

22  confusing, the last name is Shade and the baby's name, first

23  name is Shade, if Ms. Mazer knew that you took the child back

24  to Brooklyn --

25         THE COURT:  Sustained; you can't ask about what is in

C654FRA2                         Francois - cross

1    somebody else's mind.

2    Q.  Let's go to December 18.  When you got home with Shade what

3    time was it?

4    A.  About 6.

5    Q.  Isn't it a fact that Mr. Mazer was home?

6    A.  Nobody was in the apartment when we got there, sir.

7    Q.  Isn't it a fact that when you got home, Shade ran over to

8    the father and kissed him?

9    A.  There wasn't anybody in the apartment when we got there,

10   sir.

11   Q.  When did someone else come in the apartment according to

12   you?

13   A.  Mr. Mazer came in the apartment while Shade was in the tub

14   and I was in the kitchen preparing Shade's dinner.

15   Q.  You went over this testimony many times with your

16   attorneys, correct?

17            MS. REARDEN:  Objection, your Honor.

18            THE COURT:  Overruled; I provide the jury with an

19   instruction on that.  You may answer.

20   A.  Sir, I did not have to discuss that with my lawyers.  I

21   know, I remember Mr. Mazer came home, met me in the kitchen,

22   and Shade in her tub.

23   Q.  Didn't you discuss your testimony or the event with your

24   lawyers?

25            THE COURT:  Answer that yes or no.  You don't have to

C654FRA2                         Francois - cross

1   talk about the contents of any communications you have had with

2   lawyers.  You can answer whether or not you have generally

3   spoken to your lawyers about the topic of your testimony today.

4   A.  I don't remember specifically, sir.

5   Q.  There came a time when Mr. Mazer came home went into the

6   baby's room, the child's room?

7   A.  Yes, he did.

8   Q.  Prior to that date, did you ever hear Mr. Mazer use the

9   terminology black bitch?

10  A.  Not around me, sir.

11  Q.  Did you ever hear him using disparaging remarks that could

12  be deemed racist remarks in all the years that you were there?

13           MS. REARDEN:  Objection, your Honor.

14           THE COURT:  Overruled.

15  A.  Sir, overhear him on the phone conversations calling people

16  stupid and telling them how dumb they are.

17  Q.  Did he ever -- there are some stupid people in this world;

18  let's go on.  Did he ever ever use any disparaging remark with

19  reference to race?

20  A.  I don't remember.

21  Q.  In the six and a half years you were in that house, plenty

22  of times together, separately with the Mazers, any time in six

23  and a half years did you ever hear him refer to anyone or about

24  anyone in a racial, improper racial statement?

25  A.  I don't remember.

C654FRA2                         Francois - cross

1   Q.  Page 292, line 7.  Now bear this in mind; you were under

2   oath at that time, correct?

3   A.  Yes.

4   Q.  I don't hear you.

5   A.  Yes.

6          MS. REARDEN:  Objection.

7          THE COURT:  Overruled.

8   Q.  (Reading)

9   "Q.  Had you ever heard him make a racist statement before that

10  date?

11  "A.  Not in front of me?

12          You heard that question, you gave that answer,

13  correct?

14  A.  Yes.

15  Q.  Was that true?

16  A.  Like I said, I don't remember.

17  Q.  Was that true; was your answer truthful?

18  A.  Yes, it was.

19  Q.  Next question:

20  "Q.  And you never heard it?

21  "A.  No."

22          Was that answer true?

23  A.  Yes, sir.

24  Q.  And next question:

25  "Q.  Did you ever hear his wife ever use a racist statement

C654FRA2                          Francois - cross

1   before that date?

2   "A.  No."

3           Was that true?

4   A.  Yes, sir.

5   Q.  Wasn't your recall better back in 2011 than it is today?

6   A.  My recollection was much better than today, sir.

7   Q.  At that time you never heard him ever use a racial epithet,

8   is that correct?

9   A.  Like I said, I don't remember.

10  Q.  That's not what you said; you actually said no.  Do you

11  want to retract that answer?

12          THE COURT:  The issue is whether or not she remembers

13  it today or did she testify about that in 2011.

14  Q.  Before that date did you ever see Mr. Mazer ever hit his

15  child?

16          THE COURT:  Sustained.  We will talk about it at the

17  break.  We are about to have a break.  In fact, now is a good

18  time for a break.

19          THE WITNESS:  Thank you, judge.

20          THE COURT:  Let's take our mid-morning break.  Let me

21  just remind you all not to talk about this case or anything

22  about this case with each other or anyone else, not to talk

23  about the impressions of lawyers you may have, and to keep an

24  open mind.  We still have a lot of evidence to come in.  We

25  will come back in about 10 minutes or so.

C654FRA2                          Francois – cross

```
 1              (Jury leaves courtroom)

 2              THE COURT:  Ms. Francois, you can step down.

 3         I want to talk about a couple of things.  My last

 4    ruling was related to Rule 404(b) which is evidence of other

 5    wrongs or acts is not admissible to prove the character of a

 6    person in order to show action in conformity therewith.  You

 7    can't show, in other words, that somebody didn't do something

 8    to show they wouldn't have a propensity.  Were you attempting

 9    to offer that evidence for any other purpose.

10              MR. ROSENBAUM:  Your Honor, I'd rather the witness be

11    out at this moment, out of the courtroom.

12              THE COURT:  I think that in this instance it is

13    appropriate because it has to do with your cross-examination.

14    He is going to talk to me about what he might be allowed to do

15    or not do on your cross-examination.  If you wouldn't mind,

16    there will be some other things we will invite you back in.

17    Just outside the door, thank you.

18              (Plaintiff leaves courtroom)

19              THE COURT:  I was referring to Federal Rule of

20    Evidence 404(b).

21              MR. ROSENBAUM:  Your Honor, the reason I am bringing

22    that up, the court has heard testimony of how she had to

23    protect Shade from Mr. Mazer.

24              THE COURT:  Verbal.

25              MR. ROSENBAUM:  Well --
```

C654FRA2                          Francois - cross

```
 1              THE COURT:  It was only verbal.  She talked about

 2    mental, emotional.  There has not been any testimony about any

 3    kind of physical act.  Indeed, I think there was testimony that

 4    there were no physical acts.  I think it was yesterday morning;

 5    am I misremembering this.  In any event, I don't recall any

 6    testimony of there being a physical act, and showing that he

 7    didn't commit a physical act doesn't say anything about whether

 8    or not he would have committed an act against Ms. Francois.

 9              MR. ROSENBAUM:  My recollection was different, but if

10    it comes out different --

11              THE COURT:  I am going to preclude, I am not going to

12    allow you to go into this line of questioning under 404(b),

13    unless you have another reason to offer it, in which case I

14    will consider whether it falls under a different rule of

15    evidence.

16              MR. ROSENBAUM:  Thank you, your Honor.

17              THE COURT:  I told you I would tell you about

18    disability, SSI, and workers comp.

19                   (Continued on next page)

20

21

22

23

24

25
```

C65AAFRA3                          Francois - Cross

1          THE COURT:  The reason for that ruling was because it

2     goes to her immigration status and as you know under the FLSA

3     there's clear law that we can't talk about her immigration

4     status.  You are not entitled to some of those benefits based

5     upon her immigration status, some but not all.  So we can't --

6     unless you disagree with that proposition.  In other words, she

7     can't get federal disability if -- based upon her immigration

8     status.

9          MR. ROSENBAUM:  I thought she was entitled to public

10    assistance.

11         THE COURT:  Certain kinds.

12         MR. ROSENBAUM:  Pardon?

13         THE COURT:  Certain kinds.

14         MR. ROSENBAUM:  Certain kinds of public assistance.

15         THE COURT:  Well, can you folks confirm.  I will allow

16    it back in if Social Security, she doesn't have a Social

17    Security --

18         MR. ROSENBAUM:  Well, I can't approach that.

19         THE COURT:  She can't get Social Security disability

20    without a Social Security number.  And Workers' Comp also if

21    you haven't paid taxes, you are not going to get Workers' Comp.

22    You can separately pay into that fund.

23         MR. ROSENBAUM:  I think you have Workers' Comp

24    insurance.

25         THE COURT:  You do typically.  It's done at the same

C65AAFRA3                      Francois - Cross

 1   time, not necessarily.

 2               MR. ROSENBAUM:  Well, she could support her own.  I

 3   don't know.  But I do think my recollection is that public

 4   assistance standing of immigration is not an issue.

 5               THE COURT:  Well, there's two different things.  One

 6   is Social Security Disability which requires I believe -- I

 7   believe you've got to have a Social Security to do that.

 8   That's separate from whether or not she could get food stamps.

 9   That was not a question you asked.

10               Mr. Myatt.

11               MR. MYATT:  Actually, I think, your Honor, that I'll

12   let you finish.

13               THE COURT:  Do you think I am wrong?

14               MR. MYATT:  No, your Honor.  In particular whether the

15   Workers' Comp issue came up and truthfully it's actually the

16   defendants' burden under the law to actually make payments into

17   the distinct fund.

18               THE COURT:  It is.  I think that this issue in terms

19   of -- I think what you were getting at during this piece of

20   cross-examination was whether or not she felt injured enough to

21   have gone and sought assistance from some public source.  That

22   is what I took the testimony as going towards.  And because it

23   also happens to for Social Security give a misleading

24   impression that she could have when she couldn't have and

25   parsing those two out was difficult.

C65AAFRA3                      Francois - Cross

1            MR. ROSENBAUM:  I am sorry.  I didn't intend to do it

2       but counsel brought another issue which I think should not be

3       expressed in open court at this point.  We can discuss that

4       later.

5            THE COURT:  All right.  Let me see if there's

6       something else.  Now, let's talk at the sidebar about some of

7       the medical issues that had come up before if we could.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C65AAFRA3                         Francois - Cross

1          (Sidebar)

2          THE COURT:  Okay.  I have had my law clerk look into

3    the issue of chemotherapy affecting a witness' credibility and

4    how those issues have been dealt with in other cases.  And in

5    some cases the jury's informed of the fact of chemotherapy and

6    they can make a determination as to whether or not they want to

7    view it as an issue of credibility or not of credibility.

8          However, I am also mindful of Rule 403 and of things

9    being unduly prejudicial to your client in terms of things

10   evoking undue sympathy.  There's a balance to be struck.  I

11   believe in this instance we have struck the balance and I don't

12   think we should go into her current physical condition to

13   explain her lack of memory.

14         Now, what I ask you folks to do however I am now

15   directing my attention to the counsel for the plaintiff is I

16   think you need to inquire into whether or not her lack of

17   memory due to her just lack of memory or whether or not it's

18   due to a physical condition.  If it's due to just lack of

19   memory then I want to have a stipulation that will be read to

20   the jury which is there's no physical condition that has

21   resulted in a lack of memory.  I think that's fair to the

22   defendants.  If you are going to assert that a lack of memory

23   has to do with a medical condition that raises some issues that

24   we are going to have to grapple with.

25         MS. REARDEN:  Your Honor, maybe I should fill you in

C65AAFRA3                    Francois - Cross

1    on what we have already done before trial in this regard.  We,

2    obviously, knew that Ms. Francois is quite ill and she's

3    undergoing treatment.  We knew that generally.  And so as we

4    approached trial I wanted to make sure there wouldn't be any

5    issue with her standing trial.  And so I asked her to confer

6    with her physician.  When she asked the question about whether

7    or not whether she would be able to withstand trial, he said to

8    come in, I want to examine you.  And last week he examined her.

9    And he said I think that trial will put great stress on you but

10   there is no reason in my opinion that you cannot stand trial.

11          THE COURT:  Did he do a -- not a competency finding

12   because I think she's certainly competent.  Was there my

13   portion of that question that you are aware of that related to

14   whether or not her current treatment would affect her memory?

15          MS. REARDEN:  No.  It was more open-ended than that.

16          THE COURT:  I think you need to inquire into that and

17   if this is the case or inquire into the witness whether she

18   thinks that it's just past and she doesn't recall.  In which

19   case I think I should give a stipulation that her current lack

20   of memory is not due to any physical condition.

21          MS. REARDEN:  Okay.

22          THE COURT:  That would be my preferred way to go

23   because then we don't have to go down the complicated road of

24   medical the condition.  But if it's the medical condition then

25   we need to know that we have to have the facts on and I am

C65AAFRA3                        Francois - Cross

1    going to have to grapple with that in terms of how it plays out

2    here.

3              MS. REARDEN:  Your Honor, one concern I have if I try

4    to reach out to Ms. Francois to her treating physician to ask

5    this question we are going to get a call back in court and you

6    our telephones are downstairs.

7              THE COURT:  Well, you can get a pass to bring your

8    cellphone upstairs.  But here is what I would do.  First thing

9    I think you should do is talk to your client about her lack of

10   memory just time passed.  I think that's an area of inquiry and

11   even though she's in the middle of cross I think at this point

12   it's appropriate.  But then I think if she says, well, it could

13   be due to her condition, then I think we have to take -- we'll

14   take it step by step.

15             MS. REARDEN:  Okay.

16             MR. ROSENBAUM:  Can I have a ten minute break?

17             THE COURT:  Absolutely.

18             MS. REARDEN:  Thank you.

19             THE COURT:  Anything else we need to raise?  Who --

20   You wanted to raise one thing?

21             MR. ROSENBAUM:  Well, when I put Mr. Mazer on the

22   stand there's going to be an issue about Social Security, those

23   issues.

24             THE COURT:  What Social Security?

25             MR. ROSENBAUM:  He paid Social Security for --

C65AAFRA3                         Francois - Cross

1      MR. MYATT:  He had to make the required filings as to

2    the state insurance funds and maintain taxes.

3      THE COURT:  Well, we can do the taxes part since I've

4    struck the stuff on the funds.

5      MR. ROSENBAUM:  The issue that is -- and I am going

6    to -- I discussed that with Mr. Mazer.  The problem is he

7    couldn't pay into is Social Security because she didn't have a

8    Social Security number.  That's going to be his answer.

9      THE COURT:  It's different for federal income tax.

10   You can pay into federal income tax even if you don't.  I guess

11   he wouldn't have paid her portion.  He would have paid her

12   portion.

13     MR. ROSENBAUM:  She couldn't get credit because there

14   is no Social Security number.  In fact she --

15     THE COURT:  I am saying he could have done withholding

16   on her.

17     MS. REARDEN:  Yeah.

18     THE COURT:  He could have done federal withholding

19   even without an SAI because what you do without a number

20   because --

21     MR. ROSENBAUM:  That is what he told me his accountant

22   said.  He couldn't pay Social Security, couldn't do any

23   withholding.  Then we spoke to our accountant, then --

24     MR. MYATT:  What his accountant says is hearsay.

25     MR. ROSENBAUM:  I am telling you what you just learned

C65AAFRA3                        Francois - Cross

1    from him.  I am not testifying.

2              MR. MYATT:  I am saying his answer is based on --

3              MR. ROSENBAUM:  I know.

4              MR. MYATT:  -- on hearsay.

5              THE COURT:  I think you should spend the bulk of your

6    time elsewhere.

7              MR. MYATT:  I intend --

8              THE COURT:  Let me also just say we've got to finish

9    with this witness.

10             MR. ROSENBAUM:  Judge, when you told me I wasn't

11   trying to --

12             THE COURT:  How much more do you have?

13             MR. ROSENBAUM:  It's hard but about 20 minutes or so

14   which judge it's hard.

15             THE COURT:  My God.  We've got to finish in our

16   lifetime.

17             MR. ROSENBAUM:  She doesn't always come back and

18   answer.  It's a speech and that's not relevant.

19             THE COURT:  There aren't so many speeches.

20             MR. ROSENBAUM:  I am trying to deal with this as fast

21   as I can.  I've cut out a lot of stuff.

22             MR. MYATT:  With respect to Mr. Rosenbaum he did also

23   ask the same question three, four, five times.

24             THE COURT:  I know but this witness has been a -- I

25   don't fault him for that.  I am just thinking that we've now

C65AAFRA3                        Francois - Cross

1    plowed a lot of ground.  Made a lot of points.  I don't know

2    what points you might have left.  If you think you've got some

3    points left then so be it.  I'll give you 20 minutes but I am

4    going to cut you off.  Go back and study what you've got left.

5    Talk to Ms. Trepelkova and she'll tell you which are the

6    important ones.  But 20 minutes and end.

7              MS. TREPELKOVA:  Thank you.

8              MS. REARDEN:  Your Honor, we have ten minutes or so

9    now?

10             THE COURT:  Yes.  Take a ten minute break.

11             (Recess)

12             THE COURT:  All right.  We're ready to bring the jury

13   back out.

14             (Jury present)

15             THE COURT:  All right.  Let's all be seated.

16             Okay.  Mr. Rosenbaum, you may proceed.

17             MR. ROSENBAUM:  Thank you, your Honor.

18   BY MR. ROSENBAUM:

19   Q.  Did you ever hear Mr. Mazer verbally abuse his daughter

20   prior to December 18, 2008?

21             MS. REARDEN:  Objection, your Honor.

22             THE COURT:  I'll allow this one question.

23   A.  He probably would scold her for one something or the other.

24   Q.  I am sorry?

25   A.  He would scold her.

C65AAFRA3                        Francois - Cross

1    Q.  I am sorry.  I don't mean to be -- he was --

2           THE COURT:  Scold, S-C-O-L-D.

3           MR. ROSENBAUM:  Would scold her.

4    Q.  Did also Mrs. Mazer scold the child at times?

5    A.  Yes.

6    Q.  Not unusual, is it, for a parent to scold a child, is it?

7           MS. REARDEN:  Objection.

8    A.  Repeat your question.

9           THE COURT:  Overruled.

10   Q.  Is it unusual for a parent to scold a child?

11   A.  If it's unusual?

12   Q.  Yeah.  Is it wrong?

13   A.  That's what parents do.

14   Q.  So when Mr. Mazer scolded the child previous times it was

15   his parental obligation to do so?

16          THE COURT:  Sustained.

17   Q.  Now, on that night when Mr. Mazer came home what you are

18   saying -- did he go in to see his child, into her room?

19   A.  Sir, repeat your question.

20   Q.  Did Mr. Mazer when he came home go into the room where the

21   child was, where Shade was?

22   A.  Yes, sir.

23   Q.  And when he went into the room was Shade there?

24   A.  Yes, sir.

25   Q.  And were you there too?

C65AAFRA3                        Francois - Cross

1    A.  Yes, sir.

2    Q.  When he came into the room were you lying on the carpet or

3    whatever you had on the floor?

4    A.  I was sitting on a chair by Shade's table.

5    Q.  And what did Mr. Mazer say to Shade?

6    A.  Have you learned your lines for your skit.

7    Q.  Did you memorize your lines for the skit, okay.  And did he

8    say it in a nice tone of voice or was he angry by then?

9    A.  He just simply asked her, Have you learned your lines for

10   your skit?

11   Q.  And what did Shade say?

12   A.  "Yes, daddy".

13   Q.  And did Mr. Mazer say anything after that?

14   A.  He told her she have to learn it some more.

15   Q.  So she says she studied it and now he says you have to

16   learn it more, is that your testimony?

17   A.  Yes.  And Shade said --

18   Q.  I'll get to what Shade said.  When he said to her, you've

19   got to do it more, do you know what the skit was about?

20   A.  It was about a play she had to do in school.

21   Q.  And was it a special play that was involved at that time?

22   A.  I just know it was a play.

23   Q.  Was it a play with respect to the holiday that they were

24   going to celebrate?

25           MS. REARDEN:  Objection.

C65AAFRA3                          Francois - Cross

1    Q.  If you know?

2              THE COURT:  Overruled.

3    A.  I don't remember precisely what it was for but it was

4    around Christmastime.

5    Q.  And do you know what Shade's part in the celebration would

6    be, how important her part would be?

7    A.  No.

8    Q.  Do you know whether or not Shade was going to lead a

9    service that day?

10   A.  I didn't know Shade was going to lead any service.

11   Q.  Okay.  So you didn't know the details of the skit as you

12   put it, correct?

13   A.  I only help her with her lines to remember it.

14   Q.  I am sorry?

15   A.  I only help her with her lines to remember it.

16   Q.  And when Mr. Mazer said study or do it again or whatever

17   his words were, what did Shade say?

18   A.  She don't have to do it any more.  She learned it already.

19   Q.  Did you say anything at that time?

20   A.  No.  She also said, mommy said I don't have to learn it any

21   more.

22   Q.  Okay.  And did Mr. Mazer say anything after that?

23   A.  That is when he got angry when she mentioned, mommy said I

24   don't have to learn it any more.

25   Q.  And did you say anything?

C65AAFRA3                          Francois - Cross

1    A.  No.  I was just standing there.

2    Q.  And what did he say after that?

3    A.  He took her by the hand and was telling her she got to

4    learn it and she wouldn't amount to anything and took her to

5    his room.

6    Q.  Say that again.  She took -- he took her by the hand and

7    what?

8    A.  Took her to his room.

9    Q.  Did he say something to her?

10   A.  Something in the effect like, you have to learn your lines

11   some more.

12   Q.  And you didn't say a word?

13   A.  Not at that point.

14   Q.  Mr. Mazer took Shade to the master bedroom?

15   A.  Yes.

16   Q.  Okay.  At that point was that unusual between a parent and

17   a child?

18   A.  Shade started crying.

19   Q.  No.  No.  No.  What Mr. Mazer did was anything unusual,

20   what he did at that time?

21   A.  No.

22   Q.  Okay.  And he went and took the child into the bedroom.  Do

23   you think he wanted to speak to her alone without you being

24   around?

25   A.  I don't know what he wanted to do.

C65AAFRA3                         Francois - Cross

1    Q.  Okay.  Fair enough.  And then you heard crying?

2    A.  She started to cry in her room.

3    Q.  As she left?

4    A.  Because as she mentioned --

5    Q.  Please answer my question.  I have a time limit here.  As

6    she left the room she was crying when she went to Mr. Mazer's

7    room?

8    A.  She started to cry before she left the room.

9    Q.  Before she left the room.  It wasn't because he'd

10   physically abused her but something he said to her made her

11   cry?

12          MS. REARDEN:  Objection.

13          THE COURT:  Overruled.

14   A.  He got angry.  She look at his face and started to cry.

15   Q.  So it's your testimony that the child looked at her

16   father's face and that made her cry, is that what you are

17   saying to the jury?

18   A.  Yes, because he got angry.

19   Q.  Okay.  And they're in the bedroom, the master bedroom.  Did

20   you go to the master bedroom?

21   A.  I did not go straight to the master bedroom.  I stand in

22   the hallway.

23   Q.  When did you go in the master bedroom?

24   A.  After hearing Mr. Mazer telling Shade your mom, your

25   babysitter and you is against me.

C65AAFRA3                          Francois - Cross

1    Q.  You are sure that he said that?

2    A.  Yes, I am sure he said that.

3    Q.  And where were you standing in the hall?

4    A.  In front of Shade door in the hallway.

5    Q.  Were they out of the bedroom or they are in the bedroom?

6    A.  They were more like closer to the hallway.

7    Q.  Okay.  And what did you say?

8    A.  Mr. Mazer, stop.  Some things you tell a kid you can damage

9    them mentally emotionally and it can last them through their

10   lifetime.

11   Q.  Because Mr. Mazer allegedly told Shade that the mother and

12   you -- I don't know exactly what you said -- withdraw that.

13        What did Mr. Mazer say to the child that would affect

14   her adversely in her lifetime at that time?

15        THE COURT:  In this witness' opinion in her lay

16   opinion?

17        MR. ROSENBAUM:  Yes.

18   A.  Sir, I intervened by the way Shade was crying and

19   screaming, daddy stop, daddy stop, daddy stop.

20   Q.  Ms. Francois, please, I will ask you a question.  I promise

21   you I'll get right down the line.

22        When the child was crying you saw and he said the

23   words about you, your mother and Ms. Francois are all against

24   me whatever the words were, did you say anything at that time?

25   A.  Sir, I just mentioned what I said.  After hearing Shade

C65AAFRA3                          Francois - Cross

1    screaming and crying daddy stop I got up and tell Mr. Mazer to

2    stop it.

3    Q.  Because her crying was going to traumatize her for a

4    lifetime, is that what you are saying?

5    A.  The things Mr. Mazer was saying to Shade.

6    Q.  What did he say to Shade that in your opinion -- and you

7    are not a doctor, we know that -- would traumatize a child for

8    the rest of her life?  What did he say?

9    A.  I did not say traumatize her for the rest of her life.  I

10   said could damage her mentally and emotionally.

11   Q.  For the rest of her life?

12   A.  Yes.

13   Q.  What did he say that you believed -- what were the words

14   that made you believe that the child would be damaged for the

15   rest of her life?

16   A.  Sir, it is not a matter of words.  It is the matter of how

17   Shade was crying and yelling.

18   Q.  Oh, now she's yelling and crying?

19   A.  Crying, crying and screaming uncontrollable.

20   Q.  So is it your opinion that because she was crying as you

21   say "uncontrollable" that would damage her for the rest of her

22   life?

23   A.  Sir --

24   Q.  Is that what you said?

25   A.  That were the words I used at that point in time.

C65AAFRA3                          Francois - Cross

1    Q.  You will agree with me that you are not a psychiatrist or a

2    doctor, correct?

3    A.  Correct.

4    Q.  And you have been in the subway.  You have been in the

5    street.  Have you never seen children go into a tantrum, have

6    you?

7    A.  Yes, sir.

8    Q.  And all those children are going to be traumatized or would

9    be damaged for the rest of their lives because they're holding

10   their breath or in a tantrum, that is that what you are saying?

11   A.  Sir, I am not saying -- the kids that you are talking about

12   is not my concern.

13   Q.  Okay.  So you now are going to protect her because she's

14   crying or crying hard, whatever you want to use the words, is

15   that correct?

16   A.  Sir, repeat your question.

17   Q.  You are now going to try to protect her because she is

18   crying so seriously?

19   A.  I always try to protect Shade in whichever way I can.

20   Q.  Please, my question, you are trying to protect her because

21   she's crying so seriously?  Let's not talk about any other

22   things at this moment.

23           THE COURT:  On December 18, 2008 during the incident?

24           MR. ROSENBAUM:  Yes, that incident.

25   A.  Sir, I was just concerned about Shade.

C65AAFRA3                          Francois - Cross

1    Q.   No.   You were saying that you have to protect her because
2    you believe she is going to be damaged for the rest of her
3    life, right?   You said that?   My question, what did you do
4    after that thinking that she was going to be damaged the rest
5    of her life?
6    A.   I did not press charges towards her father.
7    Q.   Oh, no, please.   Let's -- at the moment what did you do at
8    that moment?   What did you do?   We'll get about pressing
9    charges later.   What did you do?
10   A.   Repeat your question.   What did I do about what, sir?
11   Q.   About protecting Shade from her father because you thought
12   her crying would cause her damage for the rest of her life?
13   A.   Just mentioned to stop it, the way he was yelling at her.
14   Q.   You said "stop it"?
15   A.   Yes.
16   Q.   Nothing else?
17   A.   Sir, I just repeated myself and tell you what I said at
18   that time.
19   Q.   And what did he say to you?
20   A.   It's his child.
21   Q.   I am sorry?
22   A.   It's his child.
23   Q.   Was he lying to you?   It's his child, right?
24   A.   Yes.
25   Q.   Did you have any doubt that he loved that child?

C65AAFRA3                          Francois - Cross

1   A.  I don't know what is in Mr. Mazer's head.

2   Q.  Are you telling the jury that you don't know whether or not

3   Mr. Mazer loved his child?

4   A.  Sir, every parents --

5   Q.  Just answer my question please.

6          THE COURT:  Sustained.

7   A.  Every parent love their children.

8          THE COURT:  Sustained.

9   Q.  Up to that time was he a father who took his child on

10  vacations?

11  A.  Yes, he do things with her.

12  Q.  He paid for schooling for that child?

13  A.  It's his child, sir.

14  Q.  Did he contribute to paying for the schooling of that

15  child?

16  A.  I don't know what goes on between Mr. Matthew Mazer and

17  Ms. Sheryl Shade Mazer.

18         THE COURT:  Might I suggest, Mr. Rosenbaum, the main

19  issue is who did what to whom during the altercation as opposed

20  to I think at this point anything else.

21  BY MR. ROSENBAUM:

22  Q.  Then what happened after that when you said you may

23  traumatize the child and may damage the child, whatever after

24  that?

25  A.  Sir, like I just mentioned, he said it's his child.

C65AAFRA3                       Francois - Cross

1    Q.   What did you say?

2    A.   I don't care.

3    Q.   That's all you said?

4    A.   Anybody abusing her I will stand up to defend her.  Anybody

5    who is abusing her regardless of whoever they are I will stand

6    up to defend her.

7             MR. ROSENBAUM:  Can I have a readback for me, please?

8             THE COURT:  You may read it back.

9             (Testimony read back)

10            MR. ROSENBAUM:  Thank you.

11   BY MR. ROSENBAUM:

12   Q.   Is it your opinion that Mr. Mazer was abusing his child at

13   that time?

14   A.   It believed to me, yes.

15   Q.   Because he was telling his child something and she was

16   crying you interpreted that as being abuse?

17   A.   Verbally, yes.

18   Q.   So you felt when the father said these things about

19   studying or whatever it may be and the child is crying you

20   interpret that in your own mine that he was abusing her, is

21   that your testimony?

22   A.   He was angry and had a attitude.

23   Q.   Answer my question, please.  When you heard him tell his

24   child all these things about having to study and the child is

25   crying and doesn't want to study, whatever it may be, is it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C65AAFRA3                      Francois - Cross

1   your opinion that that was abusive to the child?  Is that what

2   you are saying "yes" or "no" or "I don't know"?

3   A.  I don't know.

4   Q.  What did you do after that, when you told him to stop what

5   did he say?

6   A.  Sir, you keep repeating and asking me the same question

7   over and over, what did he say, is my child.

8   Q.  And you didn't accept that, did you?

9   A.  I mentioned before --

10  Q.  "Yes", "no", or "I don't know"?

11          MS. REARDEN:  Objection, your Honor.

12          THE COURT:  Overruled.

13  A.  Could you repeat your question again.

14          MR. ROSENBAUM:  Can I have that read?

15          THE COURT:  Why you don't you repeat because the word

16  "accept" might be open to more than a "yes or no" question.

17          MR. ROSENBAUM:  Okay.

18  Q.  When he was yelling at Shade is it your opinion that he was

19  abusing Shade?

20          THE COURT:  You've already asked that I think now.

21          MR. ROSENBAUM:  That's what -- I've forgotten my next

22  question.

23          THE COURT:  Well, your question was and you didn't

24  accept that, did you.  I was thinking the word "accept" may be

25  open to interpretation.

C65AAFRA3                          Francois - Cross

 1   BY MR. ROSENBAUM:

 2   Q.  What happened next?

 3          MR. ROSENBAUM:  Thank you, your Honor.

 4   A.  Next after what?

 5          THE COURT:  After he says it's my child --

 6   A.  I said I don't care.

 7          THE COURT:  Then what happened?

 8          THE WITNESS:  I said anybody who abusing Shade in any

 9   way I am going to stand up and defend her.  That's what I told

10   him.

11          THE COURT:  Then what happened?

12          THE WITNESS:  He called me a stupid black bitch.

13   BY MR. ROSENBAUM:

14   Q.  Did you ever tell anyone that night that he used the words

15   "stupid black bitch"?

16   A.  I don't remember, sir.

17   Q.  It was a horrible thing to hear, wasn't it?

18   A.  Yes, it was.

19   Q.  You don't remember -- isn't it a fact that you never told

20   anyone that night that he said that to you, isn't that correct?

21   A.  Sir, I don't remember.

22   Q.  If it was said wouldn't you have told people that he used

23   those words against you?

24   A.  Sir, I wasn't around people that night.

25   Q.  You weren't around people.  There was a doorman that came

C65AAFRA3                      Francois - Cross

1   up, correct?

2   A.  Sir, it didn't come to mind to tell anybody at that point

3   in time.

4   Q.  Please stop.  You just said there were no people around you

5   that night.  Let's go on to people.  The police came, correct?

6   A.  Yes.

7   Q.  You spoke to the police?

8   A.  Yes.

9   Q.  You didn't say that he used the words "stupid black bitch",

10  did you?

11  A.  Sir --

12  Q.  Tell me "yes", "no" or "I don't know"?

13  A.  Sir, no, but the reason why.

14  Q.  Excuse me.  Did you tell that to the doorman that came

15  upstairs and took you down in the elevator to the front?  Did

16  you tell that to that person?

17  A.  Sir, I was --

18  Q.  Did you tell it to that person "yes", "no" or "I don't

19  know"?

20          THE COURT:  To the witness you can just answer it

21  "yes" or "no" or "I don't know" and then your lawyer will have

22  another opportunity on redirect to ask you to explain your

23  answer.  That will allow him just to keep his cross-examination

24  short to the point and then Ms. Rearden can go through with you

25  your explanation so you'll have a chance.

C65AAFRA3                          Francois - Cross

1           Go ahead, Mr. Rosenbaum.

2    Q.   Could you answer that question?

3    A.   I don't remember, sir.

4    Q.   When for the first time did you tell anyone that Mr. Mazer

5    called you a stupid black bitch?

6    A.   Probably the following day.

7    Q.   To who did you say it?

8    A.   To my friend in Trinidad.

9    Q.   You called that person up?

10   A.   Yes, sir.

11   Q.   Who was that person?

12   A.   A friend of mines.

13   Q.   Anybody in the United States the next day did you tell that

14   those words that he said, allegedly, said those words to you?

15   A.   Yes, sir.

16   Q.   Who?

17   A.   Members of my organization.

18   Q.   When?

19   A.   The following Saturday.

20   Q.   A week later?

21   A.   No, sir.

22   Q.   Who was it that you told that to?

23   A.   All of the members in the organization.

24   Q.   And that pretty much raised a rumble -- I withdraw that.

25   You were at a meeting?

C65AAFRA3                    Francois - Cross

 1   A.  Yes, sir.

 2   Q.  And you told the group for the first time those words were

 3   used?

 4   A.  Yes, sir.

 5   Q.  After he allegedly called you that those names what did you

 6   say or do?

 7   A.  When he called me a stupid black bitch I told him he's a

 8   bigger bitch.

 9   Q.  And did he used anything else derogatory, racially

10   derogatory to you that night?

11   A.  Tell me he hate me and hope I die a horrible death.

12   Q.  Did he say anything to you?

13            THE COURT:  Apart from that.

14            MR. ROSENBAUM:  Yes, other than that.

15   Q.  That was racially wrong?

16   A.  He told me he hate me and despise me and hope I die a

17   horrible death.

18            MR. ROSENBAUM:  Your Honor, I have to apologize to the

19   jury.  There are some other words I have to use now.

20   Q.  Did you say to him all you need is pussy in the face, pussy

21   in the face, in front of the child?

22   A.  I never said that in front of the child.  I never said that

23   to Mr. Mazer.

24   Q.  Did you ever speak to your friend Sylvie Alexander and tell

25   her that you used those words to him?

C65AAFRA3                         Francois - Cross

1    A.  No, I didn't.

2    Q.  Let's continue.  What happened next after during your

3    argument?  Where was this argument any way, in the bedroom, in

4    the foyer, where?

5            THE COURT:  At this point in time?

6            MR. ROSENBAUM:  At this point in time.

7    A.  In the hallway.

8    Q.  Was the hallway near the front door of the child's door or

9    the master bedroom?

10   A.  By the front door.

11   Q.  By the front door?

12   A.  Yes.

13   Q.  And Shade was there during this time, correct?

14   A.  Shade was in her bedroom on her bed.

15   Q.  How come she was in the bed if you were in the front door?

16   A.  I left her there because I was leaving.

17   Q.  So after you had this discussion or fight or argument

18   whatever you want to call it where you said you would protect

19   whoever, you started to leave?

20   A.  After Mr. Mazer took his keys and his phone from me.

21   Q.  Let's get to that point, okay.  Did there come a time where

22   Mr. Mazer said to you, stop speaking to me in that way in front

23   of my child?

24   A.  Which way, sir?

25   Q.  By saying that he should -- in any way, when he was

C65AAFRA3                        Francois - Cross

1   speaking to you about don't speak that way in front of my child
2   did he ever say that to you?
3   A.  Sir, I never spoke disrespectful in front of Shade.
4   Q.  Did he ever say that to you, stop speaking that way in
5   front of my child?
6   A.  No, sir.
7   Q.  He never said that to you?
8   A.  No, sir.
9   Q.  And you kept on speaking.  He never said please don't --
10  never said that?
11  A.  No, sir.
12  Q.  Okay.  And then at what point does he say give me your key
13  and give me your cellphone?
14  A.  That was before long before I left.  That was after Shade
15  came back in her room.
16  Q.  I've got to get the sequence correct.  Just help me with
17  this.  You're there presumably.  Did there come a time when
18  this argument stopped and you were going to leave the
19  apartment?
20  A.  After Mr. Mazer followed Shade, come to her room, told me
21  give me my keys and give me my phone, which I did.
22  Q.  Were you having an argument with Mr. Mazer in the hallway
23  or in Shade's room or both?
24  A.  Both in the hallway and in Shade room.
25  Q.  In Shade's room what did you say in front of Shade with

C65AAFRA3                          Francois - Cross

1   reference to Mr. Mazer?

2   A.   In Shade room a call had came in from Ms. Mazer and I was

3   trying to speak loud to tell her how Mr. Mazer was carrying on.

4   Q.   You knew that there was a phone call that came from Mrs.

5   Mazer?

6   A.   Yes, there was.

7   Q.   When did you find out about that?

8   A.   I was right there.

9   Q.   And did you hear Shade speaking to Ms. Mazer?

10  A.   Both Mr. Mazer and Shade were trying to speak to her.

11  Q.   And did you try to speak to her?

12  A.   I didn't have the phone in my hand.

13  Q.   Did you try to speak with her?

14  A.   I was yelling to for her to hear me over the phone how

15  Mr. Mazer is carrying on with me.

16  Q.   Who called Ms. Mazer?

17  A.   A call came in from Ms. Mazer.  I could recall that.

18  Q.   Who picked up that call?

19  A.   Mr. Mazer.

20  Q.   And you hear what he said to her?

21  A.   I can't recall the precise words right now, sir.

22  Q.   Okay.  And how long did that call last?

23  A.   Not too long.

24  Q.   And then what happened?  Did Mr. Mazer say to Ms. Shade, I

25  am going to make her leave?

C65AAFRA3                    Francois - Cross

1    A.  I can't remember, sir.

2    Q.  You had no idea what Mr. Mazer said to his wife?

3    A.  I can't remember the exact things he was saying to her,

4    sir.

5    Q.  But after he got off the phone he said to you, give me your

6    keys and give me the cellphone and leave, is that correct?

7    A.  Sir, he didn't tell me to leave.  After taking his keys and

8    his phone I decided to take up my bag and my coat and leave

9    because I didn't want any more conflict.

10   Q.  You didn't want any more conflict.  You felt endangered at

11   that time, weren't you, because you had been called some nasty

12   names?

13   A.  Mr. Mazer was quite angry by then.

14   Q.  Didn't you feel endangered by this man at that point?

15   A.  Fearful.

16   Q.  "Careful"?

17   A.  "Fearful".

18   Q.  You were afraid of him?  You were afraid of him because you

19   interpreted that he was angry, right?

20   A.  Yes.

21   Q.  And you were probably concerned that he was going to hit

22   you, correct?

23   A.  I don't know what he would have done at that point in time.

24   Q.  But you were afraid.  What were you fearful of?

25   A.  I didn't want any more conflict or to get into anything

C65AAFRA3                        Francois - Cross

1    with Mr. Mazer.

2    Q.  What were you fearful of?  Were you fearful of him hitting

3    you?

4    A.  I don't know what he would have done.

5    Q.  Were you fearful that he may have hit you?

6    A.  I don't know what he would have done.

7    Q.  But it was possible in your own mind?

8    A.  I didn't want to know what he would have done or what he

9    was thinking.  I just --

10   Q.  In your own mind were you fearful because you felt you

11   would be in danger?  "Yes", "no", or "I don't know"?

12   A.  I just know I had to leave.

13   Q.  Did you -- were you fearful because you thought you were in

14   danger, yes, no, or I don't know?

15   A.  I was fearful because it was not a nice situation.

16   Q.  Did you feel you were in danger?

17   A.  I don't remember what I feel at that point in time but I

18   knew I had was to get out after Mr. Mazer took his keys and his

19   tone.

20   Q.  You told the jury that you were fearful I thought, not what

21   you felt fearful.  My question is what made you feel fearful?

22   Because you may have been hurt, may have been beaten?

23   Something what made you fearful.

24   A.  Mr. Mazer's attitude.

25   Q.  But you felt you were in danger?

C65AAFRA3                          Francois - Cross

1    A.  It was not a nice situation.

2    Q.  You were prompted to leave because you felt you were in

3    danger, correct?

4    A.  It just wasn't a good situation.

5    Q.  So you now start to go?

6    A.  Yes, sir.

7    Q.  No one stopped you?

8    A.  No, sir.

9    Q.  You are getting out of this fearful environment, correct?

10   A.  Just getting out of that ugly situation.

11   Q.  In which you felt fearful?

12   A.  Yes, sir.

13   Q.  And you got to the door, correct?

14   A.  Yes, sir.

15   Q.  You opened the door, correct?

16   A.  Yes, sir.

17   Q.  And you started to step out of the house, correct?

18   A.  Yes, sir.

19   Q.  No one stopped you, correct?

20   A.  No, sir.

21   Q.  Someone stopped you at that point?

22   A.  I heard Shade cry out and I heard Mr. Matthew told her she

23   would have to stay her by herself.

24              (Continued on next page)

25

C654FRA4                      Francois - cross

1    BY MR. ROSENBAUM:

2    Q.  Please, please, please I promise I will get to those

3    questions.  No one stopped you, what you did to yourself is

4    something else, no one stopped you from going out, is that

5    correct?

6    A.  No, sir.

7    Q.  Who stopped you; who physically stopped you from going out?

8              MS. REARDEN:  Objection.

9              THE COURT:  Let's take it as a new question.

10             Did anyone physically stop you from leaving the

11   apartment?

12             THE WITNESS:  No, judge.

13             THE COURT:  Next question.

14   Q.  At that moment did you believe you were fired?

15   A.  I wasn't thinking about after.

16   Q.  You gave your keys back because he requested them, your

17   cellphone back, you picked up all your clothing and gatherings,

18   and gathered, and then you left the apartment fearful.  You

19   felt that -- didn't you feel that you were fired and not to

20   come back?

21   A.  I wasn't thinking about that at that point in time.

22   Q.  Page 281, line 6, again your deposition in 2011 under oath.

23   Ms. Francois, isn't a fact your memory back then is better than

24   it is today?

25   A.  Yes, it is.

C654FRA4                          Francois - cross

1    Q.   (Reading)

2    "Q.   OK.   Did you get the impression that he was firing you --

3              I am sorry, I will wait for you to get your glasses.

4              (Pause)

5    Q.   Are you ready?

6    A.   Yes, sir.

7    Q.   (Reading)

8    "Q.   OK.   Did you get the impression that he was firing you?

9    "A.   Yes."

10             Do you remember being asked that question and you gave

11   that answer?

12   A.   Yes, it's written.

13   Q.   Were you telling the truth when you gave that answer?

14   A.   Yes.

15   Q.   So you knew that you were being fired, correct?

16   A.   That was my impression.

17   Q.   That's all we are asking for; you felt that you were being

18   fired, correct?

19   A.   That was my impression.

20   Q.   Then you turned around and went back into the apartment, is

21   that correct?

22   A.   Could I give you the reason why.

23   Q.   I will ask the questions please.   Did you turn around and

24   go back into the apartment, yes, no, or I don't know?

25   A.   After Shade cry out --

C654FRA4                         Francois - cross

1          MR. ROSENBAUM:  Your Honor, direct the witness to

2    answer.

3          THE COURT:  I will ask the witness for this portion, I

4    just want to have him finish cross-examination, we will give

5    your counsel a chance, Ms. Rearden will make notes, to ask you

6    for your explanation, so you will have a full opportunity to

7    explain that.  Short concise answer directly to the point.

8    A.  Repeat the question.

9    Q.  At that point you are out of the apartment; did you close

10   the door in fact when you were going out?

11   A.  The door wasn't closed.

12   Q.  Did you step into the hallway?

13   A.  I was in front of door.

14   Q.  Did you go over the saddle in the hallway?

15   A.  I was in front of door.

16   Q.  Did anyone stop you, physically stop you from going out at

17   that point, yes, no, I don't know?

18         THE COURT:  She already answered that; she said no.

19   Q.  You turned around, correct?

20   A.  Yes.

21   Q.  You ran back into the apartment?

22   A.  Yes.

23   Q.  Ms. Francois, are you with me?

24         THE COURT:  She just said yes.

25   Q.  Did you walk in, run in; what did you do?

C654FRA4                    Francois - cross

1    A.  Walk.

2    Q.  Incidentally, were you upset about being fired?

3    A.  Sir, at that point --

4    Q.  Yes, no, or I don't know?

5    A.  No.

6    Q.  You were not upset?

7    A.  No.

8    Q.  After three and a half years of work, after six and a half

9    years of work, you were not upset at being fired?

10   A.  No.

11   Q.  You had no attitude towards Mr. Mazer?

12   A.  No.

13   Q.  You still liked him?

14          MS. REARDEN:  Objection.

15          THE COURT:  I think you are now getting into the

16   explanation as to why.  You fairly elicited if she has more.

17   Q.  You ran back.  Where did you go?

18   A.  And help Shade.

19   Q.  Where did you go?

20   A.  Back in Shade room.

21   Q.  Where was Mr. Mazer?

22   A.  I believe in the hallway.

23   Q.  Did you confront Mr. Mazer?

24   A.  No, I didn't confront Mr. Mazer.

25   Q.  Did you speak to Mr. Mazer?

C654FRA4                        Francois – cross

1   A.  I remember mentioning why don't you go to your meeting.

2   Q.  Did you know he had a meeting to go to?

3   A.  He said so.

4   Q.  You came back because he had to go to a meeting?

5   A.  Because he said he would tell Shade he would leave her by

6   herself.

7   Q.  Are you telling this jury under oath that Mr. Mazer told

8   Shade, his daughter who was about 8, 9 years old at the time,

9   that he was going to leave her alone in the house so he could

10  go to a meeting; is that what you are telling the jury?

11  A.  That's the only reason I was back inside.

12  Q.  Is that what you are telling the jury, that you heard

13  Mr. Mazer say that?

14  A.  Yes.

15  Q.  Ms. Francois, in all the years that you had been working

16  with the Mazers was there any time that you knew that they left

17  the child alone without any supervision or anyone else to take

18  care of her?

19  A.  I was not around them all the time to know.

20  Q.  The times that you were around, did Shade ever tell you

21  that mom and dad left me alone?

22          MS. REARDEN:  Objection.

23          THE COURT:  Overruled; it's not for the truth but

24  whether she said it or not.

25  A.  No.

C654FRA4                          Francois - cross

1              THE COURT:  Move it along a little bit.

2              MR. ROSENBAUM:  I'm trying the best I can.

3              THE COURT:  All good things must come to an end.

4    Q.  What happened next when you ran back into Shade's room?

5    A.  Hug Shade, told her I would stay with her as long as it

6    takes.

7    Q.  As long as it takes what?

8    A.  To be with her.

9    Q.  To what?

10   A.  To be with her.

11   Q.  Did Shade ask you to stay with her?

12   A.  No, sir.  I was just being caring.

13   Q.  You were fired, you came back to be with Shade, Shade

14   didn't ask you to stay with her; then what happened?

15   A.  Like I said, Mr. Mazer came back out, I end up telling him

16   in front of Shade door, we exchange words.

17   Q.  What were you saying to each other?

18   A.  I can't recall the exact words but that is when we got into

19   the physical.

20   Q.  You don't remember what words and then you got into the

21   physical.  Was Shade there at that time?

22   A.  Shade was in her bedroom.

23   Q.  It was at the door of the bedroom this happened?

24   A.  Not exactly in front of Shade's door.

25   Q.  By the bedroom?

C654FRA4                          Francois - cross

1    A.  Yes.

2    Q.  You have no recall of what words were said?

3    A.  Sir, I remember Mr. Matthew at the time when he call me a

4    stupid black bitch and I remember telling him he is a bigger

5    bitch; that's when I got slapped and punched.

6    Q.  I thought that was before you left the first time.  You

7    said that he called you this name and then you left?

8    A.  Sir, he mentioned me being a stupid black bitch.

9    Q.  Twice that night?

10   A.  Sir, I believe so.

11   Q.  He called you a stupid black bitch before you left the

12   apartment and turned around and then he called you a stupid

13   black bitch again?

14   A.  I believe so, because it's after telling him he is a bigger

15   bitch he slapped me.

16   Q.  How did he slap you?

17   A.  With his hand across my face.

18   Q.  Just like that?

19   A.  Well I guess he didn't like hearing he is a bigger bitch.

20   Q.  So he reacted to that second calling by slapping you?

21           MS. REARDEN:  Objection.

22           THE COURT:  Sustained.  She can't see into his mind as

23   to why he would do what he is alleged to have done.

24   Q.  It happened at that point, correct?

25   A.  Repeat the question.

C654FRA4                         Francois - cross

1   Q.  When you called him the stupid bitch, that's when he

2   slapped you?

3          MS. REARDEN:  Objection.

4          THE COURT:  That's mischaracterizing what she said;

5   she said she called the defendant a bigger bitch.

6   Q.  That's when he slapped you?

7   A.  Yes, sir.

8   Q.  Shade was there at that time?

9   A.  Shade was in her room.

10  Q.  This was right in front of the room in eyesight of Shade;

11  she saw it, didn't she?

12  A.  I told Shade look what your dad did to me.

13  Q.  What did Shade say?

14  A.  I don't remember what she said.  I went to get the

15  telephone.

16  Q.  Answer my question.  You don't remember what she said?

17  A.  No.

18  Q.  Did you do anything else?

19  A.  She was crying.

20  Q.  Did you do anything else?

21  A.  Tell Mr. Mazer I am not taking it, try to get a telephone,

22  told him I was going to call the police.

23  Q.  Did you call the police?

24  A.  I didn't have chance to.

25  Q.  Did you try to call the police while you were in the

C654FRA4                         Francois - cross

1   apartment?

2   A.  Mr. Matthew grabbed me.

3   Q.  Did you try to call the police?

4          THE COURT:  She was giving you an answer.

5   A.  Mr. Matthew grabbed my hand, told me don't use his phone,

6   so I cannot dial to call the police.

7   Q.  Did you feel that you were in danger after he slapped you?

8   A.  It was horrifying getting a slap and punch like that.

9   Q.  Did you feel that you were in danger?

10  A.  That's why I wanted to call the police.

11  Q.  Why didn't you run out of the apartment?

12  A.  I tried to get phone to call the police.

13  Q.  Ms. Francois, you are just, you just testified that you

14  were hit by a man.  Why didn't you run out of the apartment to

15  get out of danger's way, harm's way; why didn't do you that?

16  A.  I don't know at that point in time but, like I said, I

17  tried to get phone to call the police.

18  Q.  Ms. Francois, you felt that you were in danger, if he

19  really hit you, and you wanted to stay in the apartment to get

20  one of the phones and call the police; is that your testimony?

21  A.  Yes.

22  Q.  Where was the phone, how close to you?

23  A.  Right on Shade table.

24  Q.  You had to go back into Shade's room to pick up a phone to

25  call the police that allegedly a man just hit you; is that what

C654FRA4                          Francois - cross

1    did you?

2    A.   Yes.

3    Q.   Weren't you concerned he was going to hit you again?

4    A.   At that time I didn't know what I think.

5    Q.   Ms. Francois, it is your testimony that even though you

6    felt you were in danger and didn't know what he was going to

7    do, you walked further into the apartment because you had to go

8    into Shade's room?

9    A.   Yes, sir.

10   Q.   Go further away from the door, correct?

11   A.   Yes, sir.

12   Q.   To call the police, while you were in the point of danger.

13   Is that your testimony?

14   A.   It was just an instant reaction.

15   Q.   Now you were in the apartment, further in the apartment,

16   you are not leaving this time, now Mr. Mazer wants you out,

17   correct?

18   A.   Sir, he grabbed on to me to get the phone away from me,

19   telling me not to use his phone.

20   Q.   Then he wanted you out of the apartment?

21        THE COURT:   You can't ask her what he wanted.

22   Q.   Did he try to get you out of the apartment?

23   A.   Tried to get the phone away from me so not to call the

24   police.

25   Q.   After that did he try to get you out of the apartment?

C654FRA4                       Francois - cross

1   A.  I had to try and get out of the apartment after that.

2   Q.  He stopped you from getting out of the apartment?  You were

3   in Shade's room.  Does he stop you from getting out of Shade's

4   room?

5   A.  He held on to me to try to get the telephone off my hand by

6   wringing my hand, viscously wringing my hand, boring his

7   fingers into my hand, we end up in a struggle, we both end up

8   on the floor.

9           MR. ROSENBAUM:  Can I ask her to answer the question.

10          THE COURT:  You asked an open-ended question.

11          MR. ROSENBAUM:  My question was did he try to stop

12  you.

13          THE COURT:  Hold on.  There has been a fair amount of

14  back and forth on this point.  Rephrase the question.  Let's

15  get as short and concise answer as we can then go on to your

16  next one.

17  Q.  After he tried to get the phone out of your hand did you

18  try to get out of the room, yes, no, I don't know?

19  A.  We ended up in a struggle.

20          MR. ROSENBAUM:  Your Honor.

21          THE COURT:  The question is did you try to get out of

22  the room, it may be you ended up in the struggle as you tried

23  to get out of the room, we don't know, did you try to get out

24  of the room, yes, no, you don't know?

25          THE WITNESS:  Yes.

C654FRA4                      Francois - cross

1   Q.  Did Mr. Shade -- did Mr. Mazer prevent you from getting out

2   of Shade's room, yes, no, I don't know?

3            THE COURT:  This may or may not take yes, no, I don't

4   know; if it does, please do.

5   A.  He came behind me and slammed the door up against me.

6   Q.  He came behind you?

7   A.  And slammed the door up against me.

8   Q.  The door in Shade's room?

9   A.  The front door.

10  Q.  Before we get to the front door, we are in Shade's room;

11  did you try to get out of Shade's room?

12  A.  You not letting me explain.  I said after he tried to get

13  the phone away from me we ended up in a struggle, we ended up

14  on the floor, and by then I was trying to get out of the

15  apartment completely.

16  Q.  You were trying to get out of Shade's room but he stopped

17  you, I presume?

18  A.  Sir, we ended up in a struggle out of Shade's room in the

19  hallway.  By that time, I was struggling to get away and get

20  out of the apartment completely.

21  Q.  Did he try to get you out of the apartment at that point?

22  A.  I tried to get out of the apartment on my own which

23  Mr. Matthew followed and slammed the door against me.

24  Q.  He was following you out of the apartment, correct?

25  A.  After I got away, trying to get out of the apartment,

C654FRA4                         Francois - cross

```
 1    Mr. Matthew follow me and slammed the door up against me.   Mr.
 2    Q.  Did there come a time when you got out of the apartment and
 3    then he slammed the door?
 4    A.  When I got out of the apartment, he took my bag and my
 5    coat.  By that time when one of the doormen came to the
 6    elevator, he fling my coat and my bag out in the hallway and
 7    said get that woman out of here.
 8    Q.  So he was trying to get you out of the apartment; his
 9    conduct was to get you out of the apartment, correct?
10              MS. REARDEN:  Objection.
11              THE COURT:  Did she interpret his conduct as trying to
12    get her out of the apartment.
13    A.  It wasn't like that.  Like I said, we ended up in a
14    struggle.  We both fell on the floor.  I struggled to get out
15    of the apartment.
16    Q.  Were you going for the door when he came up to you, the
17    door of the apartment?
18              THE COURT:  Came up to her when.
19    Q.  Did he come up behind you when you were going across the
20    door out of the apartment?
21    A.  I didn't get completely out of the door; half of my body
22    was in, half was out.
23    Q.  What did he do?
24    A.  Slammed the door up against me.
25    Q.  To push you out?
```

C654FRA4                          Francois - cross

1   A.  Squeeze me between the door.

2   Q.  The door and what?

3   A.  Sir, the door and the joining of the door, where the door

4   closes, between the door, between the door and the lock portion

5   of the door.

6   Q.  Then someone came up and he said to that person take her

7   downstairs, correct?

8   A.  Get that woman out of here, after throwing my bag and my

9   coat outside.

10  Q.  His actions were to get you out of the apartment and get

11  rid of you, is that correct?

12           MS. REARDEN:  Objection.

13           THE COURT:  It's a confusing question.  It goes to

14  state of mind.  Try again.

15  Q.  His conduct was such that he tried to get you out of the

16  apartment at that point and get off the floor?

17  A.  I don't understand what you mean by his conduct.

18  Q.  The things he was doing was to try to get you out of the

19  apartment, off the floor that they live on and get you out of

20  the building?

21           THE COURT:  Just ask him what he was trying to do when

22  you call him.  I think it's going to be not fruitful because

23  she can't know his reasoning.

24           Let me tell the jury, we are going to end for lunch at

25  12:45 by which point Mr. Rosenbaum will have completed his

C654FRA4                          Francois - cross

1   examination of this witness.  One way or the other you will

2   have completed at 12:45, over an hour and 20 minutes, almost 2

3   hours later than I told you.

4   Q.  After the incident, the following Monday, you came back to

5   the apartment where Mr. and Mrs. Mazer live, right?

6   A.  Yes.

7   Q.  You spent the day at the apartment?

8   A.  Yes.

9   Q.  And you spent the day with Ms. Shade and also with Shade,

10  correct?

11  A.  I spent the day with Shade.

12  Q.  How many hours did you spend the day with Shade that day?

13  A.  About 8 hours.

14  Q.  Did you speak to Shade about what happened the Thursday

15  before?

16  A.  I remember telling her that hitting is unacceptable.

17  Q.  Anything else?

18  A.  No.

19  Q.  Did Shade tell you anything?

20  A.  She probably said yes, Pat.

21  Q.  Sorry?

22  A.  Yes, Pat.

23  Q.  Yes, Pat?

24  A.  Yes.

25  Q.  In that 8 hours that's all you said about the incident?

C654FRA4                              Francois - cross

1          THE COURT:  That's a different question.

2          Did you say anything else about the incident?

3          THE WITNESS:  I didn't say anything else about the

4     incident except hitting is unacceptable; no matter who it is,

5     don't hit on anybody.

6     Q.  Did you tell Mrs. Shade that previous to this December 18

7     incident, that you had to go into some type of medical care and

8     had to take 2 weeks off at that time?

9     A.  No, because by then I didn't know, I didn't have an

10    appointment.

11    Q.  But you told her you would be out for 2 weeks, correct,

12    that you might have an appointment?

13    A.  No, because I did not have an appointment, I could not have

14    said which 2 weeks or when I would be off.

15    Q.  Didn't she ask you to get someone to help her when you were

16    going to be in the hospital, medical care?

17    A.  Sir, I didn't have an appointment; we didn't have a

18    conversation like that because I could not have tell her if

19    it's 2 weeks, if it was January, February or March, I could not

20    have said.

21    Q.  Did you speak to your friend Sylvia Alexander about working

22    for Ms. Shade?

23    A.  No, I did not speak with her about working for Ms. Shade.

24    Q.  Did you refer Ms. Sylvia Alexander to Ms. Shade to be a

25    babysitter?

C654FRA4                          Francois - cross

1   A.  I mentioned it because she asked me, I mentioned it, I

2   probably would tell Sylvia about it.

3   Q.  Did you speak to Sylvia about working for the Mazers?

4   A.  I mentioned it but did not tell her to work for the Mazers.

5   Q.  Did you give Sylvia the Mazers' phone number?

6   A.  Sylvia always had the Mazers' phone number.

7   Q.  She was a close friend of yours?

8   A.  She used to call me at the Mazers.

9   Q.  She was a close friend of yours?

10  A.  Yes, sir.

11  Q.  You recommended her to work for the Mazers?

12  A.  I did not recommend her; I just stated what was said.

13  Q.  Sorry?

14  A.  I just stated what was spoken between Ms. Mazer and I.

15  Q.  One of the disks that we played, that was played before, it

16  was 5:33 p.m., do you recall the disk read as follows:  Happy

17  new year, hope you had a nice vacation.  This is what Ms. Shade

18  is a saying.  So, I'm calling for Sylvia's number and just want

19  to talk to you, how are you.  Do you remember Ms. Shade called

20  you for Sylvia's number?

21  A.  Yes, sir.

22  Q.  Did you give her Sylvia's number?

23  A.  No, sir.

24  Q.  How did she get Sylvia's number?

25  A.  Sylvia and Ms. Mazer communicated.

C654FRA4                           Francois - cross

1    Q.  Did you ever tell Sylvia Alexander what happened on

2    December 18, 2008?

3    A.  Yes, sir.

4    Q.  You told her about the entire event, is that correct?

5    A.  I didn't tell her much detail, sir.

6    Q.  You found out at this point in time that Sylvia started to

7    work for the Mazers, correct?

8    A.  Yes, sir.

9    Q.  You never spoke to Sylvia about her working for the Mazers?

10   A.  I asked her why she had to work for the Mazers.

11   Q.  Didn't you tell her it was just going to be a 2-week period

12   she was going to work for the Mazers?

13   A.  I asked her why she had to go and work for the Mazers.

14   Q.  Did you tell Sylvia that you used the expression, pussy in

15   the face, pussy in the face, all you need is pussy in the face;

16   did you tell her that you said that to Mr. Mazer?

17   A.  No, sir.  That was a surprise to me.

18   Q.  What was a surprise to you?

19   A.  Hearing Sylvia saying that I said that.

20   Q.  Sylvia was close a friend yours, wasn't she?

21   A.  Yes, sir.

22   Q.  If you thought that the Mazers or Mr. Mazer was a threat or

23   a danger, wouldn't you have told Ms. Sylvia, don't work for

24   him, he is a dangerous person?

25            MS. REARDEN:  Objection.

C654FRA4                          Francois - cross

1    A.   This is why I said she had to go and work for the Mazers

2    after knowing what happened.

3    Q.   Did you tell Sylvia that you're the one that started up

4    with Mr. Mazer?

5    A.   No, I never told Sylvia that.

6    Q.   That you put it in his face, went up to his face, things of

7    that nature, you never said that to Sylvia?

8    A.   No, sir.

9    Q.   As far as you know Sylvia, is she an honorable person?

10   A.   Sir, I cannot say for a fact if Sylvia is an honorable

11   person.

12   Q.   How many years did you know her?

13   A.   A lot of years, sir.

14   Q.   How many years?

15   A.   Probably about 20-something years.

16   Q.   Did you draw an opinion as to her about her truth,

17   veracity, being a truthful person?

18   A.   Not always.

19   Q.   Not always.  Do you recall any incident where she -- forget

20   it.

21        (Pause)

22   Q.   You spoke before the jury the other day, yesterday, that

23   Mr. Mazer slapped and punched you at the same time.  Correct?

24   A.   Yes, sir.

25   Q.   Like a 1-2 punch, slap and punch, is that correct?

1   A.  Yes, sir.

2   Q.  Page 289, sorry, page 293.  Again this is a deposition of

3   June 2011, line 24:

4   "Q.  OK.  Now after you said that, after you said that to him,

5   what else was said when you called him whatever you called him,

6   a bitch or whatever?

7   "A.  I got slapped.

8   "Q.  As soon as you called he slapped you?

9   "A.  Yes."

10          That was your testimony, correct?

11  A.  Sir, repeat that again, which lines you are referring to.

12  Q.  292, line 24:

13  "Q.  OK.  Now after you said that to him, what else was said

14  when you told, when you called him whatever you called him, a

15  bitch or whatever?

16  "A.  I got slapped."

17          Do you remember being asked that question and giving

18  that answer?

19  A.  Yes, sir.

20  Q.  Next:

21  "Q.  So as soon as you called him, as soon as you called, he

22  slapped you?

23  "A.  Yes."

24  A.  Yes, sir.

25  Q.  You told the jury yesterday not only did he slap you, he

C654FRA4                          Francois - cross

1    also slapped and punched you?

2    A.  Yes, sir.

3    Q.  Was your memory better back in 2010 than it is today?

4    A.  Yes, it was.

5    Q.  2011?

6    A.  Yes, it was.

7    Q.  When he punched you and slapped you did he punch you in the

8    area of the eye?

9    A.  Under my eye, sir.

10   Q.  When he slapped you he also punched you at the same time

11   under your eye, is that correct?

12   A.  One after the other, sir.

13   Q.  Page 297, line 22, start at line 13, line 10:

14   "Q.  Were you able to get the phone call through?

15   "A.  No.

16   "Q.  He was were able to get the phone out of your hand?

17   "A.  No.  We would end up wrestling, we ended up falling on the

18   floor."

19        Remember being asked those questions and giving those

20   answers?

21   A.  Yes, sir.

22   Q.  (Reading)

23   "Q.  How did you get falling on the floor?

24   "A.  It happened so fast I guess we both skidded off, I don't

25   know, or we end up on the floor."

1              Do you remember being asked that question and giving

2    that answer?

3    A.  Yes, sir.

4    Q.  (Reading)

5    "Q.  Weren't you on top of Mr. Mazer?

6    "A.  He was almost on top of me and I am getting punched.

7    That's how I got punched on my face on the other side?"

8              Do you remember being remember being asked that

9    question and giving that answer?

10   A.  Yes, sir.

11   Q.  Incidentally, did Mr. Mazer prior to this incident, a year

12   or two prior to this incident, have major surgery on his neck,

13   if you know?

14   A.  I don't know, sir.

15   Q.  Was he wearing a brace on his neck for a quite period of

16   time in 2007 or thereabouts?

17   A.  I don't recall.

18   Q.  You don't remember him ever wearing a neck brace?

19   A.  No, sir, I don't recall.

20   Q.  You don't recall or the answer is no?

21   A.  I don't recall.  I don't remember.

22             THE COURT:  Six minutes.  Pick your best points.

23             MR. ROSENBAUM:  I'm pretty much finished, would you

24   believe.  Believe it or not I am finished.  One second.

25             (Pause)

C654FRA4                          Francois – cross

1    BY MR. ROSENBAUM:

2    Q.  When the police came, in the lobby, met you in the lobby,

3    correct?

4    A.  Yes, sir.

5    Q.  Did the police ever take you back up to the apartment

6    again?

7    A.  No, sir.

8    Q.  Did the police ask you did you need to go to the hospital?

9    A.  No, sir, I can't recall.

10   Q.  You don't recall?

11   A.  No, sir.

12   Q.  Didn't you decline having to go to the hospital?

13   A.  No, sir.

14   Q.  You didn't want to file a complaint that night because you

15   felt that Mr. Mazer would be cuffed and taken away and Shade

16   would be alone, is that correct?

17   A.  Yes, sir.

18   Q.  Why didn't you go to the police the next day and file a

19   complaint?

20   A.  I thought it was the proper thing to do, sir.

21   Q.  It wasn't the proper thing to do?

22   A.  It was the proper thing to do.

23   Q.  Not to file a complaint?

24   A.  To file a complaint.

25   Q.  So why didn't you file a complaint the next day?

C654FRA4                          Francois - cross

1   A.  Because it was the proper the thing to do.

2   Q.  But you didn't file a complaint the next day with the

3   police, did you?

4   A.  Yes, I did.

5   Q.  You filed a complaint with the police department the

6   following day?

7   A.  Yes, I did.

8   Q.  To tell them to arrest Mr. Mazer?

9   A.  I didn't tell them to arrest Mr. Mazer; I filed a

10  complaint.

11  Q.  Did you get a receipt for the filing of the complaint?

12  A.  Yes, sir.

13  Q.  Did the police move on your complaint?

14  A.  Sir, I don't understand.

15  Q.  When you filed the complaint the next day, did the police

16  go arrest Mr. Mazer?

17  A.  No, sir.

18  Q.  Was there a reason they didn't arrest Mr. Mazer?

19          MS. REARDEN:  Objection.

20          THE COURT:  Sustained.

21  Q.  If you know.

22  A.  I don't know.  I really don't know.

23  Q.  You went to the place station the next day to ask that

24  Mr. Mazer be arrested and he was never arrested?

25  A.  I signed the complaint; I didn't ask for Mr. Mazer to be

C654FRA4                          Francois - cross

1   arrested, no, sir.

2   Q.  Do you have a copy of that complaint?

3   A.  I gave it to my lawyer, sir.

4   Q.  When did you give it to your lawyer?

5   A.  I don't remember exactly when but I sent it to them.

6   Q.  You mailed it to them?

7   A.  I shared it with them.

8   Q.  Did you follow up with the police why they didn't make an

9   arrest?

10  A.  No, sir.

11           MR. ROSENBAUM:  I think we need a sidebar for an issue

12  that came up now.

13           THE COURT:  Let's take that up after lunch.  Let's

14  have the lunch break.  You can reserve your last two minutes to

15  go after lunch.  But I do want to have, I don't want to have

16  the jury wait while we have a sidebar.  Let's take our lunch

17  break and resume at about close to 2:00, 10 minutes to 2, so

18  you will have an hour and 5 minutes for your lunch break.  Does

19  that work for people.  You need more time.  No.  I am trying to

20  read the body language.  You have to be silent so we have do it

21  with our body language.  We can start a quarter of.  Does that

22  make you happier.  Quarter of made somebody happier.  Off to

23  lunch.  You are on your own for lunch so you can wander outside

24  as you see fit.

25           (Jury leaves courtroom)

C654FRA4                           Francois – cross

1           (Witness excused)

2           THE COURT:  Let's do a sidebar on this issue.

3           (At the sidebar)

4           MS. TREPELKOVA:  We requested all the documents and

5     reports relating to police intervention regarding the

6     allegations made in the complaint in our request for documents

7     back on May 24, 2010.  We never received any reports from

8     counsel.

9           THE COURT:  Did you folks receive a copy of the police

10    report.

11          MS. REARDEN:  Do you know.

12          MR. MYATT:  I would like to confer with those who

13    worked on discovery issues, but not to my knowledge.

14          THE COURT:  You had better make sure you have run that

15    down to the ground because what I would like you to do, let me

16    think about the next step, run that down to the ground as to

17    whether or not you received a copy of any police reports.  OK.

18    Then let us know.

19          MR. MYATT:  That's a different question.

20          THE COURT:  She said she made, she may call it a

21    complaint, put aside the words, she said the day after the

22    accident she went to the police, I don't know in what form, and

23    she made a complaint.  If there is any paperwork on that at

24    all --

25          MR. MYATT:  Relating to that day.

C654FRA4                         Francois - cross

1           THE COURT:  Relating to the day after the incident.

2           MR. MYATT:  There is police paperwork relating to the

3     night of the incident.

4           THE COURT:  She said the day afterward, I will

5     characterize it, she went to press charges the day after.

6     That's essentially the nature of the question.  She said she

7     thought it was appropriate to go to the the police the next

8     day.  I don't know what form she went for she went.  If there

9     is any paperwork on that at all she said she gave to you guys,

10    you may want to talk to her, who she gave it to, all that, you

11    need to trace it down.  If are going to say she didn't give any

12    paperwork to you, then we will deal with what we are going to

13    say next.

14          MS. REARDEN:  We may confer with her about this

15    limited issue.

16          THE COURT:  To whom did she give the material, OK, the

17    specific paperwork about the day after or if she's confused,

18    make sure she is clear on this.

19          MS. TREPELKOVA:  Can we confer after lunch regarding

20    the other issue whether her testimony affected --

21          MS. REARDEN:  I have not been able to --

22          THE COURT:  I don't think we can deal with that now.

23    The stipulation we have to deal with as time goes on.  I mean

24    it will take some footwork by you guys some conferring with

25    her.

1           Let's set some groundrules.  You are going to come

2    back after the lunch break and give us an answer to this

3    question and we will figure out what to do.  Then Mr. Rosenbaum

4    it going to complete his examination of her with either you got

5    it wrong, there really wasn't a complaint, you misunderstood my

6    question, didn't you, there wasn't a complaint.  She will say,

7    yes, there wasn't a complaint I thought there was, whatever,

8    she was confused or there was a complaint, I didn't give my

9    paperwork to the lawyers, or whatever her third version is.

10   You are going to complete.  You are going to have a very short

11   period of time for redirect.

12           MS. REARDEN:  Yes, your Honor.

13           THE COURT:  We have to move on to these poor witnesses

14   who I assume are cooling their heels in the hallway.

15           MS. REARDEN:  Yes, your Honor.

16           THE COURT:  15 minutes, hit the highlights, 20

17   minutes; you can't go on for an hour.

18           MS. REARDEN:  I don't think it will be an hour.  I

19   didn't go through my notes with that in mind.  I can tell you

20   less than an hour, maybe more than 15 minutes.

21           THE COURT:  Half hour or less.

22           MS. REARDEN:  OK.

23           THE COURT:  Then we are done with her.  Don't raise

24   anything he needs to do any recross on.

25           (Lunch recess)

1                        AFTERNOON SESSION

2                             1:45 p.m.

3           THE COURT:  Please be seated.  Let's have counsel at

4      sidebar.

5           (Sidebar)

6           MS. REARDEN:  Your Honor, over the lunch break we

7      rereviewed all the documents relating to police activity in

8      December of 2008.  We found a document dated December 19, 2008

9      the day after the incident.  It appears to be an

10     incident/information sheet that was filled out at a police

11     station and that is the document my client says she had in mind

12     when she testified about a complaint next day and that has been

13     produced to the defendants.

14          THE COURT:  This is the one that says Police Officer

15     Wuttke is the same officer?

16          MS. REARDEN:  Yes.

17          THE COURT:  Have you guys seen this before?  You may

18     not have recognized it.

19          MS. TREPELKOVA:  Was this reported to her the next day

20     because it seems like it was just created the next day because

21     this happened like around 11 o'clock at night.  So I don't know

22     if this is actually it because if she went -- did she actually

23     go to a police precinct?

24          MS. REARDEN:  This is what she said, she was

25     testifying about when she said she made a complaint the next

 1    day.

 2                THE COURT:  Let me see the back.

 3                MS. REARDEN:  Judge, I am sorry.  It's just double

 4    sided in our binder.  It's not anything to do with it.

 5                THE COURT:  18th Precinct.  Okay.  It's consistent

 6    with the kind of complaint report that we pulled out.  Have you

 7    received a copy of that?

 8                MS. TREPELKOVA:  I have received a copy, yes.

 9                THE COURT:  All right.

10                MS. REARDEN:  The complaints it's our proposed Exhibit

11    Five in the binder.

12                THE COURT:  All right.

13                MS. REARDEN:  Your Honor, in terms of the doctor --

14                THE COURT:  Yes.

15                MS. REARDEN:  -- we came up with a plan at lunch that

16    I wanted to run by the Court.  My experience with doctors is

17    when you call them you -- not to reach them.  They call you

18    back.  Whenever they call you back -- Ms. Francois does not

19    have a cellphone with her but everybody else on our legal team

20    does.  We thought at midafternoon break we thought we'd let her

21    use one of our phones to call the doctor.  If we could use the

22    Court's assistance in this getting the doctor let -- then we

23    could, perhaps, go into the robing room and speak with him.

24                THE COURT:  Yes.  Or we can facilitate the call by

25    having one of my clerks call, leave a message and then having

1    hill call back and when he calls back, he'll let us know.

2              MS. REARDEN:  Perfect.

3              THE COURT:  We're going to have Ms. Francois have you

4    or somebody downstairs, one of the other clerks call

5    Ms. Francois' doctor, say that she's got a question that she'd

6    like to ask.  I think that they, you know, he or she knows that

7    she is in a proceeding and if we could get the call back this

8    afternoon.  If he's got a moment that would be most helpful.

9    Give your number.  When that call comes in you immediately go

10   run upstairs and call us immediately and then, Ms. Francois,

11   you should take into the robing room and transfer the call to

12   her there with whoever else you would like to have.

13             MS. REARDEN:  His name is Kevin Kalinsky,

14   K-A-L-I-N-S-K-Y, and this is his phone number here.

15             Your Honor, I think there were two very quick issues.

16   The stipulation.  Did you want to speak to that?

17             MR. MYATT:  We've conferred with our client and she's

18   agreed to the dismissal of those claims.

19             THE COURT:  Terrific.  We'll do that at the end of

20   day.

21             MS. REARDEN:  One final issue I wanted to bring to the

22   Court's attention.  Yesterday Officer Wuttke was here and she

23   was in her uniform and she had her hair up.  Today she is here

24   in plainclothes with her hair down.  And I learned at lunchtime

25   that she was here in the courtroom for part of Ms. Francois '

C65AAFRA5                     Francois - Redirect

1    cross and no one recognized her.  I just wanted to tell the

2    Court about that.

3              THE COURT:  She was here for part of the cross?

4              MR. MYATT:  At the very beginning of the day before we

5    realized that that was --

6              THE COURT:  I don't think it was during the cross.  I

7    think she was here in the morning.

8              MR. MYATT:  I think that's actually my understanding.

9              THE COURT:  She have blond hair?

10             MR. MYATT:  Yes.

11             THE COURT:  I don't think it's during the cross.

12             MR. MYATT:  I think that that's correct, your Honor.

13             THE COURT:  Okay.  You guys willing to live with that?

14             MS. TREPELKOVA:  This morning was cross-examination.

15             THE COURT:  This is yesterday during the time we were

16   picking the jury there was a police officer who walked in

17   during jury selection.

18             MR. MYATT:  She was here this morning, your Honor, as

19   well but she was not in uniform.  She came in to report and she

20   was here for the very beginning of the day.

21             THE COURT:  Okay.  Well, you can ask her what she

22   heard.

23             MR. ROSENBAUM:  When did she come in?  Do you know?

24             MR. MYATT:  I haven't had a chance to speak to her.

25             THE COURT:  Well, you can ask her first what she

C65AAFRA5                      Francois - Redirect

1    heard, if she is conforming her testimony and how long she was

2    here and all that and you can use it as a credibility point.

3    Okay.  Anything else.

4              MS. REARDEN:  No.  Thank you, judge.

5              THE COURT:  Okay.  Are you going to use that with

6    Ms. Francois or Wuttke?

7              MS. REARDEN:  I am not sure.

8              MR. ROSENBAUM:  Give me a copy of it because I am not

9    going to ask Ms. Francois about it.

10             THE COURT:  Okay.  Well, you've got that then.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In Open Court)

2              THE COURT:  All right. we're ready for the jury.

3              Ms. Francois, do you want to step back to the jury

4    box.

5              (Jury present)

6              THE COURT:  All right. let's all be seated.

7              Mr. Rosenbaum, is there anything further?

8              MR. ROSENBAUM:  No, your Honor.  Thank you very much.

9              THE COURT:  All right.  We'll turn the witness back on

10   redirect to Ms. Rearden.

11   REDIRECT EXAMINATION

12   BY MS. REARDEN:

13   Q.  Good afternoon, Ms. Francois.

14   A.  Good afternoon.

15   Q.  Ms. Francois, what is your height?

16   A.  About five-one.

17   Q.  And is that the same height that you were on December 18,

18   2008?

19   A.  Yes.

20   Q.  I want to go back to some testimony that you gave earlier

21   today on cross.  You provided some testimony about events

22   before you went to leave the apartment the first time on

23   December 18, 2008 and also testimony about events between that

24   point and when you are able to leave later that evening on

25   December 18, 2008.  Do you recall that testimony?

C65AAFRA5                    Francois - Redirect

1   A.  Yes.

2   Q.  I just want to try to clarify that area.  You testified

3   that Mr. Mazer said to you that he wished you would die a

4   horrible death.

5   A.  Yes.

6   Q.  When did Mr. Mazer say that to you?

7   A.  He was standing by his bedroom door.

8   Q.  Did Mr. Mazer make that statement to you before you went to

9   leave the apartment the first time?

10          MR. ROSENBAUM:  Objection to the leading.

11          THE COURT:  I'll allow this limited amount so we can

12   just get through it.

13   A.  Yes.

14   Q.  How did that make you feel when Mr. Mazer said that to you?

15   A.  Horrible.

16   Q.  Did it make you feel anything else?

17   A.  Yes.

18   Q.  Describe to me any other emotions you were feeling when

19   Mr. Mazer said that to you?

20   A.  I feel put down.  I was emotionally hurt to be hearing

21   those things.

22   Q.  Anything else, Ms. Francois?

23   A.  It was just a horrible feelings overall.

24   Q.  Mr. Rosenbaum asked you some questions about where Shade

25   Mazer was at the time when Mr. Mazer slapped and punched you.

C65AAFRA5                         Francois - Redirect

1    Do you remember those questions?

2    A.  Yes.

3    Q.  Do you have an understanding as to whether Shade Mazer saw

4    her father slap and punch you the first time?

5              MR. ROSENBAUM:  Objection, your Honor.

6              THE COURT:  If she has a -- if she had a personal

7    observation of that.  Don't speculate.

8    A.  No.

9    Q.  I am not clear now on what question is being answered?

10   A.  No, she did not see.

11   Q.  And how do you know that?

12   A.  She was in her -- on her bed in her room.

13   Q.  Where exactly were you and Mr. Mazer when he slapped and

14   punched you the first time in the face?

15   A.  In the hallway.

16   Q.  Mr. Rosenbaum also asked you questions about why you tried

17   to get the phone to call for help at that point before

18   Mr. Mazer had slapped and punched you the first time as opposed

19   to trying to leave the apartment.  Do you remember those

20   questions?

21   A.  Yes.

22   Q.  When Mr. Mazer slapped and punched you in the face the

23   first time what was closer to you, the telephone or the front

24   door?

25   A.  I could say it was in the middle of both of them.

C65AAFRA5                          Francois - Redirect

1    Q.  There were some questions earlier about a woman named

2    Silvia.  Do you remember that?

3    A.  Yes.

4    Q.  And you provided testimony that Sylvia was a close friend.

5    Do you remember that?

6    A.  Yes.

7    Q.  At what point were you and Sylvia close friends?

8    A.  Back in Trinidad.

9    Q.  So can you give me a timeframe?

10   A.  We were teen-agers back then, so that's been -- that was a

11   long time ago.

12   Q.  Are you and Sylvia still friends today?

13   A.  No.

14   Q.  Why is that?  What is your understanding as to why that is?

15   A.  Because I asked her if she had to go and work for the

16   Mazers.  She told me she was desperate.  I said --

17              MR. ROSENBAUM:  Objection.

18   A.  I said Sylvia.

19              THE COURT:  It's not for the truth as to whether or

20   not she was desperate.  It is for the fact it was said.  You

21   may continue.  Overruled?

22   A.  I said, Sylvia, you should be supporting me.  She told

23   me -- she should be on my side.  She said I am not on your side

24   and I am not on the Mazers' side and after she told me she not

25   on my side I ended all communications with her.

C65AAFRA5                          Francois - Redirect

1   Q.  Ms. Francois, Mr. Rosenbaum asked you on cross about

2   certain documents, certain calendars that Ms. Shade had given

3   you at some point over the course of your employment.  Do you

4   remember that?

5   A.  Yes.

6   Q.  What kind of information was on those documents when

7   Ms. Shade gave them to you?

8   A.  Schedule for Shade.

9   Q.  When Ms. Shade gave those documents to you did they reflect

10  in any way the hours that you actually worked?

11  A.  No.

12          MR. ROSENBAUM:  Objection to leading the witness, your

13  Honor, please.

14          THE COURT:  On that question, overruled.

15  Q.  Ms. Francois, approximately, how many times did Ms. Shade

16  give you these calendar documents that you looked at yesterday

17  with Mr. Rosenbaum over the course of your employment?

18  A.  Not much.  Probably about eight to ten.

19  Q.  Eight to ten times in the six and a half years?

20  A.  Yes.

21  Q.  Are you aware if the defendants maintain any records

22  reflecting the hours that you actually worked as their

23  employee?

24          MR. ROSENBAUM:  This is improper redirect.

25          THE COURT:  She's entitled to ask if she knows.

C65AAFRA5                    Francois - Redirect

1              MR. ROSENBAUM:  It's improper redirect.

2              THE COURT:  You've opened the door in terms of

3    calendar and record keeping that way.  So you opened the door

4    to it.  Go ahead.

5    Q.  Do you need the question read back?

6    A.  Yes, please.

7              (Testimony read back)

8    A.  No.

9              MS. REARDEN:  I need to clarify that answer.

10   Q.  Are you saying that you are not aware one way or the other.

11   A.  I am not aware if they kept records of the hours that I

12   worked.

13   Q.  Did they ever show you any records of the hours that you

14   worked?

15   A.  No.

16   Q.  Did they ever -- do you believe that the Mazers kept --

17             THE COURT:  Sustained.

18   Q.  Did you ever see any document in the Mazer's household

19   reflecting any hours that you worked?

20   A.  No.

21   Q.  As between Mr. and Mrs. Mazer who was responsible for

22   paying you for the hours that you worked?

23             MR. ROSENBAUM:  Objection.

24             THE COURT:  Sustained.

25   A.  Ms. Mazer.

C65AAFRA5                          Francois - Redirect

1          THE COURT:  Sustained.  The question is, what's her

2     understanding.  She can't know as of between the two of them

3     how they split their responsibilities.  But reask the question

4     so it's a proper question at least.

5     BY MS. REARDEN:

6     Q.  Who actually paid you?

7     A.  Ms. Mazer.

8     Q.  Did Mr. Mazer ever pay you?

9     A.  Yes, a couple of times.

10    Q.  And all the other times did Mrs. Mazer pay you?

11         MR. ROSENBAUM:  Objection to the leading, your Honor.

12         THE COURT:  Overruled.

13    A.  Yes.

14    Q.  You testified earlier that you went to see an

15    ophthalmologist following the December 18, 2008 incident.  Do

16    you remember that?

17    A.  Yes.

18    Q.  Why did you go to an ophthalmologist?

19         MR. ROSENBAUM:  Objection.

20    A.  My eyes was a bit blurry.

21         THE COURT:  Overruled.

22    Q.  And did you have this problem with blurriness before the

23    December 18, 2008 incident?

24    A.  No.

25    Q.  How many times did you go to see an ophthalmologist after

C65AAFRA5                          Francois - Redirect

1     the December 18, 2008 incident?

2     A.   Two occasions.

3     Q.   I want to talk to you about the time period that you

4     testified to earlier from January of 2009 to June 2009.  Do you

5     remember testifying about that time period?

6     A.   Yes.

7     Q.   And do you remember testifying that you had a part-time job

8     between January and June of 2009?

9     A.   Yes.

10    Q.   Did you have full-time employment at any point between

11    January and June of 2009?

12    A.   Part-time, no.

13    Q.   Were you looking for full-time work at any point between

14    January and June of 2009?

15    A.   No.

16    Q.   Was there a particular reason for that?

17              MR. ROSENBAUM:  Objection.

18              THE COURT:  Overruled.

19    A.   I had applied myself to the little part-time in the

20    meantime while I recuperating.

21    Q.   What were you recuperating from between in January of 2009?

22    A.   After the incident on June -- on December 18 and following

23    up I had issues with a different health problem.

24    Q.   Were you recuperating in January of 2009 from a different

25    medical condition?

C65AAFRA5                         Francois - Redirect

1   A.  No, from what happened from December 18th.

2   Q.  You gave some testimony earlier about picking up Shade

3   Mazer at gymnastics and taking her home to the Mazers'

4   apartment.  Do you remember that?

5   A.  Yes.

6   Q.  And you testified that you typically arrived at the Mazers'

7   apartment at sometime after eight p.m. when you picked up Shade

8   from gymnastics and went home?

9   A.  Yes.

10  Q.  Were Shade's parents at home every time you picked up Shade

11  from gymnastics and took her back to her apartment?

12  A.  Yes.

13  Q.  You testified earlier that you told Shade Mazer that she

14  should always tell the truth.  Do you remember that?

15  A.  Yes.

16  Q.  Do you have an understanding as to whether Shade Mazer

17  always followed your advice in that regard?

18          MR. ROSENBAUM:  Objection, your Honor.

19          THE COURT:  If she has a particular instance of

20  knowledge she can testify to them.  Overruled.

21  A.  I am not sure.

22          MS. REARDEN:  I pass the witness.

23          THE COURT:  Well, you've got just one or two

24  questions, Mr. Rosenbaum or none?

25  RECROSS-EXAMINATION

C65AAFRA5                    Francois - Recross

1    BY MR. ROSENBAUM:

2    Q.  Did I understand that you never got a schedule from the

3    Mazers as to the calendar of -- the calendar of the dates -- do

4    that again.

5         Did you ever get any scheduling from Ms. Mazer with

6    respect to the schedule of Shade during the week?

7         MS. REARDEN:  Objection.

8         THE COURT:  Sustained.  We have been through this a

9    number of times what she testified to just now to save us all

10   time.  She testified that she got them a couple of times which

11   is inconsistent with what she told you yesterday afternoon.

12   Why don't you pick up from there?

13   BY MR. ROSENBAUM:

14   Q.  Did you find today or overnight a schedule of work that you

15   gave to the Court -- gave to your lawyer today?

16   A.  Sir, what do you mean?

17   Q.  Did you give your lawyer today a schedule of Shade for a

18   particular week that you found last night?

19   A.  Yes, sir.

20   Q.  Okay.  And do you know what week that was for or what

21   period of time that was for?

22   A.  No, sir.

23   Q.  And on Monday you would pick up, according to that

24   schedule, you would pick up Shade on Monday at eight p.m. do

25   you recall about when that would be --

C65AAFRA5                          Francois - Recross

1              MS. REARDEN:  Objection.

2     A.  Sir, I don't know what was on that schedule because the

3     lawyer who came to look for them it was all in her control.  I

4     had no control over it.

5     Q.  Because it was in your possession at that time?

6     A.  Yes.

7              MR. ROSENBAUM:  Could we just show this to the witness

8     please?

9              THE COURT:  Well, you want to -- to the witness or to

10    the jury?

11             MR. ROSENBAUM:  Yes.

12             THE COURT:  Certainly, you can show it to the witness.

13             MR. ROSENBAUM:  I want to make sure this is what was

14    picked up.

15             THE COURT:  You may approach.

16             MR. ROSENBAUM:  Can we mark this for identification?

17             THE COURT:  Sure.  What number?  Mark it for

18    identification number eight, a document.

19             MS. TREPELKOVA:  "A".

20             THE COURT:  "A" as in "apple".

21             (Pause)

22             THE COURT:  A single paged document.  Is there a

23    title?

24             COURTROOM DEPUTY:  Shade's schedule this week.

25             THE COURT:  Okay.

C65AAFRA5                         Francois - Recross

1          MR. ROSENBAUM:  Your Honor, I don't have another copy

2      with me so I may have to approach the witness.

3          THE COURT:  That's okay.  You can approach and

4      question from the witness stand if you'd like to.

5          MR. ROSENBAUM:  Thank you.

6          THE COURT:  Yes.

7      BY MR. ROSENBAUM:

8      Q.  Is that the document that was taken from your house

9      yesterday?

10     A.  Sir, I wasn't sure what was in the document but my attorney

11     said -- the attorney said this looks different to what they

12     already have.

13     Q.  Was that the document that was taken from you yesterday by

14     your attorney?

15     A.  It's supposed to be but I did not know what the contents

16     was.  I did not read it.

17     Q.  Do you have any reason to believe that it was not the

18     document that was taken from you that your lawyer gave us a

19     document that was not taken from you?

20     A.  I believe my lawyers if they say this is the document that

21     what they did not have what they got yesterday.

22         THE COURT:  You want to stipulate that this was the

23     document that you got from this witness' apartment last night?

24         MS. REARDEN:  Yes.

25         THE COURT:  Thank you.

C65AAFRA5                        Francois - Recross

BY MR. ROSENBAUM:

Q.  Do you know about what period of time you took Shade at

three o'clock in the afternoon?

A.  Sir, I don't remember when I performed these duties on

this.

            THE COURT:  Somebody's indicated they can't hear you,

so you'll have to go back to the mic.

            MR. ROSENBAUM:  I am sorry.

BY MR. ROSENBAUM:

Q.  Does that document state that on Mondays you take Shade

from three o'clock in the afternoon?

A.  Yes, it is.

Q.  And was that a document that was given to you by

Mrs.~Shade, the mother?

A.  Yes.

Q.  And do you have any idea what year that was for those --

that schedule?

A.  No, I don't.

Q.  Is it true that that schedule started when Shade was

already in school, when she got finished with school about

three o'clock?

A.  Yes.

Q.  And what year did she get -- did she start finishing school

at three low clock in the afternoon?

A.  I don't remember.

C65AAFRA5                      Francois - Recross

1   Q.  And what time would you bring her home according to that

2   schedule on Mondays?

3              MS. REARDEN:  Objection.

4              THE COURT:  Overruled.

5   A.  Sir, these for a reason doesn't always be the same as the

6   hours was printed by Mrs. Mazer.

7   Q.  According to that paper what were the hours that was

8   Exhibit A, what was the hours that you worked from three to

9   what time according to that paper?

10             MS. REARDEN:  Objection.

11             THE COURT:  Hold on one second.  Let's at least do it

12  the right way.  Do you want to move for the admission of this

13  document because if you are going to refer to the contents --

14             MR. ROSENBAUM:  Yes.

15             THE COURT:  Any objection?

16             MS. REARDEN:  No, your Honor.

17             THE COURT:  All right.  Exhibit A admitted.

18             (Defendant's Exhibit A received in evidence)

19             THE COURT:  Now, the question is a proper question.

20  According to the document you are just reading the words off

21  the page what does it say?  You can read it.

22             THE WITNESS:  Schedule -- Shade's schedule for this

23  week, Monday, pick up three p.m. Chelsea Pier team from seven

24  to 7:30.

25             THE COURT:  You don't have to read the whole thing.

C65AAFRA5                          Francois - Recross

1    What was the question?

2    BY MR. ROSENBAUM:

3    Q.  Monday was three to 7:30, is that what you are saying?

4    A.  Yes.

5    Q.  Okay.  And Tuesday?

6            THE COURT:  Now, Mr. Rosenbaum, this now in evidence.

7    We don't have to go through each day.  We have to just move on.

8    So if you want to -- the document's in evidence.  We can pass

9    it around to the jury for those dates and times if you'd like.

10   If you want to ask her whether she worked those hours or not,

11   you can ask her that or not as you see fit.

12           MR. ROSENBAUM:  Can I just look at the document?

13           THE COURT:  Yes.  I just want us to save time.

14   A.  Mr. Rosenbaum, could I mention that at 7:30 --

15           MR. ROSENBAUM:  Your Honor, please, there was no

16   question.

17           THE COURT:  There is no question pending.  You'll have

18   to wait for another question then you can see if that answer is

19   responsive.

20           Two more questions.

21           MR. ROSENBAUM:  May I show it to the jury?

22           THE COURT:  You certainly may publish it to the jury

23   if you'd like.  You may hand it to them and they can pass it

24   around if we don't have copies.

25           (Pause)

1          THE COURT:  Exhibit A being published to the jury.

2          MR. ROSENBAUM:  I have no other questions.

3          THE COURT:  All right.  Thank you.  Do you have one

4     question?

5          MS. REARDEN:  One question.

6     REDIRECT EXAMINATION

7     BY MS. REARDEN:

8     Q.  Ms. Francois, if you could look again at the document that

9     you were discussing with Mr. Rosenbaum.

10         THE COURT:  She gave it back to him and the jury has

11    it.  Could we take it from the jury and we'll give it back to

12    you.

13         MS. REARDEN:  May I approach, your Honor?

14         THE COURT:  Yes, you may.  We'll give it right back.

15         (Pause)

16    BY MS. REARDEN:

17    Q.  Ms. Francois, does this document reflect in any way any

18    hours that you actually worked?

19    A.  Yes.  I wanted to mention from Monday, pick up three p.m.

20    Chelsea Pier preteen from five to 7:30 but that is when, that

21    is the end of preteen exercise.  So from 7:30 I take about a

22    hour to get to the Mazer's apartment because we got to get a

23    bus and a train from Chelsea Pier to get to the Mazer's

24    apartment.  After getting there, like I say, I give Shade her

25    bath.  So within that time I will be leaving there like nine,

C65AAFRA5                    Francois - Redirect

9"30 is when they say from seven to five.  Doesn't mean that my

job had ended 7:30.  I just wanted to clear that up.

          THE COURT:  Thank you.  Okay.  Let's give that

document then back to the jury if we could, Ms. Rearden.  When

the jury is done with it they can just put it on the bench

there and we'll collect it.

          Okay.  Ms. Francois, you may step down.  Thank you

very much.

          THE WITNESS:  Thank you very much.

          THE COURT:  Would the plaintiffs please call their

next witness.

          MR. MYATT:  Your Honor, the plaintiffs would like to

call Dr. Gino Blancaflor.

          THE COURT:  All right, Mr. Gino Blancaflor.

 DR. GINO BLANCAFLOR,

     called as a witness by the Plaintiff,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MYATT:

Q.  Dr. Blancaflor, I am handing you a binder that contains

exhibits.  I also have a binder for the Court.

          THE COURT:  Have you given this to the defendants?

          MR. MYATT:  I have your Honor.

          THE COURT:  All right.  Is this marked for

identification the document?

C65AAFRA5                          Dr. Blancaflor – Direct

1            MR. MYATT:  Your Honor, I would like to mark this

2      document for identification as Plaintiff's Exhibit 4.

3            THE COURT:  All right.  Plaintiff's Exhibit No. 4 for

4      identification.  Why don't you just describe the document, not

5      the contents of the document, just the title of the document

6      for identification purposes only but not the contents until

7      it's in evidence.

8            MR. MYATT:  Yes, your Honor.

9            THE COURT:  You can skip past the subpoena.

10            MR. MYATT:  The document is the response, the complete

11      response to a subpoena served on Roosevelt Hospital and it is

12      what we would refer to as the medical records.

13            THE COURT:  Thank you.  You may proceed.

14      BY MR. MYATT:

15      Q.  Good afternoon, Dr. Blancaflor.  My name is Jason Myatt and

16      let me begin by thanking you for your patience.

17            Dr. Blancaflor, do you have a hospital with which you

18      are associated?

19      A.  Yes, Roosevelt Hospital.

20      Q.  And in what department of Roosevelt Hospital do you

21      practice?

22      A.  Emergency department.

23      Q.  Dr. Blancaflor, I believe you actually already have it open

24      but I was going to ask to you take a moment and look at

25      documents that are behind, I believe, Tab One of the binder.

C65AAFRA5                          Dr. Blancaflor - Direct

1    That may not be a tab at all.  And if you would let me know

2    when you have had a moment to sort of page through.

3    A.  Yes.

4    Q.  Do you recognize these documents?

5    A.  Yes, this is paper copy of the electronic chart.

6    Q.  And can I ask you to turn to what I believe is the second

7    to last page of the exhibit which has the words page 4 of 4 on

8    the upper right-hand side?

9    A.  Pang 4 of 4.

10   Q.  Page 4 of 4?

11   A.  Yes.

12   Q.  Are electronic charts such as this maintained in the

13   regular course of your practice?

14   A.  Yes.

15   Q.  And they're maintained in the regular course of Roosevelt

16   Hospital's operations?

17   A.  Yes.

18   Q.  Did you prepare this document?

19   A.  I wrote in this chart, yes.

20   Q.  So this chart contains information that was provided by

21   you?

22   A.  Yes.

23   Q.  And is it your regular practice to have charts of medical

24   records reduced to writing into electronic form?

25   A.  Yes.

C65AAFRA5                          Dr. Blancaflor - Direct

1   Q.  And is it your practice to accurately record the

2   information on these electronic charts?

3   A.  Yes.

4   Q.  And is it your practice to record the information on a

5   chart at or about the time at which the information that is

6   recorded on it is prepared?

7   A.  Yes.

8           MR. MYATT:  Your Honor, at this time I would like to

9   move -- I request to move Plaintiff's Exhibit 4 into evidence.

10          MR. ROSENBAUM:  Objection, your Honor.  No foundation.

11          THE COURT:  Overruled.  It's been properly

12   authenticated and is relevant.

13          MR. ROSENBAUM:  May we have a voir dire?

14          THE COURT:  No.  Admitted.

15          (Plaintiff's Exhibit 4 received in evidence)

16   BY MR. MYATT:

17   Q.  Dr. Blancaflor, can I ask to you turn to what is marked as

18   page 1 of 4 of the chart?

19   A.  Yes.

20          MR. MYATT:  In light of yesterday's -- we brought

21   enough copies for the jury.  Is it all right if we distribute

22   them?

23          THE COURT:  Yes.  Plaintiff's Exhibit 4 will now be

24   published to the jury.  You may proceed.

25          (Pause)

C65AAFRA5                        Dr. Blancaflor - Direct

1        THE COURT:  Was there a particular page you were on?

2        MR. MYATT:  Page 1 of 4 the fifth and last page, the

3   first page of what is --

4        THE COURT:  All right so it says 1 of 4 at the top?

5        MR. MYATT:  Yes.

6        THE COURT:  Can you also just give some identifying

7   information so that people can know that they are in the right

8   place?  Is it the one that says "Patient:  Francois, Patricia"?

9        MR. MYATT:  The document says at top left-hand side is

10  "Francois, Patricia MRI slash count number" and continues on.

11       THE COURT:  All right.  Do people have this?  Okay.

12  You may proceed.

13  BY MR. MYATT:

14  Q.  Dr. Blancaflor, what does HPI stand for?

15  A.  The history present illness.

16  Q.  And could I ask you to read --

17       THE COURT:  I don't think there is any reason to have

18  him read it.  The jury has a copy of it.

19  Q.  And this was the paragraph that immediately follows HPI is

20  published by you, specifically, correct?

21  A.  Yes.

22       THE COURT:  You mean drafted by him?

23       MR. MYATT:  I was using the word in the document, your

24  Honor, below the paragraph there's a publish colon with the

25  time of the record, the dates and then Dr. Blancaflor's name.

C65AAFRA5                          Dr. Blancaflor – Direct

1            THE COURT:  Okay.  Thank you.

2            MR. MYATT:  Your Honor, in the interest of time I have

3    no further questions for this witness.

4            THE COURT:  Let me just ask you, Dr. Blancaflor, does

5    page 1 of 4 when it says "HPI" do you see that?

6            THE WITNESS:  Yes.

7            THE COURT:  Is that an accurate reflection to the best

8    of your memory of what you were told at the time regarding

9    presentation of the patient and the information you were

10   provided?

11           THE WITNESS:  Yes.

12           THE COURT:  Okay.  Thank you.  You may proceed.

13   CROSS-EXAMINATION

14   BY MR. ROSENBAUM:

15   Q.  Doctor, stay on that page please.  My name is

16   Mr. Rosenbaum.  Did you put the arrival time of 12:18/2008,

17   22:17?

18   A.  That would be arrival time of patient.

19   Q.  Did you personally put that time?

20   A.  No.

21   Q.  In fact, it says that the person had Workers' Compensation.

22   Do you see that?

23           THE COURT:  You are beyond the scope of the direct.  I

24   am not going to have you go into the authenticity.  Let me ask

25   a few questions.

C65AAFRA5                      Dr. Blancaflor - Cross

1              Dr. Blancaflor, were documents and records kept in
2    this fashion in your experience at Roosevelt Hospital?
3              THE WITNESS:  Yes.
4              THE COURT:  In your experience has information
5    relating to vitals, time, blood pressure, pulse rate,
6    temperatures, have those been accurate to the best of your
7    knowledge?
8              THE WITNESS:  Yes.
9              THE COURT:  Have you encountered an instance with this
10   particular patient where the information was inaccurate?
11             THE WITNESS:  Not to my knowledge.
12             THE COURT:  The document is admitted for all purposes.
13             MR. ROSENBAUM:  May I just --
14   Q.  Doctor, did you take the history on the HPI personally when
15   the patient came in or was it a nurse?
16   A.  Oh, no.  That was me.
17   Q.  That was you?
18   A.  Yes.
19   Q.  Doctor, what was the final diagnosis?
20   A.  The primary diagnosis was a hand injury.
21   Q.  Was any diagnosis with reference to a history to eye damage
22   or vision damage?
23   A.  No, there was no diagnosis.
24   Q.  There was no complaint about, correct?
25   A.  There was a complaint.

C65AAFRA5                          Dr. Blancaflor - Cross

1   Q.  But there was no diagnosis or anything?

2   A.  No.

3   Q.  Was the eye examined or --

4   A.  Yes, the eye was examined.

5   Q.  Came back normal?

6   A.  The eye itself was normal, but the area around the eye was

7   not.

8   Q.  No indication of any visual problems, is that correct?

9   A.  Not that was noted here.

10  Q.  Was any referral -- was another date set up for the return?

11  A.  The patient was referred to her primary care physician to

12  follow-up in two days.

13  Q.  Was the patient given a document by the hospital to return

14  in a couple of days that she should come back in a couple of

15  days?

16  A.  Not according to this.

17  Q.  So if the patient testified that she was given a document

18  to come back to the hospital, your hospital, she would be

19  making a mistake, is that correct, according to the records?

20  A.  And according to this there was nothing that she would

21  return to the hospital.

22  Q.  And, in fact, doctor, according to that statement there was

23  no medical issues that she had that required to come back to

24  the hospital, correct?

25  A.  According to this she didn't have to come back to the

C65AAFRA5                          Dr. Blancaflor - Cross

1  hospital.

2  Q.   Doctor, the history was given, okay.  Do you have any

3  independent knowledge whether or not she was actually assaulted

4  by her employer?

5  A.   What do you mean, "independent knowledge"?

6  Q.   Well, look down at your intake.

7  A.   Yes.

8  Q.   Third line down on the second paragraph she reports being

9  involved in a physical altercation which she says was

10  assaulted, being punched in the face and left hand and twisted

11  while she was held, a phone?

12  A.   Yes.

13  Q.   Did you need that information for a diagnosis and

14  treatment?

15  A.   Well, that would be part of the history.

16  Q.   It would not be necessary for the diagnosis and treatment,

17  correct?

18  A.   I believe it would.

19  Q.   It would not?

20  A.   It would.

21  Q.   There is an assault or any type of impact?

22  A.   All the history would be necessary for the diagnosis and

23  treatment.

24  Q.   Is it your testimony, doctor, that you needed the

25  information that she was assaulted to make a determination of

C65AAFRA5                          Dr. Blancaflor - Cross

1   the injury?

2   A.  Yes, it would help.

3   Q.  It would help?

4   A.  Yes, in the diagnosis and the treatment.

5   Q.  Doctor, go to page -- it's not numbered.  But starting from

6   the first page of where it says "St. Lukes Roosevelt Emergency

7   Department".

8   A.  Which page?

9        MR. ROSENBAUM:  May I approach the witness?

10        THE COURT:  Sure.  I think you are talking about the

11   first page after the legal documents.

12        MR. ROSENBAUM:  Yes.

13        THE COURT:  So it's after the legal documents where it

14   says "request for production" there's, first page there, a

15   chart.

16   BY MR. ROSENBAUM:

17   Q.  Going from that page could you go two more pages -- one

18   more page on the very bottom it says 12/19/2008 primary survey.

19   The jury can see that the second page on the very bottom of the

20   right corner?

21   A.  Yes.

22   Q.  And it says on the bottom, note, patient states she was at

23   her place of employment today -- do you see where I am

24   reading -- when she got into an argument with the employer.

25   Patient states they both physically assaulted each other.

C65AAFRA5                          Dr. Blancaflor – Cross

1    States employer slapped her on side of face and grabbed her

2    hand.  Did you read that?

3    A.  Yes.

4    Q.  Does it indicate that the employer punched her or just

5    slapped her?

6    A.  According to this they were in a physical assault when the

7    patient stated the employer slapped her.

8    Q.  Okay.  Did it say where, what part of her body was slapped?

9    A.  The right side of her face.

10   Q.  And where was the -- where was it damage?  To what side of

11   her face as far as the eye is concerned?

12   A.  What do you mean?

13   Q.  Was it the left side or the right side?

14   A.  Let me look back at my notes.

15        (Pause)

16   A.  My notes says that the contusion was around the left side.

17   Q.  And that was caused by a slap?

18   A.  Excuse me?

19   Q.  Was that caused by a slap?

20   A.  I do not know.

21   Q.  Pardon me?

22   A.  I don't know.

23   Q.  You don't know what the contusion was caused by?

24   A.  I don't know exactly, not from my note.

25   Q.  No where in your note says there was a punch, is that

C65AAFRA5                          Dr. Blancaflor – Cross

1    correct?

2    A.  Let me just read again.

3           (Pause)

4    A.  No.  It says, in my notes it says the patient said she was

5    punched in the face.

6    Q.  Where?

7    A.  In my note I didn't specify.

8    Q.  I am sorry?

9    A.  In my note I didn't specify where.  However in the physical

10   exam shows that the confusions were on the left side of the

11   face.

12   Q.  It didn't indicate it was swollen?

13   A.  Excuse me.

14   Q.  Was it swollen, the left side of her face?

15   A.  Yes.

16   Q.  Where does it say that?

17   A.  In the physical exam under O/E head general exam.

18   Q.  But the swelling was not significant enough for cause to

19   come back or go to an ophthalmologist, correct?

20           MR. MYATT:  Objection.

21           THE COURT:  Sustained.  He's testified that she was

22   given a referral to go see another doctor two days later.

23           MR. ROSENBAUM:  Okay.  Thank you.  No other questions.

24           THE COURT:  All right.  Let me ask you, doctor, there

25   is also on page 1 of 4 in the second paragraph it says one,

C65AAFRA5                    Dr. Blancaflor - Cross

1   three lines up and pain to the dorsum of the L metacarpals.

2   A.  And pain to the dorsal, yeah.

3           THE COURT:  What's an L metacarpal.

4           THE WITNESS:  The left metacarpal.  So that would be

5   the area of the hand right here.

6           THE COURT:  And "the swelling under the L eye where

7   she was struck", what does that mean?

8           THE WITNESS:  And swelling under the left eye where

9   she is struck.

10          THE COURT:  Okay.  And this is part of the medical

11  history that you took?

12          THE WITNESS:  Yes.

13          THE COURT:  And were the injuries consistent with a

14  physical altercation in your view?

15          THE WITNESS:  Yes.

16          THE COURT:  All right.  Are we all set with this

17  witness?

18          MR. MYATT:  We are, your Honor.

19          THE COURT:  All right.  You may step down, doctor.

20  Thank you.

21          All right.  Would the plaintiffs like to call their

22  next witness?

23          MR. MYATT:  Your Honor, the plaintiffs would like to

24  call Vianca Vuelvas.

25   VIANCA VUELVAS,

C65AAFRA5                          Dr. Blancaflor - Cross

1          called as a witness by the Plaintiff,

2          having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MR. MYATT:

5    Q.  Good afternoon, Ms. Vuelvas.

6    A.  Good afternoon.

7    Q.  My name is Jason Myatt.

8               MR. MYATT:  Your Honor, may I approach?

9               THE COURT:  You may.

10              MR. MYATT:  I am handing to the witness a notebook

11   containing what plaintiffs would like to mark as Plaintiff's

12   Exhibit 5 for identification, medical records of Kings County

13   Hospital and also supply a copy to the court and a copy to --

14              THE COURT:  All right.  Exhibit 5 for identification.

15   Q.  Ms. Vuelvas, by whom are you employed?

16   A.  By Kings County Hospital.

17   Q.  And what is your job position at Kings County Hospital?

18   A.  I am a medical records specialist.  I have the ability of

19   answering subpoenas and abstracting information from records?

20   Q.  So you are authorized by the hospital to speak as the

21   custodian of records?

22   A.  Yes.

23   Q.  Ms. Vuelvas, have you had an opportunity to look at the

24   documents in the binder in front of you?

25   A.  Yes.

C65AAFRA5                          Vuelvas - Direct

1    Q.  Do you recognize these documents?

2    A.  Yes, I do.

3    Q.  What are these documents?

4    A.  These are certifications on the mediation that we usually

5    put on the records when we expedite the records and these are

6    clinic notes, x-rays and ambulatory services.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C654FRA6                           Vuelvas - direct

1   BY MR. MYATT:

2   Q.  Were these records prepared in the regular course of

3   business at Kings County Hospital?

4   A.  Yes.

5   Q.  Are these records maintained in the regular course of

6   business of Kings County Hospital?

7   A.  Yes.

8   Q.  Is it the regular practice of Kings County Hospital to

9   reduce medical records to writing?

10  A.  What do you mean by reduce?

11  Q.  To create documents such as the ones in front of you?

12  A.  Yes, we do.

13  Q.  Were the records in front of you prepared by an employee or

14  representative of Kings County Hospital --

15          MR. ROSENBAUM:  Objection.

16          THE COURT:  Overruled.

17  Q.  -- with personal knowledge of the information contained

18  therein?

19  A.  Well, they are prepared according to what we get in the

20  system; whatever we have in the system, that's what we print

21  out or whatever is in the chart, that's what we do.

22  Q.  Is it the practice for information to be entered into the

23  charts at or about the time the information is gathered?

24  A.  Yes.

25          MR. MYATT:  Your Honor, I would request to move

C654FRA6                        Vuelvas – direct

1    Plaintiff Exhibit 5 into evidence.

2              MR. ROSENBAUM:  Objection to the history; she is not

3    the author of the documents.

4              THE COURT:  She is an authorized custodian of records.

5    You can ask her on cross if she is an authorized custodian of

6    records.  Exhibit 5 is admitted.

7              (Plaintiff Exhibit 5 received in evidence)

8              THE COURT:  She obviously can't personally speak to

9    the contents herself but she is an authorized custodian of

10   records.

11             MR. ROSENBAUM:  Your Honor, I just want to --

12             THE COURT:  Your objection is noted.

13             Admitted over objection.

14             MR. MYATT:  Your Honor, I would like to publish the

15   records to the jury.

16             THE COURT:  Yes.

17   BY MR. MYATT:

18   Q.  Ms. Vuelvas, turn to page of this document which is the

19   first page after the subpoena.

20             MR. ROSENBAUM:  Your Honor, objection.

21             THE COURT:  Let me hear the question; I am waiting

22   myself to hear the next question.

23             MR. ROSENBAUM:  It has already been shown to the jury.

24             THE COURT:  It's perfectly appropriate to show it to

25   the jury but whether or not this witness can testify as to the

C654FRA6                        Vuelvas – direct

1    content is a different story.  Next question.

2              MR. MYATT:  I am simply going to ask Ms. Vuelvas if

3    she could identify what the specific documents, there are a few

4    different documents, I am perfectly happy to let the jury

5    review them, I was going to ask Ms. Vuelvas to identify the

6    four or five documents that are in this separately.  I am also

7    happy to defer to the court and have the jury view them.

8              THE COURT:  Ms. Vuelvas, are you familiar with the

9    types of documents that are contained in this exhibit that's in

10   front of you?

11             THE WITNESS:  Yes.

12             THE COURT:  You are familiar with those documents from

13   performing your duties and responsibilities at Kings County

14   Hospital?

15             THE WITNESS:  Correct.

16             THE COURT:  You may ask her about the general types of

17   documents but not about the content.

18             MR. MYATT:  Thank you, your Honor.

19   BY MR. MYATT:

20   Q.  Turning back to that document that was the first page after

21   the subpoena, can you identify the type of documents this is?

22   A.  This is a clinic visit.

23   Q.  Is which clinic?

24   A.  Ophthalmology.

25   Q.  I believe that the next document is two pages later.

C654FRA6                          Vuelvas - direct

1    A.  There is part 1 and part 2, 2 pages.

2    Q.  After page 2, there is another document?

3    A.  This will be another clinic visit.

4    Q.  Which clinic?

5    A.  For medicine.

6    Q.  What is the medicine clinic?

7    A.  It varies, it could be for follow-up, it could be for

8    different various, but this one here --

9              THE COURT:  Don't speak about the contents here

10   because you would be just reading off the page.

11             THE WITNESS:  Right.

12   Q.  I believe that's a 2-page document, so turn the page, there

13   is another document?

14   A.  Two pages.

15   Q.  It has location DIS-CP on the not-quite upper left side;

16   can you identify this document.

17   A.  Are you referring to the x-rays?

18   Q.  Yes.

19   A.  I do recognize it.

20   Q.  What is this document?

21   A.  These are x-rays.

22             MR. MYATT:  Thank you.  No further questions.

23             THE COURT:  Mr. Rosenbaum, apart from the

24   admissibility of the documents I have already ruled on, you can

25   ask questions.

C654FRA6                          Vuelvas - direct

1    CROSS EXAMINATION

2    BY MR. ROSENBAUM:

3    Q.  The first page, did you take the history yourself of the

4    patient?

5             THE COURT:  Mr. Rosenbaum, she is custodian of

6    records; of course she didn't take the history.

7             MR. ROSENBAUM:  I want it for the record.

8             THE COURT:  I understand.  For the record she is

9    custodian of records only.  I take it you have no personal

10   knowledge of the contents of this particular examination of

11   this patient, is that right?

12            THE WITNESS:  No.

13            THE COURT:  You don't?

14            THE WITNESS:  No.

15            THE COURT:  Or the history, is that right?

16            THE WITNESS:  No.

17            THE COURT:  Is there anything else.

18            MR. ROSENBAUM:  Yes.

19   BY MR. ROSENBAUM:

20   Q.  Could you please go to the second page where it says

21   primary diagnosis.

22            THE COURT:  If you are going to ask her about content,

23   you are going to open the door to the contents.  I want to warn

24   you about that.  You are obviously familiar with Rule 803;

25   records kept in the regular course of an activity and various

C654FRA6                         Vuelvas - cross

1    other rules that would apply here.  I am limiting this witness

2    not to speak about the contents because she doesn't have

3    knowledge of the contents.  If you are going to open the door,

4    you are going to open the door on redirect as well.

5    BY MR. ROSENBAUM:

6    Q.  Does it indicate that Ms. Francois has unspecified

7    glaucoma?

8    A.  I have not read the record.

9    Q.  Go to the second page.

10          THE COURT:  Publish to the jury which parts you would

11   like the jury to look at.  That's a better way of doing it than

12   trying to do it through the witness.

13   Q.  The second page starts with A/P, glaucoma suspect second

14   degree or second, also 9 months with HVF/OCT optic nerve; do

15   you know anything about that.

16   A.  No.

17   Q.  Do you know if there was a problem with the optic nerve?

18          THE COURT:  Don't ask the witness about content.  If

19   you want to point out particular pieces to the jury that you

20   think are helpful to your position, I will allow you to do

21   that.

22   Q.  Go to page 1 of 2, the last 2 pages.  You work at Kings

23   County Hospital?

24   A.  Yes.

25   Q.  Their records are pretty well kept according to you?

C654FRA6                         Vuelvas − cross

1    A.  Yes, they are.

2    Q.  Please read on page 1 of 2 where it says diagnosis,

3    traumatic amputation of arm and hand complete; do you see that?

4         MR. ROSENBAUM:  May I approach, your Honor.

5         THE COURT:  I don't think the witness needs to talk

6    about the content of the document.  You can point that out to

7    the jury; I think they will get the point.

8         MR. ROSENBAUM:  I hope so.

9         THE COURT:  Do people see where he is, second to last

10   page.  Is there any other portion of this document you would

11   like to point out.

12        MR. ROSENBAUM:  I can go through many parts, as to

13   accuracy of Kings County.

14   Q.  Do you know whether or not, incidentally, Kings County had

15   issues with the Health Department with recordkeeping; do you

16   recall that recently?

17   A.  No, I don't.

18   Q.  In the last three years?

19   A.  No.

20   Q.  Brought up on charges, do you recall that?

21        MR. MYATT:  Objection, your Honor.

22        THE COURT:  If she knows.

23   A.  I don't know.

24   Q.  How long are you working with Kings County?

25   A.  For 20 years.

C654FRA6                        Vuelvas - cross

1    Q.  You don't remember any issue in the federal court with

2    reference to Kings County?

3    A.  I know that they have several issues but I don't remember

4    any particular one; they have different issues.

5    Q.  Page 1 of 2, the next page, findings, there are no

6    fractures or dislocations.  Next is impression, no acute

7    injury.  Do you see that?

8    A.  Which page are you referring?

9              THE COURT:  Point to the jury to the part you would

10   like to point them to.

11             MR. ROSENBAUM:  Tuesday 31 August 10, I guess, at the

12   very top, your Honor.

13             THE COURT:  So it's the second to last page, the third

14   or the second paragraph up under impression in all capital

15   letters colon, no acute injury.

16             MR. ROSENBAUM:  Yes.

17             THE COURT:  Another piece you would like to point the

18   jury to.

19             MR. ROSENBAUM:  1 of 2, August 31.

20             THE COURT:  Same page.

21             MR. ROSENBAUM:  31 August 2010, page 1 of 2, Tuesday,

22   31 August 10.  Can I show the witness.

23             THE COURT:  You can show her.  Look at the very first

24   page of the document so you don't mislead anybody.

25             MR. ROSENBAUM:  Four pages from the end.

C654FRA6                          Vuelvas – cross

1          THE COURT:  Look at the first page, the very first

2     page of the document.  All right.  We can have a sidebar.  I

3     don't want to have misleading impressions.

4          MR. ROSENBAUM:  1 of page 2 which is 4 pages from the

5     back.

6          THE COURT:  The record is going to note that the

7     subpoena was issued in 2010, certification of the subpoena

8     being complied with September 2010.  You can proceed.

9     BY MR. ROSENBAUM:

10    Q.  There are no fractures or soft tissue swelling.  The

11    orbital floors are intact.  There are no air-fluid levels in

12    the paranasal sinuses or mastoid air cells.  Page 1 of 2,

13    basically 4 pages from the end.  Impression, unremarkable

14    skull, do you see that?

15    A.  Are you referring to the x-rays; which one are you

16    referring to?

17         THE COURT:  Having the witness testify about the

18    content, you can certainly point it out to the jury.

19         MR. ROSENBAUM:  I will at the conclusion.

20    Q.  Is there any indication on the note that requires

21    Ms. Francois to come back for follow-up?

22         THE COURT:  Sustained.  You can't ask her about the

23    content of the medical history; that is exactly the point.

24         MR. ROSENBAUM:  No further questions.

25         THE COURT:  Anything else from the plaintiff.

C654FRA6                    Vuelvas - cross

1           MR. MYATT:  Your Honor, just one brief moment.

2    REDIRECT EXAMINATION

3    BY MR. MYATT:

4    Q.  Staying on that same page --

5           THE COURT:  I am going to have the same rule for you;

6    you can point the jury to whatever portion you want to that's

7    consistent with the scope of cross.  Don't ask the witness

8    about the particular contents.  She doesn't know about the

9    contents.  She is custodian of records.

10          MR. MYATT:  The first page of the x-rays, the history

11   indicates, plaintiff assaulted, left infrabital tenderness,

12   ecchymosis, blurred vision?

13          THE COURT:  Anything else.

14          MR. MYATT:  The page before that, page 2 of 2 of the

15   report from the medicine clinic, printed by Pillado, Martha on

16   31 August 2010, 9:30 a.m. according to the footer of the

17   document, towards the bottom third of the page, primary

18   diagnosis number 1, which is, intracranial injury of other

19   unspecified nature, without mention of open intracranial wound,

20   with state of consciousness unspecified, continuing, noting

21   requesting an x-ray and then a secondary diagnosis as well.

22          THE COURT:  Anything else.

23          MR. MYATT:  I would just direct the jury to the

24   comment on that same page, the bottom top third, which appears

25   to be notes from the interview.

C654FRA6                          Vuelvas - redirect

1              No further questions.

2              THE COURT:  Ms. Vuelvas, you may step down.

3              Thank you very much.

4              (Witness excused)

5              THE COURT:  Would plaintiff call its next witness.

6      Actually, it's 3:00; we can take a break.  Let's take a

7      ten-minute break, the mid-afternoon break then we will come

8      back and plaintiff will call its next witness.

9              (Recess)

10             THE COURT:  Would plaintiff call its next witness.

11             MR. MYATT:  Plaintiff calls Mr. Glemen Beriguette.  My

12     colleague Rachel Lavery will be handling the examination.

13      GLEMEN BERIGUETTE,

14          called as a witness by the Plaintiff,

15          having been duly sworn, testified as follows:

16     DIRECT EXAMINATION

17     BY MS. LAVERY:

18     Q.  My name is Rachel Lavery for plaintiff.  Can you state your

19     full name for the record.

20     A.  Glemen Beriguette.

21     Q.  Mr. Beriguette, do you live in New York City?

22     A.  Yes.

23     Q.  Where do you live?

24     A.  31-38 Bailey Avenue, apartment 2I, Bronx, New York 10463.

25     Q.  Are you currently employed?

C654FRA6                         Beriguette - direct

1    A.  Yes.

2    Q.  What is your current job?

3    A.  I am a doorman.

4    Q.  Where are you a doorman?

5    A.  At Briarcliff.

6    Q.  What is the address of Briarcliff?

7    A.  171 West 57th Street.

8    Q.  Which borough?

9    A.  Manhattan.

10   Q.  How long have you held the position of doorman at 171 West

11   57th Street?

12   A.  For about 10 years, 10, 11 years.

13   Q.  What are your job duties as a doorman?

14   A.  Log in the packages, open the door for our tenants and

15   residents and food deliveries, log them in in the book, pretty

16   much it.

17   Q.  When you say log them in the book what do you mean?

18   A.  We have to log in all the deliveries that come in and out

19   of the building.

20   Q.  Do you log anything else?

21   A.  Incidents that happen.

22   Q.  Do you log anything else?

23   A.  Incidents.

24   Q.  Do you log anything else besides deliveries and incidents?

25   A.  Like if a tenant calls down for a leak or something like

C654FRA6                          Beriguette - direct

1    that.

2    Q.  Do you log any other people who enter the building?

3    A.  They sign, yes, we have a log-in for any visitors and

4    people that work in the building, that they have to sign their

5    name.

6    Q.  Do you log people when they leave the building?

7    A.  We clock them out; when they come in they put their name,

8    the time they came in, what apartment they are going, we clock

9    them out when they leave.

10   Q.  What are your typical hours for your shift at work?

11   A.  2 to 10.

12   Q.  What are the typical days of your shift at work?

13   A.  Sunday to Thursday.

14   Q.  Have you worked 2 to 10 Sunday to Thursday the whole time

15   you worked at 171 West 57th Street?

16   A.  Yes, pretty much.

17   Q.  Does the schedule change at all?

18   A.  Rarely; could be maybe one day that one of our doormen call

19   sick, my co-workers and somebody had to fill in, but rarely it

20   does.

21             MR. ROSENBAUM:  May we approach.

22             THE COURT:  Is there an issue with the binder.

23             MR. ROSENBAUM:  Yes.

24             MS. LAVERY:  Yes.

25             THE COURT:  Approach.

C654FRA6                    Beriguette - direct

1          (At the sidebar)

2          THE COURT:  Are we just learning of the issue now?

3          MS. TREPELKOVA:  The binder was just handed to me 2

4     minutes before the witness took the stand.

5          THE COURT:  Let me have a copy.

6          MS. TREPELKOVA:  This binder behind tab 1 contains

7     unredacted copies of logbooks for the building.  We entered

8     into a confidentiality stipulation and proposed order on July

9     18, 2011, that without notice or a good faith application, we

10    could not disclose unredacted copies.  I have a redacted copy

11    in my exhibit binder if it helps.

12         THE COURT:  I am going to suggest I don't know where

13    the questioning is going to go, you can question the witness on

14    this document, but you cant admit this document into evidence.

15         MS. TREPELKOVA:  The stipulation prevents them even

16    showing it to anybody that's not the court, the defendants, the

17    plaintiff, if she signed the document as well, and counsel.

18    This was entered into prior to our disclosing --

19         THE COURT:  Was it so ordered by the court.

20         MS. TREPELKOVA:  It was by Judge Sweet.

21         THE COURT:  So under the terms of the stipulation,

22    under 4E, upon notice, which was not particularly great notice,

23    let's find out what your good faith basis application is as to

24    why you intend to show this witness this document.  Let me

25    preface that by saying that I don't think the jury ought to

C654FRA6                       Beriguette - direct

1    have access to who came and went in terms of an admitted

2    exhibit at particular times, but in terms of showing this

3    witness the document, what's the purpose.

4            MS. LAVERY:  The purpose is to authenticate the

5    document and the record of who came and went from the building,

6    including Ms. Francois at the time she entered and left as

7    recorded by the doormen.

8            THE COURT:  Any reason you can't use the redacted

9    version Ms. Trepelkova has.

10           MR. MYATT:  The plaintiff has no issue preparing a

11   redacted version to be submitted to the jury.  However, it's my

12   understanding the redacted version does not necessarily contain

13   all the information which is contained in here specifically

14   relevant to Ms. Francois.

15           THE COURT:  To put it in different words, counsel for

16   plaintiff and the defendants have a dispute as to which entries

17   should be redacted or not.

18           MR. MYATT:  I don't know that there is actually a

19   dispute.

20           MS. TREPELKOVA:  On what basis are you saying --

21           THE COURT:  Hold on.  Direct it to me.  Here is what I

22   want to do.  Number 1, these kinds of things ought to be raised

23   in advance and not coming up now.  That's plaintiff's error.

24   This is the kind of thing we should have dealt with this

25   morning at 9:00 or last night.  You folks meets and confer

C654FRA6                          Beriguette - direct

 1   about it.  Have you looked at Ms. Trepelkova's redacted

 2   version.

 3              MS. LAVERY:  I have not.

 4              THE COURT:  Question the witness on this but you can't

 5   admit it until you submit a redact version.  If she has already

 6   gone through the effort of doing one, I suggest you use hers.

 7              MS. TREPELKOVA:  They didn't object to my redacted

 8   copy when we submitted our proposed exhibit list.

 9              THE COURT:  You folks confer on whether her copy works

10   in terms of an admitted exhibit.  In the meantime, question the

11   witness on the document.  It has lots of other people on here;

12   there is no reason to have other people's names in front of the

13   jury.

14              MS. TREPELKOVA:  I would note my objection to having

15   him shown an unredacted copy per the terms of our stipulation.

16              THE COURT:  What's the prejudice.

17              MS. TREPELKOVA:  We stipulated.

18              THE COURT:  Upon notice.  What's the prejudice.  We

19   are now at the point, we are at trial.

20              MS. TREPELKOVA:  I don't know we are at notice.

21              MS. LAVERY:  I would like to note that he is the

22   doorman so he has seen this logbook.

23              THE COURT:  I don't think there is any prejudice.

24              You can proceed as indicated.

25              (Continued on next page)

C654FRA6                        Beriguette - direct

1              (In open court)

2              MS. LAVERY:  May I approach, your Honor.

3              THE COURT:  Yes.

4    BY MS. LAVERY:

5    Q.  Mr. Beriguette, I direct your attention to tab 1 of the

6    binder in front of you.

7              THE COURT:  This is marked for identification as what

8    exhibit.

9              MS. LAVERY:  Plaintiff Exhibit 6.

10             THE COURT:  Marked for identification only, Plaintiff

11   Exhibit 6, and it is described generally as a logbook.

12             MS. LAVERY:  Yes, it's a logbook.

13   Q.  Mr. Beriguette, what is this document you see?

14   A.  This is the logbook that we use for the people that come to

15   visit or work in the building, they got to sign their name when

16   they come in.

17   Q.  Are you familiar with the practice of your building keeping

18   logbooks?

19   A.  Yes.

20   Q.  When you are working as a doorman have you always required

21   visitors to sign the logbook?

22   A.  Yes.

23   Q.  Who keeps the logbook after it's filled out?

24   A.  After it's filled out, we give it to the super, we get a

25   new one, and he puts it in a safe place.

1    Q.  What is the super's name.

2    A.  Ulise Gonzalez.

3    Q.  Do you have any reason to believe this document Plaintiff

4    Exhibit 6 is not a fair and accurate copy of your building's

5    logbook?

6              MR. ROSENBAUM:  Objection.

7              THE COURT:  Overruled.

8    Q.  You may answer.

9    A.  Yes, I think it's pretty accurate.

10   Q.  You believe it's seem like a fair and accurate copy of the

11   logbook?

12   A.  Yes.

13   Q.  You may close the binder right now.  Mr. Beriguette, do you

14   know the names of all of the tenants in your building?

15   A.  Yeah.

16   Q.  Do you know the defendant Matthew Mazer?

17   A.  Yes.

18   Q.  How do you know Mr. Mazer?

19   A.  He is a resident in the building I work.

20   Q.  For how long have you known Mr. Mazer?

21   A.  Couldn't say exactly years but it's been more than probably

22   5, 6 years.

23   Q.  Does the building have a board that is in charge of it?

24   A.  Yes.

25   Q.  Is Mr. Mazer a member of the board of the building?

C654FRA6                        Beriquette - direct

1   A.  Yes.

2   Q.  Is he an officer on the board?

3   A.  What do you mean by officer?

4   Q.  Does he hold any special position on the board?

5   A.  He is president of the board.

6   Q.  How long has he been president of the board?

7           MR. ROSENBAUM:  Objection; relevancy.

8           THE COURT:  I agree; I don't see the relevance.  Why

9   don't you try to connect it up very quickly or move on.

10  Q.  How long has Mr. Mazer been president of the board?

11  A.  That I am not sure, you know.

12  Q.  How many other residents of the building are on the board?

13          MR. ROSENBAUM:  Objection.

14          THE COURT:  I am not sure I understand the relevance.

15  Make a proffer.

16          MS. LAVERY:  We want to establish Mr. Mazer's role in

17  the building.

18          THE COURT:  Move on.  Thank you.

19  Q.  You testified you generally work from 2 to 10 p.m.?

20  A.  Yes.

21  Q.  What time do you usually see Mr. Mazer in the lobby during

22  your shift?

23          MR. ROSENBAUM:  Time sequence we are talking about.

24          THE COURT:  Between 2002 and 2008, ask him if it

25  varied over that time period.

C654FRA6                          Beriguette – direct

1   Q.  Between 2002 and 2008, what time do you usually see

2   Mr. Mazer in the lobby of the building?

3   A.  Usually I think when he comes from work, during 6, 7:00.

4   Q.  There was any variation in that time?

5   A.  Could be.  I am really not sure.

6   Q.  Did he ever return home later than 7:00?

7           MR. ROSENBAUM:  Objection to the vagueness of these

8   questions.

9           THE COURT:  Overruled.

10  A.  Repeat that again.

11  Q.  Did you ever see Mr. Mazer return home later than 7:00?

12  A.  Could be probably 8.  I leave at 10:00, so.

13  Q.  Do you remember how often you would see him come home at

14  8:00?

15  A.  Couldn't remember.

16  Q.  Do you know defendant Sheryl Shade?

17  A.  Yes.

18  Q.  How do you know Ms. Shade?

19  A.  She is Mr. Mazer's wife.

20  Q.  Does she also live in the building?

21  A.  Yes.

22  Q.  Did you see Ms. Shade in the lobby generally the days that

23  you worked?

24  A.  Not that often.

25  Q.  Between 2002 and 2008?

C654FRA6                          Beriguette - direct

1   A.  Not often.

2   Q.  When you did see Ms. Shade approximately what time did you

3   see her?

4   A.  I would say probably between that time, you know, 7, 8:00.

5   Q.  Did you ever see her later than 8:00?

6   A.  Like I said before, I usually leave at 10 so, you know, I

7   wouldn't be able to answer that.

8   Q.  Did you ever see her between 8 and 10?

9   A.  Yeah, pretty much.

10  Q.  Did Mr. Mazer and Ms. Shade have any children?

11  A.  Yes.

12  Q.  How many children?

13  A.  One.

14  Q.  What is that child's name?

15  A.  Shade.

16  Q.  Is her last name Mazer?

17  A.  Yes.

18  Q.  Do you know how old Shade Mazer is?

19  A.  I am thinking 10, 11 years old, something like that.

20  Q.  Have you met Shade Mazer?

21  A.  Yes.

22  Q.  Have Mr. Mazer and Ms. Shade ever employed anyone in their

23  home?

24  A.  Yes.

25  Q.  For what kinds of jobs have they employed people?

C654FRA6                        Beriguette - direct

1    A.  Babysitter.

2    Q.  Have they employed anyone else other than a babysitter?

3    A.  Not to my knowledge.

4    Q.  How many different babysitters have Mr. Mazer and Ms. Shade

5    had in the time you have known them?

6    A.  One.  You mean in total?

7    Q.  In total, in the entire time you have known them, how many

8    babysitters have they had?

9    A.  Two.

10   Q.  Is anyone currently working for Mr. Mazer and Ms. Shade as

11   a babysitter?

12   A.  Yes.

13   Q.  Who is that?

14   A.  I know her by Sylvia.

15   Q.  Do you know her last name?

16   A.  No.

17   Q.  When did Sylvia start working there?

18   A.  I am really not sure.

19   Q.  Who worked for the Mazers as a nanny or a babysitter before

20   Sylvia?

21   A.  Pat.

22   Q.  Do you know Pat's last name?

23   A.  I don't know how to pronounce it.

24   Q.  Francois?

25   A.  Yes.

C654FRA6                        Beriguette - direct

1    Q.  Do you know Ms. Francois, the plaintiff in this case?

2    A.  Yes.

3    Q.  How do you know Ms. Francois?

4    A.  She worked for the Mazers.

5    Q.  When did you first meet Ms. Francois?

6    A.  Pretty much when they first moved in.

7    Q.  Do you remember what year that was?

8    A.  Yeah, not exactly.

9    Q.  How often did you see Ms. Francois in the building lobby?

10   A.  Pretty often.

11   Q.  When you say pretty often, how many times a week?

12   A.  4 times a week.

13   Q.  When you saw Ms. Francois was anyone usually with her?

14   A.  Yes.

15   Q.  Who was usually with her?

16   A.  Shade.

17   Q.  What times did you usually see Ms. Francois entering the

18   lobby?

19   A.  Between the hours of 8, 9:00, around there.

20   Q.  Those were the times you were seeing her leave the building

21   or enter the building?

22   A.  Come in, yeah.

23   Q.  Come in?

24   A.  Yeah.

25   Q.  Did you see her leave the building -- I have question.  Is

C654FRA6                        Beriguette - direct

1    it 8:00 a.m. or 8:00 p.m.?

2    A.  P.m.

3    Q.  When she entered the building at 8:00 p.m. or 9:00 p.m.,

4    did you see her leave the building again after that?

5    A.  Yeah.

6    Q.  But your shift usually ended by 10 p.m.?

7    A.  She used to leave around 9:30, somewhere like 9:45.

8    Q.  Was there a lot of variation in the times you saw

9    Ms. Francois?

10   A.  Not to my knowledge; she was pretty consistent, you know,

11   bring Shade home and go home.

12   Q.  Did you ever see Ms. Francois enter the building in the

13   early afternoon?

14   A.  Sometimes, yes.

15   Q.  What do you mean when you say sometimes?

16   A.  Maybe she will pick up Shade from school, I am really not

17   sure, she will bring her back I guess get her ready and take

18   her back to I guess her other, you know.

19   Q.  How often do you mean when you say sometimes; give me an

20   approximation?

21   A.  Maybe twice a week, something like that.

22   Q.  Mr. Beriguette, were you at work on December 18, 2008?

23   A.  Yes.

24   Q.  What hours did you work that day?

25   A.  My usual hours, 2 to 10.

C654FRA6                          Beriguette - direct

1    Q.  Where did you work your shift that day?

2    A.  At the door.

3    Q.  Did anything happen during your shift that day?

4    A.  Yes.

5    Q.  What happened during your shift that day?

6    A.  There was a little incident in the Mazers' apartment.

7    Q.  When did you first hear about this incident?

8    A.  One of the residents called down.

9            MR. ROSENBAUM:  Objection.

10           THE COURT:  Overruled.

11   Q.  When did you first here about this incident?

12   A.  One of the residents called down.

13   Q.  Which resident was that?

14   A.  Their neighbors, the Friedmans.

15   Q.  When you say their neighbors, you mean the Mazers'

16   neighbors?

17   A.  Yes.

18   Q.  When you say neighbors, where did they live in relation to

19   the Mazers?

20   A.  Right next door.

21   Q.  So, which member of the Friedman family called you?

22   A.  If I can remember correctly, called me not personally,

23   called down the lobby.

24   Q.  Who did this person call?

25   A.  Called down the lobby and I answered the phone.

C654FRA6                         Beriguette - direct

1    Q.  Do you remember who it was from the Friedman family who

2    called you?

3    A.  I think it was Mrs. Friedman.

4    Q.  What did Mrs. Friedman tell you?

5            MR. ROSENBAUM:  Objection.

6            THE COURT:  Overruled; it's not offered for the truth,

7    it's the fact that it was said.

8    Q.  You may answer.

9    A.  She said that we should go check, she hears like a

10   commotion next door and people screaming.

11   Q.  Did she say anything else to you?

12   A.  No.

13   Q.  Did anyone else call?

14   A.  Yeah.

15   Q.  Who else called?

16   A.  Following that call, 7A Green-Armytage.

17   Q.  Do you know who from the Green-Armytage family called?

18   A.  Yes, that he heard a commotion coming from above.

19   Q.  When you say above, where does the Green-Armytage family

20   live?

21   A.  He lives below the Mazers' apartment.

22   Q.  Which member of the Green-Armytage family called you?

23   A.  Mr. Green, Mr. Green-Armytage.

24   Q.  What did Mr. Green-Armytage say to you?

25           MR. ROSENBAUM:  Objection.

C654FRA6                         Beriguette - direct

1          THE COURT:  Overruled; it's not even hearsay.

2     A.  Pretty much that he heard a commotion.

3     Q.  Did he say anything else?

4     A.  Not that I recall.

5     Q.  Did you receive any other phone calls about the incident?

6     A.  No.

7     Q.  What did you do after these two phone calls?

8     A.  Well, my co-worker, somebody had to stay at the door, it

9     was me, my coworker went up to see what was going on.

10    Q.  Who was the coworker?

11    A.  Vincent Ayende.

12    Q.  What did you do while you were staying at the door?

13    A.  My job.

14    Q.  Did you try to contact anyone?

15    A.  Not until he came down and tell me what was the problem,

16    and he actually took the walkie-talkie and told me to call the

17    police, so I called the police.

18    Q.  Do you recall what time it was when Mr. Ayende went

19    upstairs?

20    A.  Not exactly.

21    Q.  Do you remember what time you called the police?

22    A.  No, not exactly.

23    Q.  What did you tell the police when you called?

24    A.  There was an altercation, Vinny told me there was like a

25    dispute and to call the cops.  That's what I told him and they

1    came.

2    Q.   Did you tell the cops anything else?

3    A.   I had no reason to.

4    Q.   Did you call the cops or 911 more than once?

5    A.   No, I think it was just once.

6    Q.   Turning back to before the police arrived, you testified

7    your co-worker Mr. Ayende went upstairs after you received

8    calls about a commotion in the Mazer apartment; do I have that

9    right?

10   A.   Yes.

11   Q.   When did Mr. Ayende come back downstairs?

12   A.   What do you mean exactly?

13   Q.   How many minutes later did Mr. Ayende come back downstairs?

14   A.   Could have been probably no more than 5 minutes, 2 minutes,

15   3 minutes.

16   Q.   Was anyone with him?

17   A.   Yeah.

18   Q.   Who was with Mr. Ayende?

19   A.   Pat.

20   Q.   That's Pat Francois?

21   A.   Yes.  Sorry.

22   Q.   What did Ms. Francois look like when she came downstairs?

23   A.   She was crying.  She was nervous.

24   Q.   What did she look like physically?

25   A.   What do you mean, in terms of what?

C654FRA6                        Beriguette - direct

1   Q.  Did you see any injuries on her body?

2   A.  Yes, she had a black eye.

3   Q.  Anything else?

4   A.  She had some bruises, I think her left hand.

5   Q.  You just testified that Ms. Francois came downstairs with a

6   black eye and a bruised hand.  Did Ms. Francois have those

7   injuries when she arrived at the building that day?

8   A.  No, not to my knowledge.

9   Q.  These injuries you just described to Ms. Francois, did they

10  appear to have just occurred?

11  A.  Possibly.

12  Q.  Did Ms. Francois look like she had just been in a fight

13  with somebody?

14          MR. ROSENBAUM:  Objection.

15          THE COURT:  Sustained.

16  A.  Possibly.

17          THE COURT:  The jury will disregard that testimony

18  because this witness not present during the alleged incident in

19  the apartment.

20  Q.  Mr. Beriguette, open your binder again and turn your

21  attention to tab 2, which we would like to mark for

22  identification as Plaintiff Exhibit 7.

23          Are you familiar with Exhibit 7?

24          MS. LAVERY:  These are 2 photographs.

25          THE COURT:  Don't describe them any further, see if he

C654FRA6                          Beriquette - direct

1    is familiar with these.

2               THE WITNESS:  Yes.

3    Q.  What is Exhibit 7?

4    A.  Looks like a black eye.

5               MR. ROSENBAUM:  Objection.

6               THE COURT:  Did you take these photographs?

7               THE WITNESS:  No.

8               THE COURT:  How are you going to proceed.

9    Q.  Were photographs of Ms. Francois taken on the night of

10   December 17?

11   A.  I think so.

12              THE COURT:  You think so or do you know so.

13              THE WITNESS:  Well, there were so many people down

14   there, there was a lot of police officers and EMS, and I had to

15   attend the door, so there were tenants coming in, and I

16   wouldn't be able to tell you.

17   Q.  Were you present in the lobby when photographs were taken?

18   A.  I was, yeah.

19              THE COURT:  Did you see photographs being taken?

20              THE WITNESS:  I didn't see any.

21   Q.  Are those photos consistent with how Ms. Francois looked

22   that night?

23              MR. ROSENBAUM:  Objection.

24              THE COURT:  He can say yes but you are not going to be

25   able to show them to the jury because it's unclear who took

C654FRA6                        Beriguette - direct

1   them or if they were taken at that time.

2            MS. LAVERY:  Can we discuss this briefly, your Honor.

3            THE COURT:  I try to eliminate sidebars.  I do my best

4   ladies and gentlemen of the jury.  Why don't you approach.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C65AAFRA7                         Beriguette – Direct

1          THE COURT:  Yes, why don't you approach.

2          (Sidebar)

3          MS. LAVERY:  Thanks, your Honor.  You are allowed to

4    be a photographer to then testify as to the identification of

5    photos so long as you can recognize and identity the object

6    depicted as a fair representation.  I can give you a few cites.

7          THE COURT:  Hand me what you've got.  Can you hold on

8    one second.

9          Scott, can you come here.  Can you pull up this cite

10   and just print it right here if you could.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C65AAFRA7                          Beriguette – Direct

1                    (In Open Court)

2                    Ladies and gentlemen of the jury, I apologize.

3                    (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C65AAFRA7                        Beriguette – Direct

1           (Sidebar)

2                MS. LAVERY:  While he hooks it up I can move on.

3                THE COURT:  Show her the cite.

4                MS. TREPELKOVA:  The actual photographer is actually

5      on the witness list so --

6                THE COURT:  Then it can be admitted subject to

7      connection.  That actually makes it a lot easier.  We can admit

8      the photographs now and it can be subject to connection.

9                MS. TREPELKOVA:  The photographer says that's not what

10     she looked like that night.

11               THE COURT:  Who is --

12               MS. TREPELKOVA:  Julissa Gonzalez.

13               THE COURT:  She said she didn't look like that that

14     night.

15               MS. LAVERY:  Mr. Beriguette's deposition said she did.

16               THE COURT:  I am going to read the case.

17               MS. LAVERY:  Do you want me to continue?

18               (Continued on next page)

19

20

21

22

23

24

25

1              (In Open Court)

2              THE COURT:  Ladies and gentlemen of the jury, I am

3     going to have something printed to actually look at so you'll

4     hear the printer going for a moment.  In the meantime

5     Ms. Lavery is going to move on to other questions.

6              Okay.  Go ahead and proceed please.

7     BY MS. LAVERY:

8     Q.  Mr. Beriguette, you previously testified you called the

9     police, correct?

10    A.  Yeah.

11    Q.  Did you police come to the building?

12    A.  Yeah.

13    Q.  And where was Ms. Francois when the police arrived?

14    A.  She was in the lobby.

15    Q.  Do you remember what time the police arrived?

16    A.  You mean after I called?

17    Q.  Yes.

18    A.  Minutes.  I mean one minute maybe, two minutes.

19    Q.  How many police officers arrived at the building?

20    A.  In the lobby alone there was like five or six of them.

21    There was some upstairs too in the Mr. Mazer's apartment.

22    Q.  Do you remember how many went upstairs?

23    A.  I think probably four maybe.

24    Q.  The police officers who went upstairs to the Mazer's

25    apartment how long were they there?

C65AAFRA7                         Beriguette - Direct

```
 1   A.  A good -- I couldn't say exactly but probably ten minutes.

 2            MR. ROSENBAUM:  Objection, your Honor.

 3            THE COURT:  Do you have an approximate number?  Don't

 4   speculate but can you give an approximate number if you've got

 5   knowledge.

 6   A.  12 minutes, 15 minutes.

 7   Q.  Did the police speak to Ms. Francois in the lobby?

 8   A.  Like I said, I was at the door.  They were talking, yeah.

 9   Q.  Did you hear what Ms. Francois told the police?

10   A.  Some of it.

11   Q.  What did you hear her tell the police?

12            THE COURT:  Hold on.

13            MR. ROSENBAUM:  Objection.

14            THE COURT:  Sustained.

15   Q.  What time did you leave work the evening of December 18,

16   2008?

17   A.  Ten o'clock.

18   Q.  Was Ms. Francois in the lobby of the building when you left

19   your shift?

20   A.  No, not at that time.

21   Q.  Had Ms. Francois left the building when you finished your

22   shift and went home?

23   A.  Yep.

24            MR. ROSENBAUM:  Objection, your Honor.

25            THE COURT:  Hold on.  Sustained.  Do you mean "went
```

1    home"?  It's confusing.  Did you say "she went home".

2    BY MS. LAVERY:

3    Q.  When Mr. Beriguette went home was Ms. Francois still in the

4    building.

5              THE COURT:  If you know.

6    A.  No, I don't think so.

7    Q.  Other than this trial, have you seen Ms. Francois after the

8    evening of December 18, 2008?

9    A.  No.

10   Q.  After the incident, when was the next time you saw

11   Mr. Mazer?

12   A.  About three, maybe four days after.

13   Q.  Did Mr. Mazer appear to have any injuries that next time

14   that you saw him?

15   A.  No, not -- I can't recall, actually.

16   Q.  Are you saying that he didn't have injuries or you don't

17   recall?

18   A.  I don't recall, yeah.

19   Q.  Can you please open up the binder in front of you to the

20   tab marked "deposition transcript".  Can you please look at

21   page 45 starting at line 21 of that page and going on to the

22   next page.

23   A.  45 you said?

24   Q.  Yes, the bottom of page 45 starting at line 21 reading onto

25   the next page through line five.  Just tell me when you are

C65AAFRA7                        Beriguette - Direct

1   done.  Does that refresh your recollection about whether you

2   saw any injuries on Mr. Mazer after that night?

3   A.  Yeah.

4   Q.  So what does it refresh your recollection as to?

5   A.  No, I didn't see any injuries.

6   Q.  Did you see any bruises on Mr. Mazer after that night?

7   A.  No.

8   Q.  You can close that binder.

9           MS. LAVERY:  Your Honor, that's all my questions save

10   for that issue.

11           THE COURT:  Hold on for one moment because I just want

12   to give counsel a chance to take a look at this case,

13   particularly, the portion that I've underlined.  Not you but to

14   Mr.  Rosenbaum and Ms. Trepelkova.

15           (Pause)

16           THE COURT:  Ladies and gentlemen of the jury, we do

17   our best to try to resolve evidentiary issues at the beginning

18   of the day before you folks come in.  They do arise and I

19   apologize for the fact that you have to spend your time waiting

20   for them to be dealt with.

21           (Pause)

22           THE COURT:  Okay.  Have you had a chance to review the

23   case?  All right.  Why don't you attempt to lay a foundation

24   for Exhibit 2 and we'll see.  Why don't you offer its admission

25   and we'll see what defendants have to say.

1           MS. LAVERY:  Okay.  I've already asked several of

2     these questions.

3           THE COURT:  Why don't you go through them again so I

4     can have them freshly in mind.

5     BY MS. LAVERY:

6     Q.  Mr. Beriguette, can you please open your binder again and

7     turn to Tab Two.  Who do you see in these photos?

8     A.  Pat.

9     Q.  Pat Francois?

10    A.  Yes.

11    Q.  Do these photos fairly and accurately portray how

12    Ms. Francois appeared the night of December 18?

13    A.  Yeah, pretty much.

14    Q.  Do her clothes she's wearing look like the clothes she was

15    wearing that night?

16    A.  Yeah, I think so, yeah.

17    Q.  Does the room in the background of the photos look

18    familiar?

19    A.  Yeah.

20    Q.  What is that room?

21    A.  Looks like the lobby.

22    Q.  So you think that these photos fairly and accurately

23    portray how Ms. Francois appeared the night of December 18?

24    A.  Yeah.

25          MS. LAVERY:  Your Honor, I'd like to move Plaintiff's

C65AAFRA7                         Beriguette - Direct

1    Exhibit 7 into evidence at this time.

2              THE COURT:  Defense.

3              MR. ROSENBAUM:  May I ask a question for voir dire?

4              MS. TREPELKOVA:  There's some writing on the

5    photographs.

6              THE COURT:  There's some writing on the upper

7    right-hand side of that document.  Is that yours?

8              THE WITNESS:  No.

9              THE COURT:  Do you recognize it?

10             THE WITNESS:  No.

11             THE COURT:  Do the defendants have an objection?

12             MR. ROSENBAUM:  Yes.

13             THE COURT:  Plaintiff's Exhibit 7 is admitted.

14             (Plaintiff's Exhibit 7 received in evidence)

15             THE COURT:  And in particular just so the record is

16   clear, I also want to make sure the record reflects the

17   Kleveland versus United States Add Marine contracting case 345

18   F.2d 134 Second Circuit Court of Appeals.

19             You may proceed.  It's admitted.

20             MS. LAVERY:  May I publish this exhibit to the jury,

21   your Honor?

22             THE COURT:  You may.

23             (Pause)

24             MS. LAVERY:  May I approach?

25             THE COURT:  You may.

C65AAFRA7                     Beriguette - Direct

1          (Pause)

2          THE COURT:  Just be clear that the Kleveland case is

3     spelled with a "K".

4     BY MS. LAVERY:

5     Q.  Mr. Beriguette, can you please look at Tab Two and look at

6     page one of that exhibit.  Can you describe what you see.

7     A.  Pat has a black eye.

8     Q.  Did Ms. Francois have a black eye like this when she

9     arrived at your building on December 18?

10    A.  No.

11    Q.  Mr. Beriguette, can you turn to page two of the exhibit?

12    Could you please tell me what you say see on page two.

13    A.  Bruise and her hand, her left hand.

14    Q.  Did Ms. Francois have a swollen hand like this when she

15    arrived at your building on December 18?

16    A.  No.

17         MS. LAVERY:  Turning over the witness, your Honor?

18         THE COURT:  All right.  Mr. Rosenbaum or

19    Ms. Trepelkova?

20    CROSS-EXAMINATION

21    BY MR. ROSENBAUM:

22    Q.  Mr. Beriguette, do you know how all those bruises occurred?

23    A.  No, sir.

24    Q.  You were not present, is that correct?

25    A.  No, sir.

C65AAFRA7                          Beriguette - Cross

```
 1   Q.  And are you sure the EMS came that night?
 2   A.  Yeah, I think so, yeah.
 3             MS. LAVERY:  Objection.
 4             THE COURT:  Overruled.
 5   Q.  Do you know what night Ms. Francois left with EMS?
 6             MS. LAVERY:  Objection.
 7             THE COURT:  Overruled.
 8   A.  Repeat that again.
 9   Q.  Did Ms. Francois go away with EMS people?
10   A.  I can't remember exactly.  I don't think so.  Wait a
11   minute.  No, I don't think so.
12   Q.  Did the EMS leave without Ms. Francois?
13   A.  To my knowledge, yeah.
14   Q.  Did you hear that Ms. Francois said she didn't need any
15   medical assistance?
16             THE COURT:  Sustained.
17   A.  Yeah, I think so.
18   Q.  How long do you know Mr. Mazer?
19   A.  Like I said before five, six years.
20   Q.  And have you ever spoken with your co-workers about
21   Mr. Mazer, just generally?
22   A.  Regarding?
23   Q.  Just general.
24   A.  Yeah.
25   Q.  Did you ever speak with your co-workers with reference to
```

C65AAFRA7                        Beriguette - Cross

1   Mr. Mazer's reputation for the truth and veracity?

2   A.  No, not regarding that.

3   Q.  I am sorry?

4   A.  No.

5   Q.  Do you know what he was thought of with regard to truth and

6   veracity?

7   A.  No, we didn't.

8   Q.  Did you find him to be a truthful person?

9   A.  Yeah, pretty much.

10              MR. ROSENBAUM:  No other questions.

11              THE COURT:  All right.  Thank you.  All right.

12  Anything on redirect?  It would have to be limited to the scope

13  of the cross.

14              MS. LAVERY:  Yes.

15              THE COURT:  Okay.

16  REDIRECT EXAMINATION

17  BY MS. LAVERY:

18  Q.  Mr. Beriguette, earlier you testified that the police came

19  to the building, correct?

20  A.  Yeah.

21  Q.  Mr. Rosenbaum was talking about EMS in the building.  Did

22  EMS emergency services ever show up at the building?

23  A.  Yeah, they showed up.

24  Q.  EMS and the police?

25  A.  If I could remember correctly they showed up, yeah.

C65AAFRA7                         Beriguette - Redirect

1   Q.  And what did Ms. Francois say to the police?

2              THE COURT:  No.  Sustained.

3              MR. ROSENBAUM:  Objection.

4              MS. LAVERY:  Mr. Rosenbaum --

5              THE COURT:  I sustained it for him as well.  Although

6   it got answered I sustained it.

7              MS. LAVERY:  No further questions, your Honor.

8              THE COURT:  Mr. Beriguette, thank you very much.  You

9   may step down.

10             All right.  Would the plaintiff like to call their

11  next witness please.

12             MR. MYATT:  Your Honor, plaintiff's next witness

13  Mr. Vincent Ayende.

14             THE COURT:  Mr. Ayende.

15             MR. MYATT:  And my colleague Ms. Seema Gupta will be

16  conducting that examination.

17   VINCENT AYENDE,

18        called as a witness by the Plaintiff,

19        having been duly sworn, testified as follows:

20  DIRECT EXAMINATION

21  BY MS. GUPTA:

22  Q.  Can you please state your full name for the record.

23  A.  Vincent Ayende.

24  Q.  Can you spell your last name?

25  A.  A-Y-E-N-D-E.

C65AAFRA7                          Ayende - Direct

1    Q.  Where do you live?

2    A.  1990 Lexington Avenue, New York, New York, zip code 10035.

3    Q.  Are you currently employed?

4    A.  Yes, I am.

5    Q.  By whom?

6    A.  Property Markets Group.

7    Q.  What is your job?

8    A.  Doorman.

9    Q.  Where are you a doorman?

10   A.  171 West 57th Street.

11   Q.  How long have you been a doorman at 171 West 57th Street?

12   A.  Seven and a half years now.

13   Q.  Seven and a half years?

14   A.  Yes.

15   Q.  Can you describe what being a doorman there entails?

16   A.  Besides opening the door, getting cabs, assisting with

17   luggage, groceries, food deliveries, garbage sometimes.

18   Q.  What year did you start working there?  Was it 2004?

19   A.  I know this October makes eight years.

20   Q.  Okay.  Mr. Ayende, what are your typical hours working as a

21   doorman there?

22   A.  1:30 to 9:30.

23   Q.  Does that change often?

24   A.  No.  I have had the same schedule now about four years,

25   maybe five years.

C65AAFRA7                          Ayende – Direct

1   Q.  Okay.  What days of the week are you working from 1:30 to

2   9:30?

3   A.  Tuesday through Saturday.

4   Q.  So you do not work Monday?

5   A.  Sunday or Monday.  Those are my days off.

6   Q.  Mr. Ayende, do you interact with the tenants as a doorman

7   of that building?

8   A.  Yes, day-to-day.

9   Q.  In what ways do you interact with them?

10  A.  Assisting them with getting cabs.  If I see them with

11  groceries, luggage, packages, delivering packages, stuff like

12  that.

13  Q.  Do you know the defendant Matthew Mazer?

14  A.  Yes, I do.

15  Q.  How do you know him?

16  A.  He lives in the buildings where I work.

17  Q.  How long have you known him?

18  A.  Since the beginning of my employment.

19  Q.  About how many interactions have you interacted with him

20  since you started working there in 2004?

21  A.  No different than any other person who lives in the

22  building.

23  Q.  Typically, what hours do you see him during your 1:30 to

24  9:30 shift?

25  A.  I would mostly evenings.

C65AAFRA7                          Ayende – Direct

1   Q.  Do you have any -- can you approximate the time?

2   A.  After five.

3   Q.  And can you give any further details?

4   A.  Comes home from the office, good evening.

5   Q.  Do you know the defendant Sheryl Shade?

6   A.  Yes, I do.

7   Q.  How do you know her?

8   A.  His wife, she lives in the building also.

9   Q.  And have you had any interactions with Ms. Shade in the

10  years that you've worked there?

11  A.  Yes.

12  Q.  How often do you see her?

13  A.  Also evenings.

14  Q.  Would you say you see her regularly in the evening?

15  A.  Yes.

16  Q.  And would you be able to approximate a time that you see

17  her?

18  A.  After five, usually, after hours.

19  Q.  Are you aware if the defendant's both Mazer and Sheryl

20  Shade have any children?

21  A.  Yes, I am.

22  Q.  How many children?

23  A.  One.

24  Q.  Do you know her name?

25  A.  Shade.

C65AAFRA7                           Ayende – Direct

1   Q.  Do you know if the defendant's employ any people in their

2   home?

3   A.  Yes.

4   Q.  Who do they employ?

5   A.  Babysitter.

6   Q.  Only babysitter?

7   A.  Yes.

8   Q.  Have you ever met any of the babysitters?

9   A.  Yes, I have.

10  Q.  Do you know Patricia Francois?

11  A.  Yes, I do.

12  Q.  How long have you known her?

13  A.  During the time she was working for the Mazers.

14  Q.  Do you remember when that was?

15  A.  Dates.

16  Q.  When did you meet her?

17  A.  She was already working when I got hired, so.

18  Q.  How often did you see Ms. Francois?

19  A.  During the day after Shade got out of school, play dates,

20  in and out of the building.

21  Q.  You said you saw her on play dates.

22  A.  Leaving the building and you know after school when Shade

23  gets out of school, stuff like that.

24  Q.  Did you ever see her with anyone other than Shade Mazer?

25  A.  No.

C65AAFRA7                        Ayende - Direct

1   Q.  And about what time day did you see her around?  What time

2   of day was that?

3   A.  Whatever time Shade gets out of school three, four, p.m.

4   Q.  Did you ever see her at any time later in your shift?

5   A.  Yes, going home.

6   Q.  Do you remember around what time that was?

7   A.  Different hours, depending on the Mazer's schedule.

8   Q.  So it varied?

9   A.  Yes, it does did.

10  Q.  You said you saw her everyday?

11  A.  For the most part.

12  Q.  Okay.  What -- how would you describe the interaction

13  between Ms. Mazer and Shade Mazer?

14  A.  Friendly.

15  Q.  Did you see how Ms. Francois treated Shade?

16          MR. ROSENBAUM:  Objection.

17          THE COURT:  Why don't you be more specific?

18  Q.  Can you describe the interactions other than friendly

19  with -- between Ms. Francois and Shade Mazer?

20  A.  My dealings with them were very brief so it was usually

21  just either coming in or going out and it was always friendly

22  in my opinion.

23  Q.  Mr. Ayende, I want to turn your attention to December 18,

24  2008.  Do you recall working on that evening?

25  A.  Yes, I do.

1   Q.  And what do you recall about that evening?

2   A.  Me and Alex were at the door.  He got a phone call from 8B

3   about a loud noise coming from across the hall 8B and was asked

4   if one of us could go upstairs and find out what was going on.

5   And I went upstairs and saw Mr. Mazer and Ms. Francois in the

6   hallway.

7   Q.  You said you and Alex.  Who is Alex?

8   A.  Alex is my co-worker, the other doorman on duty usually

9   when I worked.

10  Q.  What's his full name?  Do you know?

11  A.  Alex Beriguette.

12  Q.  You said you got a call from Apartment 8B?

13  A.  Yes.

14  Q.  Do you know what lives in Apartment 8B?

15  A.  Yes, I do.  Ivan and Eileen Friedman.

16  Q.  Do you know who, specifically, called from that apartment?

17  A.  Mrs.~Friedman.

18  Q.  Do you know where apartment 8B is in relation to where the

19  defendant's lives?

20  A.  In front.

21  Q.  You mean?

22  A.  They're in front of each other.

23  Q.  Did you receive any other calls that night?

24  A.  Mr. Green-Armytage had come down to talk to Alex about

25  noises and yelling coming from somewhere in the elevator shaft.

C65AAFRA7                        Ayende - Direct

1   Q.  Do you know where Mr. Green-Armytage lives?

2   A.  Underneath the Mazers.

3   Q.  So you said they reported a loud noise, is that correct?

4   A.  Yes.

5   Q.  And then what happened?

6   A.  Mr. Green went back upstairs and I went -- then the phone

7   call came after that and that's when I went upstairs.

8   Q.  So Mr. Green-Armytage came first and then the phone call

9   came?

10  A.  Yes.

11  Q.  And while you went upstairs what did Mr. Beriguette do?

12          THE COURT:  While he is upstairs?

13  Q.  Did he stay downstairs?

14  A.  No.  He remained in the lobby.

15  Q.  So you went upstairs.  How did you go upstairs?

16  A.  Through the front elevator.

17  Q.  And when you arrived, you eventually arrived on the

18  defendants' floor?

19  A.  Yes.

20  Q.  What did you see when you arrived there?

21  A.  Mr. Mazer was in his doorway and Ms. Francois was standing

22  in the corner holding her boots and I asked Ms. Francois to

23  accompany me downstairs, that the authorities were on their

24  way.

25  Q.  Did the defendant Matthew Mazer say anything to you?

C65AAFRA7                        Ayende - Direct

1   A.  He asked me to escort her out the building.

2   Q.  Did he say anything else?

3   A.  No.

4   Q.  And around what time was this?

5   A.  I can't recall that exactly.

6   Q.  Did you, in fact, escort Ms. Francois off the floor?

7   A.  Yes, I did.

8   Q.  And did Ms. Francois voluntarily go with you?

9   A.  Yes, she did.

10  Q.  And then what happened?

11  A.  We went down to the lobby.  Ms. Francois sat on the bench

12  and waited for the police to arrive.

13  Q.  How would you describe Ms. Francois' appearance when you

14  saw her?

15  A.  She had a bruise on one side of her face and her wrist was

16  black and blue.

17  Q.  How would you describe her emotional condition?

18  A.  Very nervous and hyper I would say and angry at the same

19  time.

20  Q.  Did you see her crying?

21          MR. ROSENBAUM:  Objection to leading, your Honor.

22          THE COURT:  Overruled.

23  A.  Yeah, after a point, yeah, she started crying when she was

24  explaining the story.

25  Q.  So you went downstairs to the lobby with Ms. Francois,

C65AAFRA7                    Ayende - Direct

1   correct?

2   A.  Yes.

3   Q.  Are you aware if the police came to the building that

4   night?

5   A.  Yes, they did.

6   Q.  Around what time?

7   A.  I would have to say about ten minutes after -- five or ten

8   minutes within after the phone call was made.

9   Q.  After what phone call was made?

10  A.  After the police were called.

11  Q.  Do you know who called the police?

12  A.  I believe Alex told me it was 8B.

13  Q.  Did you call the police?

14  A.  No.

15  Q.  How many police officers were there?

16  A.  I would say about six.  Six officers responded.

17  Q.  Did you speak with any of those officers?

18  A.  Yes, I did.

19  Q.  What did you tell them?

20  A.  They asked me what took place and I explained what I was

21  told by Ms. Francois and that's when they went upstairs to talk

22  with Mr. Mazer.

23  Q.  How many officers went upstairs to talk with Mr. Mazer?

24  A.  Four.

25  Q.  Do you know how many stayed -- did any stay in the lobby?

1   A.  Yes, two.

2   Q.  What -- did you see what those officers did in the lobby?

3   A.  They were talking with Ms. Francois about the incident.

4   Q.  Are you aware if charges were pressed begins Mr. Mazer that

5   night?

6   A.  No charges were pressed against Mr. Mazer.

7   Q.  So you saw Mr. Mazer that night, isn't that correct?

8   A.  Yes, I did.

9   Q.  What did he tell you again?

10  A.  To please escort Ms. Francois from the foyer from his

11  floor.

12  Q.  How far were you from Ms. Francois and Mr. Mazer when you

13  were in the elevator?

14  A.  I was only in the elevator with Ms. Francois.

15  Q.  How far were you from Ms. Francois when you entered the

16  floor?

17  A.  Ten feet.  It's not a big area.  Maybe ten feet.  As soon

18  as you get off the elevator it's to the right.

19  Q.  How far were you from Mr. Mazer?

20  A.  About the same.

21  Q.  Did he appear to have sustained any physical injuries when

22  you saw him?

23  A.  No.  I didn't see any visible.

24  Q.  In addition to telling you to escort Ms. Francois off the

25  floor, did he express any desire to seek medical attention?

C65AAFRA7                         Ayende - Direct

1    A.  He didn't ask me.

2    Q.  Did he express any desire to press charges against

3    Ms. Francois?

4            MR. ROSENBAUM:  Objection.

5            THE COURT:  If he stated it to the witness.

6    Q.  Did Mr. Mazer express any desire to you to press charges

7    against Ms. Francois?

8    A.  No, not to me.

9            MS. GUPTA:  Turnover the witness, your Honor.

10           THE COURT:  All right.  Mr. Rosenbaum Ms. Trepelkova?

11   CROSS-EXAMINATION

12   BY MR. ROSENBAUM:

13   Q.  When you went upstairs to Mr. Mazer's floor, did he tell

14   you that he had just assaulted -- that she'd assaulted

15   Mr. Mazer?

16   A.  That Ms. Francois --

17   Q.  That Ms. Francois assaulted Mr. Mazer?

18   A.  Yes.

19   Q.  Did he say to you that Ms. Francois assaulted me in front

20   of Ms. Francois?

21   A.  Yes.

22   Q.  Did Ms. Francois in any way say that's a lie or objected to

23   what he said?

24   A.  Yes.

25   Q.  What did she say?

C65AAFRA7                          Ayende - Cross

1   A.   She said it was the other way around.  He assaulted her.

2   Q.   Okay.  But you did not see it?

3   A.   No.

4   Q.   Did you know whether or not Mr. Mazer wore a neck brace a

5   few days after this incident?

6   A.   Yes.

7   Q.   Did he wear a neck brace?

8   A.   Yes.

9   Q.   How long did he wear that neck brace?

10  A.   I can't answer that precisely.

11  Q.   Do you know how many days after the incident took place

12  that he wore the neck brace?

13  A.   I don't recall exactly how long after.

14  Q.   Would it be less than a week?

15  A.   Yes.

16  Q.   Based on your recollection -- now, with reference to the

17  date the times that Ms. Francois brought the child home between

18  Tuesday and Friday?

19  A.   Yes.

20  Q.   Did you see what hours they would come in on your tour of

21  duty?

22  A.   They were different hours depending on Shade's schedule,

23  gymnastics and stuff like that, so pretty much they were

24  different.

25  Q.   But would it be basically between the hours of eight

C65AAFRA7                          Ayende - Cross

1    o'clock or about eight o'clock at the latest?

2    A.  Yes, sometimes nine.

3    Q.  Never past nine?

4    A.  Not to my recollection.

5    Q.  And would Ms. Francois bring the child back prior to eight

6    o'clock on different dates?

7    A.  Yes.

8    Q.  And what was the general time that Mr. Mazer came home

9    during the week?  Would it be about six o' clock at night?

10   A.  Sometimes, sometimes later.

11   Q.  Seven o'clock?

12   A.  Yes.

13   Q.  The most times between six and seven?

14   A.  Yes.

15   Q.  Would it be your recollection that Ms. Francois came back

16   to the house Mr. Mazer would, basically, be there at that time?

17   A.  Yes.

18   Q.  And with reference to Mrs. Mazer, would Mrs. Mazer, what

19   time would she usually come back at night?

20   A.  Around the same time.

21   Q.  Six, eight o'clock, six, seven o'clock?

22   A.  Yes.

23   Q.  And would she, generally, be home when Ms. Francois brought

24   the child back home?

25   A.  Yes.

C65AAFRA7                          Ayende - Cross

1   Q.  Now, when Ms. Francois would bring the child back home it

2   could be six, seven, eight o'clock at night, is that correct?

3   A.  Yes.

4   Q.  Would you have any recollection after she brought the child

5   home how soon after she brought the child home did she leave to

6   go back?

7   A.  Sometimes ten minutes, sometimes an hour.

8   Q.  All right.  So if she brought the child back home at six o'

9   clock she is going back home at seven about?

10  A.  Yes.

11          MS. GUPTA:  Objection.

12          THE COURT:  No.  Overruled.  Don't speculate but if

13  you know.  Go ahead.

14  BY MR. ROSENBAUM:

15  Q.  It could be ten or 15 minutes after six also?

16  A.  Yes.

17  Q.  Okay.  Would you say that most of the time Ms. Francois

18  left before eight o'clock at night?

19  A.  Yes.

20  Q.  Somewhere between six and eight?

21  A.  Yes, that's correct.

22  Q.  Do you know what time she would pick the child up during

23  the week?

24          MS. GUPTA:  Objection, your Honor.

25          THE COURT:  Sustained.  I think you mean at what time

C65AAFRA7                        Ayende – Cross

```
 1   did she come to the building?
 2              MR. ROSENBAUM:  That's fair.
 3   Q.  What time would Ms. Francois come to the building when the
 4   child was going to school?
 5   A.  Well, in the mornings I am not in the building.
 6   Q.  Okay.  You get on the job at what time?
 7   A.  1:30 p.m. so she's in school.
 8   Q.  And would she come home -- would she come to the house at
 9   three o'clock or would you know -- if you know -- did she go to
10   the school and pick the child up at three?
11   A.  When Shade finished school she was picked up by
12   Ms. Francois.
13   Q.  And so most of the time she would be picked up by
14   Ms. Francois probably at the end of school?
15              MS. GUPTA:  Objection, your Honor.
16              THE COURT:  He seems to have an understanding.  Don't
17   speculate but if that's your understanding, it's okay.
18   BY MR. ROSENBAUM:
19   Q.  And come back to the house anywhere between six to eight?
20   A.  Yes.
21   Q.  And that was at least between Tuesday, Wednesday, Thursday
22   and Friday?
23   A.  Yes.
24   Q.  Would that include the years 2008, 2007 and 2006?
25   A.  Yes.
```

C65AAFRA7                     Ayende - Cross

1   Q.  Do you recall whether or not the EMS people came to the
2   building the night of December 18?
3   A.  No, I don't.
4   Q.  You don't recall or they did not come either way?
5   A.  They did not come while I was in the building.
6   Q.  Were you in the building at about nine other ten o'clock at
7   night when this was going on or eight o'clock at night?
8   A.  Yes, I was.
9   Q.  You saw the police come?
10  A.  Yes, I did.
11  Q.  But you did not see the EMS, is that correct?
12  A.  No, I didn't.
13  Q.  When you came up to the floor on December 18 and Mr. Mazer
14  was in the hall and Ms. Francois was in the hall, did Mr. Mazer
15  in any way prevent Ms. Francois from leaving the floor?
16  A.  No.
17  Q.  Isn't it a fact that he said, take her out of the building?
18  A.  Yes, he did.
19  Q.  Did he seem upset?
20  A.  Yes.
21  Q.  Did he seem nervous?
22  A.  I don't know.
23  Q.  Now, you indicated that you knew Mr. Mazer from the time
24  you started working there, correct?
25  A.  Yes.

C65AAFRA7                          Ayende - Cross

1   Q.  Do you know about his reputation with reference to honesty
2   and veracity?
3   A.  I normally don't deal with people on a personal level so.
4   Q.  Did you discuss with your co-workers with reference to his
5   reputation?
6   A.  No.
7   Q.  Did you ever indicate any time, on any time when he was
8   dishonest in speaking to you?
9   A.  No.
10  Q.  And the same holds true with Mrs. Mazer?
11  A.  Yes.
12  Q.  Would you describe -- did you ever see Mr. Mazer and Shade
13  with him?
14  A.  Yes.
15  Q.  Could you describe that relationship based on your
16  observations?
17  A.  Regular family, nice.
18  Q.  Sorry?
19  A.  Regular family, nice people.
20  Q.  Same thing with Mrs --
21  A.  Yes.
22  Q.  And how would Shade react to Mr. Mazer when you saw them?
23  A.  Do you mean the night of the incident?
24  Q.  No.  No.  During the years that you saw them together?
25  A.  Oh, they were always together.

C65AAFRA7                     Ayende - Cross

```
1   Q.  Loving?

2   A.  Yes, very.

3   Q.  And the same thing is true with Mrs. Mazer?

4   A.  Yes.

5           MR. ROSENBAUM:  Thank you.

6           THE WITNESS:  You are welcome.

7           THE COURT:  All right.  Thank you.

8           Ms. Gupta, do you have anything else?

9           MS. GUPTA:  Yes.

10          THE COURT:  Make it very short and only limited to the

11  cross.

12          MS. GUPTA:  Yes, your Honor.  Redirect.

13  REDIRECT EXAMINATION

14  Q.  Mr. Ayende, you testified that you saw Mr. Mazer in a neck

15  brace?

16  A.  Yes.

17  Q.  Had you ever seen Mr. Mazer in a neck brace prior to

18  December 2008?

19  A.  Yes, I have.

20  Q.  When was that?

21  A.  I believe due to a surgery he had.

22  Q.  When was that?

23  A.  I don't know exact dates but it was maybe a year or two

24  before.  I don't know exact dates though.

25  Q.  So seeing him in a neck brace after December 18, 2008 was
```

C65AAFRA7                      Ayende - Redirect

1    not the first time you've seen him in a neck brace?

2    A.   That's correct.

3            MS. GUPTA:  No further questions, your Honor.

4            THE COURT:  You may step down, Mr. Ayende.  Thank you

5    very much.

6            Would the plaintiffs like to call their next witness

7    please.

8            MR. MYATT:  Your Honor, at this point the plaintiffs

9    would like to make a slight change in the order of witnesses

10   we've represented and would like to call Mr. Steven

11   Green-Armytage to the stand.  And my colleague Matthew Knox

12   will be handling this examination.

13           THE COURT:  While we're waiting, ladies and gentlemen

14   of the jury, we're going to go to five o'clock.  Is that all

15   right people, okay?  All right.  Thank you.

16    STEPHEN GREEN-ARMYTAGE,

17        called as a witness by the Plaintiff,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20           MR. KNOX:  Thank you, your Honor.  May I approach the

21   witness.

22           THE COURT:  You may.  Have you given one of those to

23   the counsel for defense?

24           MR. KNOX:  Yes, I have.

25           THE COURT:  Thank you.  Describe for the record what

1    you are handing over.

2              MR. KNOX:  Handling over to the witness a binder

3    containing one document which is a copy of his deposition.

4              You don't need to open it unless you are asked.

5    A.  All right.

6    Q.  Good afternoon, sir.  Can you please state your name for

7    the record?

8    A.  Steven Green-Armytage.

9    Q.  What is your current home address?

10   A.  171 West 57th Street.  I live in Apartment 7A.

11   Q.  How long have you lived at that address, sir?

12   A.  Oh, I would guess, certainly, more than 30 years, maybe 35.

13   Q.  And do you know the defendants in this action Matthew Mazer

14   and Sheryl Shade?

15   A.  I do, yes.

16   Q.  How do you know them?

17   A.  Well, from, mainly, from passing each other in the lobby or

18   in the elevator and they've always been just, you know, 15, 20

19   second conversations but, yes, I've known them for as long as

20   they've been in the building.

21   Q.  Is it fair to say that they are your neighbors?

22   A.  Yes.  They're upstairs neighbors immediately above me.

23   Q.  What apartment are you in?

24   A.  I am in 7A and they are in 8A.

25   Q.  Let me take you back to the night of December 18, 2008.

1   When did you -- were you home on that evening?

2   A.  Initially not.  I rode up in the elevator and when I --

3   there's a little lobby.  It's -- I don't know ten or 12 feet by

4   five or six feet that serves the A and B apartments and I came

5   up to the seventh floor.  And as I emerged from the elevator I

6   could hear raised voices coming from above and I could tell

7   that it was quite animated and I could hear the voice of a lady

8   who was clearly in distress.

9              MR. ROSENBAUM:  Objection, your Honor.

10             THE COURT:  Overruled.

11  Q.  Please continue?

12  A.  And I paused for a moment and went down -- to the elevator

13  in that building automatically goes back to the lobby after

14  it's delivered, whoever has taken it.  So I went back to the

15  lobby and rode the elevator back up and pressed eight and when

16  I reached the eight floor and the door opened Mr. Mazer was

17  standing there facing me and I said, Does anybody need a doctor

18  here?  I mean it was what I was hearing from below made that a

19  logical question.  Does anybody need a doctor here?  And he --

20  Q.  Go ahead.

21  A.  Yeah.  And I could see behind Mr. Mazer was pretty much

22  blocking my view but I could see behind him Patricia Francois

23  and she was, I could say, cowering in the furthest corner of

24  this little lobby.  And Mr. Mazer brushed aside the doctor

25  question and he just said, Get the doorman or Get a doorman.  I

C65AAFRA7                    Green-Armytage - Direct

1   forget what.  So I rode back down and spoke to Vincent who you

2   saw recently here and I said there is some violent activity

3   going on on the eight floor and he said the police have already

4   been summoned.

5           MR. ROSENBAUM:  Objection, your Honor.

6           THE COURT:  Overruled.

7   Q.  Did you say anything else to Mr. Mazer in addition to

8   ask --

9   A.  No.  I just saw that he was standing, you know, right by

10  the door and facing me and I could just glimpse behind him but

11  not long enough to get any impression other than the fact the

12  that she seemed frightened.

13  Q.  Were Mr. Mazer and Ms. Francois the only individuals --

14  A.  Correct.

15  Q.  -- on that floor that evening?

16  A.  Yeah.

17  Q.  You described Ms. Francois as cowering?

18  A.  That was -- she seemed like a frightened person in the

19  furthest possible corner.

20          MR. ROSENBAUM:  Objection.

21          THE COURT:  Overruled.  Go ahead.

22  A.  It's a small lobby but she was about as far away from him

23  as she could be.

24  Q.  At the time you arrived on the eighth floor did Mr. Mazer

25  appear to be injured in any way?

C65AAFRA7                         Green-Armytage - Direct

1   A.  No.  He seemed quite in command of everything.

2   Q.  Did he appear to need medical attention based on what you

3   observed?

4            MR. ROSENBAUM:  Objection, your Honor.

5            THE COURT:  Based on his observation, overruled.

6   A.  No.

7   Q.  Did he mention to you any injuries had he suffered during

8   the course of that night?

9   A.  No.  It was, literally, as far as I know all he said was he

10  said no to my suggestion of a doctor and he said -- he said,

11  Get a doorman.  He didn't say notify the doorman.  He just

12  said, Get a doorman.

13  Q.  Did he tell that you Ms. Francois had attacked him?

14  A.  No, he did not.

15           MR. ROSENBAUM:  Your Honor, that's just leading.

16  A.  He did not.

17           THE COURT:  Overruled.  Cat's out of the bag.

18  Q.  Are you aware that a counterclaim is being brought against

19  Ms. Francois in this action?

20  A.  That's news to me.  I was not aware, no.

21           MR. KNOX:  I'll pass the witness.

22           THE COURT:  All right.  Mr. Rosenbaum or Ms. Trip?

23           MR. ROSENBAUM:  Can we have a moment please?

24           (Pause)

25  CROSS-EXAMINATION

C65AAFRA7                        Green—Armytage — Cross

1   BY MR. ROSENBAUM:

2   Q.  Mr. Armytage?

3   A.  It is "Green—Armytage".

4   Q.  Excuse me, sir.  What kind of sounds were you hearing?

5   A.  From below when I paused on my first trip in the elevator I

6   was hearing the sound of something antagonistic.  I did -- it

7   wasn't easy to make out words but I did hear one sentence.  I

8   hear her say, "you are a very cruel man".

9   Q.  Where were you when you heard that?

10  A.  I was in this little lobby on the seventh floor and the

11  voices were coming from in a region above me on the eighth

12  floor.

13  Q.  You are in a lobby one floor down?

14  A.  Correct.

15  Q.  And there's a doorway and there is a floor and there's a

16  ceiling and you were able to hear that?

17  A.  Yes.  It was loud.  And you can, actually, you can hear

18  more.  You can't hear from apartment to apartment but the

19  elevator lobbies and the elevator itself you can hear voices.

20  And that was -- I heard enough during that time for me to feel

21  that I needed to intervene.

22  Q.  Did you feel there was physical abuse going on?

23  A.  I couldn't hear that.  I just heard the noise of a male

24  voice and a frightened female voice.

25  Q.  Did you have any idea that there was a physical fight going

1    on?

2    A.  I did not have any idea that there was personal injury but

3    there was the possibility of it because of the nature of what

4    was being --

5    Q.  Did there --

6            THE COURT:  Let my him finish.  "Because of the nature

7    of"?

8    A.  Yeah.  Whatever I was hearing, hearing a female voice in

9    clear distress was why I asked if a doctor was needed.

10   Q.  Sir, when you hear a person in distress is that consistent

11   with someone being abused?

12   A.  They can be physically abused or verbally abused.  I didn't

13   know which.  I assumed physically because this is why I asked

14   about the doctor.

15   Q.  Okay.  So you assumed that someone is being physically

16   abused when you heard that sound, right?

17   A.  Whatever I heard when I got off the elevator made me

18   extremely anxious.

19   Q.  But, sir, if you can answer my question, did you feel that

20   the -- because of this yelling and the screaming which you are

21   seeking of, did you feel that someone was being physically

22   abused?

23   A.  I guess I did.  Otherwise I would not have had this motion

24   of medical help being needed.

25   Q.  All right.

C65AAFRA7                           Green-Armytage - Cross

1   A.  But I didn't hear fists flying or anything like that.  I

2   did not hear anything like that.  It was all verbal.

3   Q.  Do you recall being asked this question on a deposition

4   page 28, line number 3.  Do you have that book in front of you?

5   A.  I guess so.  You said 28?

6   Q.  Yes, sir.

7   A.  Yeah verbal, yeah.

8   Q.  What kind of sounds were you hearing?

9   A.  Just verbal.

10  Q.  I wasn't hearing any sound of physical abuse but I

11  definitely heard voices that indicate extreme distress.

12  A.  Yeah.  Well, that's what I am saying.  I didn't hear

13  punches landing or somebody being knocked around but it just

14  seemed that she was frightened.

15  Q.  When you went upstairs and you saw the lady did she ask for

16  medical assistance?

17  A.  No, she was silent.

18  Q.  Did she ask for you to take her down?

19  A.  She was silent.

20  Q.  She didn't ask for any help from you, did she?

21  A.  She was silent.

22  Q.  Did you ask her if she needed --

23  A.  No.  I just --

24  Q.  Excuse me.  Let me just finish my question.  You spoke with

25  plaintiff's counsels before, the lawyers, before, haven't you?

C65AAFRA7                    Green—Armytage – Cross

1    A.   Sorry with?

2    Q.   The lawyers.

3    A.   Whoever I gave a deposition so there were two lawyers

4    present, yes.

5    Q.   You went into their office and you gave a --

6    A.   Correct.

7    Q.   Please, sir, let me finish.  You gave a deposition,

8    correct?

9    A.   Right.

10   Q.   They asked you questions?

11   A.   Uh-huh.

12   Q.   Before they asked you questions on the record did they have

13   a conference with you or conversation with you?

14   A.   No, I don't remember being briefed or anything just being

15   told the format.  I've never given a deposition before so they

16   told me that there would be questions and I should answer them

17   truthfully and they took me through it but I don't think they

18   tried to lead me or brief me in any way.

19   Q.   Did you see Mr. Mazer hit this lady any time that night?

20   A.   No.

21   Q.   Did you see Mr. Mazer anywhere near her when you came up

22   there?

23   A.   No, I explained the physical relationship between the two

24   of them.

25   Q.   Did you ask Ms. Francois, the lady up there, come with me

1    because you felt she was in danger?

2    A.  I did not.

3    Q.  Did you think she was in danger?

4    A.  It seemed that at the time I emerged from the elevator the

5    things had calmed down because he was -- they were not close to

6    each other.  He was by the door and she was in the far corner.

7    Q.  Wasn't she standing at one point?

8    A.  Sorry.

9    Q.  She was standing?

10   A.  Yep, she was upright.

11   Q.  What is the difference between standing and cowering?

12   A.  Body language suggested that she was frightened.

13   Q.  What did she do?

14   A.  She was just looked frightened and I only had a brief

15   glimpse but that was my impression.  You asked me and I am

16   telling you.

17          THE COURT:  Let him finish.

18   Q.  When you use used the word "cowering" what did you mean by

19   "cowering"?  Standing in the corner and slumping down?

20   A.  I don't know.  I mean it's a pretty good word.  I think it

21   described what I saw of a frightened person trying to be as far

22   away as possible.

23   Q.  Sir, if you believed that she was frightened and you

24   believed that she was far away as possible, why if you really

25   believed that, didn't you take her away with you for protecting

C65AAFRA7                    Green-Armytage - Cross

1   her?  Why didn't you do that sir?

2   A.  Well, I can't answer that.  Maybe it wouldn't have been

3   appropriate.

4   Q.  Maybe because you didn't see her cowering?

5   A.  No.  I disagree with you.

6   Q.  I disagree with you.

7           THE COURT:  Well, I move to strike that.

8           Look, ladies and gentlemen of the jury, only questions

9   should be asked by counsel.  Counsel should not make

10  statements.

11          Why don't you ask a question, Mr. Rosenbaum.

12  BY MR. ROSENBAUM:

13  Q.  Are you a gentleman, sir?

14          MR. KNOX:  Objection.

15          THE COURT:  Overruled.

16  Q.  It's a proper thing to help a lady in distress if you

17  believe the lady is in distress, correct, sir?

18  A.  That would have been appropriate.  I answered you before.

19  I said maybe that would have been appropriate.  That's not what

20  happened though.

21  Q.  You said it was you heard a person in distress?

22  A.  Right.

23  Q.  You see a person who you are assuming wants to get away

24  from this person being Mr. Mazer?

25  A.  Right.

1   Q.  You let the door close and you believe those two people

2   alone.  Is that what you did?

3   A.  That's what I did.

4   Q.  You are doing that, sir believing that this lady is in

5   distress and possibly going to be hurt by Mr. Mazer and you

6   leave her alone.  Is that your testimony?

7           MR. KNOX:  Objection.

8           THE COURT:  No.  Overruled.

9   Q.  I don't think it's a joke, sir.

10  A.  Well, it's strange that you are trying to imply that

11  because I went to get the doorman that I am some kind of an

12  ungentlemanly coward.  I am not happy with that.

13  Q.  You may be, sir.  That's not --

14          THE COURT:  Mr. Rosenbaum, out of line.  That comment

15  is struck from the record.

16  BY MR. ROSENBAUM:

17  Q.  Sir, I just want to get the parameters correct.  You are a

18  rather -- how tall are you, sir?

19  A.  About six one and a half.

20  Q.  And it was a small lady standing in front of you,

21  Ms. Francois?

22  A.  Ms. Francois is smaller than both myself and Mr. Mazer,

23  yes.

24  Q.  Didn't you testify that Mr. Mazer was standing in front of

25  Ms. Francois?

1  A.  He was standing right in front of the door to the elevator.

2  He, obviously, heard it coming up and --

3  Q.  I am just asking you where he was standing?

4          MR. KNOX:  Objection, your Honor.

5          THE COURT:  He was standing right in front of the

6  elevator.

7  Q.  And he is then between yourself and Ms. Francois?

8  A.  Correct.

9  Q.  So he is behind Ms. Francois?

10  A.  Sorry?

11  Q.  So, Ms. Francois is behind him?

12  A.  Yes.  He is not facing -- he is facing me.

13  Q.  Didn't you try to take an attempt to go and help or ask

14  Ms. Francois, Do you need help?

15  A.  Well, we have had this question and I've said, no, I

16  didn't.  Perhaps, I should have done but I didn't.

17  Q.  Perhaps, sir, it wasn't warranted.  Isn't that possible?

18  A.  It seemed that the situation --

19          THE COURT:  Let him answer the question.  I am not

20  sure that the jury heard the answer.  Why don't you answer the

21  question again.

22  Q.  If a person is cowering and appears to be frightened and

23  that person is behind someone and still cowering, according to

24  your testimony would it have been appropriate if you really

25  believed that she is frightened or cowering, wouldn't it have

C65AAFRA7                          Green—Armytage – Cross

1    been appropriate for you to go and ask her at least, do you

2    need assistance?

3            MR. KNOX:  Objection.

4    A.  Well, you've asked this question and I've said, perhaps, it

5    would have been but instead I went along with Mr. Mazer's

6    suggestion to get a doorman rather than become involve myself.

7    So I went down to get a doorman but which I wanted to be

8    involved enough to investigate.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C654FRA8                           Green—Armytage — cross

1   A.  Obviously if I had witnessed --

2   Q.  I have no question.

3          THE COURT:  He may have paused in his answer.

4   A.  If I had witnessed him in a threatening position towards

5   Ms. Francois, then I would have intervened, but that was not

6   the situation as I emerged from the elevator.

7   Q.  How much time elapsed from the time you had heard a person

8   in distress and the time that you came up to the floor?

9   A.  As long as it would take the elevator to go down to the

10  lobby by itself and for me to summon it back up again and if so

11  probably less than two minutes, somewhere between a minute and

12  two minutes I would guess.

13  Q.  During that minute and a half or two minutes, did the

14  distress seem to be over?

15  A.  I think possibly when Mr. Mazer heard the elevator coming

16  up, he reacted to the fact that there was a possibility of

17  somebody arriving.

18  Q.  Did you hear anyone screaming when the elevator was coming

19  up?

20  A.  I wouldn't say scream but clear distress.  As I say, I did

21  hear that one sentence which seemed to echo her feelings.

22  Q.  Did you come back with the doorman to see what occurred?

23  A.  When I spoke to the doorman, who was Vincent Ayende who was

24  here a moment ago, and I said that Mr. Mazer, I said there

25  seemed to be some violence on the 8th floor and Mr. Mazer asked

C654FRA8                         Green-Armytage - cross

1    for a doorman and Vincent said the police have been summoned,

2    so I felt that it was out of my hands at that point.

3    Q.  Did you ever tell the police that you thought this woman

4    was in distress?

5    A.  I didn't meet the police.

6    Q.  Did you know that the police came?

7    A.  I was confident that they would come and I subsequently

8    heard that they did come.

9    Q.  Did you go down to the lobby to speak to the police to tell

10   them what you heard or saw?

11   A.  No.

12            MR. ROSENBAUM:  Thank you.

13            THE COURT:  Mr. Knox, anything else.

14            MR. KNOX:  No further questions, your Honor.

15            THE COURT:  Thank you.  Mr. Green-Armytage, you may

16   step down.  Thank you very much.

17            (Witness excused)

18            THE COURT:  We have 10 minutes.  Is there any other

19   witness you can call we can start with.

20            MS. REARDEN:  Your Honor, the plaintiff calls Michael

21   Hertzberg to the stand.

22            THE COURT:  All right.  We are on 7 of 9 of the

23   plaintiff's witnesses, just to let you know, ladies and

24   gentlemen of the jury.

25            (Pause)

C654FRA8                            Green—Armytage — cross

1           THE COURT:  We are going to go for 10 minutes.  It's

2    very likely you will have to come back in the morning.  We

3    apologize.  That's the way these things go.

4     MICHAEL LEE HERTZBERG,

5          called as a witness by the Plaintiff,

6          having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MS. REARDEN:

9    Q.  Good afternoon, I am Jennifer Rearden; I represent the

10   plaintiff Pat Francois in this action.  Tell us where you live.

11   A.  171 West 57th Street, New York City.

12   Q.  How long have you lived there?

13   A.  Since approximately 1986.

14   Q.  Do you know the defendants Matthew Mazer and Sheryl Shade?

15   A.  I know who they are, I know that they are in the building

16   but I don't know them on any basis beyond that in any depth.

17   Q.  Did you know the Mazers before they moved into the

18   building?

19   A.  I did.

20   Q.  How did you know them?

21   A.  I was at a social function of a mutual friend and I met

22   them at that dinner.  That was the first and only time I saw

23   hem outside the building.

24   Q.  Do you know how the Mazers came to live in your building?

25   A.  Yes.  I believe that my wife who was also present at the

1    social function they were at heard from our mutual friend that

2    they were looking for an apartment.  My wife heard that at

3    about the time that we had knowledge --

4            MR. ROSENBAUM:  Hearsay.

5            THE COURT:  Sustained.

6    Q.  Did you play any role in connection with the Mazers moving

7    into the building or renovating an apartment in the building?

8    A.  My wife did vis-a-vis bringing them into the building and I

9    played a role in helping them get their apartment renovated,

10   approval for the renovation they were seeking when I was on the

11   board of directors and they were having an apparent problem

12   getting approval for some of the renovations they wanted --

13           MR. ROSENBAUM:  Objection; relevance.

14   A.  -- before they came into the building.

15           THE COURT:  I think that was setting some background.

16   Move on to the events in question.

17   Q.  Mr. Hertzberg, do you remember the night of December 18,

18   2008?

19   A.  I remember, I don't remember that specific date, but I

20   remember in about a week before Christmas in 2008, events

21   surrounding Mr. Mazer.

22   Q.  Do you recall what you were doing in the early evening on

23   this night?

24   A.  I do.

25   Q.  What were you doing?

C654FRA8                          Hertzberg – direct

A.   There was a meeting of owners of the building.  I am one of
the owners.

          MR. ROSENBAUM:  Objection.  I know where this is
going; I have to ask for sidebar.

          MS. REARDEN:  Your Honor, I already said I was not
going where Mr --

          THE COURT:  She is going to proceed very carefully.

          MR. ROSENBAUM:  Once it's said going to be late.

          THE COURT:  Ms. Rearden will is not going to deal with
the issues that you are suggesting.

          MR. ROSENBAUM:  Can I speak with counsel to make sure
we are on the same page.

          THE COURT:  The two of you confer, make sure you are
on the same page.

          (Pause)

          MR. ROSENBAUM:  Sidebar.

          MS. REARDEN:  I don't see the need.

          THE COURT:  Come over.

          (Continued on next page)

C654FRA8                           Hertzberg - direct

1            (At the sidebar)

2            THE COURT:  Tomorrow you have to confer, iron issues

3    out beforehand, the binders, the logbooks.

4            MS. REARDEN:  Your Honor, we talked about this in

5    front of the court.  I made a representation I was not going to

6    draw out the character evidence Mr. Rosenbaum is worried about.

7    I am trying to establish that he was in the building, he left

8    the building, when he came back in the building --

9            MR. ROSENBAUM:  He's talking about the meeting.

10           THE COURT:  Don't go into the meeting.

11           MR. MYATT:  The reason to go into the meeting, there

12   is a dispute as to whether Mr. Mazer was in the apartment when

13   Ms. Francois and Shade returned home.

14           THE COURT:  Ask him what time the meeting was.

15           MS. REARDEN:  I am trying to ask him about the

16   meeting.

17           THE COURT:  What's the character issue.

18           MR. ROSENBAUM:  I am thinking if she asks about a

19   meeting with the co-op board.

20           MR. MYATT:  It's not the same meeting.

21           MR. ROSENBAUM:  Anything about an argument or some

22   statements made at that meeting about Mr. Mazer.

23           MR. MYATT:  It's not this meeting.

24           THE COURT:  The time of evening this meeting occurred.

25           MS. REARDEN:  I can ask him without telling me

C654FRA8                          Hertzberg – direct

1    anything that happened with the meeting.

2              THE COURT:  Who was present and what time it occurred.

3              MR. ROSENBAUM:  I want to be cautious because if he is

4    going to volunteer he heard Mr. Mazer say something to another

5    person on the board which is a horrible statement, if he made

6    that statement, I am telling my adversary I will ask at that

7    point for a mistrial because it's a very very horrible

8    statement.

9              THE COURT:  We will take it step by step.

10             MR. ROSENBAUM:  That's where --

11             THE COURT:  I don't need to know.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

C654FRA8                         Hertzberg – direct

1              (In open court)

2              THE COURT:  Ms. Rearden, you have 4 minutes so end at

3    a logical point.

4    BY MS. REARDEN:

5    Q.  Mr. Hertzberg, do you recall what you were doing in the

6    early evening on the night in question?

7    A.  Yes, I do.

8    Q.  What was that?

9    A.  First I attended a meeting of owners in the building, then

10   I went out for dinner with my family, then I returned to the

11   building.

12   Q.  Can we put a timeframe on that.  Approximately what time

13   were you at the meeting in the building that you mentioned?

14   A.  I think the meeting may have started around 5 or 5:30.  It

15   didn't last all that long.  And then I would assume that, I

16   can't say how long we spent at dinner.

17   Q.  Who was at the meeting you attended?

18   A.  The meeting in the building?

19   Q.  Yes.

20   A.  Fellow owners.

21              MR. ROSENBAUM:  Objection; relevancy.

22              THE COURT:  I understand the relevance.  You may

23   proceed.  Overruled.

24   A.  Fellow owners and I am pretty certain which would have

25   included Mr. Mazer.

C654FRA8                          Hertzberg – direct

1    Q.  Did you see Mr. Mazer at the meeting?

2    A.  I am certain I did.

3    Q.  After the meeting what happened?

4    A.  After the meeting I went out for dinner with my wife and my

5    daughter.  We returned to the lobby of the building to go up to

6    our apartment.  When I entered the lobby, I saw a woman who I

7    now know to be Patricia Francois sort of slumped or sitting

8    with her back against the wall of one side of the lobby sitting

9    on a bench.  She was being attended to by some police officers

10   I don't know whether it was two or three police officers.  And

11   she appeared to me to be in distress.  When I saw her I

12   thought, well, this poor woman has been mugged or she has been

13   the victim of an accident.

14            MR. ROSENBAUM:  Objection.

15            THE COURT:  Overruled.

16   A.  That was my initial impression.

17   Q.  What was it specifically you noticed?

18   A.  I noticed that she had a bruise under one eye on her face,

19   her face appeared to be puffed up, and she seemed to be in pain

20   or in distress.

21            THE COURT:  Ms. Rearden, a logical place to stop.

22            MS. REARDEN:  That's fine, your Honor.

23            THE COURT:  Ladies and gentlemen, we are going to

24   break for the evening.  We will pick up again promptly at 9:30

25   tomorrow with testimony.  As I said, we are getting towards the

C654FRA8                          Hertzberg – direct

1    end of the plaintiff's case then we will go directly into the

2    defendants' case and proceed apace.

3              Again, don't talk with anybody, don't talk with each

4    other about anything that you have heard.  There is still a lot

5    more evidence to come in.  Don't talk about your impressions of

6    any of the evidence or witnesses or the lawyers.  Don't Google

7    anything, use any electronic media, no Tweeting, no Facebooking

8    relating to this matter of any kind.

9              With that said, see you tomorrow morning.

10             You can leave your documents on the chairs.  They will

11   be given to you as exhibits during your deliberations.  You can

12   leave them right there.

13             (Jury leaves courtroom)

14             THE COURT:  You may stand down, Mr. Hertzberg, and

15   once the jury leaves, we will have you leave the courtroom.

16             (Witness excused)

17             (Continued on next page)

18

19

20

21

22

23

24

25

C654FRA8

1          THE COURT:  Before you confer I want to make sure we

2     have done a couple of things on the record.  We had some

3     outstanding business that we heard about during the break that

4     I do want to put, not at a break, at sidebar, that I want to

5     put on the record that related to the Section 191 claim by

6     plaintiff, which is the 6th cause of action, the negligent

7     infliction of emotional distress claim, the 10th cause of

8     action, and the promissory estoppel claim, the 8th cause of

9     action.  Counsel have informed me that they do agree to a

10     stipulation of dismissal of those three counts.

11          MR. MYATT:  We do, your Honor.

12          THE COURT:  What else is there to raise if anything

13     before we break for the evening.

14          MR. ROSENBAUM:  Your Honor, we are trying to find out

15     if Mr. Gonzalez is going to be called by them.  He is on their

16     list.  So we have to know for scheduling purposes whether or

17     not they are going to call Mr. Gonzalez.  I am being told they

18     are not sure.

19          THE COURT:  If you want to call him for sure, issue a

20     trial subpoena just to protect yourself.  I think since

21     plaintiff had put them on their list, it's difficult to say

22     there's a lot of prejudice if you now want to call him.

23          MR. MYATT:  Your Honor, defendants actually did issue

24     a trial subpoena to Mr. Gonzalez.

25          THE COURT:  Hopefully he will show up at the right day

C654FRA8

1  and time.  What date did you issue it for.

2         MR. MYATT:  Your Honor, it was originally issued for

3  Monday and he's graciously agreed to carry over.

4         THE COURT:  I think it's very likely you are going to

5  get through a bunch of your witnesses well before then.

6         MR. MYATT:  This past Monday, both parties issued it

7  for Monday.

8         THE COURT:  You folks make whatever arrangements with

9  Mr. Gonzalez you see fit.  Plaintiff doesn't have any cause

10  issue why he wouldn't be able to testify for defendants.

11         MR. MYATT:  None, your Honor.

12         THE COURT:  Defendants can call him.

13         MR. MYATT:  Yes.

14         THE COURT:  Anything else.

15         MS. REARDEN:  There is an issue we discussed at

16  sidebar earlier today that I think I should gived the court a

17  brief update on.  Perhaps we should do it at sidebar.

18         THE COURT:  A health issue.

19         MS. REARDEN:  Yes.

20         THE COURT:  Let me also, before we do that, see if

21  there is anything apart from that that we need to deal with.

22  Anything else.  Let me also ask everybody to preview with each

23  other any interesting inflammatory issues, evidence that may

24  come up, before it comes up so he can eliminate as many of

25  these sidebars as possible.  Documents that are going to be

C654FRA8

1    admitted, they should be shared if at all possible in advance

2    or we should get a ruling on them if you know there is

3    something for sure that's going to come up and we need a ruling

4    because there is going to be an objection.

5            Rather than have a sidebar, let's have argument at 9

6    tomorrow morning.  Do it in advance.  The sidebars are killing

7    me because it's taking so much time from the jury.  We probably

8    spent all together over an hour of the jury's time between the

9    various sidebars I would say, all together, the last two days.

10   It seem likes a long time.  I am sure we will still have to

11   have some.  Let's minimize them to the extent reasonably

12   practicable.  Step over.  Let's talk but this issue.

13           (At the sidebar)

14           MS. REARDEN:  Your Honor, I understand the court's

15   clerk contacted the office of Dr. Kalinsky.

16           THE COURT:  We put in a call that otherwise you would

17   have put in had you had a cellphone.

18           MS. REARDEN:  I understand the doctor's office called

19   back and spoke with the court's clerk and said Dr. Kalinsky is

20   traveling, however, a nurse would be available if we thought it

21   would be helpful to speak to a nurse.  I want to find out, get

22   some guidance from your Honor how to proceed.  I think the

23   appropriate thing is to talk to my client about whether there

24   might be another treating physician to speak to the issue.

25           THE COURT:  Let's articulate clearly what the issue

C654FRA8

```
 1    is.  As I understand the issue, it is whether or not, really,
 2    you folks, if plaintiff is going to in any way assert or
 3    insinuate or infer that any memory issue is related to a
 4    medical condition, if the answer is no, then I would like to
 5    put on the record at the appropriate time if the defense would
 6    like, they may want to leave it alone right now, I will take
 7    direction from the defense, there is no memory issue related to
 8    a medical condition.  If the answer there is a memory issue
 9    related to a medical condition, then we need to understand that
10    and then we have to take it one step at a time depending on
11    what that information is.
12            MS. REARDEN:  Yes, your Honor.
13            THE COURT:  That's how I understand the issue.
14            MR. ROSENBAUM:  That's fair.
15            MS. REARDEN:  Yes.
16            THE COURT:  You should speak with your client.  You
17    can certainly confer with her about this issue in some detail.
18    And you and she will figure it out.  Speak to whomever you need
19    to speak to.  There may be an expert.  Every chemo is
20    different.  Certain kinds may or may not lead to memory issues.
21    Certain kinds may.  You need to find somebody who can speak to
22    you about that issue.  We have got until the end of the case to
23    resolve the issue.  Anything else.
24            MR. ROSENBAUM:  No, I am fine.  I am tired.
25            THE COURT:  Thank you.
```

C654FRA8

1                (In open court)

2                THE COURT:  We are going to adjourn for the evening.

3      We will pick up tomorrow morning with counsel and the clients

4      at 9:00 a.m. to deal with whatever needs to get dealt with at

5      that time.  Thank you.

6                (Trial adjourned to June 6, 2012, 9 a.m.)

7                                    -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX OF EXAMINATION

2    Examination of:                            Page

3    Cross By Mr. Rosenbaum . . . . . . . . . . . 210

4    Redirect By Ms. Rearden  . . . . . . . . . . 324

5    Cross By Mr. Rosenbaum . . . . . . . . . . . 333

6    Redirect By Ms. Rearden  . . . . . . . . . . 339

7    DR. GINO BLANCAFLOR

8    Direct By Mr. Myatt  . . . . . . . . . . . . 340

9    Cross By Mr. Rosenbaum . . . . . . . . . . . 345

10   VIANCA VUELVAS

11   Direct By Mr. Myatt  . . . . . . . . . . . . 353

12   Cross By Mr. Rosenbaum . . . . . . . . . . . 359

13   Redirect By Mr. Myatt  . . . . . . . . . . . 364

14   GLEMEN BERIGUETTE

15   Direct By Ms. Lavery . . . . . . . . . . . . 365

16   Cross By Mr. Rosenbaum . . . . . . . . . . . 395

17   Redirect By Ms. Lavery . . . . . . . . . . . 397

18   VINCENT AYENDE

19   Direct By Ms. Gupta  . . . . . . . . . . . . 398

20   Cross By Mr. Rosenbaum . . . . . . . . . . . 409

21   Redirect Q.  . . . . . . . . . . . . . . . . 416

22   STEPHEN GREEN-ARMYTAGE

23   Direct Mr. Knox  . . . . . . . . . . . . . . 417

24   Cross By Mr. Rosenbaum . . . . . . . . . . . 422

25   MICHAEL LEE HERTZBERG

```
1   Direct By Ms. Rearden  . . . . . . . . . . . . 433

2                     PLAINTIFF EXHIBITS

3   Exhibit No.                              Received

4    4   . . . . . . . . . . . . . . . . . . . . 343

5    5   . . . . . . . . . . . . . . . . . . . . 356

6    7   . . . . . . . . . . . . . . . . . . . . 394

7                     DEFENDANT EXHIBITS

8   Exhibit No.                              Received

9    A   . . . . . . . . . . . . . . . . . . . . 337

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```