C664FRA1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   PATRICIA FRANCOIS,
3              Plaintiff,

4        v.                          09CV3275(KBF)

5  MATTHEW MAZER and SHERYL SHADE,
              Defendants.
6  ------------------------------x

7                                  New York, N.Y.
                                   June 6, 2012
8                                  9:00 a.m.
   Before:
9
                   HON. KATHERINE B. FORREST
10
                                   District Judge
11
                       APPEARANCES
12
   GIBSON DUNN & CRUTCHER
13      Attorneys for Plaintiff
   JENNIFER H. REARDEN
14 JASON MYATT
   MATTHEW KNOX
15 RACHEL LAVERY
   SEEMA GUPTA
16 ILISSA SAMPLIN
   JENNIFER MACAULEY
17
   ROSENBAUM & ROSENBAUM
18      Attorneys for Defendants
   GEORGE DAVID ROSENBAUM
19 NATHALIE TREPELKOVA

20

21

22

23

24

25

C664FRA1

1          (Trial resumed; jury present)

2          THE COURT:  I have a couple of things I wanted to

3     raise this morning.  I want to make sure we had enough time to

4     deal with anything else you believe we should deal with.  My

5     law clerk will hand out now our draft, of the court's draft of

6     the verdict form.  You folks can look at that.  We will review

7     that at some point, perhaps later today or at the end of the

8     day or tomorrow morning.  We will figure out what timing works

9     based on the pace with which we proceed today.

10          We have the charges.  We are making some final changes

11     to the charges.  I am going to include, I debated whether to do

12     it here, it fits better in the charges, how to calculate

13     certain things.  After the charge itself, there will be

14     something that will say if you find there has been a breach of

15     contract for the following period of time, you need to deduct

16     from any damages the amount that she was actually paid, that

17     kind of thing.  I'm not sure that's clear.

18          Same thing in terms of quantum meruit, if you find

19     that, and it's clear that you can't do both, quantum meruit and

20     breach of contract, if you find by a preponderance of the

21     evidence proof of the quantum meruit claim, in calculating

22     damages you need to find that period of time what she is owed,

23     deduct the amount she has been paid.

24          So those kinds of things we are making the final

25     changes now then I will hand out the jury charges to you and we

C664FRA1

1    can go over those.

2            MS. REARDEN:  We do have a draft proposed verdict form

3    we are preparing to submit by noon today.  Would you like us to

4    to proceed with that plan.

5            THE COURT:  I do.  I may not use yours.  I do want to

6    see what input you have.  We pay do a combination of all 2 or

7    all 3.  So, give it to us, to defense, let's look at each

8    other's, see what the best verdict form is that will reflective

9    of what is presented to the jury and clearest to the jury.  So

10   we really have the substantive issue as to what should be

11   presented and then we have the how to make it as clear as

12   possible for these jurors.

13           MS. REARDEN:  Thank you.

14           MR. ROSENBAUM:  Your Honor, as I told you yesterday we

15   are not ready to do that.  I have assigned someone in my office

16   to prepare that verdict form.  I thank the court for the

17   opportunity.

18           THE COURT:  We will take that when it is prepared,

19   Mr. Rosenbaum.  The only issue that I see is one of timing.  I

20   don't know, one of my questions this morning right now, how

21   quickly things will proceed.  I would expect that the Mazers'

22   testimony would be lengthier than the witnesses yesterday

23   afternoon but hopefully not as lengthy as Ms. Francois.

24   Sufficient unto the day, I am going to ask you that.  That will

25   help determine whether or not we are going to be done tomorrow

C664FRA1

1   or whether we are going to be done Monday.

2              MR. ROSENBAUM:  Your Honor, our scheduling is a little

3   different.  For example, we have Dr. Lombardi coming here today

4   I believe at 3:00.  We do have other witnesses but I don't

5   think we will get to my clients today because we have to

6   accommodate somebody coming from Boston.

7              THE COURT:  I am not suggesting they need to come on a

8   particular day or at a particular time.  The order is up to

9   you.  I am thinking in terms of the ultimate number of hours

10  left, they are most likely to be longer; I assume Mr. Mazer

11  will be the longest of the remaining witnesses.

12             MR. ROSENBAUM:  Right, your Honor.

13             THE COURT:  Maybe not.

14             MR. ROSENBAUM:  There was a deposition yesterday in

15  the evening of Shade mazer.  Counsel and I got into a

16  conversation with respect to what was asked of her and what

17  events; in other words, the two areas in Brooklyn, two times

18  she went back to Brooklyn, the event of bucking bronco,

19  whatever it may be, the play dates, and that was it.

20             My understanding from the court is that when the child

21  gets on the stand, am I permitted to ask that child why didn't

22  you tell mom because I think, that's what I discussed with

23  counsel yesterday, why didn't you tell mom and have an answer

24  for whatever the reason is she didn't her mom or father on any

25  of those instances.  For me not to be able to ask why she

C664FRA1

1  didn't make this report, I think I am being precluded from

2  giving the jury a fair reason what was running through the

3  child's mind.

4      THE COURT:  Let me put it a little differently.  I

5  think this goes to not necessarily the child mind.  Really in

6  my view, we have to take it analytically in its purest form, it

7  goes to the damages claim, the compensatory damages in terms of

8  plaintiff's inability to find work later on, not for the period

9  of time when she was, potentially for the jury to determine,

10  incapacitated due to the injury, but at the point at which she

11  would otherwise have gone back to work for the Mazers had the

12  incident not occurred, was able to find work.  I think it's

13  relevant that she would have been fired if that's going to be

14  the testimony.

15      I guess one of the issues is is that a correct

16  articulation of the damages theory, then number 2, Mrs. Mazer

17  Shade, by that I am trying to use both names, I don't know

18  which one she uses more often, is she going to say I have

19  listened to my daughter, I would have fired her had I known.

20  If the answer is no, the answer is yes.

21      MR. ROSENBAUM:  Absolutely.

22      THE COURT:  Let's find out if the damages theory is

23  correct because it would be relevant to a future damages theory

24  based on whether or not she would have had employment from the

25  Mazers.  Maybe her damages theory is not that.

C664FRA1

1          MR. MYATT:  Your Honor, could we have a moment to

2     confer.

3          THE COURT:  Yes.  Let's put this to the side for the

4     moment; I don't think the daughter is going to be testifying

5     today.

6          MR. ROSENBAUM:  No.

7          THE COURT:  Let's put this to the side.  You folks

8     think about This.  It also goes to how we charge.  Let me

9     describe the variations on damages.  There is one damages

10    theory which says, you need to think about how to you want to

11    articulate it, once the battery occurred, there is no way in

12    the world she ever would have gone back to work, that's her

13    testimony, she wouldn't have done it, so we are not asking for

14    any damages for the future relating to the Mazers.  So there's

15    no future damages relating to the Mazers whatsoever; it doesn't

16    come into play.

17         There's another damages theory which says if the jury

18    is to find that the assault and battery did not occur, is there

19    any room left, or the battery didn't occur, any room left for

20    compensatory damages that would relate to any employment by the

21    Mazers.  If the answer to that is also analytically no, you are

22    going to have to work through whether or not it's relevant to

23    your damages theory and let the court know.  Let's put the

24    damages theory aside.

25         Mr. Rosenbaum, I want to make sure that I have a full

C664FRA1

1    list of the reasons you would want to offer that testimony.  I

2    keep talking about the damages issue.  For what other reason

3    would you offer this testimony.

4         MR. ROSENBAUM:  To make it sound credible.  Why, she

5    didn't tell her mother.

6         THE COURT:  What issue, what element of which cause of

7    action or defense, to the battery or the tort, it's not going

8    to be relevant to whether that occurred and to whether or not

9    she told her mother, didn't tell her mother, was told to keep

10   it secret or not.  You have established talking the witness

11   about whether or not she took her to Brooklyn.  You can ask the

12   daughter, certainly, did she take you to Brooklyn, and if the

13   daughter says yes, the jury can draw their credibility

14   determinations.

15        So the only part that I am drawing a line at, I am not

16   suggesting you can't do it, I am trying to figure out why you

17   want to do it, is the statement, I was told not to tell my

18   mother, because it doesn't go to the security of the child,

19   unless you want to make an argument that it does, or to the

20   feeding and the other job responsibilities that Ms. Francois

21   testified she was supposed to fulfill, unless you say it does.

22   But then I am struggling with why the secrets are relevant.  It

23   sounds to me an awful like you want to put the plaintiff on

24   trial for something that is not a cause of action.

25        MR. ROSENBAUM:  I have to approach it factually.  The

1    jury hears that the child has gone back to Brooklyn two times.

2            THE COURT:  I think you talked about three.

3            MR. ROSENBAUM:  An additional two times, that she

4    didn't go to play dates, that he was not candid with her mother

5    when she fell and got hurt with the bucking bronco with

6    Ms. Francois.  As a juror, I think they would probably say why

7    didn't the child tell the mother.

8            THE COURT:  But I don't know that they ever have to

9    get to whether she did or did not tell the mother.  That's

10   really my question.  You can certainly ask the child did the

11   events occur, no doubt about it.  Why do we need to get at

12   whether the child did or did not tell the mother.

13           MR. ROSENBAUM:  Because the mother would have fired

14   the child --

15           THE COURT:  Fired the nanny.

16           MR. ROSENBAUM:  I am sorry -- fired the nanny

17   immediately.

18           THE COURT:  So what.  You can't say that the tort

19   never would have occurred.  That's not a defense to the tort.

20   You can't say if you fired her in 2005, the tort wouldn't have

21   occurred.

22           MR. ROSENBAUM:  It gives a reason to the jury why the

23   mother was not told.

24           THE COURT:  It gives a reason to the jury why the

25   mother was not told.  The jury right now does not know the

C664FRA1

1   mother was not told because that was not elicited yesterday,

2   nor would I have allowed that to have been elicited yesterday;

3   so right now it's not really a relevant fact.  Keep going.

4           MR. ROSENBAUM:  If I keep it in reference to damages,

5   it's one thing.

6           THE COURT:  That I understand; that's for plaintiff to

7   make their argument as to whether it goes there or not.

8           MR. ROSENBAUM:  It also goes to the credibility of the

9   child's testimony.

10          THE COURT:  How.

11          MR. ROSENBAUM:  Because if the child is told don't

12  tell your mom, there is a reason she is not telling her mom.

13          THE COURT:  What I am saying is the child's

14  credibility on that issue is not currently in issue because it

15  was not elicited yesterday, nor would I have allowed that to

16  have been elicited yesterday, that she didn't tell her mom, so

17  we are not having a battle of yes, I did, no, I didn't.  That's

18  not currently at issue.  So there is no credibility issue.  The

19  only credibility issue will be did the incident happen.  We

20  need to separate out, did it happen from did I did tell my mom.

21          There is also of course underlying this 403 issue,

22  which is even we find it's not relevant to damages because

23  their theory is otherwise, the idea of the secrets I may find

24  is relevant but under 403 it's still unduly prejudicial and

25  confusing to the jury as to what's going and why they are being

C664FRA1

1  offered this testimony.

2       MR. ROSENBAUM:  The reason I didn't ask the nanny

3  yesterday was only because your prohibited me from doing so.

4       THE COURT:  I don't find it relevant; I am still

5  struggling with it.

6       MR. ROSENBAUM:  I took exception to that ruling

7  because I was unable to cross-examine the nanny with respect to

8  those issues.

9       THE COURT:  Fine.  I am still trying to figure out

10  what is the relevance of the issues, putting aside damages,

11  because right now there is no testimony that the child did or

12  did not tell the mother.  For all the jury knows, the mother

13  knew about the three trips to Brooklyn or didn't know about

14  them, putting aside the firing which goes to the damages issue,

15  that I get.  Let's assume for the moment they say it's not

16  going to go to damages.

17       MR. ROSENBAUM:  That is an assumption.

18       THE COURT:  I don't know.  I think there are multiple

19  ways by which you are able as defendants and counterclaim

20  plaintiffs here to attack credibility in terms of hours worked,

21  in terms of testimony that you will elicit from either the

22  daughter or the father, in terms of what occurred on December

23  18 where there will be, I assume, I don't know, a variation in

24  the factual presentation.  The jury will choose as to whom they

25  believe.  There is going to be a lot of credibility

1    opportunity.

2              I don't see this one as the same.  I understand that

3    you folks believe it's an important point in terms of the

4    overall relationship, but I don't see it as relevant to a

5    wage-and-hour claim under New York labor law, the FLSA, or

6    whether the battery and assault occurred on December 18, 2008.

7    That's where I am coming from.

8              MR. ROSENBAUM:  I will reserve anything else to say at

9    this point to see what the court rules.

10             THE COURT:  I think if it goes to the damages theory,

11   then this other conversation is rather academic because then it

12   is about whether or not you are suggesting there should be any

13   future damages relating to the Mazers.

14             Let's hold on that for now.

15             MR. ROSENBAUM:  Mr. Hertzberg, who is testifying now,

16   is going to testify about observations, what he saw that night,

17   the condition of Ms. Francois.

18             THE COURT:  Is he the fellow who took her to the

19   emergency room.

20             MR. ROSENBAUM:  Yes.  I can understand where it goes

21   thereafter.  If he says again what she looked like, it becomes

22   cumulative.

23             THE COURT:  It depends whether or not you are going to

24   call Mr. Gonzalez who says she didn't look like that, because

25   then it's corroborative.

C664FRA1

1          MR. ROSENBAUM:  I don't know if they are going to call

2     Mr. Gonzalez.

3          THE COURT:  Is anybody going call Mr. Gonzalez.

4          MR. MYATT:  Plaintiff will not call Mr. Gonzalez.

5          THE COURT:  Defense.

6          MR. ROSENBAUM:  Yes.

7          THE COURT:  Then it's corroborative.  Let me be clear

8     because this occurred at sidebar.  Yesterday at sidebar there

9     was a proffer that Mr. Gonzalez will say that Ms. Francois did

10    not look like the photographs when he saw her I assume in the

11    lobby at the same time that Mr. Beriguette saw her.  Is that

12    approximately correct.

13         MR. ROSENBAUM:  Yes.

14         THE COURT:  In that case, if we are going to have one

15    doorman who says that is what she looked like, then somebody

16    else say that's not what she looked like, then Mr. Hertzberg

17    who's going to say she looked like that or not like that or

18    something else, will corroborate one or the other and/or he

19    will offer a third version which itself may provide information

20    to the jury.

21         MR. ROSENBAUM:  There were two doormen who already

22    testified, now a third person testifying as to what she looked

23    like at that point.

24         THE COURT:  He is not a doorman; he's a resident.

25         MR. ROSENBAUM:  He is not a doorman.

C664FRA1

         THE COURT:  Right.  If you don't call Mr. Gonzalez, I
don't know.  The central issue in the case is whether or not,
it shouldn't be whether or not really although it seems to be
an incident occurred which caused facial swelling and an
abrasion to the hand.  That seems to me like a fool's errand,
because nobody believes that we are involved in Fight Club
here.  Nobody reasonably can believe that we are involved in a
situation where somebody punched himself.

         So talking about what the person looked like, you make
your own decision, the issue should be who did what to whom and
whether or not it occurred because Ms. Francois was the
aggressor, although there is no self-defense asserted defense,
or whether or not Mr. Mazer was the aggressor or whether or not
they were both aggressors.  So the physical evidence at the end
of the day, suggesting it didn't happen, is not particularly
truthful.  I understand you don't like because it could be
prejudicial in terms of if they find there was an assault and a
battery, it could --

         MR. ROSENBAUM:  I think the counterclaim is consistent
with a self-defense position.

         THE COURT:  You didn't assert a self-defense defense.

         MR. ROSENBAUM:  No, but we did say, we spelled out
that she was the assailant.

         THE COURT:  That's fine.  You are saying that she was
the aggressor.  That's different from saying I had hit her in

1    self-defense.  Being the aggressor is somebody who doesn't land

2    a punch.

3              MS. TREPELKOVA:  We are not making self-defense.

4              THE COURT:  All right.  In any event, Mr. Hertzberg

5    will be, based on the fact that this is an issue in the case

6    for whatever reason, it is not for me to make tactical

7    determinations of what should or shouldn't be offered, he will

8    be allowed to testify.  Mr. Gonzalez will give his version of

9    the events.  The jury will make its determination as to what

10   they believe happened.  We will proceed from there.  OK.

11             A couple other things.  One thing I want to ask has to

12   do with any other issues that you folks expect to occur today

13   that you know are likely to occur.  When I say issue, you know

14   what I mean, the kinds of things that have caused us to go to

15   sidebar.  I would like to head some of those off at the pass.

16             MR. MYATT:  Your Honor, if I might, in light of the

17   fact plaintiffs don't currently know who's going to be

18   testifying for defendants today, it's difficult to address

19   that.

20             THE COURT:  There are only 8 witnesses, now 9 with Mr.

21   Gonzalez.  So, of the 9 do you anticipate any issues; there are

22   not that many.

23             MR. MYATT:  Yes.  We have issues with Dr. Lombardi.

24             THE COURT:  You have been told he is going to testify

25   at 3.  What's the issue.

1    MR. MYATT:  The issue is, as we previously discussed,

2  that he is being offered, scope of his testimony.

3    THE COURT:  We have already discussed that before on

4  the record on the first day of trial.  This is the issue about

5  he is an infectious disease practitioner who will say that he

6  examined the defendant Mr. Mazer some period of time after the

7  incident, saw certain things, referred him to among others a

8  cardiologist, that he and the cardiologist, I believe the

9  testimony was proffered, are going to say jointly diagnosed the

10  defendant, which you can cross-examine the infectious disease

11  doctor to your heart's content about.  That was the proffer

12  from Mr. Rosenbaum.  So he is not going to be offering it as

13  expert testimony.  He is going to be offering it as I saw him,

14  I examined him, I diagnosed him.

15    He can say I referred him to the world's best

16  cardiologist.  What he can't say is the cardiologist told me,

17  because that's being offered for the truth as to the reason why

18  he may have developed a cardiac condition.  He can say, I

19  participated personally in the diagnosis of that individual and

20  in my professional diagnostic view, the reason for the whatever

21  was, for the cardiac condition was due to the incident.  Was

22  that inconsistent with anything that you ever learned

23  otherwise, which captures really the conversation with the

24  doctor, answer I assume no.

25    You can cross-examine him on did you perform any

1    cardiac tests.  You can perform whatever cross-examination you

2    would like to try to undermine that.

3         MR. MYATT:  Your Honor, although he has not been

4    retained as an expert, in light of the fact that he's being

5    offered to give medical testimony as to Mr. Mazer's physical

6    condition, he did provide an expert opinion.

7         THE COURT:  Did he physically examine the defendant.

8         MR. ROSENBAUM:  Yes.

9         THE COURT:  He is not being offered as an expert.  I

10   will preclude expert testimony.  He will be offered for what he

11   saw, heard, felt, touch from the defendant personally.

12        MR. MYATT:  Is he going to be allowed to testify that

13   the stress, the supposed stress which supposedly caused the

14   cardiac event, was caused by the assault by Ms. Francois.

15        THE COURT:  He can say I diagnosed him with a cardiac

16   condition.  He is an infectious disease guy; you will

17   cross-examine him on that.  The jury will do whatever they

18   want.  That's your cross-examination.  It's not for me to

19   preclude.  He can say I examined him and believe whatever.

20            Consistent with what came in yesterday, doctors take

21   histories of patients.  Yesterday we had testimony from

22   Dr. Ginno Blancaflor who said he found it relevant to his

23   diagnosis that he understands the parameters of when the

24   alleged physical symptoms were, how they occurred.  What's good

25   for the goose is good for gander.

1      MR. MYATT:  I am not objecting necessarily.  I think

2  we need to establish whether or not that information was

3  relevant to the diagnosis.

4      THE COURT:  You can do that.

5      MR. MYATT:  My question is that there is a difference

6  between then opining on the ultimate issue of causation that

7  the stress was caused by an assault by Mr. Francois.

8      THE COURT:  He is going to say as I understand the

9  testimony, if it turns out otherwise, it will turn out

10  otherwise.  I am a doctor in X, or maybe he won't be elicited

11  on direct I am a doctor.  You can elicit on cross whatever he

12  is a doctor in.  I diagnosed him.  My diagnosis was based on

13  the following things.  Perfectly appropriate.  Not expert

14  testimony.  Based on his expertise in the area, based on his

15  examination of the defendant.  I don't know that to be expert.

16      Even so, you deposed him.  He has not put in an expert

17  report.  He couldn't say I have examined a number of people who

18  have stressful events occur and I am aware that stressful

19  events can generally result in cardiac conditions.  He can't

20  say that.  That's expert testimony.  He can't say I have met

21  with 27 people who had assaults occur.

22      MR. MYATT:  Yes, your Honor.

23      MR. ROSENBAUM:  Your Honor, the emergency room doctor.

24      THE COURT:  I am with you, Mr. Rosenbaum.

25      MR. MYATT:  A very particular issue, was it caused by

C664FRA1

1    Ms. Francois' assault.

2              THE COURT:  I understand.

3              MR. MYATT:  The history I understand.  If he is going

4    to opine as to the causal relationship between --

5              THE COURT:  Yesterday the testimony was, which we

6    allowed, that Dr. Ginno Blancaflor said when he was asked

7    specifically the question on cross-examination, did you need

8    that history for your diagnosis, and he said yes, all of the

9    information is relevant to my diagnosis.  He said that.  It was

10   helpful then, maybe, maybe not, you know.

11             MR. MYATT:  Perhaps I am being inarticulate.

12             THE COURT:  You are not being inarticulate.  I

13   understand where you're coming from.  I am going to draw a

14   direct parallel between the two different types of testimony.

15   If I allowed it yesterday with one doctor who was helpful, I am

16   going to allow it today with another doctor who may not be so

17   helpful.

18             MR. MYATT:  There was no opinion yesterday that

19   Ms. Francois' injuries were a result of Mr. Mazer striking her.

20             THE COURT:  No.  I asked a question myself.  I said

21   were her injuries consistent with a physical altercation and he

22   answered yes.  I did not say were her injuries consistent with

23   Mr. Mazer hitting her.  That obviously he can't know.  I think

24   he opined that he had no idea what actually happened.  He

25   stated, not opined.

1          Mr. Rosenbaum, when you are examining Dr. Lombardi,

2     you will do so I am certain consistent with what we have been

3     talking about.  You need to stay within the boundaries of his

4     physical examination of the defendant as well as what we have

5     talked about which is what he found relevant to his diagnostic

6     determination.  He should not opine apart from providing what

7     he found relevant to his diagnostic determination.

8          MR. ROSENBAUM:  Yes.  I want to make an observation.

9          THE COURT:  I have ruled.  If we are going to pile on,

10     no need.  We are not going to reargue this one.  Another one.

11          MR. MYATT:  Dr. Lombardi.

12          THE COURT:  Something new.  Don't reargue.

13          MR. MYATT:  The medical records themselves contain a

14     large number of reports from other doctors which are hearsay.

15     I have not seen or heard anything about someone coming in the

16     authenticate those records.

17          THE COURT:  Are they in Dr. Lombardi's records.

18          MR. MYATT:  They are.

19          THE COURT:  Dr. Lombardi, I would assume as a doctor

20     sometimes does, periodically requests records from other

21     doctors in connection with their diagnosis.  There are

22     physicians all the time who say make sure you have the

23     radiologist send a report to me.  That then becomes part of the

24     records.  If a custodian of records was asked to provide the

25     file records of a physician, they would provide whatever is in

1  that file, not extracting from that file certain things like

2  radiology reports that are received.

3        I understand what you are saying.  Sufficient unto the

4  day.  We have to see how it's authenticated.  I am sure

5  Mr. Rosenbaum or Ms. Trepelkova will authenticate it as they

6  see fit.  We will determine before it's published to the jury

7  whether or not they have laid a proper foundation for all

8  aspects.  As with yesterday, we found that a custodian of

9  records was entitled to put something in.  It then came in as a

10  business record.  It then is under a hearsay exception and it

11  comes in for the truth.

12        If Dr. Lombardi can do that, then it would come in for

13  the truth.  There were statements in the Kings County Hospital

14  records that one might have preferred not to have been there.

15  They came in through the custodian of records.

16        MR. MYATT:  Within records that were maintained and

17  created by Kings County.

18        THE COURT:  If Dr. Lombardi, there is a timing issue,

19  I don't want to give you your cross, if it turns out that

20  Dr. Lombardi makes a diagnosis on January 1 and he makes a

21  diagnosis that day and he receives records on January 27 or in

22  July, clearly they are not relevant to the diagnosis, they are

23  not going to come in as part of that.  But if in connection

24  with his diagnosis he gets various records from various places,

25  life.  Right.  What's good for the goose is good for the

C664FRA1

1    gander.  Sufficient unto the day.  Let them bring these in.  We

2    will take it one step at a time.  Anything else.

3              (Pause)

4              MR. MYATT:  The logbook.

5              THE COURT:  The redacted logbook, is that going to

6    come up today.

7              MS. TREPELKOVA:  Yes.

8              THE COURT:  Which witness.

9              MS. TREPELKOVA:  Mr. Gonzalez.

10             MR. MYATT:  We subject to foundation don't have an

11   issue with a redacted logbook being introduced in evidence.

12   Our issue is that we believe that the version of a redacted

13   logbook that's going to be introduced into evidence is not a

14   complete representation of the signings in and out of

15   Ms. Francois.

16             THE COURT:  Present me with your version, their

17   version, flag and highlight where Ms. Francois signed in, if

18   it's not in the redactions, I will rule.  We will do the same

19   thing we did yesterday.  You can question the witness about the

20   logbook and we will then determine, it will have to take then,

21   after the witness comes off the stand if he comes on before you

22   can do that, the actual admission and presentation to the jury

23   will await my ruling on what should be in or out.  The only way

24   I can make that ruling is I need both versions.  Can't do it in

25   the abstract.  Anything else.

C664FRA1

1          (Pause)

2          THE COURT:  Anything else.  You guys work this out.

3          MR. ROSENBAUM:  One thing briefly.  I read the

4    deposition of Mr. Hertzberg who goes on and on in his answers.

5    I am concerned that he is going to just spurt out things.  My

6    questions to him are going to be very limited in scope.

7          THE COURT:  I will give him a cautionary instruction.

8    Then, Ms. Rearden, whoever is going to do the redirect, can

9    bring out on redirect whatever other information you would like

10   to bring out if any.

11         MS. REARDEN:  A further update on the health issue.

12         THE COURT:  Not now.

13         MR. MYATT:  Can I know the first witness defendants

14   plan to call today so we have some idea of the order.

15         MR. ROSENBAUM:  Either Mr. Gonzalez or Mr. Govas.

16         THE COURT:  You folks during a break discuss who is

17   coming after that.  Let's bring out of the jury.

18         (Continued on next page)

19

20

21

22

23

24

25

1              (Jury enters courtroom)

2              THE COURT:  Mr. Hertzberg, I want to remind you, you

3     are still under out from yesterday.

4              Ms. Rearden, you may proceed.

5      MICHAEL LEE HERTZBERG,

6          called as a witness by the Plaintiff,

7          having been previously sworn, testified as follows:

8     DIRECT EXAMINATION

9     BY MS. REARDEN:

10    Q.  Good morning.  When you were testifying yesterday, I

11    believe when we left off you were talking about, beginning to

12    talk about Ms. Francois' physical injuries as you observed them

13    on the evening of December 18, 2008.  Please tell the jury all

14    the physical injuries you observed.

15    A.  Initially, her face appeared to be very puffy and there was

16    a very prominent bruise under one of her eyes.  Later on she

17    showed me her one of her hands, I am not sure which one it was,

18    and it was very puffy and there appeared to be an abrasion on

19    it.  And she showed it to me in connection with explaining that

20    she had tried to call the police.

21              MR. ROSENBAUM:  Objection.

22              THE COURT:  Overruled.

23    A.  She tried to call the police when the incident occurred in

24    the Mazer apartment and she explained that Mr. Mazer tried to

25    wrest and I think succeeded in wresting the phone out of her

1    hand by grabbing --

2                MR. ROSENBAUM:  Objection.

3                THE COURT:  Overruled.  You may continue.

4    A.  -- by grabbing her arm in which she was holding the phone

5    and twisting or yanking it, and she attributed the puffiness,

6    when she showed me the puffiness and the condition of that

7    hand, it was in connection with that explanation.

8    Q.  Where were you when you initially observed these physical

9    injuries?

10   A.  In the lobby of the building.

11   Q.  What did you do after you observed the injuries?

12   A.  Just to explain, initially I observed her face, then we

13   went up, my wife, my daughter and I went up and got ice in the

14   apartment, and the arm was shown to me after I came back down

15   into the lobby.  I observed everything in the lobby but not at

16   the same time.

17   Q.  When you came back down from your apartment the ice, did

18   Ms. Francois' face look the same to you as it had previously?

19   A.  Yes.

20               MR. ROSENBAUM:  Objection; leading.

21               THE COURT:  Try not to lead.

22   Q.  To your knowledge did anyone take photos of Ms. Francois

23   that night?

24   A.  Yes.

25   Q.  Who took photos of Ms. Francois?

1   A.  Ulise Gonzalez, superintendent of the building.

2   Q.  Where were you when the photographs were taken?

3   A.  Proximate to Ms. Francois, who was sitting on the bench,

4   leaning against the wall where I first observed her when I came

5   into the building.

6           MS. REARDEN:  May I approach, your Honor.

7           THE COURT:  Yes.

8   Q.  Look at tab 1 in the binder I just handed you.  This has

9   previously been marked Plaintiff Exhibit 7.  What does the

10  document behind tab 1 in the binder consist of?

11  A.  Behind it?

12  Q.  Yes, behind tab 1.

13  A.  These are several photographs of Ms. Francois which

14  reflect, to me reflect her appearance at the time the

15  photographs were taken, and these photographs I believe are the

16  photographs that were taken by Mr. Gonzalez, the evening we are

17  discussing.  You can see the --

18          MR. ROSENBAUM:  Objection.

19          THE COURT:  Sustained.

20  Q.  Are these photographs consistent with the injuries you

21  observed the night of December 18, 2008?

22          MR. ROSENBAUM:  Objection; leading.

23  A.  Yes, they are.

24          THE COURT:  Try not to lead in your questions.

25  A.  Yes, they are.

1   Q.  We have been discussing the physical injuries that you

2   observed on Ms. Francois the night of December 18, 2008.  Could

3   you describe for us Ms. Francois' emotional condition as you

4   observed it in the lobby of the building that night?

5           THE COURT:  Let me ask a question.  When you spoke a

6   few moments ago about Ms. Francois telling you about how she

7   allegedly received the injury on her hand, approximately when

8   did that occur; did it occur in the lobby?

9           THE WITNESS:  Yes.

10          THE COURT:  That comes in as an excited utterance.

11  You may continue.  I want the record to be clear as to the

12  hearsay exception under which it's coming in.

13  Q.  Describe Ms. Francois' emotional condition as you observed

14  it in the lobby when you first encountered her the evening of

15  December 18, 2008?

16  A.  She appeared to be in a state of shock.

17          MR. ROSENBAUM:  Objection.

18          THE COURT:  Overruled.  He can talk about his

19  observations.  Overruled.  You may continue.

20  A.  She was very subdued.  As I mentioned before, she was

21  leaning it appeared to me for support against the back wall,

22  which is the wall in the background of these photographs, and

23  she was speaking on and off with one or more of the police

24  officers who were there, but I think the overriding emotion

25  that was discernible to me was one of utter shock that this had

1  happened to her.

2          MR. ROSENBAUM:  Objection to that conclusion, your

3  Honor.

4          THE COURT:  The jury will disregard the assumption

5  that this witness drew as to why the witness was in shock,

6  subject to connection.  His observations the jury can consider.

7  Q.  You testified that at some point you went upstairs to your

8  apartment and got some ice?

9  A.  Yes.

10  Q.  What did you do after that?

11  A.  Came back down to the lobby, gave the ice to Ms. Francois,

12  and began to reach a conclusion that I wanted to help her when

13  she expressed that she was eventually going to go whom.

14          MR. ROSENBAUM:  Objection.

15          THE COURT:  Overruled.

16  A.  She expressed that she was going to go home, I understood

17  home to be I think in Brooklyn, that she was going to go there

18  by subway, I concluded that she was not in any shape to do that

19  at that moment.  I was concerned by her state of mind, her

20  physical condition, I was concerned she might have a

21  concussion, and we invited her to come up to our apartment, get

22  some water, and try to relax while she was dealing with what

23  had happened.

24  Q.  Did you in fact go up to your apartment with her?

25  A.  We did.  She came back to the apartment with my wife, my

1   daughter and myself.  We gave her water, engaged in some

2   conversation with her.

3   Q.  What conversation did you engage in with her?

4   A.  She volunteered a little bit about the course of her

5   employment with Mr. Mazer and also what had happened that

6   evening.  Most immediately what had happened that evening, she

7   indicated --

8           MR. ROSENBAUM:  Objection.

9           THE COURT:  Overruled.

10  A.  She stated that the incident began when she reproached

11  Mr. Mazer.

12          MR. ROSENBAUM:  Your Honor.

13          THE COURT:  Overruled.  We are not going to have a

14  sidebar on this.

15  A.  She reproached Mr. Mazer for some way that Mr. Mazer was

16  dealing verbally with his daughter that evening in the

17  apartment and that led to Mr. Mazer assaulting her and beating

18  her.  And she described that he had punched her in the face and

19  I believe but I am not certain that he said, that she said that

20  he had hit her in her body as well, and she had previously

21  shown me in the lobby, described at that time what happened

22  with the telephone wrestling, and I have believe she told me

23  that when she tried initial to to exit the apartment --

24          MR. ROSENBAUM:  Your Honor, I believe she told me.

25  A.  It is my best recollection that she told me --

1          THE COURT:  Thank you.  Overruled.

2    A.  It is my best recollection that she told me that when she

3    tried initially to leave the apartment, Mr. Mazer blocked her

4    exit.  As a separate matter, this was not what any of the

5    people in any family, myself included, were initiating as part

6    of the conversation.  She also said that in connection with the

7    incident in the apartment that evening, Mr. Mazer had used

8    racially charged language and had verbally abused her as well.

9          Then as a separate matter she volunteered that in the

10   course of her employment, Mr. Mazer had been verbally abusive

11   to her and that she had engaged in arguments with him or

12   incidents where he said things in the presence of the daughter

13   or to the daughter that she thought he shouldn't be saying to

14   her and she had said things to him, and so there was tension

15   between them when those things happened.

16   Q.  Did she saying say anything else to you that you recall?

17   A.  Nothing comes readily to mind at this moment although we

18   were discussing, I asked her some questions about how she

19   intended to get home, things related to that.

20   Q.  Did your interaction with Ms. Francois that evening end in

21   your apartment?

22   A.  No, it did not.

23   Q.  What happened next?

24   A.  I told her that I didn't think it was a good idea for her

25   to go home on the subway at that time, and that in fact, I

1   thought she should go to the hospital, and I asked her, I

2   volunteered to accompany her to the emergency room at Roosevelt

3   Hospital which is about 6 or 7 blocks from our apartment, and

4   she agreed.

5   Q.  Did you in fact go to the emergency room?

6   A.  Yes.  I took her in a cab; we went to the emergency room.

7   Q.  Had EMS come to the building earlier that evening?

8           MR. ROSENBAUM:  If he knows.

9           THE COURT:  To the extent that you know.

10  A.  I don't know.

11  Q.  What happened when you got to the hospital with Francois?

12  A.  We went to the main desk where you check in, if that's the

13  right expression, the emergency room.  They told us to wait in

14  the main waiting room.  That's what we did initially for about

15  an hour.

16  Q.  How did Ms. Francois act when you were waiting with her in

17  the hospital?

18  A.  She was very subdued; she was in pain.

19          MR. ROSENBAUM:  Objection.

20          THE COURT:  Let me caution the witness not to make

21  assumptions about Ms. Francois' state of mind.  If she

22  expressed something explicitly to you that can allow you to

23  draw that conclusion.

24          THE WITNESS:  She did.  She said that her hand hurt

25  and she said that her face heart, and she continued to me as

1    far as I was concerned to be in utter shock.

2              MR. ROSENBAUM:  Medical conclusions.

3              THE COURT:  Present sense impression.

4    A.  She also told me, I am not sure, she may have told this to

5    me earlier when we were at the apartment, on reflection it

6    occurred then rather than in the hospital.  She said that the

7    police had offered to arrest Mr. Mazer and that she had told

8    them that she didn't want them to.

9              MR. ROSENBAUM:  Objection.

10             THE COURT:  Overruled.

11   A.  She told them that she didn't want them to because she was

12   afraid that the daughter who she had cared for would be taken

13   to the custody of child services because the mother was out of

14   town on a business trip.  So if Mr. Mazer was arrested and

15   removed from the apartment, then the child would at least for

16   that night have to be in the custody of some city agency.  She

17   didn't want that to happen.  She said that to me explicitly

18   that that was what her response was to the police, not to

19   arrest Mr. Mazer, because she was afraid of the consequences to

20   the child.

21             When she told me that, then something that had

22   happened in the lobby made sense to me, because in my presence,

23   when I was with my wife in the lobby earlier in the evening,

24   one of the police officers had come to my wife and asked her a

25   couple of questions about whether she knew the child and I

1  couldn't figure out why that was being asked.  Later on when I

2  learned from Ms. Francois about how the police offered to

3  arrest Mr. Mazer, I then had a context for the questions

4  because it seemed to me the reason the police were asking my

5  wife if she knew the child --

6       THE COURT:  Sustained.  You can't make an assumption

7  about what was going on in the police officer's mind, why the

8  police officer did or didn't do something.  You may continue.

9  Q.  How long did you remain at the hospital?

10  A.  3 to 3-1/2 hours.

11  Q.  You were with Ms. Francois during that time?

12  A.  I was with her the entire time that I stayed at the

13  hospital.  We were eventually after the initial hour --

14       MR. ROSENBAUM:  Not responsive.

15       THE COURT:  This is her questioning, Mr. Rosenbaum.

16       You may continue with your answer.

17  A.  After we spent the initial hour approximately in the main

18  waiting room of the hospital, they put us in a private room.

19  She and I were in one of these small rooms off the main waiting

20  room.  We waited several hours more there.  Then eventually it

21  was past midnight and eventually I asked her whether she was

22  going to be OK if I left at that point.

23       In connection with my discussion with her at that

24  time, I ascertained that she had some form of friends or family

25  who could look after her, and I also concluded that eventually

1   she was going to be examined at the hospital and if the medical

2   personnel thought she shouldn't go home that night, she wasn't

3   going to be going home that night and my presence was not

4   needed to ensure that.

5   Q.  Did you speak with Ms. Francois that night after you left

6   the hospital?

7   A.  I did not.

8   Q.  Have you continued to be in touch with Ms. Francois in any

9   way?

10  A.  After that evening, we had a few phone calls.  She thanked

11  me and my family, through me, profusely for the attention that

12  we gave her that evening.  That was the initial call.  And she

13  called me on a few occasions after that.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1                MS. REARDEN:  Pass the witness, your Honor.

2                THE COURT:  Okay Mr. Rosenbaum or Ms. Trepelkova.

3    CROSS-EXAMINATION

4    BY MR. ROSENBAUM:

5    Q.  You are a lawyer, correct?

6    A.  I am.

7    Q.  You are a personal injury lawyer?

8    A.  I am not.

9    Q.  You have never done any personal injury cases?

10   A.  Never once.

11   Q.  Is it your testimony that you never represented anyone a

12   personal injury action case?

13   A.  None comes to mind.  None comes to mind to me.

14   Q.  Case of Larry Wollersheim against the Church of Scientology

15   in California, remember that case?

16   A.  I'm very familiar with the case.

17   Q.  And you represented the church?

18   A.  I represented the Church of Scientology I believe in this

19   action.

20   Q.  What kind of case was that?

21   A.  That was a case where he brought Mr. Wollersheim was the

22   plaintiff.  He sued the Church of Scientology of California for

23   various causes of action and I am not sure -- I have nothing to

24   do with the trial.  I am not sure what the complaint alleged in

25   terms of specific causes of action.  I was an appellate lawyer

1   for the church and I argued constitutional issues on appeal in

2   that case.

3           THE COURT:  All right.  Let me just now just because I

4   forgot to get it at beginning of cross-examination,

5   Mr. Hertzberg, just give you a general sort of instruction on

6   the cross-examination which is -- and it's not reflective of

7   your prior answer, okay -- but Mr. Rosenbaum is going to ask

8   you some questions and we're going to ask you to keep your

9   answers as short as possible that are responsive to the

10  question and if you've got more that you want to say then

11  Ms. Rearden will bring that out on redirect.  I wanted to lay

12  some ground rules so we can proceed efficiently.  Thank you.

13  BY MR. ROSENBAUM:

14  Q.  Did you ever refer any personal injury cases to other

15  lawyers?

16          MS. REARDEN:  Objection, your Honor.

17          THE COURT:  Overruled.

18  A.  I have.

19  Q.  And when you refer those cases to other lawyers you get a

20  percentage of the fee?

21  A.  I believe --

22  Q.  Yes or no?

23  A.  I have on occasion received a percentage of the fee.

24  Q.  Please.  How many years are you in practice?

25  A.  I was admitted to the bar in 1975.

1   Q.  How many cases have you referred to personal injury lawyers

2   during your tenure as a lawyer?

3   A.  Very few.  I think less than a handful.

4   Q.  And when you met Ms. Francois that first night isn't it a

5   fact you gave her your business card?

6   A.  I did.

7   Q.  And didn't you, in fact, speak to her about a possible

8   litigation?

9   A.  I have no recollection of discussing that with her.  I gave

10  her the card so she could be --

11  Q.  Please.

12          THE COURT:  No.  No.  This is responsive.  You may

13  continue.

14  A.  I gave her the card merely for my contact information and,

15  sir, let me -- I want to respond to your question fully.

16  Q.  Go ahead.

17  A.  In no sense in connection with any possible litigation

18  either by myself or anybody else.

19  Q.  Did she ever speak to you about her litigation?

20  A.  Yes.

21  Q.  Weren't you surprised that the case was brought in federal

22  court, correct?

23  A.  I was.

24  Q.  You thought it should be a case brought in state court,

25  correct?

1         MS. REARDEN:  Objection.

2    A.  No.

3         THE COURT:  It's actually irrelevant.

4    A.  It's not true.

5         THE COURT:  Hold on, Mr. Hertzberg.  Why don't you

6    move onto the next point.  Apart from the fact that he spoke to

7    her, everything else is irrelevant.

8    BY MR. ROSENBAUM:

9    Q.  Do you know what Ms. Francois' weight was that day when you

10   saw her?

11   A.  No, I don't know what her weight was but no.  Exact weight

12   I have no idea.

13   Q.  Was she a thin lady?

14   A.  I wouldn't say thin but I would say -- no, I wouldn't say

15   thin.

16   Q.  Would you say obese?

17        THE COURT:  Mr. Rosenbaum.

18        MR. ROSENBAUM:  There is a reason for this.

19        THE COURT:  But hold on let's just go to sidebar.

20   This is on me.

21            (Continued on next page)

22

23

24

25

1          (Sidebar)

2          THE COURT:  Where are you going with this is my

3    concern.  This is a witness who I now know for the very first

4    time has cancer and the reason why she -- versus another but

5    whether or not she lost weight today versus then how she looks

6    is going to be unfair and you can open the door to something.

7          MR. ROSENBAUM:  The reason why I am asking this

8    question, your Honor, is because she was 155 pounds.

9          THE COURT:  Then you've don't need it.

10          MR. ROSENBAUM:  But now if a person lost 155 pounds

11    would have puffy hands and face --

12          THE COURT:  No.  No.  Irrelevant 403 there is no

13    reason in the world to suggest that that bruise and that hand

14    came from her being overweight.

15          MR. ROSENBAUM:  No.  He kept on saying that her face

16    was puffy and her hand was puffy.

17          THE COURT:  We're not going to go into a witness'

18    weight.  This witness has got cancer.  It's a completely

19    inappropriate line of questioning.

20          MR. ROSENBAUM:  Your Honor, the fact that she has

21    cancer does not and I understand --

22          THE COURT:  Make your argument.  You can make your

23    argument based upon the medical records, okay.

24          MR. ROSENBAUM:  Which is not been 155 pounds.

25          THE COURT:  In your closing statement you can make

1    your argument but don't use the witness for it, okay.

2                    (In Open court)

3    BY MR. ROSENBAUM:

4    Q.  Had you ever seen Ms. Francois prior to December 18, 2008?

5    A.  I have no recollection.

6    Q.  So you did not know what she looked like prior to that

7    date, is that correct?

8    A.  That's correct.

9    Q.  You knew Mr. Mazer, didn't you?

10   A.  I did.

11   Q.  And you were on the board of directors of the condo that

12   you live in?

13   A.  I was for several years.

14   Q.  And was there a -- just answer yes or no, please.  Was

15   there a vote as to when you were voted out of the board of

16   directors?

17                    MS. REARDEN:  Objection, your Honor.

18                    THE COURT:  Sustained.

19   Q.  Did you and Mr. Mazer run against each other to remain on

20   the board of directors?

21                    MS. REARDEN:  Objection.

22                    THE COURT:  Overruled.

23   A.  No.  We didn't run against each other.  I was on the board

24   for a number of years and when you --

25   Q.  I've answered --

1          THE COURT:  Mr. Hertzberg, Ms. Rearden will be able to

2   go into the remainder of that.  Go ahead.

3   BY MR. ROSENBAUM:

4   Q.  Did there come a time when you were off the board of

5   directors and Mr. Mazer was on the board of directors?

6   A.  Yes.

7   Q.  Was he on the board of directors because -- if you know --

8   you were not re-elected to the board of directors, yes or no or

9   I don't know?

10          THE COURT:  If it's amenable to that kind of answer.

11  A.  Excuse me.  I didn't hear.

12          THE COURT:  If it's amenable.

13  A.  There is no way of knowing that because two people -- I

14  wasn't the only person who wasn't re-elected in a particular

15  year and he wasn't the only person who ascended to the board at

16  the time, so it doesn't work that way.

17  Q.  Okay.  Did you hold a grudge against him because he is on

18  the board and you weren't?

19  A.  No.

20  Q.  Were you angry at him?

21  A.  No.

22  Q.  Were you upset at the fact that he was on the board and you

23  were not?

24          MS. REARDEN:  Objection.

25          THE COURT:  Overruled.

1   A.  No.  I wouldn't say that.  What I noted at the time was

2   that several of us including myself --

3   Q.  Just about yourself.

4   A.  -- thought he had been deceitful in the manner in which he

5   became a board member.

6   Q.  Okay.  So you -- it was your opinion that he was a

7   deceitful person to become a member of the board?

8   A.  That he had misled some -- that he had misled some of the

9   owners and was not trustworthy.

10  Q.  Okay.  And after how many years -- Withdrawn.

11          Were some of the people on the board terminated your

12  presence on the board cause they may have felt that you were

13  untrustworthy?

14          THE COURT:  Sustained.  He can't possibly know what's

15  in their mind.  You can ask him if he had ever heard that.

16  Q.  Have you ever heard those accusations from anyone?

17  A.  No.

18  Q.  Did you know whether or not the police offered to take

19  Ms. Francois to the hospital?

20  A.  I have no knowledge of that.

21  Q.  Did you ask Ms. Francois if the EMS people came?

22  A.  I don't believe I did.

23  Q.  Did you ask Ms. Francois whether or not the police offered

24  to take her to the hospital or get an EMS?

25  A.  I have no recollection of doing so.

1   Q.  And you didn't ask her?

2   A.  I don't recollect asking her that.

3   Q.  Now, you said she used -- she said that Mr. Mazer used some

4   racially charged language?

5   A.  Yes, she told me that.

6   Q.  What did she say he said?

7   A.  I don't remember the specific words but I remember.

8   Q.  If you don't remember?

9   A.  It is my best recollection that the word "black" was in the

10  formulation.

11  Q.  Only the word "black" and that was racially charged?

12          THE COURT:  In the formulation.

13  A.  No, she told me --

14          THE COURT:  Sustained.

15  A.  She told me that he insulted her racially that night and

16  you asked me what it was that she related.  And I don't recall

17  the entire dialogue that she told me had occurred but I

18  remember that word.

19  Q.  If Ms. Francois testified yesterday --

20          THE COURT:  Sustained.  You can't go into a

21  hypothetical.  You can ask him what he remembers.

22          MR. ROSENBAUM:  Your Honor, can I just put my question

23  please?

24          THE COURT:  If it's going to be a hypothetical --

25  okay. go ahead.  I will allow this one.

1   BY MR. ROSENBAUM:

2   Q.  If Ms. Francois testified yesterday that the first time she

3   used or told anybody that there was the word "black" or some

4   racially statements is when she called someone in Trinidad the

5   following day, would she be correct in saying that if you know?

6           MS. REARDEN:  Objection.

7   A.  It is my best recollection that she told me that he had

8   insulted her or verbally abused her that evening in particular

9   using racially charged language.  That is my best recollection

10  of what she said.

11  Q.  Did she tell you -- when did she call you the first time

12  after she left the hospital the day that you --

13  A.  I think it was very approximate in time after the evening

14  of the incident.

15  Q.  Within a week's time?

16  A.  It's difficult for me to pinpoint right now but that makes

17  sense to me but I have no specific recollection.

18  Q.  Do you recall anything about that telephone conversation

19  with her?

20  A.  Yes.  What I mentioned before which is that she thanked me

21  profusely for having been attentive to her that evening and

22  also wanted to be sure that I conveyed those sentiments to my

23  wife and daughter as well.

24  Q.  Did she tell you how she felt physically?

25  A.  If she did I don't recall.

1  Q.  Did she tell you anything about her going back to work?

2  A.  I believe she said that she was going -- I believe she said

3  that she was going to have to look for work.

4  Q.  And she would be looking for a job at that time?

5  A.  I don't remember, specifically, anything that is said along

6  those lines.

7  Q.  Page 48.

8          THE COURT:  Have you given the witness a copy of the

9  deposition?

10         MS. REARDEN:  It's in the binder.

11         THE COURT:  So they're going to refer you,

12 Mr. Hertzberg, to the deposition which is in one of those two

13 binders.

14 Q.  Page 48, line 19.

15 A.  Yes.

16 Q.  Are you ready?

17 A.  I am ready.

18 Q.  Okay.  And you gave this deposition back on May 7, 2010?

19 A.  May 7, 2010.  And I am sorry.  What page and line again?

20 Q.  Page 48, line 19.

21 A.  I am looking at it.

22 Q.  Do you remember being asked this question.

23         And what about the other calls?  Which was the first

24 time she contacted you?  Was it shortly after the incident?

25         Do you remember being asked that question?

1    A.  Yes.

2    Q.  Answer:  Yeah, I think it was.  And it was to report that

3    she was home.  I think she said something to the effect that

4    she would be looking for a job, correct?

5              MS. REARDEN:  Objection, your Honor.

6              THE COURT:  Overruled.

7    Q.  Did she indicate to you at any time that she was too sick

8    to look for a job?

9    A.  I don't recall if she did.  I think --

10   Q.  Please.

11   A.  I will tell you what my understanding was.

12   Q.  No.

13             THE COURT:  Mr. Hertzberg, Ms. Rearden will make

14   another note but we're going to -- otherwise it'll go on.

15   It'll go back and forth beyond where it should.

16   A.  I think the testimony is she would be looking for a job.  I

17   don't think I said that she was looking for a job.

18   Q.  It speaks for itself.  My question to you is, did you ask

19   her if she was able to work?

20   A.  Oh, I don't recall asking her that.

21   Q.  Did she tell that you she was sick, at any time, too sick

22   to look for a job or work at any of your conversations with

23   her?

24   A.  I don't recall if she did or didn't.

25   Q.  Did she complain to you about any time about the condition

1  of her vision?

2  A.  I don't think that was the subject that we discussed.  I

3  think what she did -- what I do recall is that she was

4  offered -- she did tell me in one of the conversations that she

5  is being offered her job back.

6          MR. ROSENBAUM:  Your Honor?

7          THE COURT:  All right.  So, Mr. Hertzberg, Ms. Rearden

8  will bring out anything else during the subsequent

9  conversations that she feels is needed.

10          All right, Mr. Rosenbaum.

11  BY MR. ROSENBAUM:

12  Q.  Did you ever ask Mr. Mazer what happened that night?

13  A.  No.

14  Q.  Did you ever ask Mrs. Mazer if she knew what happened that

15  night?

16  A.  No.

17  Q.  Do you know who was in the apartment that night?

18  A.  I wasn't in the apartment.

19  Q.  No.  I said do you know who was in the apartment that

20  night?

21  A.  On the basis of what you've described so far I know at

22  least Mr. Mazer, Ms. Francois and the Mazer daughter were in

23  the apartment.

24  Q.  Did you ever see their daughter before the incident?

25  A.  I think I may have seen her in the lobby of -- the Mazer's

1    apartment is located -- there are two elevator banks in our

2    building.  Theirs is located on one side of the lobby.

3    Q.  Did you ever see the daughter --

4    A.  And ours is on the other side and I cannot recall if I had

5    seen her prior to that evening.

6    Q.  So you know other than Ms. Francois Mr. Mazer, the child

7    and possibly Mrs. Mazer may have been on the phone, do you know

8    anyone else who had seen what happened that night, is that

9    fair?

10   A.  Mrs. Mazer is out of the equation based on my knowledge

11   because she was away on a business trip from the information

12   that I have.

13   Q.  Who gave you that information?

14   A.  Mrs.~Francois.

15   Q.  And did Mrs.~Francois tell you that Mrs. Mazer called up

16   while this incident was occurring?

17   A.  No.

18   Q.  She didn't tell that to you?

19   A.  No.  If she did I don't recall it and I have no

20   recollection of that, whatsoever.

21   Q.  Do you know Mr. Green-Armytage?

22   A.  I do.

23   Q.  You are close friends with him?

24   A.  I would say close friends.

25   Q.  Did you ever discuss this case with him?

1   A.   Yes.

2   Q.   How frequently?

3   A.   Not frequently.  I mean maybe two or three times at most.

4   Q.   When was the last time you spoke to him?

5   A.   When was the last time.

6   Q.   About the case?

7   A.   About the case a long, long time ago, long time ago.  The

8   only conversations I had with him were very approximate to

9   after the incident occurred.  And they had to do with the

10  possibility that he may have known something about it and I

11  can't remember what that was and he may have at one time.

12          THE COURT:  I think now we've probably reached the

13  bounds of that question.

14          Go ahead, Mr. Rosenbaum.

15  Q.   Did you know that Mr. Armytage testified in this case?

16  A.   I saw him yesterday outside the courtroom.  I saw him being

17  called in so I assume he did.  I have not spoken with him since

18  I saw him disappear in the door.

19  Q.   When you saw him yesterday were you surprised to see him?

20  A.   No.

21  Q.   Did you speak to him at all yesterday?

22  A.   Yes.

23  Q.   Did you ask him, Why are you here today?

24  A.   No.  We didn't speak about the case.

25  Q.   You were surprised to see him here?

1    A.  I didn't say that.  I said the opposite.

2    Q.  And you didn't ask him -- did he ask you anything about the

3    case?

4    A.  No.

5    Q.  Were you instructed not to talk to each other?

6    A.  No, but I had no desire to talk to him about the case and

7    he didn't talk to me about the case.

8    Q.  Did he speak to you after he finished testifying?

9    A.  No, I have not had a word with Mr. Green-Armytage since I

10   saw him leave the bench in the hallway and enter the doors to

11   the courtroom.

12   Q.  And you say that under oath as a lawyer?

13   A.  Absolutely.

14   Q.  When Mrs.~Francois told you that she told the police,

15   allegedly, told the police do not arrest Mr. Mazer because the

16   child would be left alone, did you tell Ms. Francois that she

17   can go to the police the next day and file the complaint?

18   A.  I didn't give her any advice about what she could do or not

19   do.

20   Q.  Did you know whether or not she went back to the police the

21   next day?

22   A.  I have no knowledge.

23   Q.  Do you as a lawyer know, if you know, could she have gone

24   back to the police the next day to file the charges against

25   Mr. Mazer?

1              MS. REARDEN:  Objection.

2    Q.  If you know?

3              MS. REARDEN:  Objection.

4              THE COURT:  Overruled.  Actually, no.  Sustained.  You

5    are asking him -- it's outside the scope.  Go to your next

6    topic.

7              MR. ROSENBAUM:  Excuse me, your Honor.

8              THE COURT:  Yes.

9              (Pause)

10   BY MR. ROSENBAUM:

11   Q.  Did you have a case in which you were a representative of a

12   party in which the case name Anthony J. Devlin a/k/a Gabriel of

13   Aurantia Shannon against --

14             MS. REARDEN:  Objection.

15   Q.  -- Durango Herald Incorporated in Arizona?

16             THE COURT:  Where is it going?

17             MR. ROSENBAUM:  References damages for intentional

18   intimidation of plaintiffs.

19             MS. REARDEN:  I don't see.

20             THE COURT:  All right.  So understand the relevance, I

21   don't want it talk about the relevance in front of the jury.

22   This is going to the same issue as before in terms of the

23   personal injury?

24             MR. ROSENBAUM:  Yes.

25             THE COURT:  All right.  Ask one or two questions.

1    We'll see if you can connect it up.

2    BY MR. ROSENBAUM:

3    Q.  Do you recall that case?

4    A.  I am aware of that case.  It's an ongoing case.  I am

5    counsel of record in the case that also involves constitutional

6    issues.  I don't know view that as -- I actually don't view

7    that as personal injury case.  So I am not sure whether that's

8    the tenor of your question.

9    Q.  Is one of the causes of action the intention infliction of

10   emotional distress?

11            MS. REARDEN:  Objection.

12   A.  Yes, it is.

13            THE COURT:  Now, you are not going to make him into an

14   expert witness on that cause of action.  It's got to go to

15   credibility or something else.

16   A.  When I --

17            THE COURT:  Hold on.  There is no pending question.

18   BY MR. ROSENBAUM:

19   Q.  And the threat and intentional intimidation of plaintiffs

20   regarding their religious beliefs, are you part of that case?

21            MS. REARDEN:  Objection.

22            THE COURT:  Sustained.  It's irrelevant, okay.  You

23   have to connect it up to the credibility or something else.

24            MR. ROSENBAUM:  I have no further questions.

25            THE COURT:  Okay.  All right.  Thank you.  Is there

1    anything further, Ms. Rearden?

2              MS. REARDEN:  Very briefly, your Honor.

3              THE COURT:  Limited to the scope of cross.

4              MS. REARDEN:  Yes, I understand.

5    REDIRECT EXAMINATION

6    BY MS. REARDEN:

7    Q.  Mr. Hertzberg, you were asked by Mr. Rosenbaum whether you

8    and Mr. Mazer were competing against each for a board seat or

9    running against each other?

10   A.  Yes.

11   Q.  And you were starting to explain.  Could you please go

12   ahead and tell the jury what you were about to say?

13   A.  Yes.  I was on the board of the building for the first

14   number of years after the condominium was, the building was

15   converted in a condominium.  The board was controlled at that

16   time by the management company, the company that was managing

17   the building and that also had owned the building.  They

18   controlled the board, essentially, during this time period.

19   There came a time where a fellow owner member and I were at

20   odds.  We disagreed with the course of action that was being

21   taken by the other board members and we had some owner meetings

22   to discuss what could be done about it with the other owners

23   who we felt we'd represented.

24              Mr. Mazer was new to the building.  He came to one or

25   more of those meetings.  At one of the meetings, in fact, he --

1          THE COURT:  Hold on.

2          MR. ROSENBAUM:  Objection.

3          THE COURT:  I want to make sure we don't get into,

4    Ms. Rearden, some of issues that aren't relevant.

5          MS. REARDEN:  I am not trying to go there.

6          THE COURT:  Why don't you reformulate another

7    question.  I think the issue -- and I think the witness

8    explained this -- that there was more than one board seat up

9    for election in the year in which you were then not re-elected,

10   is that right?

11         THE WITNESS:  That's right.

12         THE COURT:  Okay.  And there was more than one

13   candidate who was running for election, is that right?

14         THE WITNESS:  That's correct, your Honor.

15         THE COURT:  I think that's all you need.

16   BY MS. REARDEN:

17   Q.  Mr. Hertzberg, you also on cross referenced your

18   understanding I believe that Ms. Francois was offered her job

19   back by the Mazers.  Do you remember that?

20   A.  Yes.

21   Q.  And you were starting to explain that, sir.

22   A.  Yes.  And one of the conversations that we had, one of the

23   few conversations that we had after the night of the incident,

24   she said that I think it was Ms. Shade had called and that she

25   was being offered her job back.

1          MR. ROSENBAUM:  Objection.

2          THE COURT:  Sustained.  It's going to be double

3     hearsay.

4          MS. REARDEN:  No further questions at the moment, your

5     Honor.

6          THE COURT:  Okay.  Thank you.  Mr. Hertzberg, thank

7     you very much.

8          Would the plaintiff like to call their next witness

9     please.

10          MR. MYATT:  Your Honor, plaintiffs call Officer Karen

11     Wuttke to the stand.

12          THE COURT:  Officer Wuttke.

13      KAREN WUTTKE,

14          called as a witness by the Plaintiff,

15          having been duly sworn, testified as follows:

16     DIRECT EXAMINATION

17     BY MR. MYATT:

18     Q.  Good morning, Officer Wuttke.

19     A.  Good morning.

20     Q.  By whom are you employed?

21     A.  New York City Police Department.

22     Q.  And what is your job description?

23     A.  Patrol officer.

24     Q.  And how long have you been a patrol officer?

25     A.  12 years, almost 12.

1    Q.  And in which precinct do you work?

2    A.  18th Precinct.

3    Q.  And is that the same precinct in which you worked in

4    December of 2008?

5    A.  Yes, sir.

6    Q.  Have you worked in other precincts?

7    A.  48th Precinct in the Bronx, South Bronx.

8    Q.  In the course of your work have you had experience dealing

9    with calls relating to assault and batteries?

10   A.  Several.

11          THE COURT:  I don't want to make her into an expert

12   witness.  Just go straight to this one, okay.

13   Q.  Do you recall the evening of December 18, 2008?

14   A.  Yes.

15   Q.  Were you -- on that evening were you dispatched to 171 West

16   57th Street?

17   A.  Yes.

18   Q.  And do you recall why you were dispatched to that address?

19   A.  It came over as assault, a radio run so it was answered.  I

20   was dispatched there.

21   Q.  Do you know who called for police assistance?

22   A.  No, not at that time.

23   Q.  Did you have an understanding of what the call was about?

24   A.  It just came over as -- I believe it came over as a female

25   assaulted but I don't recall.

1              MR. ROSENBAUM:  Objection, your Honor.

2              THE COURT:  Overruled.

3    Q.  So what did you do after you received the call?

4    A.  Responded to the location.

5    Q.  And when you -- you reached the building and you proceeded

6    inside, is that correct?

7    A.  Yes.

8    Q.  Were any other officers on the scene at that time?

9    A.  I had a partner with me.  I don't recall the officer's name

10   and I believe a sergeant did respond as well.

11   Q.  Did you ever -- what did you observe when you arrived at

12   the building?

13   A.  There was a doorman there.  I don't recall his name and

14   Ms. Francois was sitting on a bench in the lobby.

15   Q.  Did you speak with Ms. Francois?

16   A.  Yes.

17   Q.  And what did -- did you observe Ms. Francois' appearance?

18   A.  Yes.

19   Q.  What was your observation of her appearance at the time?

20   A.  That beneath her left eye was very swollen and red.

21   Q.  Any other observations?

22   A.  She had a mark on one of her hands.

23   Q.  Do you recall which one?

24   A.  No, I don't.

25   Q.  Did you -- did Ms. Francois give you an explanation as to

1   the source of those injuries?

2   A.   Yes.   She said that she got into an argument with her

3   employer and that there was a physical altercation.

4   Q.   And do you recall who her employer was?

5   A.   Mr. Mazer.

6           MR. MYATT:   Your Honor, may I approach?

7           THE COURT:   You may.

8           MR. MYATT:   I am handing the witness a binder of

9   exhibits and a binder to the Court.   Opposing counsel already

10  has one.

11          (Pause)

12          THE COURT:   Why don't you identify them just by type

13  so that they're identified for the record for identification

14  purposes.

15          MR. MYATT:   Of course, your Honor.

16          THE COURT:   You can do them one at a time as you do

17  them with the witness if you'd like.

18          MR. MYATT:   Thank you, your Honor.

19  Q.   Officer Wuttke, I direct your attention to the document

20  behind tab number one which is a two-page document, the first

21  page of which is entitled Incident Information Slip and the

22  second page of which is New York City Police Department Aided

23  report?

24  A.   Yes.

25  Q.   Are you familiar with this document?

1   A.  Yes, I am.

2   Q.  And did you prepare this document?

3   A.  Yes, I did.

4   Q.  And does this document accurately reflect information you

5   checked on the night of December 18, 2008?

6   A.  Yes.

7   Q.  Do you believe this a fair and accurate copy of the

8   document you created?

9   A.  This does not look like my handwriting but it could

10  possibly be.  The person I was working with filled it out for

11  me.

12  Q.  Would that be unusual?

13  A.  No.

14  Q.  Do you create reports like this as part of your ordinary

15  practices in your role as a police officer?

16  A.  Yes.  The aided report I do recall that I did fill out

17  myself.

18          THE COURT:  It's the second page?

19          THE WITNESS:  Yes.

20          THE COURT:  All right.

21          MR. MYATT:  Your Honor, at this time I'd like to

22  move --

23          THE COURT:  Let me just ask if you are ready to offer

24  let me ask a couple of questions since the witness said it's

25  not her handwriting on the first page.

1          Officer Wuttke, is the information to the best of your

2   knowledge correct that's reflected in the handwriting on the

3   first page?

4          THE WITNESS:  Yes, absolutely.

5          THE COURT:  All right.  Now you may offer it.

6          MR. MYATT:  Actually, your Honor, I forgot to offer it

7   for identification with a number first.  But, your Honor,

8   plaintiff would move the admission of Incident Information Slip

9   and attached New York City Department Aided Report as

10  Plaintiff's Exhibit 8.

11         THE COURT:  All right.

12         Mr. Rosenbaum, Ms. Trepelkova, no objection?

13         MR. ROSENBAUM:  No objection.

14         THE COURT:  Plaintiff's Exhibit 8 admitted.

15         (Plaintiff's Exhibit 8 received in evidence)

16         MR. MYATT:  Your Honor, may I pass out copies of

17  Plaintiffs Exhibit 8 to the jury?

18         THE COURT:  Yes, you may publish it to the jury.

19         (Pause)

20  BY MR. MYATT:

21  Q.  Officer Wuttke, at what time did you receive the call to

22  the defendant's building?

23  A.  Approximately, a little bit before nine o'clock.  I can't

24  give an exact time.

25  Q.  Did you arrive a relatively shortly thereafter?

1    A.  Yes.

2    Q.  Can you briefly describe -- I think we talked briefly about

3    when you arrived at the building you saw Ms. Francois.  Can you

4    describe her emotional state at that time?

5    A.  She seemed very upset.  She was unsure whether or not she

6    wanted to make a complaint at that time but she just was very

7    shaken, very upset and was concerned for the child.

8    Q.  Do you recall whether she was crying?

9    A.  Yes, she was.

10   Q.  And did she explain briefly that she told you that there

11   was a argument, there was a physical altercation?

12            MR. ROSENBAUM:  Objection; leading.

13            THE COURT:  Why don't you rephrase the question.

14   Q.  What did Ms. Francois tell you about why she was upset?

15   A.  I believe she stated that they had a difference of opinion

16   over something to do with the care of the child.  Then she

17   explained that she was a child caregiver for the Mazers and

18   that's how the argument ensued.

19   Q.  And did she tell you what happened after the argument

20   ensued?

21   A.  She did but I don't recall what she had explained to me.

22   It's been a while.

23   Q.  Turning to the second page of Plaintiff's Exhibit 8,

24   towards the bottom of the page there's a section entitled

25   Narratives Section.

1    A.   Yes.

2    Q.   Which reads at TPO aided female had bruised below left eye.

3    What does TPO stand for?

4    A.   Time/place of occurrence.  Actually, on the 61 it says CV

5    stands for "complaint" and "victim".

6    Q.   So this is a complaint form?

7    A.   Yes, it is.

8    Q.   And does this form indicate that she was a crime victim?

9         MR. ROSENBAUM:  Objection.

10        THE COURT:  Why don't you ask her what the form

11   indicates or some other question?

12   Q.   Towards the top of the page and what I would describe as

13   the third box, text box there's a line that says "crime victim

14   colon Y".  Can you explain what that means?

15   A.   Excuse me.  Which box?

16   Q.   The third box.  It starts with L-O-C with the address and

17   then over on the lower right-hand side that box about a third

18   of the way up, third of the way down.

19        THE COURT:  To the right under the word "Manhattan".

20   Do you see where "Manhattan" is?  It is on the next page.

21        THE WITNESS:  Oh, the next page.

22        THE COURT:  Where it says L-O-C on that third chunk

23   down, it's over to the right.

24        THE WITNESS:  Oh, 171 West 57 Street, Manhattan.

25        THE COURT:  Right.

1              MR. MYATT:  In that box.

2              THE COURT:  Why don't you reask the question now.

3              MR. MYATT:  Yes, your Honor.

4    BY MR. MYATT:

5    Q.  In that box are the words "crime victim colon Y" appeared.

6    Can you explain what that means?

7    A.  "Y" means "yes".

8    Q.  Turning back to the narrative section --

9              THE COURT:  What do you mean by "narrative section",

10   counsel?

11             MR. MYATT:  It's actually the second to last box on

12   that page which in the center says "narrative section".

13             THE COURT:  So it's on the second page.

14             THE WITNESS:  Actually, it's on the first page.

15             THE COURT:  Exhibit 8 you would like the witness to

16   turn to the second page and down towards the bottom there is

17   also a section called "narrative section" and he wants to turn

18   your attention to that.

19             Is that where you want to be, counsel?

20             MR. MYATT:  Yes, your Honor.

21             THE WITNESS:  Where it says "details"?

22             THE COURT:  Where it says "at TPO".

23             What is the question, Mr. Myatt?  Where are you?  What

24   do you want to do here?

25             MR. MYATT:  I just was going to -- I was going to

1    confirm with Officer Wuttke that it states aided states was

2    struck by officer, I want to ask her if that's an accurate

3    representation of --

4              THE COURT:  Okay.  Go ahead and ask.

5    A.  Yes.

6    Q.  So, Ms. Francois did told you at the time that you

7    responded that she had been struck by her employer?

8              MR. ROSENBAUM:  Objection; leading, your Honor.

9              THE COURT:  Overruled.

10   A.  Yes, she did.

11             THE COURT:  Present sense impression combined with

12   excited utterance.

13   Q.  And the next sentence is "aided RMA", what does RMA stand

14   for?

15   A.  Excuse me.  Are we looking at the aided report or are we

16   looking at the complaint report, sir?

17   Q.  We're looking at the aided report.

18   A.  Okay.  The aided report, "RMA" stands for "refused medical

19   attention".

20   Q.  So you discussed the possibility of seeking medical

21   attention with Ms. Francois that night?

22   A.  Yes.  Any time whether it's a crime victim or somebody

23   that's a trip and fall we're expected to ask the person if they

24   want us to call an ambulance for them.  That was asked.

25   Q.  Did she give you a reason why she refused medical

1    attention?

2    A.  Honestly, I would assume that she just wanted to go home at

3    the time.

4          MR. ROSENBAUM:  Objection to the assumption.

5          THE COURT:  The jury will disregard the assumptions.

6    A.  I am not sure, sir.

7    Q.  So you do not recall why she refused medical treatment?

8    A.  No.

9    Q.  Do you recall discussing with Ms. Francois whether she

10   wanted to press charges against Mr. Mazer?

11   A.  Yes.

12   Q.  And did she want to press charges?

13   A.  No, she id not.

14   Q.  Do you have an understanding as to why she did not?

15          THE COURT:  If she -- if there was something that was

16   said but not if you are just assuming.

17   A.  No, it's not an assumption.  She had stated to me that Mrs.

18   Mazer was away on business or not in Manhattan and the child

19   would not have anybody to take care of her if Mr. Mazer was

20   arrested.

21   Q.  You spoke with Ms. Francois that evening?

22   A.  Yes.

23   Q.  Did you speak with defendant Mazer that evening?

24   A.  Not as much as I did with Ms. Francois.  I believe

25   Mr. Mazer spoke with the other officer and the sergeant on the

1  scene.

2  Q.  Did you speak with him at all?

3  A.  I believe I did but I don't recall the context of the

4  conversation.

5  Q.  Do you recall whether he seemed angry?

6  A.  Yes, he did.

7        MR. ROSENBAUM:  Objection, your Honor.  He is leading

8  again.

9        THE COURT:  All right.  Try not to lead.

10  Q.  Officer Wuttke, what do you recall of defendant Mazers --

11        THE COURT:  I think you've already gotten the answer.

12  Try not to lead in the future unless you've got something else

13  that you wanted to try to elicit.

14  Q.  Did he express any other emotions at that time?

15        MR. ROSENBAUM:  Objection again.

16        THE COURT:  Your perception, Officer Wuttke, if you

17  have any impression.

18  A.  He seemed at first that he did not want to speak to the

19  police when we went to the front door.

20  Q.  And what is the basis of that belief?

21  A.  When he opened the door it was slightly ajar and we asked

22  if we could come in.  I could see that he was angry.

23  Q.  Did Mr. Mazer tell you anything about what happened that

24  night?

25  A.  Not directly to me.

1   Q.  Not directly?

2   A.  That I recall.

3   Q.  Did you observe Mr. Mazer physically that night?

4   A.  Excuse me?

5   Q.  Did you remember his appearance?

6   A.  Yes.

7   Q.  Did he appear to have sustained any physical injury?

8            MR. ROSENBAUM:  Objection; leading.

9            THE COURT:  How did he appear?

10  Q.  How did he appear?

11  A.  He did not appear injured.

12  Q.  Did you discuss medical assistance with Mr. Mazer?

13  A.  No, I did not.

14  Q.  Did you create any record of -- strike that.  Did Mr. Mazer

15  describe any physical concerns at that time?

16           MR. ROSENBAUM:  Objection again to leading, your

17  Honor.

18           THE COURT:  Why don't you put it as does she recall

19  anything at all other than?

20  Q.  Do you recall anything else about Mr. Mazer's physical

21  appearance at that time?

22  A.  No that I am aware, no.  I don't recall.

23  Q.  Officer Wuttke, did you speak with the defendant's daughter

24  that evening?

25  A.  Yes, I did.

1   Q.  And do you recall what you spoke about?

2   A.  I asked her if she was okay and my main goal was to make

3   sure that there was no injuries to the child.

4   Q.  And did you tell you anything about her observations of the

5   incident?

6           THE WITNESS:  Am I able to say what she stated to me?

7           THE COURT:  Hold on.  Let me think about it.  I have

8   to work through a couple of things.

9           Is there an objection?

10          MR. ROSENBAUM:  Yes.

11          THE COURT:  Yes, you may.

12  A.  I asked her if she saw what happened and she stated no.

13  And I asked her if she heard anything that had happened.  And

14  she stated that her father and Ms. Francois had an argument.

15  And that was -- I don't want to push the issue any further

16  because I didn't feel it was necessary.  She didn't have any

17  injuries, suitable living conditions, well taken care of,

18  obviously, and she was visibly shaken.  She was shaking.

19  Q.  Officer Wuttke, can you -- ask you to turn to what is Tab

20  Two in the binder in front of you.  Reads at the top New York

21  City Police Department -- forms system complaint.

22  A.  Yes.

23  Q.  Do you recognize this document?

24  A.  Yes, I do.

25  Q.  Was this document prepared but you?

1    A.  No, it is not.  I do a handwritten document and then it

2    get's entered into the computer and then we -- this is the

3    result of the handwritten document.

4    Q.  So if I understand you the information in this report was

5    collected by you?

6    A.  Excuse me.

7    Q.  The information that's contained in this report though was

8    collected by you?

9    A.  Yes, it was.

10   Q.  And is it standard procedure for you to collect information

11   and then to have reports such as this generated?

12   A.  Yes.

13   Q.  Would you believe this report is a fair and accurate

14   representation of your understanding at the time that it was

15   created?

16   A.  Yes.

17   Q.  And was it created near in time to when you made the

18   observations reflected in the report?

19   A.  Yes, it was.

20          MR. MYATT:  Your Honor, at this time plaintiffs would

21   like to move the document behind Tab 2 into evidence as

22   Plaintiff's Exhibit 9.

23          THE COURT:  All right.  Any objection?

24          MR. ROSENBAUM:  No objection.

25          THE COURT:  All right.  Plaintiffs Exhibit 9 admitted.

1          (Plaintiff's Exhibit 9 received in evidence)

2          MR. MYATT:  Your Honor, may I publish the report to

3     the jury?

4          THE COURT:  You may.

5     BY MR. MYATT:

6     Q.  Officer Wuttke, if I can direct your attention to the

7     narrative section -- actually, I am not going to ask you any

8     questions about this document.  I think we've already covered.

9     Can I ask you to turn to what is Tab Three in the binder in

10    front of you which has previously been marked as Plaintiff's

11    Exhibit 7.  Just take a moment to flip through that exhibit.

12          (Pause)

13    Q.  Looking at page one of the exhibit, is this photograph

14    consistent with your recollection of Ms. Francois' appearance

15    on the night of December 18, 2008?

16    A.  Yes.

17    Q.  Turning to the second page of the exhibit, is this

18    photograph consistent with your recollection of Ms. Francois'

19    appearance on the night of December 18, 2008?

20    A.  Yes.

21    Q.  Officer Wuttke, do you recall -- did any other female

22    officer report to the scene that night?

23    A.  Not that I recall.

24    Q.  Turning to the third page of the exhibit, is this

25    photograph an accurate depiction of your recollection?

1    A.   Yes.

2    Q.   Turning to the fourth page.  Is this picture consistent

3    with your recollection of Ms. Francois' appearance on the night

4    of December 18, 2008?

5    A.   Yes.

6    Q.   Officer Wuttke, did you have an opinion as to whether

7    Mr. Mazer --

8              THE COURT:  You can't make her an expert witness.

9              MR. MYATT:  I can't ask that question.

10   Q.   On the night of December 18, 2008 when you arrived to the

11   scene of the incident, did you consider arresting any

12   individual?

13             MR. ROSENBAUM:  Objection.

14             THE COURT:  Overruled.

15   A.   Yes, I did.

16   Q.   Was that individual defendant Matthew Mazer?

17   A.   Yes.

18   Q.   And why did you not arrest Mr. Mazer?

19   A.   Ms. Francois dissuaded me stating that she just wanted a

20   report for her records and that she -- appeared that there

21   wouldn't be anybody able to watch the child.

22             MR. MYATT:  No further questions, your Honor, at this

23   time.

24             THE COURT:  All right. thank you.

25             Mr. Rosenbaum.

1   CROSS-EXAMINATION

2   BY MR. ROSENBAUM:

3   Q.  Good morning, officer.

4   A.  Good morning.

5   Q.  Officer, you came to court on Monday of this week?

6   A.  Yes, I did.

7   Q.  And were you instructed by counsel for the plaintiff that

8   you must wait outside the courtroom while testimony was going

9   given?

10  A.  No, I was not.

11  Q.  Were you in the courtroom -- were you outside the courtroom

12  with other potential witnesses, if you know?

13  A.  Yes, I was.

14  Q.  Did any of them tell you that you're not supposed to --

15  A.  Excuse me.  Could you repeat that?

16  Q.  You were not to come into -- any witness come into the

17  courtroom while the trial was going on?

18  A.  No, they did not.

19  Q.  Officer, how many times have you testified in court?

20  A.  In criminal court I don't know.  I couldn't give you a

21  number.  More than 50.

22  Q.  Criminal?

23  A.  Yes.

24  Q.  Isn't it a fact that you are always instructed by the

25  assistant district attorney, do not come in while the witness

1    is testifying?

2              MR. MYATT:  Objection.

3              THE COURT:  Overruled.  Why don't you ask her if she

4    was here during the testimony.

5    Q.  Were you here during the testimony yesterday?

6    A.  For yesterday, no.  I sat outside.

7    Q.  You didn't sit in the back of the room yesterday?

8    A.  Probably for about a half an hour to let the -- I guess,

9    the assistant know that I was here.

10   Q.  I am sorry?

11   A.  To let the assistant know that I was here, yes, I was

12   sitting in the back.

13   Q.  You heard who testify?

14   A.  Yes, I heard some testimony.

15   Q.  From who?

16   A.  I believe Ms. Francois was sitting on the stand.

17   Q.  And did you let counsel know that you were here listening

18   to the testimony?

19   A.  Yes.  That's when they instructed me to wait outside.

20              (Continued on next page)

21

22

23

24

25

1  BY MR. ROSENBAUM:

2  Q.  That was after how long you heard the testimony?

3  A.  Probably a half hour.

4  Q.  Is it your testimony you didn't tell counsel, that counsel

5  did not tell you not to be in this courtroom during testimony

6  at any time before you came in?

7  A.  No, they did not.  I was asked about it after I let the

8  assistant know that I was here.  She said you have to wait

9  outside during testimony.  I said OK.

10 Q.  What is a domestic violence case?

11 A.  Domestic violence case is when you have people that are

12 intimate, living together and have children in common or have

13 previously dated.

14         THE COURT:  We are not going to make her an expert

15 witness.  Ask her about the incident, the topic of her

16 examination.  We are not going to make her an expert witness on

17 domestic violence.

18 Q.  Was this a domestic violence case?

19 A.  No, it was not.

20 Q.  Officer, when you came to the property, the house, did you

21 come there because there was an alleged crime that took place?

22 A.  Yes, sir.

23 Q.  Assault in the third degree?

24 A.  Yes.

25 Q.  What is assault in the third degree?

1   A.  Anything that causes physical injury, pain, swelling,

2   visible injury, without a weapon, without serious physical

3   injury.

4   Q.  In an assault in the third degree, would you be compelled

5   to take pictures of the victim?

6   A.  If she wanted to prosecute, yes.

7   Q.  Before she wanted to prosecute, would you take pictures of

8   the victim?

9   A.  No.

10  Q.  Isn't it protocol to take pictures of the victims when you

11  come to the scene and you see an injury?

12  A.  No.

13              MR. MYATT:  Objection.

14              THE COURT:  Overruled.

15  Q.  Did you have a memo book that night?

16  A.  Yes, I did.

17  Q.  Do you have it with you?

18  A.  No, I do not.

19  Q.  Where is your memo book?

20  A.  I have a memo book that I am using for today.

21  Q.  The one you had the night of the incident?

22  A.  I was not instructed to bring it.

23  Q.  What would be included in that memo book?

24  A.  Probably just the radio run.

25  Q.  Doesn't it include the charges?

1    A.  If there are no charges to be filed I wouldn't put down the

2    charge.

3    Q.  Would it include some history of what went on, what you

4    did?

5    A.  Yes, there probably will be information on what's called

6    the fly page of both parties concerned.

7    Q.  Isn't it a common duty to bring your memo book with you

8    when you testify?

9            MR. MYATT:  Objection.

10           THE COURT:  Sustained.  I don't understand the

11   relevance of this in terms of the documentation.  Ask what

12   documents she did have.

13   Q.  Would the memo book assist you in recollection of what

14   happened that day?

15   A.  Yes, it would.

16   Q.  You would not remember the date independently without that

17   memo book, would you?

18           MR. MYATT:  Objection.

19           THE COURT:  Overruled.

20   A.  Yes, I would; I do recall certain instances of the night.

21   Q.  How many years ago did this occur?

22   A.  Four.

23   Q.  How many arrests have you gone to between the last 4 years?

24   A.  Probably about 50.

25   Q.  You remember this one individually without a memo book?

1    A.  Yes.

2    Q.  If Ms. Francois did not want to file charges because the

3    child might have been left alone, could she have filed charges

4    the next day?

5    A.  Yes.

6    Q.  Did you speak to her the next day?

7    A.  No, I did not.

8    Q.  Do you know if she came to the precinct the next day?

9    A.  I don't recall.

10   Q.  Would there be any record if she came to the precinct the

11   next day?

12   A.  Yes.

13   Q.  Is it on any record you brought today?

14   A.  No.

15   Q.  What kind of record would there be at the precinct that she

16   came the next day?

17   A.  There is a sign-in book for people that want to come in and

18   make complaints or pick up reports, they can sign it or they

19   cannot sign, they don't have to sign it, but if they need proof

20   they were there, they would sign it.

21   Q.  If she actually filed a complaint wouldn't it be in your

22   files?

23        MR. MYATT:  Objection.

24   Q.  Police department files?

25   A.  What do you mean my file.

C664FRA3                    Wuttke - cross

1    Q.  Do you have file or does the police department have a file

2    with reference to this incident?

3    A.  Yes, they would but I would not have control over it.

4    Q.  If the file was subpoenaed to court, it would include every

5    injury report?

6            MR. MYATT:  Objection.

7            THE COURT:  Overruled.

8    A.  Yes.

9    Q.  Is there in the documents that you have in front of you

10   which I assume are all police department documents --

11           MR. MYATT:  Objection.

12           THE COURT:  Sustained.  No need to comment on them,

13   your intro.

14   Q.  Do you have any document in there which shows that she went

15   back to the precinct the next day to file a complaint?

16   A.  No, sir.

17   Q.  Please look at Exhibit 1, it says incident information

18   slip?

19   A.  Yes.

20   Q.  Is that your handwriting?

21   A.  It looks similar to my handwriting but I cannot confirm

22   that that is my handwriting.

23   Q.  It seems to be your handwriting?

24   A.  Yes.

25   Q.  Do you recall filling out that document?

1    A.  No, I do not.

2    Q.  Were you on duty on December 19?

3    A.  I can't answer that; I don't know.

4    Q.  Do you know when this, was this report filed at the

5    precinct or was this a report you prepared at the scene?

6    A.  My report was prepared later on after we left the scene.

7    Q.  That would be December 19, the date on top of it?

8    A.  No.

9    Q.  Who wrote 12/19/08?

10   A.  I don't know.

11   Q.  Is that your handwriting?

12   A.  Like I said, it could or could not be; it does not look

13   like my handwriting but it could be.

14   Q.  You were on duty on 12/19, the next morning, right, after

15   midnight, correct?

16   A.  After midnight?

17   Q.  What was your tour of duty that day?

18   A.  I finished up at 11:30.

19   Q.  Who put the date 12/19/08?

20   A.  Don't know, sir.

21   Q.  You prepared that document you believe?

22   A.  I believe I filled it out but it does not look like my

23   handwriting.

24   Q.  Was that document prepared by you at the precinct or where?

25   A.  I don't recall.  It's standard procedure when you take

1   information from somebody and they request a report to give

2   them this slip to show them that they in fact filed a report.

3   It has really no bearing on anything other than that they have

4   a record that they made a report.  It could have been that I

5   did not have one of slips.  Sometimes if you don't have a slip

6   on you, you handwrite something on a piece of paper to let them

7   know where to get a copy of the report.

8   Q.  There is no document, last question on this issue, no

9   document that you have produced or seen that indicates that

10  Ms. Francois came to the precinct the following day and filed a

11  complaint?

12          MR. MYATT:  Objection.

13  Q.  Is that correct?

14          THE COURT:  Overruled.

15  A.  I have no idea if she came to the precinct the next day.

16  Q.  There is no record that shows that she did come there?

17  A.  No, there is no record in this binder.

18  Q.  When you came to the scene, did you take Ms. Francois back

19  up to the apartment with you?

20  A.  I believe I did; I am not quite sure.

21  Q.  Page 32, line 4 of the deposition taken of you on May 3,

22  2010, do you have that, officer?

23  A.  Yes, I do.  What was the line?

24  Q.  I am sorry?

25  A.  Page 32, line --

1    Q.  Starting with line 1, do you remember being asked:

2    "Q.  So after you spoke with Ms. Francois in the lobby --

3    "A.  That's when we went up to the apartment.

4    "Q.  Did Ms. Francois go up with you to the apartment?

5    "A.  I believe she did."

6           During do you recall being asked those questions and

7    giving those answers?

8    A.  Yes, I do.

9    Q.  Does that refresh your recollection that you went up with

10   Ms. Francois to the apartment?

11   A.  I believe she did.

12   Q.  When you went up to the apartment with Ms. Francois, what

13   did you do when she was there?

14   A.  I don't recall.

15   Q.  Did you speak with Mr. Mazer and Ms. Francois at the same

16   time?

17   A.  I don't recall.

18   Q.  Did the apartment look that violence had taken place there?

19   A.  If I remember correctly there was some things that were

20   knocked over on a table in what I believed to be like a living

21   room.

22   Q.  In the living room?

23   A.  Yes.

24   Q.  What did the living room look like?

25   A.  It had carpet, white walls, a lot of books.

1  Q.  What was knocked over?

2  A.  Looked like books, papers.

3  Q.  Did you take pictures of the scene?

4  A.  No, sir.

5  Q.  When you went up to the apartment, at that point did you

6  come to a conclusion before you went up to the apartment would

7  there be an arrest?

8  A.  I couldn't make that determination until after I entered

9  the apartment.

10 Q.  So when Ms. Francois first spoke to you downstairs --

11 A.  Yes.

12 Q.  -- even though she didn't want to make an arrest allegedly,

13 you didn't make a determination at that point whether you were

14 making an arrest or not, correct?

15 A.  Like I said, I can't arrest somebody if the other party

16 does not want to press charges.  We also have check on the

17 child and check on the other person involved.

18 Q.  So are you telling this jury that if you came into a lobby,

19 let's assume a victim was slashed up.

20         MR. MYATT:  Objection.

21         THE COURT:  Sustained.  Let's not go with

22 hypotheticals.  Ask her what happened here.

23 Q.  You saw bruises on Ms. Francois?

24 A.  Yes.

25 Q.  Was that consistent with an assault if you knew the facts

1   of what occurred?

2   A.  Yes.

3   Q.  An assault is a misdemeanor?

4   A.  Yes, it is.

5   Q.  In your opinion, you didn't have an opinion whether or not

6   to make an arrest at that time, correct?

7   A.  Yes.

8   Q.  Even though she did not want an arrest you still did not

9   make a decision, correct?

10  A.  Did not make a decision.  How do I know there is not a

11  party injured upstairs, sir.

12  Q.  We were speaking about Ms. Francois.  With reference to

13  Ms. Francois not another party, you did not make a decision at

14  that point that there should be an arrest, is that correct?

15  A.  Yes.

16  Q.  You wanted to further investigate?

17  A.  Yes.

18  Q.  When you spoke to Mr. Mazer, did Mr. Mazer say to you that

19  she attacked me?

20  A.  I don't recall but I believe like I said before the other

21  personnel that were on the scene spoke to Mr. Mazer more than I

22  did.

23  Q.  Do you recall anything that he said to you?

24  A.  Honestly, I am not going to guess, I don't recall.

25  Q.  Before you made a determination not to make an arrest, were

1    you waiting to hear what Mr. Mazer or anyone else may have

2    said?

3    A.  Not necessarily.

4    Q.  Was it possible?

5    A.  It's possible, yes.

6    Q.  You went to Mr. Mazer to ask questions to evaluate, I don't

7    want to put words in your mouth, evaluate maybe an arrest

8    should be made or should not be made; was that part of the

9    reason you spoke with Mr. Mazer?

10   A.  Yes.

11   Q.  In fact, you did speak to Mr. Mazer.  I call to your

12   attention page 31, line 3 of the same deposition we spoke about

13   before.  Do you recall being asked the question --

14   A.  Yes.

15   Q.  You were speaking to Mr. Mazer, line 3:

16   "Q.  Did Mr. Mazer state to you that night that Mr. Francois

17   had attacked him?"

18            Remember being asked that question?

19   A.  Yes, I do.

20   Q.  The answer is yes, he did, correct?

21   A.  Yes.

22   Q.  (Reading)

23   "Q.  And what did he say?

24   "A.  I believe he said that she grabbed his shirt."

25            Do you remember that?

1    A.  Yes.

2    Q.  (Reading)

3    "Q.  Anything else?

4    "A.  Not that I recall."

5            Correct?

6    A.  Yes.

7    Q.  Would you in the ordinary course of your business, or

8    profession I should say, make a report as to what the parties

9    said in your memo book?

10   A.  No.

11   Q.  Is that your testimony, you don't make a report or memo?

12   A.  The memo book is to show where I am going, what jobs I

13   answered; it doesn't necessarily have to be what people have

14   stated.

15   Q.  Did you memorialize any of the questions and answers given

16   by the respective parties in any document that you wrote?

17   A.  Complaint report.

18   Q.  Anything else?

19   A.  That's it, and the 85.

20   Q.  When you spoke to Mr. Mazer did you take into consideration

21   what he said with respect to being arrested?

22   A.  I don't recall.

23   Q.  Did he say I refuse to answer any questions because I want

24   to get a lawyer?

25   A.  No.  He was not being formally interviewed, sir.

1  Q.  When you went up there, he definitely was a suspect to you,

2  is that correct?

3          THE COURT:  You don't have to go into the whole

4  Miranda issue.

5          MR. ROSENBAUM:  Your Honor, please.

6          THE COURT:  I will give you a little leeway.

7  Q.  If he had admitted attacking her, would that admission be

8  incorporated in your papers?

9  A.  Yes, the complaint report, yes.

10 Q.  If he said to you, I don't want to speak to you because I

11 want to get a lawyer, would that be put down in your papers?

12         MR. MYATT:  Objection.

13         THE COURT:  Overruled.

14 A.  I would have to go with the situation.  I mean, that's if I

15 am sitting down and formally interviewing him knowing that I am

16 going to arrest him; at that point, no, I would not put that

17 down in my memo book.

18 Q.  So you went up to the apartment for a purpose to speak to

19 him, is that correct?

20 A.  Yes, that is.

21 Q.  The reason was to find out I presume what happened?

22 A.  Yes.

23 Q.  If he admitted to you that he beat her up, you would have

24 had him arrested at that point?

25 A.  That would have been up to the sergeant at that point.

1  Q.  You would have recommended an arrest, is that correct?

2  A.  Yes.

3  Q.  So, notwithstanding the fact that Ms. Francois says I don't

4  want him arrested, you would be obliged to make an arrest, is

5  that correct?

6          MR. MYATT:  Objection.

7          THE COURT:  Overruled.

8  A.  I would not be obliged make an arrest, sir.

9  Q.  In your judgment, in your judgment, where a person admits

10 the commission of an assault --

11         THE COURT:  Sustained; you can't go there.  I think

12 you have made the point.  We are going to take the mid-morning

13 break.

14         MR. ROSENBAUM:  Can we do it now.

15         THE COURT:  I was hopeful we would be done with the

16 witness.  How much longer.

17         MR. ROSENBAUM:  A little break would not hurt me at

18 this moment, your Honor.

19         THE COURT:  All right.  Let's take our mid-morning

20 break right now, about 10 minutes.  Try to keep it to 10

21 minutes so we can proceed apace.  I remind the jury not to talk

22 to each other or to anybody about anything you heard so far and

23 continue to keep an open mind because there is still a lot of

24 evidence to come in.

25         (Jury leaves courtroom)

1          THE COURT:  Anything we need to go over.

2          MS. TREPELKOVA:  The logbook, I plan to introduce it

3     with Mr. Gonzalez.

4          THE COURT:  You two work it out.  I will come back on

5     the bench a minute before we recommence; hopefully you will

6     have worked out any issues, or we will do what we said, which

7     is, you can question on the logbook but we won't admit it

8     until --

9          MS. TREPELKOVA:  I am going to be asking him about

10    entries in the logbook.

11         THE COURT:  You can do that.  You can't publish it

12    until we have a version you have agreed on or I have ruled on.

13         (Recess)

14         THE COURT:  I have one thing first before we bring the

15    jury out.  Have you reached agreement on the logbook or are we

16    just going to talk about the logbook then worry about

17    publishing a version to the jury later on.

18         MS. TREPELKOVA:  I was just given plaintiff's copy.  I

19    flipped the pages at random to see if they match what I have.

20    They do match so far.  I did 20 random pages.  Mr. Myatt's

21    concern is because there was one part of the logbook produced

22    early on in the litigation that was redacted, it was only part

23    of the logbook.  Subsequently when we entered into the

24    confidentiality stipulation, we produced full unredacted copies

25    which I am assumes where they prepared theirs from and that's

1    where I prepared my exhibit from.  They should be the same.

2              MR. MYATT:  We have not had a chance to confirm that,

3    to look at their newly redacted version either.

4              THE COURT:  Let's not argue about it now.

5              MR. MYATT:  I don't think we have a problem.

6              THE COURT:  Is it the same logbook she produced

7    yesterday, the same redactions.

8              MS. TREPELKOVA:  It's the same logbook but different

9    redactions.

10             THE COURT:  Is this the redacted version you gave to

11   them or referred to them yesterday.

12             MS. TREPELKOVA:  Yes.

13             THE COURT:  Why didn't you guys do it overnight.  This

14   is one of the issues we shouldn't be dealing with right now.

15   You will come back to it.  Here is another issue.  Juror No. 4

16   knows somebody named Ulysses Gonzalez.  I referred to I think

17   Ulise Gonzalez during voir dire.  When his name came up today

18   as Ulysses, the juror told the deputy he thinks he may know an

19   individual named Ulysses Gonzalez.  I asked my deputy to get a

20   physical description so we can determine whether it's the same

21   Ulysses Gonzalez.  The Ulysses Gonzalez Juror No. 4 knows is

22   5'3", dark hair, has a heart problem, used to work at Altiman

23   Lighting.  Is this the same guy; do we know.

24             MR. ROSENBAUM:  I can ask him.

25             THE COURT:  Is he 5' 3".

1           MS. TREPELKOVA:  He is not tall.

2           THE COURT:  5'3", has a heart problem, used to work at

3     Altiman Lighting.

4           MS. TREPELKOVA:  I don't know anything about his

5     health condition.

6           (Pause)

7           MR. ROSENBAUM:  He never worked at Altiman Lighting.

8     I asked if he had a heart condition, whatever, he has a little

9     heart problem.  I don't know if it's the same person or not.

10          THE COURT:  Dark hair, does he.  We are going to

11    proceed.  I will have my deputy check afterwards as to whether

12    or not this is the same guy.  He will have already testified.

13    The jury will be instructed not to confer with each other.  If

14    it's the same guy that he knows, one of the alternates will

15    take Juror No. 4's place.  Sufficient unto the day.  We can't

16    really, I don't want to take him out the room and introduce

17    them now; that would be inappropriate.  We can take the juror

18    in and figure out how close the relationship was, do another

19    step before dismissing Juror No. 4.  We will figure it out step

20    by step.

21          MR. ROSENBAUM:  May I make a suggestion; do we know

22    the person's name.

23          THE COURT:  Juror No. 4.

24          MR. ROSENBAUM:  I can ask him if he knows that person.

25          MS. TREPELKOVA:  Kevin Fisher.

1          THE COURT:  Good idea.

2          (Pause)

3          MR. ROSENBAUM:  Your Honor, I asked the gentleman.  He

4     said he does not know a Kevin Fisher.

5          THE COURT:  It's not that uncommon a name that there

6     couldn't be a case of mistaken identity.

7          Let's bring out the jury.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury enters courtroom)

2          THE COURT:  You may proceed.

3   BY MR. ROSENBAUM:

4   Q.  Officer, when you went back upstairs to the apartment and

5   you spoke with Mr. Mazer, where was Ms. Francois?

6   A.  I don't recall.

7   Q.  Did you go up with Ms. Francois and another person, another

8   officer?

9   A.  I recall a sergeant and another officer.

10  Q.  Did you see if Mr. Mazer, did you examine Mr. Mazer, see if

11  there were any marks on him?

12  A.  No, I didn't.

13  Q.  If there were marks on his neck, you would not have seen

14  that because you didn't examine him, is that correct?

15          MR. MYATT:  Objection.

16  A.  That's correct.

17  Q.  When you saw Ms. Francois -- withdrawn.  After you were in

18  the apartment with Ms. Francois did you and Ms. Francois go out

19  of the apartment and back downstairs?

20  A.  Yes, we did.

21  Q.  At that time is that when the EMS people came?

22  A.  I don't recall EMS coming.

23  Q.  In the report it says refused medical aid; what does that

24  mean?

25  A.  That means I if I call an ambulance for somebody and the

1  person essentially says, no, I don't want an ambulance.

2  Q.  Did you ask her why she didn't want an ambulance?

3  A.  I don't recall.

4  Q.  Did she look like she was in pain and needed an ambulance?

5  A.  Yes.

6  Q.  Did you try to convince her?

7  A.  That's not up to me to convince anybody to get medical

8  treatment.

9  Q.  Did you ask her where she would be going after the

10  incident?

11  A.  I don't recall.

12  Q.  When you spoke to the child, what did you ask her?

13  A.  First thing I asked her was she OK.

14  Q.  What did she say?

15  A.  She said yes.

16  Q.  Where was this discussion?

17  A.  In her bedroom.

18  Q.  Do you have any memorandum of this discussion?

19  A.  No.

20  Q.  Do you recall what her bedroom looked like?

21  A.  I don't recall.

22  Q.  In the ordinary course of your job, isn't it appropriate to

23  make entries of discussions you have with people?

24          MR. MYATT:  Objection, your Honor.

25          THE COURT:  Overruled.

1    A.  Appropriate as to what?

2    Q.  To have things to refresh your recollection.

3    A.  Not necessarily, no.

4    Q.  It was in your judgment that you didn't have to make any

5    notes with reference to what you spoke with the child about?

6    A.  If I felt there was some form of abuse then, yes, I would

7    have written notes, but I did not see that and, therefore, I

8    did not write it, sir.

9    Q.  Did you write any note that said there was no abuse of the

10   child?

11   A.  No, I did not.

12   Q.  There was no abuse at all, correct?

13   A.  Not that I could visibly see.

14   Q.  Was the child crying?

15   A.  Yes.

16   Q.  Was she nervous.

17   A.  Yes.

18   Q.  Did you ask her why she was nervous?

19   A.  No.

20   Q.  Did you ask her why she was crying?

21   A.  No.

22   Q.  When a child is crying or nervous, wouldn't it be possible

23   because she was abused?

24           MR. MYATT:  Objection.

25           THE COURT:  Sustained.  To what end.

1  Q.  You didn't ask her why she was crying, you didn't ask her

2  why she was nervous, and you really don't remember what your

3  entire conversation was?

4              THE COURT:  Sustained.  We have to move this along.

5  You have already gone through those questions and answers now.

6              MR. ROSENBAUM:  I have no further questions.

7              THE COURT:  Thank you.  Anything else that is really

8  quite necessary.

9              MR. MYATT:  Your Honor, we have no further questions

10 of this witness.

11             THE COURT:  Thank you.

12             Thank you, officer, you may step down.

13             (Witness excused)

14             THE COURT:  Are there any additional witnesses for

15 plaintiff.

16             MR. MYATT:  No, your Honor.

17             THE COURT:  Does the plaintiff rest.

18             MR. MYATT:  Subject to rebuttal.

19             THE COURT:  Will defense call its first witness.

20             MR. ROSENBAUM:  Can we reserve our opportunity to make

21 motions.

22             THE COURT:  Yes.

23             MS. TREPELKOVA:  Defense calls Steve Govas to the

24 stand.

25  PANAGIOTIS STEVE GOVAS,

1          called as a witness by the Defendants,

2          having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MS. TREPELKOVA:

5    Q.   Where do you currently work.

6    A.   At the Briarcliff.

7    Q.   Where is that located?

8    A.   171 West 57th Street in Manhattan.

9    Q.   How long have you worked there?

10   A.   Close to 9 years.

11   Q.   Would it be fair to say that you started somewhere in 2003

12   or 2004?

13   A.   Yes.

14   Q.   When you first started working what were your hours?

15   A.   That would be 6:15 in the morning until 2:15 in the

16   afternoon.

17   Q.   Were you working full or part-time?

18   A.   Part-time.

19   Q.   Did there come a time when your schedule changed?

20   A.   Yes, about 2 or 2-1/2 years later, I was offered a

21   full-time shift.

22   Q.   Would it be fair to say approximately 2005 when your shift

23   changed?

24   A.   Yes.

25   Q.   You began full-time?

1   A.  Yes.  That was in the evenings.

2   Q.  What were those hours?

3   A.  10:15 p.m. until 6:15 a.m.

4   Q.  What days of the week did you work?

5   A.  Wednesday night through Sunday night.

6   Q.  Did you work from 2005 to present continuously at that job?

7   A.  Yes.

8   Q.  Other than vacations did there come time when you took a

9   leave of absence?

10  A.  No.

11  Q.  Those are your hours 2005 through 2012, is that correct?

12  A.  Yes.

13  Q.  Did there come a time when you met Pat Francois?

14  A.  Yes, I did.

15  Q.  Do you recognize her to be the lady sitting at that table?

16  A.  Yes.

17  Q.  When was that?

18  A.  When I worked the day shift as a part-timer.

19  Q.  Do you know what year that was?

20  A.  That I don't remember.

21  Q.  But it was when you were working the part-time shift?

22  A.  Yes.

23  Q.  When would you typically see Ms. Francois?

24  A.  When I worked part-time I was there on Thursday and Friday

25  during the day and that's usually when I would run into her.

1  Q.  What time of the day if you remember?

2  A.  That I am not sure but it was on either one of those two

3  days that I might have seen her.

4  Q.  When you started working your full-time shift, the night

5  shift you subsequently took around 2005, did you continue to

6  see Ms. Francois?

7  A.  When I started my shift I don't remember seeing her at that

8  time of the evening.

9  Q.  Did you ever see her in the evening when you started that

10  shift?

11  A.  I don't think I did, no.

12  Q.  Do you remember seeing her in 2005?

13  A.  Not at night.

14  Q.  2006?

15  A.  No, I don't think so.

16  Q.  2007?

17  A.  I don't think so.

18  Q.  2008?

19  A.  No.

20  Q.  2009?

21  A.  No.

22       MS. TREPELKOVA:  She wasn't working in 2009; I will

23  withdraw that.

24  Q.  Would it be fair to say you never saw her after 10:15 p.m.

25  when your night shift began?

1   A.  Yes.

2   Q.  Directing your attention to the big binder in front of you,

3   flip to tab A, do you recognize this document?  You can flip

4   through the pages if you need to.

5   A.  This would be from our logbook.

6   Q.  Sorry?

7   A.  What do you want me to ask?

8   Q.  Do you recognize what that document is?

9   A.  Yes, I think it's from our visitors logbook.

10  Q.  Thank you.  When you were working the full-time shift, the

11  night shift, did you ever see the Mazers, by that I mean either

12  Matthew Mazer or Sheryl Shade?

13  A.  Yes, I did.

14  Q.  Did you see them often?

15  A.  No; every once in a while.

16  Q.  What time would you see Mr. Mazer; how often would you see

17  him in a typical month when you were working the night shift?

18  A.  Maybe 2 or 3 times a month because he traveled for

19  business.

20  Q.  That would be the only time you typically saw him?

21  A.  Yes.

22  Q.  What about Mrs. Shade?

23  A.  Maybe almost the same amount because she also traveled.

24  Q.  Would it be fair to say you only saw them on rare occasions

25  when they were traveling during your shift?

1    A.  Yes.

2              MS. GUPTA:  Objection.

3              THE COURT:  Overruled.

4    Q.  Did you have an understanding when you started the shift at

5    10:15 p.m. if you didn't see the Mazers that night that they

6    were upstairs?

7              MS. GUPTA:  Objection.

8              THE COURT:  Sustained.  If he knows they were

9    upstairs, you can ask him, if he saw them go upstairs,

10   something like that.

11   Q.  Did you ever see them going upstairs at the beginning of

12   your shift?

13   A.  I would either see Mr. Mazer or Mrs. Mazer.

14   Q.  You never saw them together?

15   A.  Might have been very rarely.

16   Q.  When you worked on the night shift if visitors come into

17   the building do they need to sign in the logbooks you

18   mentioned?

19   A.  Yes.

20   Q.  Do they also need to sign out?

21   A.  We usually sign them out.

22   Q.  If someone is there in the morning and they leave but come

23   back, do they have to sign out and in every time they come in

24   and out or just once in the morning and then when they finally

25   leave for the night either you sign them out or they sign

1   themselves out?

2           MS. GUPTA:  Objection.

3           THE COURT:  Ask him his normal practice.

4   Q.  What is your normal practice for signing visitors in and

5   out of the building.

6   A.  If they show up on my shift, I usually have them sign in,

7   then as they are leaving, I would use usually sign them out.

8   Q.  Leaving for the day?

9   A.  If they're going home.

10  Q.  What about if they just leave the building?

11  A.  No, no, if they tell me they are coming right back, then I

12  won't sign them out.

13  Q.  Your normal practice is to sign them in when they come in

14  then out when they are leaving to go home for the day?

15  A.  Yes.

16          (Pause)

17  Q.  When did you meet Mr. Mazer?

18  A.  I think it was around 2005.

19  Q.  How well do you know Mr. Mazer?

20  A.  Pretty well, from the time that I helped him with any

21  packages, or if they were leaving for a trip or coming home

22  from a trip.

23  Q.  Do you have any opinion about what his character is for

24  truthfulness and veracity?

25          MS. GUPTA:  Objection.

1              THE COURT:  Overruled.

2    Q.  You can answer.

3    A.  He is a polite person, professional, very easy-going.

4    Q.  Have you ever spoken with other employees in the building

5    about Mr. Mazer?

6    A.  No, only if we needed to do something.

7    Q.  Have you ever seen Mr. Mazer wear a neck brace?

8    A.  That I am not sure.

9    Q.  Were you working on December 18, 2008?

10   A.  I don't remember what day that was.  I might have been, if

11   it was Wednesday through Sunday, then I was at work.

12   Q.  Do you remember coming to hear about an incident involving

13   Ms. Francois?

14             MS. GUPTA:  Objection.

15             THE COURT:  Do you know about an incident involving

16   Ms. Francois; were you there that evening?

17             THE WITNESS:  I worked that evening, but I don't

18   remember being told about it the same day or the following day.

19   Q.  You never saw Ms. Francois that evening?

20   A.  No.

21   Q.  Did you ever see Mr. Mazer that evening?

22   A.  No.

23             MS. TREPELKOVA:  No more questions.

24             THE COURT:  Thank you.

25             Ms. Gupta.

1    CROSS EXAMINATION

2    BY MS. GUPTA:

3    Q.  I am Seema Gupta; I represent the plaintiff.

4         What days of the week did you say you currently work?

5    A.  Wednesday night through Sunday night.

6    Q.  You don't work Monday night?

7    A.  No.

8    Q.  You have no personal knowledge what time people enter the

9    building on Monday?

10   A.  What time they enter?

11   Q.  On Mondays?

12   A.  It's usually different times.

13   Q.  You are not in the building on Mondays, is that correct?

14   A.  I thought you meant Wednesday.

15   Q.  Monday?

16   A.  Monday, no.

17   Q.  You have no personal knowledge what time they exit the

18   building on Mondays?

19   A.  No.

20   Q.  You don't work Tuesday, is that correct?

21   A.  That's correct.

22   Q.  Again, you have no personal knowledge what time people

23   enter and exit the building on Tuesday?

24   A.  No.

25   Q.  You also take vacations, is that correct?

1    A.  Yes.

2    Q.  Two to three weeks?

3    A.  Yes.

4    Q.  While you were on vacation you have no personal knowledge

5    who comes in and who exits the building?

6    A.  No.

7    Q.  What year did you say you believe defendants Mazers moved

8    into the building?

9    A.  I think either 2004 or 2005.

10   Q.  In 2005 you switched to the schedule of 10:15 to 6:15?

11   A.  Yes.

12   Q.  That was 10:15 p.m. to 6:15 a.m.?

13   A.  That's right.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. GUPTA:

2   Q.  And you saw them once in a while during that time period

3   right?

4   A.  Yes.

5   Q.  And based on seeing them once in a while you are able to

6   testify as to Mr. Mazer's credibility and truthfulness?

7   A.  Yes.

8   Q.  How many interactions would you say you have had with

9   Mr. Mazer?

10  A.  Like what in a one week period or a month?

11  Q.  In a month.

12  A.  It's about four times, five times.

13  Q.  Four times or five times a month?

14  A.  Yes.

15  Q.  And how long do those interactions last?

16  A.  I think for a few minutes.

17          MS. GUPTA:  Thank you, your Honor.  No further

18  questions.

19          THE COURT:  All right.  Thank you.

20          Anything further, Ms. Trepelkova?

21          MS. TREPELKOVA:  No.  Thank you.

22          THE COURT:  All right.  Sir, you may step down.  Thank

23  you, sir.

24          Would the defense like it call its next witness.

25          MS. TREPELKOVA:  Defense now calls u lis see Gonzalez.

1              THE COURT:  Mr. Gonzalez to the stand.

2       ULISE GONZALEZ,

3            called as a witness by the Defendants,

4            having been duly sworn, testified as follows:

5     DIRECT EXAMINATION

6     BY MS. TREPELKOVA:

7     Q.   Good morning, Mr. Gonzalez.  Are you currently employed?

8     A.   Yes.

9     Q.   Where are you employed lease?

10    A.   At Briar Cliff.

11    Q.   Where is that located?

12    A.   171 West 57 Street.

13    Q.   And what's your current position?

14    A.   Superintendent.

15    Q.   What duties do you do, generally, as a superintendent?

16    A.   Maintenance of the building, day-to-day, basically,

17    construction, take care of the construction, anything that goes

18    in and out of the building, orders, basically day-to-day

19    interaction with the office, the board, any residents.

20    Q.   Do you supervise any staff?

21    A.   Yes, I do.

22    Q.   Do you supervise the doormen?

23    A.   Yes.

24    Q.   How long have you had a position as superintendent?

25    A.   About six years now.

1    Q.  Is it fair to say you had that position since 2006?

2    A.  Yes.

3    Q.  Were you employed with the Briar Cliff before 2006?

4    A.  Yes.

5    Q.  What was your position before?

6    A.  I was first when I started in 1998 as a porter.  I believe

7    I did that for about three to four years, then I became the

8    handyman.

9    Q.  So you have been working with them for a long time?

10   A.  Yes.

11   Q.  Right now as the superintendent what are the hours that you

12   typically work?

13   A.  Usually to me I say I don't have no hours.  But normally

14   it's eight to four.  I am there eight to five, six, whatever is

15   needed.

16   Q.  What about days of the week?

17   A.  Days of the week?  That would be usually as I'm up by

18   seven, so I would be depending on what's going on till about

19   six, seven o'clock.

20   Q.  I am sorry.  I -- just what days of the week do you usually

21   work?

22   A.  Monday through Friday.

23   Q.  And Monday through Friday your hours are what you testified

24   earlier eight to four, five, six depending?

25   A.  Yes.

1    Q.  I just want to direct you to the binder that's in front of

2    you, the bigger one right there.  Can you just flip to Exhibit

3    8 for me please.  Can you just take a look at those pages.  Do

4    you recognize that document?

5    A.  Yes.

6    Q.  What do you recognize it to be?

7    A.  That's our logbook, basically, our sign-in logbook.

8    Q.  Is that the logbook for the Briar Cliff?

9    A.  Yes.

10   Q.  Do you keep that logbook in the ordinary course of your

11   business?

12   A.  Yes.

13   Q.  Is that logbook in front of you a fair and accurate

14   representation of what you know the logbook to look like?

15   A.  Yes.

16            MS. TREPELKOVA:  I now move to have that admitted as

17   Defendant's Exhibit B subject to our earlier discussion.

18            THE COURT:  Any objection?

19            MR. MYATT:  Your Honor, subject to our prior

20   discussion and assuming we can resolve --

21            THE COURT:  No objection?

22            MR. MYATT:  No objection.

23            THE COURT:  All right.  No objection.  Defense Exhibit

24   A admitted or B admitted.

25            MS. TREPELKOVA:  Thank you.

1              (Defendant's Exhibit B received in evidence)

2    BY MS. TREPELKOVA:

3    Q.  Can you flip to the very end of that.

4    A.  Close to B?

5    Q.  Yes.  You could just look at the last page.

6    A.  Yes.

7    Q.  Do you see the name "Patricia Francois" anywhere on that

8    document?

9    A.  Yes.

10   Q.  Before I get there let me just ask you, what is the general

11   practice for why you keep this logbook?

12   A.  For security purpose making sure that who's coming in the

13   building they belong in the building get's any happening we

14   know who was in the building at what time, what time they left.

15   Q.  Who has to sign the logbook?

16   A.  Who has to sign?  Any visitors.

17   Q.  Residents don't have to sign?

18   A.  Not residents.

19   Q.  In your normal practice when do you require the visitors to

20   sign-in and sign-out?

21   A.  As they come in for the day and as they leave for the day.

22   Q.  If they just step out for a brief moment do they have to

23   sign out and then sign back in?

24              MR. MYATT:  Objection.

25              THE COURT:  Overruled.

1    A.  We usually ask them especially if it's a nanny, a maid

2    cause on normal day we'd either ask them if they're leaving for

3    the day or they're just going to the store and will be right

4    back.

5    Q.  Just going to direct you back to the page in front of you

6    that's the last page of what is in front of you?

7              THE COURT:  Let me ask a clarifying question.  You

8    supervise the doormen who do the logging-in and logging-out?

9              THE WITNESS:  Yes.

10             THE COURT:  Do you yourself ever log people in or out?

11             THE WITNESS:  Yes, I do.

12   BY MS. TREPELKOVA:

13   Q.  Do you see Patricia Francois' name?

14   A.  Yes, I do.

15   Q.  Does it indicate what time she entered the building that

16   day?

17   A.  From here, yes.

18   Q.  Does it enter what day that's referred to?

19   A.  What day?

20   Q.  Not day of the week but what date?

21   A.  The date?

22   Q.  Um-hmm?

23   A.  11/26/08.

24   Q.  Sorry.  Looking at the last page or the next to last

25   page --

1    A.  I am sorry.  It's 12/1/08 that's the date?

2    Q.  What time does it say that she signed it in?

3    A.  1:15.

4    Q.  Does that indicate a time that she signed out on that day?

5    A.  No, it does not.  I don't see it here.

6    Q.  You can flip to the page before that.  Does that indicate a

7    date that Ms. Francois was in the building?

8    A.  Yes.

9    Q.  What date is that please?

10   A.  11/26/08.

11   Q.  Does it indicate a time that she signed-in?

12   A.  Yeah.

13   Q.  What time is that?

14   A.  Looks like -- I see two different times, 12:50 and 3:30.

15   Q.  Why would there be two different times?

16           THE COURT:  Why don't you ask, are there instances

17   when there are two different times and what are some of reasons

18   for that unless he knows about this particular entry.

19   Q.  Are there instances when there are two different time-ins?

20   A.  Could be.  If they are going to leave for a good amount of

21   hours, say an hour or two they will say, I am leaving but then

22   they will come back.

23   Q.  Does it indicate a time that she signed out of the

24   building?

25   A.  5:10.

1   Q.  Can you flip to the next page please.  I don't want to take

2   you through each entry, generally.  But can you just look

3   through some of the pages and let me know if you see any

4   time-out that's after ten o'clock?

5           THE COURT:  With respect to Ms. Francois.

6           MS. TREPELKOVA:  With respect to Ms. Francois.

7   Q.  You don't have to go through every page.

8   A.  The latest I see is 9:30.

9   Q.  What year is that you are looking at?

10  A.  2008.

11  Q.  Can you flip to the beginning of that tab that's in front

12  of you?

13  A.  Which one?

14  Q.  Same exhibit that is in front of you but towards the

15  beginning pages.  What year is that that you are looking at

16  now?

17  A.  '07, 2007.

18  Q.  If you could just do the same thing, just look through some

19  pages and tell me if you see any entries after ten o'clock

20  p.m.?

21          MR. MYATT:  Objection, your Honor.

22          THE COURT:  Overruled.  You can do what you want on

23  cross.

24  A.  So far no, nothing after ten p.m.

25  Q.  Just that page in front of you, what date are you looking

1    at right now?

2    A.  The last one was, I believe it's March 23, 2007.

3    Q.  Let me just make sure I am on the same page.  What time

4    does it show her signing in on that date?

5    A.  9:15 a.m.

6    Q.  And what time did she sign-out?

7    A.  Six p.m.

8    Q.  Thank you, Mr. Gonzalez.  You can put the binder away.  I

9    am going to direct you to December 18, 2008.  Do you have an

10   independent recollection if you were working on that day?

11   A.  Yeah, I was working.

12   Q.  Are you aware of an incident that involved Mrs.~Francois?

13   A.  Yes.

14   Q.  Can you tell me when you first learned that there was an

15   incident?

16   A.  When I first learned -- well, when I stepped in the

17   building -- I can't remember the exact time I stepped in with

18   my family and my staff told me what was transpired.

19   Q.  In around December of 2008 did you also live at the Briar

20   Cliff 171 West 57 Street?

21   A.  Yes.

22   Q.  Were you working that day or were you just coming home?

23   A.  I was just coming home.

24   Q.  I know you said you don't remember the exact time.  Do you

25   remember was it evening time?

1    A.  Evening time.

2    Q.  Who did you see when you came in?

3    A.  When I came in I saw Alex Beriguette, Vincent Ayende.  I

4    saw Patricia and I believe two or three officers.

5    Q.  When you say Alex Beriguette, what's his full name?

6    A.  Glemen Beriguette.

7    Q.  You said you saw Mrs.~Francois?

8    A.  Um-hmm.

9    Q.  Did you see if she had any physical injuries at all?

10   A.  Very minor from what I remember.

11   Q.  Where were those, please?

12   A.  If I remember it was -- I don't remember if it was the

13   right or left hand and I believe left eye.

14   Q.  Can you just take that, the thinner binder that's in front

15   of you.

16          MS. TREPELKOVA:  May I approach?

17          THE COURT:  You may.

18          (Pause)

19   Q.  If you could look at the photographs which I believe are

20   previously marked as Plaintiff's Exhibit 7.

21          THE COURT:  They are in evidence.

22   Q.  Did there come a time that you took photographs of

23   Ms. Francois that night?

24   A.  I am sorry.

25   Q.  Did there come a time that you took photographs of

1   Ms. Francois that night?

2               MR. MYATT:  Objection.

3               THE COURT:  Overruled.

4   A.  It might have helped to take a picture.

5   Q.  I am asking did you take a picture of her?

6   A.  I believe I took one, yes.

7   Q.  Why did you take a picture of her?

8   A.  She asked me to.

9   Q.  What did you take the picture with?

10  A.  I can't remember if it was a cellphone or a digital camera.

11  Q.  Was it your digital camera or cellphone?

12  A.  No, it was not.

13  Q.  Did Ms. Francois give you the --

14  A.  Yes.

15  Q.  You don't remember if it was a cellphone?

16  A.  I don't remember these pictures looking like this or

17  herself looking like this.

18  Q.  Mr. Gonzalez, did you ever develop those pictures?

19  A.  No.

20  Q.  Are those pictures that you are looking at right now, is

21  that an accurate representation of what Ms. Francois looked

22  like that night?

23  A.  Not to me, no.

24  Q.  You don't remember her looking like that?

25  A.  No.

1   Q.  Do those look like pictures that you took that night?

2   A.  Pictures looked like they were almost taken outside this

3   lobby.

4   Q.  I am sorry.  Can you repeat that?

5   A.  They almost look like they were taken outside this lobby.

6   Q.  What do you mean "outside the lobby"?

7   A.  I mean even the detail --

8           THE COURT:  Well, don't speculate.  If you know where

9   they were taken you can testify to that but don't speculate.

10  Q.  Do you recognize where the Briar Cliff or somewhere else

11  they were taken?

12  A.  Not from here.

13  Q.  Do you see any writing anywhere on those pictures?

14  A.  Yes, the top.

15  Q.  Did you write those dates?

16  A.  No, this is not my handwriting.

17  Q.  On the night in question on December 18, 2008, were the

18  police there when you came in?

19  A.  Yes.

20  Q.  Was the EMS there?

21  A.  I honestly don't recall.

22  Q.  Did you have any conversations with Mrs.~Francois other

23  than when she asked you to take photographs?

24  A.  That night?

25  Q.  Yes.

1    A.   Yes.

2    Q.   What was --

3    A.   Basically, what happened.

4    Q.   What did she say to you?

5    A.   That Mr. Mazer attacked her.

6    Q.   Did you speak with will Mazer that night?

7    A.   No, I did not.

8    Q.   Did she say anything else to you?

9    A.   No, not really.

10   Q.   Have you ever seen Mr. Mazer wearing a neck brace?

11   A.   Yes.

12   Q.   When was that?

13   A.   He's wore it before the incident but I would say a day or

14   so after.

15   Q.   Let me ask you about the day or so after.  You saw him

16   wearing a neck brace?

17   A.   Yeah.

18   Q.   For how long a period of time did you see him wearing a

19   neck brace?

20   A.   If I could remember, well over a month.

21   Q.   Did you have any conversation with him regarding that?

22   A.   Yes.

23   Q.   Did you -- tell me about that?

24            MR. MYATT:  Objection, your Honor.

25            THE COURT:  Sustained.

1   Q.  You also mentioned a time that you saw him wearing a neck

2   brace prior to this incident.  When was that to the best of

3   your recollection?

4   A.  Over -- and I am not a hundred percent sure.  At least four

5   months prior.

6   Q.  Okay.  How long a period of time was he wearing the neck

7   brace?

8   A.  Well, I mean from that I wouldn't see him very often but he

9   had it for quite some time.

10  Q.  Did you ever see him in 2005 wearing a neck brace?

11  A.  I can't say no.  I don't remember.

12  Q.  I know you worked at the Briar Cliff for a long time, so I

13  am going to just try to break it down by years and if it's not

14  helpful to you, just let me know.  In 2008 did you see

15  Mrs.~Francois on a daily basis when you were working or just as

16  a resident in the building?

17  A.  In 2008?

18  Q.  Yes.

19  A.  Yeah, I saw her.

20  Q.  How, typically, would you see her?

21          THE COURT:  How often?

22          MS. TREPELKOVA:  How often?

23  A.  You would not say everyday coming out, not always at the

24  lobby.

25  Q.  Would she usually be with Shade Mazer?

1   A.  To be honest, most of the times when I did see her was when

2   she was coming in with Shade.

3   Q.  What times did you usually see her in 2008?

4   A.  I would say 3:30/four o' clock.

5   Q.  Did you ever see her after that?

6   A.  What do you mean?

7   Q.  In the daytime.  In the nighttime -- I am sorry -- of that

8   same day when you would see her at 3:30 or four o' clock did

9   you ever see her leaving the building?

10              MR. MYATT:  Objection, your Honor.

11              THE COURT:  If he saw her?

12  A.  I believe I did and the time that she would leave was not

13  in, my recollection not past seven, 7:30.

14  Q.  That's in 2008?

15  A.  Yes.

16  Q.  What about 2007?

17  A.  I could barely remember.  I can't say I remember much.

18  Q.  Do you remember if those were the same general hours?

19  A.  Yes.  From when I was at the front door, those were the

20  hours that I would see her come in.  It would be 3:30, four o'

21  clock, sometimes five, 5:30ish and be leaving by at least 7:30.

22  Q.  And that was when you said you were at the front desk, what

23  year did you start that?

24  A.  It depends what's going on.  It depends how the day is

25  going, what information I either got to get or give the doormen

1    or the next day events or what's coming in the next day, you

2    know, I would stick around and see what's transpiring through

3    the building.

4    Q.  What about in 2005, would you see Ms. Francois coming in or

5    out of the building?

6    A.  I could but I can't say I could remember that far back.

7    Q.  I am sorry.  I think I skipped 2006.  What about 2006?

8    A.  My honest recollection of Ms. Francois was from those

9    times.  I really did not see her past those times.

10   Q.  Can I just refer you to that big binder in front of you

11   again towards the back for 2008?

12   A.  Same day?

13   Q.  Yeah.  You can just flip to the page that, the top

14   left-hand corner the date is October 14, 2008.

15   A.  Okay.

16   Q.  Does it indicate that Mrs.~Francois signed into the

17   building on October 14, 2008?

18   A.  Yes.

19   Q.  What time does it indicate she signed-in?

20   A.  3:30/4:00.

21   Q.  We're looking at October 14, 2008?

22   A.  No, I am sorry.  I am looking at November.

23   Q.  Sorry.  If I could just direct your attention to October

24   14.

25   A.  Yes.

C66AAFRA4                    Gonzalez – Direct

1   Q.  What time does it indicate that she signed-in?

2   A.  I believe 12:55.

3   Q.  What time did she sign-out?

4   A.  7:10.

5   Q.  When is the next time her name appears on that page?

6   A.  The 15th.  October 15th.

7   Q.  And what time does she sign-in on that day?

8   A.  4:15.

9   Q.  And she signed out?

10  A.  Six p.m.

11  Q.  Is that consistent with your recollection of the hours she

12  worked in 2008?

13  A.  Yes.

14  Q.  Can you flip to the next page.  Do you see Ms. Francois'

15  name on that page?

16  A.  Yes.

17  Q.  What date?

18  A.  October 16, 2008.

19  Q.  What time did she sign-in on that date?

20  A.  Six p.m.

21  Q.  What time did she sign-out?

22  A.  8:20.

23  Q.  Is her name on this page again?

24  A.  Yes.

25  Q.  And what date is that?

1    A.   October 17, 2008.

2    Q.   What time does it indicate she signed-in?

3    A.   3:30.

4    Q.   And what time does it indicate she signed-out?

5    A.   4:10.

6    Q.   Can you flip to the next page for me, please.  Does her

7    name appear on that page?

8    A.   Yes.  October 20, 2008.

9    Q.   What time did she sign-in?

10   A.   3:45.

11   Q.   What time did she sign-out?

12   A.   Nine p.m.

13             THE COURT:  I don't know that we need to do a lot more

14   than this.

15             MS. TREPELKOVA:  If you'll just give me a little bit

16   more leeway, just one more minute.

17             THE COURT:  But then it'll come off the back end of

18   the minutes.  Take a minute off your end because this document

19   is in evidence.

20             MS. TREPELKOVA:  Okay.

21             THE COURT:  If it's a different kind of point but I

22   think we get the point here.  But if it's a different type of

23   point you want to make with the document you should feel free

24   to do so.

25             MS. TREPELKOVA:  I'll defer to the Court then.  You

1    can put the binder away.  Thank you.

2            THE COURT:  Ladies and gentlemen of the jury, this

3    document which you don't have right now because we're going to

4    take some irrelevant things and names off of it before you see

5    it, you'll have access to it.  And you will have it in the jury

6    room during your deliberations and you can go through each

7    entry yourself and you can go through the entirety of it if you

8    would like.

9            You may proceed.

10   BY MS. TREPELKOVA:

11   Q.  You know Mr. Mazer, correct?

12   A.  Yes, I do.

13   Q.  Do you remember when you met Mr. Mazer?

14   A.  Yes, I do.

15   Q.  When was that?

16   A.  The exact year?  I don't want to get the dates wrong but it

17   was, that was in 2003.

18   Q.  Was it when he first moved into the building?

19   A.  Yes.

20   Q.  So you don't remember exactly when that was?

21   A.  No.

22   Q.  Do you know Mrs.~Shade?

23   A.  Yes.

24   Q.  Did you meet her around the same time?

25   A.  Yes.

C66AAFRA4                    Gonzalez – Direct

1   Q.  How well do you know Mr. Mazer?

2   A.  Day-to-day interaction I would say.

3   Q.  You see him pretty much everyday?

4   A.  Just about.

5   Q.  Do you have any opinion about his character for

6   truthfulness and veracity?

7              MR. MYATT:  Objection.

8              THE COURT:  Overruled.

9   A.  All right.  I have no problem.  He's great.  No issues.

10  Q.  What about Ms. Shade, how well do you know Ms. Shade?

11  A.  Just about the same.

12  Q.  Do you see her on a daily basis?

13  A.  Yes.

14  Q.  And direct interaction with her on a daily basis?

15  A.  Just about.

16  Q.  Do you have an opinion regarding Ms. Shade's character for

17  truthfulness and veracity?

18  A.  She's the same as Mr. Mazer, never no problems.  Always

19  been a pleasant situation.

20  Q.  Thank you, Mr. Gonzalez.

21  A.  You're welcome.

22             THE COURT:  All right.  Who is -- Mr. Myatt?

23             MR. MYATT:  I will, your Honor.

24             THE COURT:  All right.  You may proceed.

25  CROSS-EXAMINATION

1    BY MR. MYATT:

2    Q.  Good afternoon, Mr. Gonzalez.  My name is Jason Myatt.  I

3    believe we met briefly in the hallway.  I'd like to begin by

4    talking to you briefly about what has been marked as

5    Defendant's Exhibit B, the logbook.  Could I ask you to turn to

6    that document in the binder that's in front of you and can you

7    just tell me what is the first date in the logbook?

8    A.  March 7, 2007.

9    Q.  So there's nothing in this logbook that reflects when

10   Ms. Francois entered or left the building in 2002?

11   A.  In this one?

12   Q.  Yes, sir.?

13   A.  No.  It's 2007.

14   Q.  There's nothing in here that would tell you what time she

15   worked in 2003?

16   A.  Not this one, no.

17   Q.  2004?

18   A.  Sorry?

19   Q.  2004?

20   A.  No.  This is the date that I see here.

21   Q.  And it won't tell you what time she worked in 2005, six or

22   seven, just so we can move along?

23   A.  Time she worked?

24   Q.  What time she checked-in or checked-out of the building.

25            MS. TREPELKOVA:  Objection.

1          THE COURT:  You mean till March of '07?

2          MR. MYATT:  Through March of 207.

3          THE COURT:  This logbook, Mr. Gonzalez, to the best of

4   your knowledge, doesn't include any time period other than

5   match of 2007 and later, is that right?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.

8   BY MR. MYATT:

9   Q.  Mr. Gonzalez, can I ask you to turn to the second page of

10  Exhibit B for March 12, 2007?

11  A.  March 12?

12  Q.  Do you see --

13  A.  Sorry.  You said March 12 in --

14  Q.  March 12, 2007 second page of the copy that I have.

15  A.  Yes.

16  Q.  Do you see any entry for Patricia Francois?

17  A.  Yes.

18  Q.  What time does it say she entered?

19  A.  8:45.

20  Q.  What time does it say she left?

21  A.  7:30.

22  Q.  How many hours is that, do you know?

23          THE COURT:  We can do the math.  Go ahead.

24  Q.  Mr. Gonzalez, do you know Ms. Francois?

25  A.  If I know her, personally?

1   Q.  Do you know who she is?

2   A.  Yes, I do.

3   Q.  And have you ever seen her interact with defendant's

4   daughter, Shade Mazer?

5   A.  Yes.

6   Q.  And how would you describe their interactions?

7   A.  As far as interaction, they were very brief.  Used to come

8   into the lobby, hi, how you doing?  And they would go right

9   upstairs.

10  Q.  I am sorry, Mr. Gonzalez.  How would you describe the

11  nature of the interaction between Ms. Francois and Shade Mazer?

12          MS. TREPELKOVA:  Objection.

13          THE COURT:  We don't need to go into this.  I mean

14  it's not an element of any of the causes of action.  I think we

15  have been through this before let's go on to the next topic.

16  BY MR. MYATT:

17  Q.  Mr. Gonzalez, can I ask you --

18          MR. MYATT:  My apologies, your Honor.

19          (Pause)

20  Q.  Mr. Gonzalez, I'd like to ask you a few questions about the

21  documents that have been previously marked as Plaintiff's

22  Exhibit 7.  I believe you have a copy of those in front of you,

23  the photographs of Ms. Francois?

24  A.  Small binder.

25  Q.  The small binder, please.

1    A.  Okay.

2    Q.  I believe that on direct-examination you testified that you

3    took photographs of Ms. Francois at Ms. Francois' request.  Do

4    you recall that testimony?

5    A.  Yes.

6    Q.  Do you recall being deposed in this action?

7    A.  Yes, I remember.

8    Q.  I'd like to direct you to --

9              THE COURT:  Now, we've got till 12:45.  Are you going

10   to finish with this witness by then?

11             MR. MYATT:  My colleague says that I will.

12             THE COURT:  All right.

13             MR. MYATT:  Your Honor, may I approach?

14             THE COURT:  Yes.

15             (Pause)

16             MR. MYATT:  I am handing the witness and your Honor

17   copies of a binder which contains, among other things, a copy

18   of Mr. Gonzalez's deposition taken in this matter.

19   Q.  Mr. Gonzalez, can I direct your attention to page 31 of

20   your deposition transcript?

21   A.  Yes.

22   Q.  And on page 31, line 20 you are asked the question with

23   regards to what was then marked as Exhibit One and is now

24   marked as Plaintiff's Exhibit 7.

25             Do you know who took these pictures?

1          You answered "yes".

2     A.   Um-hmm.

3     Q.   Who took these pictures?  I did.

4          Then turning to page 32, beginning on line 10, I'm

5     happy to read the intervening lines if the Court would wish me

6     too.

7          And when -- where did you take these pictures?

8          Answer:  It would have been at the lobby.

9          Question:  And when?

10         Answer:  Huh?

11         Question:  When were these pictures taken?

12         When?

13         Question:  Yes.

14         Answer:  The day of.

15         Question:  And why did you take these pictures?

16         Answer:  For basically filming evidence if ever

17    needed.

18         Do you recall giving that testimony?

19         MS. TREPELKOVA:  Objection.  Your Honor, he should go

20    on.

21         THE COURT:  Overruled.  We'll figure out if he is

22    going to go on or not.  If not you'll have the opportunity on

23    redirect.

24    Q.   Do you recall that testimony, Mr. Gonzalez?

25    A.   Vaguely.

1    Q.  I am sorry?

2    A.  Vaguely.  That date I was under a lot stress.  My wife was

3    giving birth and you guys were stressing me to answer these

4    questions.  That's what I remember.

5    Q.  Mr. Gonzalez?

6    A.  Yes, sir.

7    Q.  Is it your testimony that you did not give truthful

8    testimony on --

9              MS. TREPELKOVA:  Objection.

10             THE COURT:  It's fair in light of what he said but he

11   can explain his answer.  That is not a yes or no answer,

12   necessarily.

13             THE WITNESS:  Sorry.  What's the question?

14             THE COURT:  Were you being truthful when you gave the

15   answers that are reflected in your deposition?  And that's the

16   answers in particular to which you had been pointed on page 32

17   about taking the photographs.

18             THE WITNESS:  I didn't take all those pictures.

19             THE COURT:  You did not take the pictures that are

20   reflected in Plaintiff's Exhibit 7?

21             THE WITNESS:  Not these, no.

22             THE COURT:  Did you take any of the ones that are in

23   Plaintiff's ' Exhibit 7?

24             THE WITNESS:  I believe I did.

25             THE COURT:  Which ones did you take?

1          THE WITNESS:  I don't know what is -- marked.  This

2   one here.

3          THE COURT:  All right.  Let the record reflect that

4   it's the first -- count the number of pages in and that would

5   help us.  Count the first page.  Okay.  So it is the third page

6   in is one that the witness recollects taking.  Any others?

7          THE WITNESS:  No.

8          THE COURT:  All right.  You may proceed, Mr. Myatt.

9          What is that background there on the third one in?

10  When you took the picture, where were you standing?

11         THE WITNESS:  In the lobby.

12         THE COURT:  That's the lobby right there behind her?

13         THE WITNESS:  Yes.

14         THE COURT:  Okay.

15  BY MR. MYATT:

16  Q.  So if I understand your testimony, you took what is the

17  third page of Plaintiff's Exhibit 7?

18  A.  Um-hmm.

19  Q.  Did yo take any other pictures that night?

20  A.  No, not that I remember.

21  Q.  Turning to page 7 of your deposition, Mr. Gonzalez, I

22  direct your attention to line 19.  Do you see that line you

23  were asked the question --

24  A.  Um-hmm.

25  Q.  Is there any reason that you would be unable to give

1   truthful testimony today?

2           MS. TREPELKOVA:  Objection.

3           THE COURT:  Overruled.

4           MR. MYATT:  Answer:  No.

5   Q.  Like to direct your attention, Mr. Gonzalez, to page 5.

6           THE COURT:  Well, hold on.  Were you asked that

7   question and did you give that answer?

8           THE WITNESS:  Yes, I did.

9           THE COURT:  Okay.  Next one.

10  Q.  Mr. Gonzalez, can I direct your attention to page five of

11  your deposition, transcript line 21.

12  A.  Um-hmm.

13  Q.  The question at deposition was --

14          MS. TREPELKOVA:  Objection.

15  Q.  Do you understand that you are under oath today just as if

16  you were in court?

17          Answer:  Yes.

18          Do you see hat testimony?

19  A.  Yes.

20  Q.  Do you recall being asked that question at your deposition?

21  A.  I think so.

22  Q.  Do you recall giving that answer?

23  A.  Sorry?

24  Q.  Do you recall giving that answer?

25  A.  Might have, yes.

1           THE COURT:  Got one minute.

2           MR. MYATT:  Your Honor, I have no further questions of

3   this witness.

4           THE COURT:  All right.  Does Ms. Trepelkova have --

5           MS. TREPELKOVA:  I am sorry.  Briefly.

6           THE COURT:  All right.  Yes.

7   REDIRECT EXAMINATION

8   BY MS. TREPELKOVA:

9   Q.  Mr. Gonzalez, can you go back to page 32 of your

10  deposition.

11  A.  Yes.

12  Q.  Just going to direct you to line 22.  This is the portion

13  directly after the portion Mr. Myatt just read out to you.  Do

14  you remember being asked these questions and giving those

15  answers?

16          MR. MYATT:  Objection, your Honor.

17          THE COURT:  No.  She is entitled to do this.  You

18  opened the door to this.

19          You may proceed.

20          MS. TREPELKOVA:  Question:  Are these pictures

21  consistent with your memory of Ms. Francois on that night?

22          Answer:  Not this one indicating.

23          THE COURT:  You don't have to have the voice

24  inflection.

25          Question:  But this is picture you took on that night?

1          Answer:  I know what I took.

2          Question:  So your memory has since, has faded?  The

3   pictures have the pictures have more detail than your memory?

4          Answer:  This is not important to me as my family is

5   as far as in caring for my family, as far as in paying more

6   attention to what I need for them than this case.  I never

7   thought this was going to be something I would ever have to be

8   part of.

9   Q.  Do you remember being asked those questions and giving

10  those answers?

11  A.  Yes.

12  Q.  What are you referring to regarding what's important to you

13  and your family in that answer?

14  A.  That I told the gentleman my wife was giving birth to our

15  third child was a preemie which he was, as soon as I got there,

16  basically, was almost was born with his cord wrapped around his

17  neck.  And in the midst of even this deposition I did tell the

18  counselor a couple of times what was going on and all the phone

19  calls I was getting.

20  Q.  Mr. Gonzalez, the pictures that -- the photographs that you

21  took were not taken on a device that belonged to you, is that

22  correct?

23  A.  No.

24  Q.  So, you have no idea what happened to the pictures you

25  took?

1              MR. MYATT:  Objection, your Honor; leading.

2              THE COURT:  Overruled.

3   Q.  I know you don't have the logbooks from 2006 or 2007 in

4   front of you based on your recollection what hours did

5   Ms. Francois -- what hours did you see Ms. Francois coming into

6   and leaving the building?

7              THE COURT:  I think we've covered that.  He testified

8   on direct.

9              MS. TREPELKOVA:  Thank you, Mr. Gonzalez.  No further

10  questions.

11             THE COURT:  All right.  I have one question.

12  Mr. Gonzalez, you are the superintendent of the building.

13             THE WITNESS:  Yes.

14             THE COURT:  Who is your boss?

15             THE WITNESS:  That's Property Markets Group.

16             THE COURT:  Okay.  The property.

17             THE WITNESS:  Which is the management office?

18             THE COURT:  Okay.  Who hires the management office do

19  you know?

20             THE WITNESS:  The board.

21             THE COURT:  The board of the building?

22             THE WITNESS:  Yes.

23             THE COURT:  Is the board of building -- is that the

24  board that Mr. Mazer is on.

25             THE WITNESS:  Yes.

1              THE COURT:  Okay.  Thank you.  Is there anything else?

2              MR. ROSENBAUM:  One moment, your Honor.

3              (Pause)

4              MS. TREPELKOVA:  One more.

5              THE COURT:  It's fair.

6    BY MS. TREPELKOVA:

7    Q.  Are you concerned that Mr. Mazer is going to fire you if

8    you don't give a certain kind of testimony here today?

9    A.  No.

10   Q.  Does Mr. Mazer, if you know have direct influence in who

11   gets hired and who gets fired?

12   A.  Mainly who gets hired as far as my position that would go I

13   believe to management.  As far as doorman usually through me

14   then it will go through management.

15   Q.  Thank you.

16              THE COURT:  All right.  Mr. Gonzalez, you may step

17   down.  Thank you.

18              All right.  Ladies and gentlemen of the jury, we are

19   going to take our lunch break.  It's 1:49 right now.  Would one

20   hour be enough?  Could we come back and just pick it right up

21   and plow on through for the afternoon?  Yes.  Fantastic.  Let's

22   resume then at 1:50.

23              All right.  Thank you not to speak about this case

24   with each other with anybody else or any impressions you may

25   have of the lawyers or any witnesses.  Thank you.

1          (Jury not present)

2          THE COURT:  Let's be seated.

3          We will have the jury charges ready for you before the

4     end of the lunch break.  What we'll do is we'll leave a couple

5     of copies on each of the tables if you are not here.  So you

6     can begin your review of them and then we'll talk later today

7     about when we can have our charging conference, okay.

8          All right, is there anything else?

9          MR. ROSENBAUM:  Your Honor, I have to respectfully

10    make an objection to your Honor's question of the witness with

11    reference to the board hiring.  I think that that question may

12    have been inappropriate.  I just want to make a record.

13         THE COURT:  All right.  You can make a record of it.

14    Certainly, the Court I am always entitled to ask questions and

15    you, of course, as I allowed Ms. Trepelkova is always I would

16    always provide an opportunity to respond but it is more common

17    than not to have courts in civil and criminal cases but

18    primarily in civil cases to ask questions all the time.

19    Indeed, I would suggest that I am very restrained by not asking

20    very many questions.  Some judges actually take over entire

21    examinations.  I am sure you have had that experience.

22         MR. ROSENBAUM:  Unequivocal.

23         THE COURT:  So, I did not take over.  Sometimes there

24    are questions which litigants don't like.  That's a different

25    issue but it doesn't go to the ability, the authority or the

C66AAFRA4                    Gonzalez - Redirect

1    discretion of the Court to ask questions.  I do very little of

2    it in fact.  I do it when I believe that there is an important

3    question that has not been asked and I did so here.

4            All right we're adjourned for lunch.  Thank you.

5            (Luncheon Recess)

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      AFTERNOON SESSION

2      (1:50 p.m.)

3      (In open court, jury not present)

4      THE COURT:  The jury charges are coming.  I had to

5  make a few more changes.  As life would have it, there is

6  always something else to change.  I've got them coming up very

7  shortly.  We have enough copies so that we should have three

8  for each side so that the clients can also look.  We don't need

9  to deal with anything right now.

10      MS. REARDEN:  I think we do.  We have here the

11  stipulation of dismissal.  We prepared that.  We can have

12  everybody sign that and hand it to the court.  That's the

13  stipulation of dismissal of the particular claims.

14      THE COURT:  It's on the record; that's fine, we are OK

15  having it on the record, or you can do it that way too.

16      MS. REARDEN:  OK.  I also have plaintiff's proposed

17  verdict form.  I have a copy for counsel and the court.  Your

18  Honor, the defendants have told us they only plan to call two

19  witnesses this afternoon.  Of the two one is Dr. Lombardi.  We

20  have dealt with him.  The other is Sylvia Alexander.  There are

21  two issues with respect to her.  On the record at Shade Mazer's

22  deposition last night Mr. Rosenbaum agreed he would not be

23  questioning any witness on any secrets other than those he

24  covered with Pat Francois.  That's the first issue.

25      THE COURT:  Is this going to come up as an issue at

C664FRA5

1    all.

2          MR. ROSENBAUM:  No.

3          THE COURT:  It doesn't matter.  If it's not an issue,

4    it's not an issue.

5          MS. REARDEN:  The court previously ruled that the

6    character evidence that might come from Sylvia Alexander would

7    be excluded under Rule 404.

8          THE COURT:  It depends.  She can certainly say,

9    putting aside specific acts, that is different, she can say, I

10    have worked for the Mazers for some period of time, I found

11    them to be truthful, honest, they have always kept their word

12    with me; she can certainly say that.

13          MS. REARDEN:  It's character evidence about the

14    plaintiff.  I was hoping to get some parameters around the

15    court's ruling.  Activity in Trinidad years ago that

16    Ms. Alexander may know about relating to Ms. Francois --

17          THE COURT:  Is this going to come up.  That's too far

18    removed.  I don't want to get into it and have to go through a

19    whole explanation.

20          MR. ROSENBAUM:  In answer to your question, I have to

21    go back to how long they knew each other; they were close

22    friends.

23          THE COURT:  Is it going back to conduct.

24          MR. ROSENBAUM:  I'm not going back to conduct in

25    Trinidad; I have no problem with that.

1        THE COURT:  Are you going to elicit, lay the cards on

2   the table, are you going to elicit from Ms. Alexander testimony

3   about her belief in the truthfulness or veracity of the

4   plaintiff.

5        MR. ROSENBAUM:  I will not ask that question.

6        THE COURT:  You are allowed to ask her if she has an

7   opinion about a truthfulness and veracity.

8        MR. ROSENBAUM:  Based on the relationship, many things

9   are going to come up.  These two ladies were friends since they

10  were early teens.

11       THE COURT:  We are going to keep, Ms. Alexander's

12  only, the only things for which her testimony is relevant here,

13  so we are clear, she can certainly, she can say if she has an

14  opinions as truthfulness and veracity.  I want to be clear, I

15  am not saying she can't.  She can give that kind of

16  reputational, she shouldn't go into conduct that's going to be

17  that we ought to deal with now, she can give with her view as

18  to representation.

19       The only issue I think she is relevant to is whether

20  or not she for instance told Ms. Alexander what happened or

21  didn't happen and it's consistent or inconsistent.  There has

22  been testimony raised, I am not clear exactly as to why, in

23  terms of who gave whom the phone number for Ms. Alexander, but

24  whatever, that's certainly an  area which is free game at this

25  point, it has been opened and explored.  I am not sure what

1  else is relevant from Ms. Alexander; she's a very limited

2  witness.

3         MR. ROSENBAUM:  She is not limited, if I may.  The

4  witness will testify with reference to admissions made by

5  plaintiff.

6         THE COURT:  About the incident itself.

7         MR. ROSENBAUM:  Absolutely.

8         THE COURT:  She can talk about, that's an admission of

9  a party opponent.  She can give an admission of a party

10  opponent, if there are 37, she can give 37, if there is one,

11  she can give one.  That's within the realm of what I think is

12  appropriate.  Is there anything apart from admissions of a

13  party opponent relating to the alleged conduct at issue,

14  including the overtime claim, I am not talking about torts, I

15  am talking about the overtime claim, or general reputational,

16  her view about truthfulness and veracity or this issue about

17  the phone number.

18         MR. ROSENBAUM:  The incidents that she was present

19  when Ms. Francois, after the December 18, 2008 incident,

20  approached the child in the presence of Ms. Alexander and there

21  were conversations at that point.

22         THE COURT:  Are these admissions about incidents or

23  just about like I want to see the kid, you should stay away

24  from the child.

25         MR. ROSENBAUM:  It's a combination of several things.

C664FRA5

1    There was minutes involved.

2              THE COURT:  What is the connection of it to the either

3    at this point it's post-incident, there is no overtime claim,

4    what's the connection to the assault and battery.  Did she say

5    it didn't happen, never happened, here is what happened during

6    that encounter.

7              MR. ROSENBAUM:  Not during at that encounter.

8              THE COURT:  With the child.

9              MR. ROSENBAUM:  Not when the child was there.

10             THE COURT:  Anything where there is not an admission

11   of a party opponent.

12             MR. ROSENBAUM:  She may have said I am coming back

13   soon.

14             THE COURT:  That's not relevant.  Skip to the part

15   where she is giving admissions.

16             MR. ROSENBAUM:  I will unequivocally address that.

17             THE COURT:  I don't want to waste time on a lot of

18   background about she tried to come up to me, I told her to stay

19   away, none of that's relevant to the claims here.  Very

20   specific claims; assault, battery, overtime.

21             MR. ROSENBAUM:  What she does is put into the child's

22   mind that's she's coming back.

23             THE COURT:  That's not relevant to anything.  There is

24   no claim.  They could have made a claim for pain and suffering

25   for the child.  That's not a claim.

C664FRA5

1          MR. ROSENBAUM:  Please, your Honor.  There are tapes

2     that have been brought in, undated tapes they played where the

3     child now is calling the plaintiff up, in which she says please

4     call me back, when are you coming back.  Those statements made

5     by the child or calls made by the child is prompted by

6     representations made by the plaintiff.

7          THE COURT:  You can ask the child.  You can't ask

8     Ms. Alexander.  You can ask the child.  I am highly skeptical

9     about this.  I think it's going to be a waste of time.  But if

10    you want to ask the child did she put that in your mind, you

11    can.  My view about the child, by the way, we are going to

12    straight to 5, there ought to be enough witnesses here to take

13    us to 5, Ms. Alexander I will circumscribe her testimony

14    appropriately.  I never end before 5 when we have a jury

15    sitting.

16         MR. ROSENBAUM:  On scheduling, I spoke with counsel

17    before lunch, Dr. Lombardi's scheduled to be here at 3:00.  I

18    spoke to counsel whether or not they would agree we can

19    interrupt Ms. Alexander's testimony just in case it's not

20    finished to call Mr. Lombardi.

21         THE COURT:  That's fine; you can take a witness out of

22    order by consent.

23         MR. ROSENBAUM:  They would not agree with me to that.

24         THE COURT:  It's fine.  It's a doctor, it's a human

25    taking time out of their day, the jury can keep it in mind.  As

to Ms. Alexander, keep in mind that I don't want to have to cut

you off in front of the jury but if the issue did the child

make those phone calls in response to a specific approach by

the witness, then you should elicit it from the child not from

Ms. Alexander.

My parameters about the child, I want the child on and

off the stand as quickly as possible on both sides.  You have

to do what you have to, Mr. Rosenbaum, I understand that, you

have to build whatever record you have to build.  I want

cross-examination and direct to be as quick as Muniz possible

for the child.

MR. ROSENBAUM:  Bear in mind there was about 3 plus

hours of deposition by plaintiff.  A lot things have been

brought up on those things.  I will do my best to be concise

with the child, the best of my ability.  I don't think I should

be restricted on anything that may have come up during the

deposition.

THE COURT:  I am not restricting you.  I am suggesting

in terms of covering relevant topics, what I am suggesting is

pick the points that really matter for God's sake.  This is a

child and let's get her on and off the stand.  There should be

no irrelevancies, no redundancies, things you shouldn't be

covering.

MR. ROSENBAUM:  Bear in mind, the child was a witness

to the incident.

1          THE COURT:  There is debate about that.  Of course she

2   is going to be allowed to testify to her recollection of

3   events; that's why she is here.

4          MR. ROSENBAUM:  Also about the 4 events we spoke of.

5          THE COURT:  Yes.  OK.  We are going to go until 5.

6   Assuming Dr. Lombardi and Ms. Alexander don't take until 5,

7   there has to be somebody lined up behind them.

8          MR. ROSENBAUM:  I have two people.

9          MS. REARDEN:  If we could at the mid-afternoon break

10  speak with the court briefly about the health issues.

11         THE COURT:  Sure.  Scott is going to hand out the jury

12  charges while we are getting the jury.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury enters courtroom)

2          THE COURT:  Would the defendants like to call their

3   next witness.  You are going to call Ms. Sylvia Alexander.

4          MR. ROSENBAUM:  Yes.

5    SYLVIA LINDSAY ALEXANDER,

6       called as a witness by the Defendants,

7       having duly affirmed, testified as follows:

8   DIRECT EXAMINATION

9   BY MR. ROSENBAUM:

10  Q.  Good afternoon.  I am going to ask you questions.  If you

11  do not understand my question, please tell me, I will do the

12  best I can to clarify it, and if you give me yes or no answer

13  if possible or I don't know.  OK?

14  A.  Thank you.

15  Q.  Ms. Francois, you and I have spoken before today?

16  A.  I stand to correct you; Ms. Alexander.

17  Q.  What did I say?

18  A.  Ms. Francois.

19          THE COURT:  Start again.

20  Q.  Good afternoon.

21  A.  Good afternoon.

22  Q.  My name is Mr. Rosenbaum.  We spoke before, is that

23  correct, Ms. Alexander?

24  A.  Yes.

25  Q.  Did we discuss your testimony before today?

1    A.  Yes.

2    Q.  Were you told to tell the truth?

3    A.  Yes.

4    Q.  You have taken an oath to tell the truth?

5    A.  I affirmed to tell the truth, yes.

6    Q.  You will tell the truth?

7    A.  Yes.

8    Q.  Who are you employed by at the present time?

9    A.  I am employed by both Mr. and Mrs. Mazer.

10   Q.  Have Mr. and Mrs. Mazer in any way insisted that you

11   testify here today?

12   A.  No.

13   Q.  Have they threatened you with dismissal or anything of that

14   nature?

15   A.  No.

16   Q.  Are you testifying under your own free will?

17   A.  Yes.

18   Q.  Where were you born?

19   A.  In Trinidad and Tobago; Trinidad is where I was born.

20   Q.  Do you know the plaintiff Patrice Francois?

21   A.  I know the plaintiff but I don't know her by Francois; I

22   know her by Patricia Francis, not Francois.

23   Q.  Do you know when she changed her name?

24   A.  No, I don't.

25   Q.  Was she known as Patricia Francis back in Trinidad?

1   A.  She carried both names, Patricia Radeem and sometimes she

2   will carry Patricia Francis.

3   Q.  Do you know her by both names?

4   A.  Yes, I do.

5   Q.  When in Trinidad were you friends with her?

6   A.  Yes, I was.

7   Q.  Could you describe the extent of your friendship with her?

8   A.  We were very good friends in Trinidad and we continue in

9   the United States.

10  Q.  When did you come to the United States?

11  A.  I came to the United States in 1992.

12  Q.  Before you came to the United States, were you educated in

13  Trinidad?

14  A.  I was both educated in Trinidad and in the United States.

15  Q.  Tell the jury what type of education you had in Trinidad?

16  A.  I have a college degree in Trinidad and Tobago.  When I

17  came to the United States I got a chef degree in New York Chef

18  School.

19  Q.  Chef?

20  A.  Yes.

21  Q.  What was the name of the college you went to in Trinidad?

22  A.  The college I went to in Trinidad was named Progressive; I

23  got a scholarship at Progressive Institute.

24  Q.  How did you merit that scholarship?

25  A.  I merited that scholarship playing sports, represented my

1   country.

2   Q.  Where did you represent your country?

3   A.  I represented my country in both Barbados, I represent my

4   country St. Lucia, I represent my country in St. Vincent.

5   "Q.  What sport?

6   A.  Netball and basketball.

7           THE COURT:  Was there something.

8           MS. LAVERY:  Objection.

9           THE COURT:  Overruled.

10  Q.  When you came to the United States you went to what chef

11  school?

12  A.  New York Restaurant School, at the time it was New York

13  Restaurant School; it is now known as New York Career

14  Development on 75 Varick Street.

15  Q.  Is that a 1-year, 2-year course?

16  A.  It is 2-year course because I was doing it on weekends.

17  Q.  You worked during week then you went to school on weekends?

18  A.  Yes.

19  Q.  When did you graduate from this school; can't be that long

20  ago?

21  A.  It is; it is a long time ago.

22  Q.  If you remember?

23  A.  No, I don't remember.

24  Q.  What is your status in the United States; are you a

25  citizen?

1   A.  Not yet.

2           MR. MYATT:  Objection.

3           THE COURT:  Overruled.

4   Q.  What is your standing now?

5   A.  I'm a green cardholder.

6   Q.  How long have you been holding that green card?

7   A.  More than 10 years actually.

8   Q.  Did you have income in the last few years?

9   A.  Yes, I did, I have.

10  Q.  Have you filed income tax returns for all the years that

11  you were working?

12          MR. MYATT:  Objection.

13          THE COURT:  Overruled.

14  Q.  When you came into the United States, did you resume your

15  relationship or friendship with Ms. Francois?

16  A.  At the time when I came --

17          THE COURT:  Overruled.  You can continue.

18  A.  When I came, she was not in the country as yet.  She came

19  long after I lived here.

20  Q.  When she came into the country did you resume your

21  relationship with her?

22  A.  Yes, I did.

23  Q.  Approximately when was that; what year was that?

24  A.  I didn't know when she came into the country.  I received a

25  phone call.  Apparently she met some friends and they gave her

1   my phone number.  I receive a phone call stating that she is in

2   the country.

3   Q.  Did you meet with her?

4   A.  Yes, I did.

5   Q.  What year was that approximately?

6   A.  I can't really say, actually, I don't remember, but I know

7   the month because it was around Thanksgiving.

8   Q.  Would it be more than 5 years, 10 years?

9   A.  Yes.

10  Q.  Approximately?

11  A.  Yes.

12  Q.  Between 5 and 10?

13  A.  Yes.

14  Q.  You resumed that relationship with her at that point?

15  A.  Yes, I did.

16          MR. MYATT:  Objection; leading.

17          THE COURT:  Overruled.  You led a lot too; we will

18  allow a little bit of it.

19  Q.  How often would you be meeting with her say when you came

20  and met her up to the year 2008, how often would you be seen

21  with her?

22  A.  Well, when do you mean how often?

23  Q.  Would you call her every day, once a month, see her every

24  day, once a month, how often would you see her?

25  A.  No, I wouldn't see her he every day.  I wouldn't call her

1    once a month.  But I would call or she would call.

2    Q.  Were there any times you got together with her, spent time

3    with her?

4    A.  Yes.

5    Q.  How would you describe your relationship with her during

6    the years in the United States?

7    A.  We were good friends.

8    Q.  Had she come to your home?

9    A.  Yes, she would.

10   Q.  Did you go to her home?

11   A.  Yes, I would.

12   Q.  Did there come a time you started to work with Mr. and

13   Mrs. Mazer; before that time did you ever meet Shade, the

14   daughter?

15   A.  Yes.

16   Q.  Answer yes or no; we will move fast.  When did you meet the

17   daughter and under what circumstances did you meet the

18   daughter?

19   A.  I met not only the daughter, I met the mother.

20   Q.  This lady over there?

21   A.  Mrs. Mazer, yes, it is.

22   Q.  When was that; tell us about that meeting.

23   A.  It was at the Cirque de Soleil show that I was invited.

24   Mrs. Mazer, at that time Patricia was working there.  Can I.

25   Q.  Go ahead.

1    A.  And she invites me, she said to Patricia she has extra

2    tickets, could she invite a friend.  Patricia came and invited

3    me.  That's how I met Sheryl and Shade.  She was like 5 or less

4    than 5 years old.  That's how I met the Mazers.

5    Q.  Had you seen Shade on other occasions prior to December 18,

6    2008?

7    A.  Yes.

8    Q.  Can you please tell the jury what those occasions were.

9    A.  After leaving chef school I became a chef at the Hampton

10   Chutney.  I opened two restaurants with them; one in Soho, one

11   in Amsterdam.  That's the one that Patricia would bring Shade

12   after school to visit me.

13   Q.  Did you see, how often would Patricia take Shade to that

14   restaurant?

15            MR. MYATT:  Objection.

16   A.  She will take her pretty often.

17            THE COURT:  You can answer.

18   Q.  Sorry?

19   A.  She will take her pretty often; sometimes I might not be at

20   that restaurant, I will at the next restaurant, but she would

21   still come by.

22   Q.  What time of day would she take the child to the

23   restaurant?

24   A.  After school.

25   Q.  Between 3 and what time?

C664FRA5                      Alexander - direct

1    A.   Between 3 and 3:30.

2    Q.   How often did she take the child to the restaurant?

3    A.   Sometimes I would see her like 2 weeks, in 2 weeks time I

4    would see her, sometimes 3.

5    Q.   Where are the restaurants located, what streets?

6    A.   The only restaurant she was taken is the one close to Shade

7    school on Amsterdam between 82nd and 83rd.

8            THE COURT:  We will move beyond the background to some

9    critical events.  I don't want to go too far afield.

10           MR. ROSENBAUM:  I'm trying to move it as quickly as I

11   can.

12           THE COURT:  We don't need too much background.

13   Q.   Did Shade know you by name at that point?

14   A.   Yes, she did.

15   Q.   What would she call you?

16   A.   Sylvie.

17   Q.   How would you describe Shade as a young child at that

18   point, happy, anything you knew about her?

19           THE COURT:  It's not really relevant.  I will allow

20   it.  Let's move this into something else?

21   A.   How should I say; when she sees me, she is happy and I am

22   too.  Other than that, I can't say.

23   Q.   Moving to more current years, do you recall if you received

24   a telephone call from Ms. Francois somewhere about December 18

25   or 19, 2008, yes or no?

1    A.  Yes.

2    Q.  What date, December 18 was on a Thursday; do you know when

3    you got a call from her?

4    A.  I got call in the wee hours of the morning.

5    Q.  Wee hours?

6    A.  After midnight.

7    Q.  Early morning, the 19th?

8    A.  Yes.

9    Q.  Could you please tell the jury what she said to you in the

10   wee hours of the morning?

11   A.  Well, I will have to go into my Trini dialect.  I received

12   a call, I was like, hello, she's like Sylvie girl, me and

13   Mr. Mazer have gotten into it, and I'm like, oh my God, what

14   you mean got into it, what did you do.  She was getting a call

15   at the same time, so she said she is going to call me back.

16   Q.  Did she call you back?

17   A.  Yes.

18   Q.  When?

19   A.  She called me back like in the evening time like when she

20   got home, actually because the call was, like I just got home

21   and me and Mr. Mazer got into it and I was all in his face.

22   Q.  He was --

23   A.  She was all in his face.  That's what she was saying to me

24   on the phone.

25   Q.  I don't know that's lingo or not; can you tell what it

C664FRA5                    Alexander - direct

1    meant?

2            THE COURT:  What she witness understood it to mean.

3    A.  OK.  The lingo being up in your face means like all up

4    there.

5    Q.  You were what?

6    A.  I'm all.

7    Q.  Is that like an aggressive movement?

8    A.  Yes.

9    Q.  Continue.

10   A.  So I ask her, what do you mean all up in his face.  She

11   said, she said some words that she told Mr. Mazer.

12   Q.  Did she tell you what words she told Mr. Mazer?

13   A.  Yes, she did.

14   Q.  Tell the jury what she told Mr. Mazer.

15   A.  She said to Mr. Mazer that what you need is --

16   Q.  Go ahead?

17           THE WITNESS:  Do I?

18           THE COURT:  I will tell that I think that we know what

19   you are going to say.  We think we have heard it before.  You

20   will not be the first to mention the word.  You may proceed.

21   A.  What he need is a pussy in his face.

22   Q.  Do you know about do you know what she meant by that, yes

23   or no?

24           MR. MYATT:  Objection.

25           THE COURT:  Not what she meant.  Ask what the witness

1   what she understood.

2   Q.  What did you understand that to be?

3   A.  I don't know.  I am not going to answer that question.

4          THE COURT:  She doesn't want to answer the question.

5   If you want to ask her a different question, I think it perhaps

6   probes into areas that are embarrassing.

7          THE WITNESS:  Yes.

8   Q.  Would it be a sexual issue, is that what she was referring

9   to?

10  A.  To my understanding, yes.

11  Q.  What did you say if anything in response to that?

12         MR. MYATT:  Objection, your Honor.

13         THE COURT:  Overruled.

14  A.  I was like, oh my gosh, no, you didn't, and she said, yes,

15  I did.  And there was more.

16  Q.  What else please?

17  A.  She said she asked him, do you think I'm a stupid black

18  bitch, and I was like no, you didn't.  I said no, you didn't,

19  you didn't say those words.

20  Q.  What did she say?

21  A.  She said yes, I did.  Then she said to me I am going to

22  call you again.

23  Q.  What?

24  A.  She is going to call me back.

25  Q.  That was the end of that conversation?

1   A.  That was the end of the conversation.

2   Q.  Did he she call you back?

3   A.  No, she didn't.

4   Q.  That was on a Saturday morning?

5   A.  That was the 19th.  I don't know but, no, she didn't.

6   Q.  Did there come a time after that conversation that you

7   spoke with Ms. Francois again?

8   A.  Yes, I did.

9   Q.  I am trying to make it as quickly as I can.

10          When did you speak with her again?

11  A.  I forgotten that I had spoken to Patricia on the weekend; I

12  had forgotten that she came to my house.

13  Q.  When did she come to your house?

14  A.  It's on the weekend because I had forgotten.  I had said

15  she had called me.  My friends, when I was discussing with

16  them, reminded me.

17  Q.  Was this a different weekend you are speaking about?

18  A.  No, it was after the 19th.  I had forgotten.  I have two

19  friends at my house over the weekend.

20  Q.  What are their names?

21  A.  One is Modica Victor, one's name is Modica Victor; the

22  other's name is Martha Haring.

23  Q.  They were at your house other the weekend.  Where were you

24  living at that time?

25  A.  Where I am still living actually.

C664FRA5                    Alexander - direct

1    Q.  You said she came over to the house?

2    A.  Yes.

3    Q.  When she came over to the house, did she call first, did

4    she come to your house, unannounced; how did that meeting take

5    place?

6    A.  She just dropped by; normally, that's how we do it.

7    Q.  What happened; did she come into your home?

8    A.  Yes.

9    Q.  Were there any discussions between you and your two friends

10   and Ms. Francois with respect to what happened on the night of

11   December 18?

12          THE COURT:  Let's be clear that we should talk only

13   about what you and Ms. Francois said, not what your two friends

14   said, OK.

15          MR. ROSENBAUM:  Thank you.

16   Q.  What did Ms. Francois say if anything?

17          THE WITNESS:  Can I address the judge with what she

18   just said.

19          THE COURT:  If you need clarification, yes.  If your

20   two friends added into the conversation.

21          THE WITNESS:  One of my friends did ask questions

22   actually.

23          THE COURT:  Asking a question would be OK, just asking

24   a question.  It's not coming in for the truth, for asking a

25   question.  If you want to get it, it's up to you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. ROSENBAUM:  Is she permitted to say what plaintiff

2     responded.

3          THE COURT:  Party admission, yes, or not; that's the

4     theory, OK.  I am not stating whether, I have no view as to

5     accuracy.

6     Q.  What did Ms. Francois say?  Who started to speak first?

7     A.  She did actually.  She came in and she said, hi, how you

8     going, stuff like that.  My friends was there, well, Martha

9     knows Patricia, Modica don't know her, so actually I introduce

10    her again.

11    Q.  Did there come a time when the discussion came up with

12    reference to what happened on December 18?

13    A.  Yes.

14    Q.  Could you tell the jury as carefully and slowly as you can

15    who said what?

16    A.  Patricia was explaining what happened the night December

17    18.

18    Q.  What did she say?

19    A.  Same thing that I just said, that she was all up in

20    Mr. Matthew face, that Mr. Matthew, they had Shade with her

21    homework, and she and Mr. Matthew had a disagreement and she

22    was all up in Mr. Matthew face and she repeats it that what you

23    need is a pussy in his face, if you think I'm a stupid black

24    bitch.  Modica turn to Ms. Francois and she said, you told your

25    boss that, and she was like yes, I did.

1       Modica asks her again, your boss didn't fire you.  She

2    was like no.  Modica asks again, are you going to go back to

3    work with these people.  She said yes, I have to go in on

4    Monday and I am going to go in on Monday because I want my

5    one-week pay, my one-week vacation pay and my bonus, and after

6    that, I am going tell them that I need two weeks to get back on

7    my feet because I have fibroid.

8    Q.  She has fibroids?

9    A.  Yes.

10       THE COURT:  The jury will disregard any references to

11    health conditions.

12    Q.  Anything else happen, any other discussion happen at that

13    meeting about the events of December 18?

14    A.  Yes, it did.

15    Q.  Please tell the jury.

16    A.  After Modica asked her those questions, she turned to me,

17    Sylvia, she said, she ask me the question, I am going to tell

18    Mr. and Mrs. Mazer that I am taking my 2 weeks, I am taking 2

19    weeks off to get myself together, so they will be needing a

20    temporary babysitter, would you, Sylvia, take the job because

21    Shade knows you.  I said OK.  At that time I was out of a job.

22    I got a call from her like the Tuesday.

23    Q.  Her being?

24    A.  Ms. Francis.  She says I gave Sheryl your number and Sheryl

25    is going to call you.  I said OK.

1    Q.  Did Sheryl call you?

2    A.  Sheryl did call me.

3    Q.  Did she say anything about, the two meetings you had with

4    Ms. Francois, anything about the fight itself, the physical

5    fight itself?

6    A.  Yes, she did.

7    Q.  What did she say?

8    A.  She said after she was up in his face and saying all these

9    things, Mr. Matthew was reaching for his phone, probably to

10   call, I don't know who he is going to call, but he was reaching

11   for the phone, and that's when she went and grabbed the phone

12   from him and he fell, scrambling for the phone, and he fell and

13   she was on his back.  Why she jump off, because Shade was

14   standing there watching them, crying.

15   Q.  When she was on his back did she say what she was doing?

16   A.  She had her hand around his neck like that because she's

17   still fighting to get the phone.  At that time Shade was crying

18   and Shade was on the phone.

19   Q.  Do you know who Shade was on the phone with?

20   A.  Her mother.

21   Q.  Anything else she said about the fight?

22   A.  No.

23   Q.  When you saw her on the Saturday that followed this

24   incident, did you see any marks or any signs of injury on her

25   face?

1   A.  No.

2   Q.  How about on her hands?

3   A.  No.

4       MR. ROSENBAUM:  May I approach, your Honor.

5       THE COURT:  You may.

6   Q.  Ms. Alexander I am showing you Plaintiff Exhibit 7.  Do

7   those photos represent what she looked like when she came to

8   your house on Saturday?

9   A.  No.

10  Q.  Are you sure?

11  A.  Yes.

12  Q.  Did she complain to you about any physical injuries?

13  A.  No.

14  Q.  Did she point out anything to her eye or eye area?

15  A.  No.

16  Q.  Did Ms. Francois normally have like black bags, for lack of

17  another word?

18      MR. MYATT:  Objection; leading.

19      THE COURT:  I will allow it.  You can go ahead, I

20  allowed a lot of leading on your end.  This will help to speed

21  it along.

22  Q.  Like black marks, not marks, like baggy eyes?

23      THE COURT:  How would you describe her face typically?

24      THE WITNESS:  She had two black beauty marks on her

25  face which I know personally.

1   Q.  When Ms. Shade ultimately called you up, did you go to her

2   home?  What happened after you got a call.  Withdrawn.

3            What was the conversation you had with between

4   Ms. Shade and yourself?

5   A.  Sheryl call me and she said that Patricia gave me your

6   number and we are going away and when we got get back, we are

7   going to give you a call, so that you could come in because

8   Shade already knows you, and I told her OK.

9   Q.  They said they were going to go away?

10  A.  Yes.

11  Q.  Did tell you where they were going?

12  A.  Yes.

13  Q.  Where?

14  A.  Florida.

15  Q.  Do you know when they came back, about when they came back

16  from Florida?

17  A.  I think after a week.

18  Q.  Very close to New Year's Day or thereabouts and did you get

19  a call from them at that point?

20  A.  I got call after New Year's Day.

21  Q.  New Year's Eve?

22  A.  New Year's Day, after New Year's Day.

23  Q.  Tell the judge and jury what the sum and substance of that

24  conversation was?

25            MR. MYATT:  Objection.

1              THE COURT:  I need to know what the content is before

2     I can make a ruling.  If it's not coming in for the truth, the

3     fact that it was said, it's obviously not hearsay.

4     Q.  Was there a discussion between you and Ms. Sheryl?

5     A.  Yes, there was.

6     Q.  Was there a discussion about whether or not you were going

7     to start working?

8     A.  Yes.

9     Q.  As a result of that discussion when did you start to work

10    for the Mazers?

11    A.  The day that school reopened.

12    Q.  Was that the first week in January of 2009?

13    A.  Yes.

14    Q.  What were your job instructions; what were you supposed to

15    do with Shade, assuming you were going to take care of Shade

16    is, that correct?

17    A.  Yes.

18             THE COURT:  We don't need to get into this witness's

19    hours, so we are clear, her hours, job responsibilities,

20    anything like that.  That's not what's on trial.  If you want

21    to talk about that, we can go over here.

22             MR. ROSENBAUM:  May we.

23             THE COURT:  Yes.

24             (Continued on next page)

25

1          (At the sidebar)

2          THE COURT:  I stopped you because I wanted to make

3  sure we were not going through this witness's hours and job

4  responsibilities to inferentially suggest what Ms. Francois'

5  were.  You obviously can't use instance of good conduct to show

6  whether or not other conduct occurred.  It's also frankly

7  irrelevant to whether or not Ms. Francois did or did not work

8  the hours in question.  I don't know if that's where you are

9  going, that's the nature of my thinking.  I don't want you to

10  say, when you pick her up after school do you work until 7:30

11  of past 8:00.  That's irrelevant to this case.

12          MR. ROSENBAUM:  I would like the jury to know she

13  basically stepped into the shoes of Ms. Francois in the job

14  description.

15          THE COURT:  You can't talk to her about the hours.

16  That's not an inference.  You can't suggest that the hours that

17  this witness worked are the hours that Ms. Francois worked.

18  It's not what's on trial.

19          MR. ROSENBAUM:  Can I ask her what in specific did she

20  do, pick the child up from school.

21          THE COURT:  You ask her job description.  I don't want

22  you to go on through Monday what did you do, Tuesday, what time

23  do you leave, arrive, do you log in, log out, none of that is

24  relevant.

25          MR. ROSENBAUM:  Can I ask her whether or not her job

1    description included taking the child from school and going to

2    various programs, play dates; is the court prohibiting me from

3    going into that.

4            THE COURT:  To what end; what's the relevance to this

5    case.  You've gotten this witness talking about admissions,

6    you've gotten those.  You have talked about the telephone,

7    about how she got the number, how she communicated with Mrs.

8    Mazer.  What else is she going to be proffered for, this

9    witness.  What personal knowledge does she have of the elements

10   of the causes of action of the defense in this action.

11           MR. ROSENBAUM:  I think it goes into the credibility

12   of the times which Mrs. Francois said she was working.

13           THE COURT:  That you can't do.  Factually you have to

14   have people who are contemporaneous.  You can't use ex post

15   facto events to prove whether or not something in the past

16   occurred.

17           MR. ROSENBAUM:  We have had testimony with the same

18   extracurricular activities the child did.

19           THE COURT:  The mother can talk about that about what

20   happened when Ms. Francois worked.

21           MR. ROSENBAUM:  The mother could say --

22           THE COURT:  She won't talk about this particular

23   witness's hours.  The only issue that's at issue here is

24   Ms. Francois' hours for that claim, not Ms. Alexander's.  It

25   could have changed.

1          MR. ROSENBAUM:  I believe it's relevant, with respect,

2     because they have a right to cross-examine.

3          THE COURT:  How are Ms. Alexander's hours relevant to

4     whether Ms. Francois on July 2, 2006 worked until 10:00 at

5     night.

6          MR. ROSENBAUM:  She will testify it's a 2-week job and

7     this 2-week job because Ms. Francois was going to come back to

8     work, what she did before Ms. Francois presumably was going to

9     be come back to work.  That's what she did.  She was

10    substituting the 2 weeks of Ms. Francois.

11         THE COURT:  You can talk to her about was Ms. Francois

12    going to come back, did she say she was going to come back.

13    You can ask her again what happened in certain conversations.

14         MR. ROSENBAUM:  Can I ask her did Mr. Francois tell

15    her what she had to do on the job.

16         THE COURT:  It's not relevant to the claim.  You are

17    trying to prove through this witness that different nannies

18    work different hours or the same hours, and that's not an

19    appropriate topic.

20         MR. ROSENBAUM:  Can I ask the witness did Ms. Francois

21    tell her what her duties would be, what the hours would be.

22         THE COURT:  Yes.  That you may ask, party admission.

23         MR. ROSENBAUM:  Assume she says, I don't know, can I

24    ask her did she follow.

25         THE COURT:  You can ask one more question; in your

1   experience was it consistent with that, was it consistent with

2   that.  OK.  Let's not going through a whole long litany.  One

3   more question.

4           MR. ROSENBAUM:  To be absolutely open with the court,

5   Ms. Francois never came back so she became the nanny.  I would

6   like to know whether or not I am permitted to say did those

7   hours continue.

8           THE COURT:  No.  You can ask her an open-ended

9   question, did she tell you what the hours were going to be, did

10  you find that was true, yes, leave it.  That will do enough.

11  You're better with that than having me jump all over you for

12  going too far.  The jury can draw an inference or not.  What

13  you cannot do is try to prove Ms. Francois' hours in prior

14  periods through proof of what her hours were in subsequent

15  periods.

16          MS. REARDEN:  Even if it's only for this 2-week

17  period, isn't that what he would be doing.

18          THE COURT:  I'm going to allow that.  That goes to a

19  party admission about during that 2-week period, she may well

20  have known what her hours were going to be because it's close

21  enough in time to when she was working.  I would allow that.

22              (Continued on next page)

23

24

25

1              (In open court)

2      BY MR. ROSENBAUM:

3      Q.  Did there come a time when you started working for the

4      Mazers?

5      A.  Yes.

6      Q.  Before you started working for the Mazers did Ms. Francois

7      tell you what your duties were to be?

8      A.  No.

9      Q.  She didn't tell you what you had to do for the child?

10     A.  No.

11     Q.  Did Ms. Francois ever tell you when she will be back, if

12     any?

13     A.  No.

14     Q.  Did you believe she was going to come back to work after 2

15     weeks or so?

16     A.  Yes.

17     Q.  When did she tell that to you?

18     A.  She told me that the same day when she came and she was

19     telling with my friends that Sheryl is going to call me.  She

20     said that she will tell Sheryl she is taking 2 weeks off.

21     Q.  Was it your understanding that you were going to work for

22     those 2 weeks when Ms. Francois was off?

23     A.  Yes.

24     Q.  Did you have any other phone calls, telephone conversations

25     with Ms. Francois?

1    A.  Yes.

2    Q.  Tell the jury what those conversations were about.

3    A.  That she has given Sheryl my number, that Sheryl is going

4    to give me a call.

5    Q.  Was there any other phone conversation even after that?

6    A.  There was, long after.

7    Q.  Tell the jury what those conversations were about?

8    A.  Well, I gave her a call, and when she answered the phone

9    she was very at me.

10   Q.  Very what?

11   A.  She was accusing me of going behind her back and phoning

12   Mr. and Mrs. Mazer about her job, when that was not true.

13   Q.  What did she actually say to you?

14   A.  These were her exact words: how could you, how could you go

15   behind my back and call Sheryl about the job.

16   Q.  What did you say?

17   A.  I was like, I was shocked.  I was very much shocked,

18   because I don't have the telephone number.  The only number I

19   have for the Mazers was the cellphone number that at the time

20   Patricia had to be in contact with the parents and Shade.  So

21   how I could go behind your back if I say I'm your friend, how

22   can I go behind your back and call for your job.

23   Q.  Let me get this right.  Initially she told you or asked you

24   to call Shade, Ms. Sheryl, Ms. Shade, to work for the 2 weeks?

25   A.  No.  She said to me that Sheryl, she is going to give

1  Sheryl my number and Sheryl is going to call me so I could work

2  for the 2 weeks because Shade already knows me and I am out of

3  a job and I told her OK.

4  Q.  Then she denied ever giving you that number?

5  A.  That's right.

6  Q.  Was that a lie?

7  A.  It is a lie.

8  Q.  What did you ask her at that point?

9          MR. MYATT:  Objection.

10          THE COURT:  Overruled.

11  Q.  If anything?

12  A.  I was shocked because you could say, you said it twice in

13  the presence of my friends that you are going to give Sheryl my

14  number, then to call me and told me the exact thing again, that

15  you are going to give Sheryl my number and then when I call you

16  you are going to say but I went behind your back and called

17  your employers.  Come on.  What kind of friend am I.

18  Q.  Did you respond to her?

19  A.  I responded by hanging up the phone.  Just how I answer

20  you, that's the same thing I answer the phone.  Then I told

21  her, these are my words: if you do could lie blatantly on me

22  like that, then a friend like you I don't need, and I hung up

23  the phone and I have never spoken to Patricia, I have never

24  seen her until today.

25  Q.  Had you ever known her to lie before that day with

1   reference to you?

2   A.  Yes.

3           MR. MYATT:  Objection.

4           THE COURT:  Overruled.

5   Q.  What was her reputation as far as you knew about telling

6   the truth or lies?

7           THE COURT:  Ask about her opinion first, her personal

8   opinion about Ms. Francois' propensity for truthfulness or

9   untruthfulness; did you have an opinion of that.

10          THE WITNESS:  Yes, I did.

11  Q.  Tell the jury what your opinion is.

12          THE COURT:  Without going into any specific instance

13  of conduct, your opinion.

14  A.  My opinion is that if she can get away with it, she sure as

15  well would and she would lie blatantly with a serious face.

16          MR. ROSENBAUM:  One moment please.

17          THE COURT:  Sure.

18          (Pause)

19          THE COURT:  Ladies and gentlemen, I will take this

20  moment to tell you we have a witness coming in for the defense

21  who is going to come in at about 3:00.  So we will actually

22  probably have to interrupt this witness's testimony, either

23  more of her direct or cross, to take the other witness which

24  happens from time to time, then the witness will come back on.

25  We will take a witness out of order.  You may proceed.

1    BY MR. ROSENBAUM:

2    Q.  Did you ever, after the incident occurred, did you see

3    Ms. Francois again while you were with Shade?

4    A.  Yes, I did.

5    Q.  How many times?

6    A.  Two.

7    Q.  When was the first time?

8    A.  First time was at Shade's school.

9    Q.  Do you know what school Shade went to?

10   A.  Rodeph, it's funny, Jewish name, Rodeph Sholom, something

11   like that, it's on 79th Street.

12   Q.  For a Jewish name, you did very good.

13          Tell the jury what occurred when you saw her by Rodeph

14   Sholom?

15          THE COURT:  We talked about this.  We are not going to

16   go into this particular incident.  You can establish both times

17   but we are not going to go into the interaction.  You can

18   establish both times, where they occurred, when they occurred.

19   Q.  When did they occur?

20   A.  One was at the school; the other was at Shade's home by the

21   bus stop.

22   Q.  Without saying what was said, did Ms. Francois attempt to

23   speak with Shade --

24   A.  Yes.

25   Q.  -- on either occasion?

1    A.  Yes.

2    Q.  On the first occasion by the school, how long did she speak

3    if at all to Shade?

4            MR. MYATT:  Objection.

5            THE COURT:  Overruled.  I will allow this amount a

6    little bit to set the scene.

7    A.  She spoke to her for a while.

8    Q.  Were you present?

9    A.  Yes.

10   Q.  Without going into the conversation --

11           THE COURT:  No, you have another witness for that.

12   Q.  The second time in front of her school, in front of her

13   home?

14   A.  Yes, we just got off the bus.

15   Q.  You just got off the bus.

16   A.  Yes.

17   Q.  With Shade?

18   A.  Yes.

19   Q.  Where were you coming from?

20   A.  We were coming from school.

21   Q.  What time of day was it?

22   A.  In the evening time, after school actually.

23   Q.  About what time?

24   A.  Like 3, 3:15.

25   Q.  How long did Ms. Francois speak with Shade at that time?

1    A.  Not too long.

2    Q.  Less than the first time around?

3    A.  Yes.

4    Q.  I am going to ask you a question about whether or not you

5    ever saw Ms. Francois reading using a magnifying glass.  Do you

6    know what a magnifying glass is?

7    A.  Yes, I do.

8    Q.  When did you see her for the first time or the last time?

9    A.  A very, very long time.

10   Q.  When you say very, very, more than 5 years ago?

11   A.  Before she start working with Sheryl and Mr. Mazer.

12   Q.  That was in 2002, so before 2002, 2003, before year 2003,

13   she was using a magnifying glass?

14   A.  Yes.

15   Q.  Did she also wear glasses back then?

16   A.  Yes, reading glasses at the time.

17   Q.  During the six and a half years that Ms. Francois was

18   working, you knew her during that period of time?

19   A.  Yes.

20   Q.  Did she ever complain to you about anything negative about

21   her working environment or conditions?

22   A.  No.

23            MR. MYATT:  Objection.

24            THE COURT:  Overruled.

25   Q.  Did she ever tell you anything about the actual physical

C664FRA5                    Alexander - direct

1    fight between herself and Mr. Mazer on December 18, yes or no?

2    A.   Rephrase that question please.

3    Q.   Did she ever discuss with you about the physical fight, the

4    actual physical fight?

5    A.   No.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. ROSENBAUM:

2  Q.  Do you have an opinion with respect to the Mazers'

3  regarding their truth and veracity based upon your dealings

4  with them and other people?

5  A.  Can I hear that again?

6        THE COURT:  Why don't you take them one at a time just

7  so the record is clear.

8  Q.  Do you have an opinion about the truthfulness of the

9  Mazers, their reputations for being truthful people?

10        MR. MYATT:  Objection, your Honor.

11        THE COURT:  Overruled.

12  A.  My opinion?

13  Q.  Yes.

14  A.  They are.

15  Q.  They are with what?

16  A.  They are very truthful people.

17        THE COURT:  Each one of them?

18        THE WITNESS:  Each one of them.

19  Q.  Did you ever find an occasion in which they lied to you?

20  A.  No.

21  Q.  Did you ever hear from either of them any racial comment in

22  all the years that you have been there?

23  A.  If I did I wouldn't be here with them still.

24        MR. ROSENBAUM:  Your Honor, it's about four minutes to

25  three.  I may not be finished but I would like to speak to the

1    next witness outside if he is there just for a moment, if I

2    could ask for a brief recess at this point, I may not have any

3    questions for the witness.  But I would like to speak to the

4    doctor outside a little bit more than five minutes if it's --

5              THE COURT:  He is a doctor and you are going to get a

6    diagnosis?

7              MR. ROSENBAUM:  He will not give a diagnosis but

8    not --

9              THE COURT:  Why don't we talk our midafternoon break

10   now so that we don't take up time twice.  So why don't we take

11   about ten minutes.  But last time we said ten minutes we were a

12   little bit longer because we had some matters to deal with

13   unexpectedly out here.  So we'll keep it to ten minutes.  How

14   is that?  And so we'll resume at five minutes after three with

15   another witness Dr. Lombardi and then we'll continue with

16   Ms. Alexander after that.

17             All right.  Ladies and gentlemen, let's take our ten

18   minutes.

19             (Jury not present)

20             THE COURT:  Let's take ten minutes and we'll resume.

21             MR. MYATT:  Just a clarification point from before.

22   There is some concern moving papers around that we may not have

23   handed identical copies and Mr. Rosenbaum I would just like to

24   have --

25             THE COURT:  I'll throw out what I have.

1          MR. MYATT:  All right, your Honor.

2          Let's talk a recess for ten minutes.

3          (Recess)

4          THE COURT:  Okay.  Go ahead and get the jury, Joe.

5          (Jury present)

6          THE COURT:  All right.  Let's all be seat.

7          Defendants call their next witness.

8          MR. ROSENBAUM:  Dr. Lombardi.

9          THE COURT:  Dr. Lombardi, come on up to the witness

10   stand.  Stand here and my deputy will swear you in.

11    DR. GEORGE V. LOMBARDI,

12        called as a witness by the Defendants,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MR. ROSENBAUM:

16   Q.  God afternoon, Dr. Lombardi.

17   A.  Good afternoon.

18   Q.  Okay.  Dr. Lombardi, we have met I think about two

19   occasions before today I believe or maybe just one?

20   A.  Just one.

21   Q.  And that was in the plaintiff's law office?

22   A.  Correct.

23   Q.  Law firm.  And that was during a deposition that you, that

24   they took of you on that date?

25   A.  Last week.

1    Q.  About a week or so ago, two weeks ago?

2    A.  Last week.

3    Q.  Seemed longer than that but I was there at that point?

4    A.  Two weeks.

5    Q.  No.  You are right.  I am wrong.  Dr. Lombardi, you are a

6    medical doctor, is that correct?

7    A.  Correct.

8    Q.  Where did you attend college?

9    A.  City College of New York.

10   Q.  And what year did you graduate from college, at CCNY?

11   A.  1976.

12   Q.  From college did you enter into medical school?

13   A.  I did.

14   Q.  What medical school did you attend?

15   A.  New York University.

16   Q.  And did you graduate from NYU Medical School?

17   A.  I did.

18   Q.  And when was that did you graduate?

19   A.  1980.

20   Q.  And did you do an internship after that?

21   A.  I did my internship at Case Western Reserve University

22   Hospitals in Cleveland, Ohio.

23   Q.  And will you tell the jury please what does internship

24   mean?

25   A.  Internship is the first year after medical school when you

1  basically rotate through all the different services in the

2  hospital.

3  Q.  And how long did you intern for?  How many years?

4  A.  You are an intern for one year and then you do, then you

5  decide you want to do medicine or surgery or OB/GYN.  So I

6  chose a medical residency and I also did that at Case Western.

7  Q.  Okay.  And when did you finish your residency?

8  A.  I finished my residency in 1983.

9  Q.  And did you become board certified -- when did you become a

10  doctor at that point?  What year?

11  A.  Sir, when you graduate medical school in 1980 you have your

12  M.D. but you don't have a license.  You are eligible for your

13  license after your internship.  Then after you finish your

14  residency you can, if you so desire, you can take an

15  examination called a board certification.  So if I finished in

16  1983 I would have taken the exam in November and I think you

17  are here, so late '83 early '84.

18  Q.  Are you board certified in any fields of medicine?

19  A.  I am board certified in internal medicine and I am board

20  certified in infectious diseases.

21  Q.  When you say "board certified" can you explain to the jury

22  what board certified means?

23  A.  So the American Board of Intern Medicine is the body that

24  oversees all these training programs and you have to fulfill so

25  many of their requirements, see so many cases.  They may have a

1  research provision and then, ultimately, you know then,

2  ultimately, take an examination.

3  Q.  And if you pass that examination you become board

4  certified?

5  A.  Correct.

6  Q.  Do you have to be recertified after a period of time?

7  A.  That's a very good question, actually.  I don't cause I am

8  grandfathered in but now in the last ten or 12 years you have

9  to recertify.

10 Q.  And are you certified you said in infectious disease also?

11 A.  That's correct.

12 Q.  Are you grandfathered into that also?

13 A.  I hope so.

14 Q.  You better.

15 A.  I think so.  No.  I am.

16 Q.  Okay.  Could you describe to the jury what infectious

17 disease board certification involves, please.

18            MR. MYATT:  Objection, your Honor.

19            THE COURT:  Overruled.

20 A.  So that my infectious disease fellowship was at Barnes

21 Hospital in St. Louis.  And so let's see.  So I finished in

22 '83.  Then I was a doctor in Africa for a year.  Then I went to

23 St. Louis and I was there three years, '85, '86, '87.  So it's

24 a big complex.  It's the largest medical center in the Midwest.

25 So it would be Barnes Hospital, Jewish Hospital St. Louis which

C66AAFRA6                    Dr. Lombardi - Direct

1   is then the VA Medical Center of St. Louis.  So two out of

2   those three years you spend -- you see all of the infectious

3   disease cases in those hospitals.

4   Q.  Now you say you were practiced medicine in Africa.  Is that

5   what you said before?

6   A.  Well, I, actually, headed a field project in Africa for a

7   year.

8              THE COURT:  I think now we've established he is a

9   doctor.  He is not going to be an expert witness, so let's get

10  up to the -- you can do a little bit more but he is not an

11  expert witness.  He is here as a percipient witness.

12  BY MR. ROSENBAUM:

13  Q.  Doctor, did you at a period of time in the past that you,

14  that Mother Teresa was a patient of yours?

15             MR. MYATT:  Objection, your Honor.

16             THE COURT:  Okay.  No.  No. no.  It's not relevant,

17  okay.

18             MR. ROSENBAUM:  It is relevant.

19             THE COURT:  It is irrelevant.  He is not an expert

20  witness.  Move on to the personal contact that Dr. Lombardi had

21  with the defendant.  That's the area for which he is here to

22  testify.  We've talked about this, okay.

23  BY MR. ROSENBAUM:

24  Q.  Are you affiliated with any hospitals now?

25  A.  New York Presbyterian Hospital.

1  Q.  Okay.  In your practice, sir, do you have -- when did you

2  open your own practice?

3          THE COURT:  Sustained.  Move on to this defendant.

4          MR. ROSENBAUM:  Your Honor, I am trying to.

5          THE COURT:  You've got to connect it up.

6          MR. ROSENBAUM:  I am.

7          THE COURT:  Are you familiar with Mr. Mazer?

8          THE WITNESS:  Sure.

9          THE COURT:  Did you have occasion to examine Mr. Mazer

10  physically after December 18, 2008?

11          THE WITNESS:  Yes.

12          THE COURT:  All right.  Pick it up from there.

13  BY MR. ROSENBAUM:

14  Q.  From before December 2008 did he have any problems of the

15  heart issues?

16  A.  He did not.

17  Q.  Before December of 2008 did he have any neck issue?

18  A.  Yes, he did.

19  Q.  Did he have surgery on his neck?

20  A.  He had surgery on his cervical spine, on his neck, yes.

21          THE COURT:  Okay.  I want to establish that you have,

22  have you examined his cervical spine?

23          THE WITNESS:  I am sorry.  When?

24          THE COURT:  At any point in time.

25          THE WITNESS:  Yes.

1            THE COURT:  Okay.

2    BY MR. ROSENBAUM:

3    Q.  When did you first examine his cervical spine?

4            THE COURT:  Just move on to December 18 and then you

5    can connect it back up.  We are not going to go through his

6    entire medical history with this defendant, counterclaimed

7    plaintiff.

8    Q.  When did you see Mr. Mazer after December 18, 2008 what was

9    the date?  You can check.

10           THE WITNESS:  May I check my records, your Honor?

11           THE COURT:  You certainly may.

12           MR. ROSENBAUM:  Your Honor, may I also have

13   Defendant's Exhibit C marked in evidence?

14           THE COURT:  Yes.  Have you shown it to the plaintiffs?

15           MS. REARDEN:  Yes, we've seen it.

16           THE COURT:  Is it marked for identification?

17           MR. ROSENBAUM:  I'll mark it now for identification.

18           THE COURT:  All right.

19           (Pause)

20   BY MR. ROSENBAUM:

21   Q.  Doctor, do you have your records starting with December 22,

22   2008?

23   A.  I do.

24   Q.  When you saw Mr. Mazer did you see Mr. Mazer on that date?

25   A.  Yes, I did.

1    Q.  And the record that you have in your hand, are they kept in

2    the regular course of business?

3    A.  Yes, they are.

4    Q.  And I ask you are those records that are handwritten -- Dr.

5    Lombardi, why don't you look at the copy.  I am showing you

6    Exhibit C marked for identification and ask if those records

7    are kept in the regular course of your business?

8    A.  Yes, these are copies that I am holding in my hand.

9    Q.  And the writing there is your writing?

10   A.  Yes, sir.

11           MR. ROSENBAUM:  Your Honor, I move into evidence

12   Exhibit C.

13           THE COURT:  Any objection?

14           MR. MYATT:  Beyond what we discussed earlier, no, your

15   Honor.

16           THE COURT:  Exhibit C is admitted over objection.

17           (Defendant's Exhibit C received in evidence)

18           MR. ROSENBAUM:  Thank you.

19   BY MR. ROSENBAUM:

20   Q.  Okay.  Could you look at the December 22 entry that you

21   wrote, is that what you wrote on that day?

22   A.  Yes, sir.

23   Q.  Could you please tell or read that entry please.  It's

24   difficult to read your handwriting.  All deference to doctors.

25   A.  So, I write, fight with babysitter, says she grabbed him,

1   rolling around floor, no LOC, which is means no loss of

2   consciousness.  Notes pain in and around neck from being

3   grabbed.  Then I write no ER, meaning no emergency room.  And

4   then my examination is his blood pressure is 150 over 100 which

5   is elevated.  His pulse is 80.  Then my examination it says

6   P-E-R-L which means pupils are equal to light, equal and

7   reactive to light.  That's part of my neurological assessment.

8   No bruising on face.  Bruising around neck on both sides from

9   being grabbed from behind.  No lymph nodes, no nodes.  And I

10  examine his heart which is normal.  And then at the top, you

11  know it is done kind of, you know you start in the middle, then

12  at the top is my conclusion, status post physical altercation.

13  Instructions given.  Hypertension secondary to stress.

14  Q.  Now, your physical examine saw some marks on his neck, is

15  that correct?

16  A.  That's what I had written down, yes.

17  Q.  Do you have any independent recollection what those marks

18  looked like at this point?

19  A.  I really don't.

20  Q.  But it was significant enough to make note of it, is that

21  correct?

22  A.  Yes.

23  Q.  Did you see him after December 22?

24  A.  The next time I saw him was January 5, 2009.

25  Q.  That's about two weeks later or thereabouts?

1    A.  (Nodding).

2    Q.  And can you please read your notes for that date.  Is that

3    in your handwriting?

4    A.  Yes.  Again, starts in the middle.  I wrote, have spoken

5    with patient several times over holiday.  Patient and wife very

6    upset by babysitter incident.  Patient reports vague anterior

7    chest pain.  And then I write, seated at rest.  No clear

8    exertional pattern.  And then, no shortness of breath.

9    Q.  Can I interrupt you please?  When you say "seated at rest"

10   is that when he had the pain?

11   A.  Yes.

12   Q.  And is that a abnormal finding at that point?

13   A.  Well, it's not a finding so much as it's just what he is

14   telling me.  So you know I write down -- when I interview

15   somebody I ask a lot of questions.  I can't write them all

16   down.  So I write down what I think are the significant answers

17   to the questions I ask.  So, he reports this pain.  And then I

18   asked him many questions after, when did it happen?  You know,

19   moving around, you know that kind of thing.  So he must have

20   told me it occurred even while he was seated is how I would

21   interpret that.

22   Q.  Did he tell you when his pain started?

23   A.  No.

24   Q.  Did he ever complain of pain as he complained here prior to

25   December 18, 2008?

1    A.  Not to me.

2    Q.  Okay.  Can you continue reading please?

3    A.  So then I examined him again.  His blood pressure is 150

4    over 96 which is again elevated.

5    Q.  Again, I am going to interrupt you.  Respectfully, did he

6    have any elevated blood pressures prior to that?

7    A.  No.

8    Q.  Okay.

9    A.  Pulse is 66 and bruising.  I write ear bruising around neck

10   resolved or resolving.  I can't tell.  No chest wall

11   tenderness.  So I, certainly, you know pressed all over his

12   chest.  You know, given that story of the incident from several

13   weeks before his heart exam is normal.  Then my conclusion is

14   chest pain etiology unclear suggests stress test.

15   Q.  What is a stress test and what is the purpose of a stress

16   test?

17   A.  If somebody has chest pain, certain types of chest pain you

18   know anterior chest pains, you want it to see if that pain is

19   due to a low blood plea to the heart.  So you put them on a

20   tread mill and they walk at an increasing rate of speed and

21   then every three minutes the treadmill goes a little higher and

22   a little faster, so the body's demanding more oxygen.  And if

23   there's partial blockage of a coronary artery such that the

24   blood can't get through they may get chest pain or angina.

25   Q.  And did he go for the stress test?

1   A.  He did.

2   Q.  Would that be on January 8, 2009?

3   A.  Yes.

4   Q.  And where were the results of that stress test?

5   A.  The results of that stress test was done by me in my office

6   and he had during the treadmill while he was walking, he

7   developed what we call atypical symptoms.  He didn't have

8   clear-cut pain across his chest.  He had pain on the inner

9   aspect of his left arm which can also be due to a partial

10  blockage of a coronary artery and the strips were equivocal.

11  Q.  When you say "strips" what do you mean?

12  A.  So this is a running EKG and if there's low blood flow to

13  the heart the EKG can show some fairly classic signs on these

14  tracings and these did not.  These were, you know, this would

15  be called an equivocal stress test.  But I thought enough about

16  his story as I am thinking about it here that I can see that

17  day I had him see the cardiologist or I made the call and he

18  saw the cardiologist the next day.

19  Q.  And before you go to the cardiologist, were there blood

20  tests taken that day at New York Hospital if that's part of

21  your record -- I believe it is -- it would be about the fourth

22  page in your records.

23  A.  Yes.  Blood work was a complete blood count, white count,

24  complete platelet count and then chemistries, liver function

25  test, kidney function tests.

1  Q.  Okay.  Now, I see after that blood test there's another

2  note by you, another memo also January 8, 2009.  The next page

3  after the blood test I see another date of January 8, 2009?

4  A.  Oh, yeah.  It's the same page.  Yeah, I didn't read what

5  was at the bottom.

6  Q.  All right.  So --

7          MR. ROSENBAUM:  May I approach the witness, your

8  Honor?

9          THE COURT:  Yes.

10          MR. ROSENBAUM:  I am incorrect.  I made a mistake.

11  It's January 8.

12  Q.  Could you tell us what January 8 says, the records of

13  January 8?

14  A.  So January 8 is the day that he had a stress test in my

15  office and it says, stress test border line positive in setting

16  of atypical symptoms, developed left inner arm pain and

17  achiness at end of 12 minutes.  In other words, he went 12

18  minutes on the treadmill and developed kind of an -- what's the

19  word?  Atypical symptoms.  Again, not this kind of clear-cut

20  pain across my chest.  And it says here, full discussion with

21  patient regarding options.  Will see Dr. Feuerbach the next

22  morning.

23  Q.  Let me ask you who is Dr. Feuerbach?

24  A.  Dr. Feuerbach is a cardiologist that I use.

25  Q.  How long have you used Dr. Feuerbach?

1   A.  Oh, a good ten years.

2   Q.  What is his reputation in the field of cardiologies?

3           MR. MYATT:  Objection, your Honor.

4   A.  I think it's pretty good.

5   Q.  Do you know what hospital he is associated with?

6   A.  New York Hospital.

7   Q.  Okay.  And did Dr. Feuerbach ultimately send a report back

8   to you?

9   A.  So Dr. Feuerbach saw him the next day and -- yes.  And then

10  he called me I am sure because that's the way we do it and then

11  he did generate a consultation letter.  That would have come

12  later.

13  Q.  The January 9th letter, was that just his findings and all?

14  A.  Sorry.  I missed that.

15  Q.  The January 9 letter of Dr. Feuerbach was that his findings

16  or what was that letter?

17  A.  That's his review of the patient, the stress test I had

18  performed, his examination, his cardiogram and then what he

19  thought should be done next.

20  Q.  And --

21          THE COURT:  Let me just ask a question.  Is it your

22  normal practice to include the consultation letters in your

23  records as part of your records?

24          THE WITNESS:  Yes.

25          THE COURT:  And would you normally rely upon the

1   entirety of your records in forming any views you have as to

2   the diagnosis for a patient or a plan of action for a patient?

3   In other words, would you use Dr. Feuerbach's letter as part of

4   your information regarding this patients?

5             THE WITNESS:  Well, at the time I saw him I didn't

6   have Dr. Feuerbach's letter.

7             THE COURT:  No but afterwards?

8             THE WITNESS:  Yes, fair enough.

9             THE COURT:  I want to try to probe whether or not once

10  you got his letter, are these part of your records what you

11  would consider to be your file on this patient.

12            THE WITNESS:  Yes.  Yes, ma'am.

13            THE COURT:  So your patient file.  Thank you.

14            MR. ROSENBAUM:  Thank you, your Honor.

15  Q.  After you got the letter from Dr. Feuerbach what did you do

16  with reference to treatment or other diagnosis of Mr. Mazer?

17  A.  Well, Dr. Feuerbach you know would have called me while the

18  patient was still there.

19  Q.  Did you have a conversation with Dr. Feuerbach?

20  A.  You know I don't have a specific memory but I am sure I

21  did.

22            MR. MYATT:  Objection, your Honor.

23            THE COURT:  Overruled.

24  A.  And he would have told me I am sure.

25            THE COURT:  Well, don't do that.  Don't speculate if

1    there's something now that's in the records which is now part

2    of your regularly maintained business records for this patient,

3    you can refer to that.  That would be the appropriate way to do

4    it unless you have an independent recollection.  But do you see

5    where I am going?

6            Mr. Rosenbaum, this record is now his record.  You can

7    question him on Dr. Feuerbach's letter if you'd like.

8            MR. ROSENBAUM:  Yes.

9    Q.  Could you please look in summary page of Dr. Feuerbach's

10   letter to you as to what the conclusion of the diagnosis was at

11   that point of Mr. Mazer?

12   A.  Yeah.  That this was a, you know, at the time a 57 year old

13   man with, again, kind of this new onset, funny or atypical

14   chest pain with a, you know, with an abnormal stress test with

15   a family history for heart disease.  And you know you play

16   these things very carefully.  So Dr. Feuerbach -- again, I

17   don't remember the conversation but I am sure Dr. Feuerbach

18   would have called me and you know you can go in one of several

19   different directions.

20           THE COURT:  Well, just don't speculate about Dr.

21   Feuerbach.  Just talk about what your then diagnosis or plan

22   was for the patient.

23   BY MR. ROSENBAUM:

24   Q.  So after you spoke with Dr. Feuerbach did you make a

25   determination what to do with reference to trying to diagnose

1    the issues?

2    A.   Yes.

3    Q.   What did you do and when did you start doing that?

4    A.   All right.  So Dr. Feuerbach and I would have spoken on the

5    afternoon of January 9th or you know maybe even while Mr. Mazer

6    was in his office and then the plan was for him to undergo, for

7    the patient to undergo an elective cardiac catheterization.

8    Q.   Could you please -- what was the purpose of that treatment

9    or that examination?

10   A.   It's -- you know it's considered the gold standard as to

11   see if there's a partial blockage or a blockage of a coronary

12   artery.

13   Q.   What is the procedure of catheterization?  How is that done

14   please?

15   A.   So it's done in the hospital and it's done in the cardiac

16   catheterization lab.

17   Q.   What is the process that they go through?

18   A.   So, you know the patient's brought in and undressed and the

19   groin is cleaned and prepped and anesthetized.  And then a

20   catheter is inserted and threaded up through the femoral

21   artery, up through the aorta, through the aortic arch.  Then

22   the coronary I didn't arteries come out right where the aortic

23   valve is.  And this is all done under laparoscopy.  It can all

24   be watched on a camera.

25   Q.   Is there a risk in that procedure?

1    A.   Yes.

2    Q.   What is the risk at that point?

3    A.   Well, they quote you different risks.  The possibilities

4    include to precipitate a heart attack cause you know you are

5    entering into a coronary artery.  You can rupture the aorta.

6    You can rupture the heart.  You would sign a very detailed

7    consent form.

8    Q.   If there is a rupture of the aorta is that a fatal --

9              THE COURT:  All right.  We don't need to go there.

10             MR. ROSENBAUM:  All right.

11   Q.   Did he go through this catheterization?

12   A.   He did.  He underwent the catheterization.  Well, Dr.

13   Feuerbach -- sorry -- on January 9 started him on a medication

14   for his heart.

15   Q.   What medication was that, doctor?

16   A.   It's called toprol.  It's a beta blocker.  It's to reduce

17   the oxygen demand of the heart.  And if there was a concern

18   that this, again, this chest discomfort or chest pain was due

19   to a low blood oxygen, so you'd make the heart need less

20   oxygen.  So we started him on toprol and then the

21   catheterization was scheduled electively the following week, it

22   looks like it's January 15th.

23   Q.   And did you see him on January 16th?

24   A.   Well, I probably, actually, went up to see him in the

25   cardio cath lab cause you go in in the morning and you spend

1    the whole day there.  So I probably saw him on the afternoon of

2    the 15th but I don't know.

3    Q.  If you look after, page after the Carnegie Hill Radiology

4    report.

5    A.  Yes, I did.  I am sorry.

6    Q.  And when you saw him on the 16th could you please read that

7    entry in your record?

8    A.  So when I saw Mr. Mazer in my office on January 16th I

9    basically wrote here, reviewed results, no chest pain or

10   shortness of breath.  You know, I examined him briefly.  You

11   want to make sure there is no complications from the procedure

12   itself and then I wrote up top, you know discussed with Dr.

13   Feuerbach what to do next.

14   Q.  Are you in your January 16 record?

15   A.  Right here.

16           MR. ROSENBAUM:  May I approach again?

17           THE COURT:  You may.

18           (Pause)

19   A.  This came first, then this came, so I'm not done with

20   January 16.

21   Q.  You are reading from January 10, is that correct?

22   A.  January --

23   Q.  There's January?

24   A.  I believe that's January 16, actually.

25           THE COURT:  That is your handwriting?

1        THE WITNESS:  I know it's January 16 cause he had the

2   catheterization on January 15th and I brought him in the next

3   day on January 16th to discuss what to do next.

4        MR. ROSENBAUM:  Can I just ask him if this is a six or

5   a zero?

6        THE COURT:  Sure.  Is there a Bates number on that

7   page?  Just to identify it for the record.

8   BY MR. ROSENBAUM:

9   Q.  Is this January 10 or 16?

10  A.  January 16.

11       MR. ROSENBAUM:  Sorry, judge.  It looked like a ten.

12       THE COURT:  That's okay.

13       MR. ROSENBAUM:  No insult, sir.

14  Q.  So January 16 is a two-page document?

15  A.  Correct.

16  Q.  Okay.  And I thought it was a 10.  Can you give us what it

17  said on the first page of the January 16?

18  A.  I just did.

19       THE COURT:  Yeah, so maybe go on to the part he hasn't

20  already gone.

21  Q.  Go ahead please.

22  A.  Okay.  So then on the second page that also has January 16,

23  2009 written on it is what the plan -- what the plan -- what

24  the plan of action is.

25  Q.  What was the plan?  Could you please read it?

1  A.  Yeah.  So because of the unusual findings on the cardiac

2  catheterization we wanted to follow-up with on that with a

3  cardiac MRI and that was arranged.  He probably left my office

4  with an appointment for that and then he was --

5  Q.  Could I interrupt you please because we're not doctors.

6  What is the difference between a cardiac MRI and also taking a

7  cardiogram?  Is there a difference in those two?

8  A.  Big difference.  Sure.

9  Q.  Is the cardiac MRI a more invasive or a more detailed

10  examination?

11          THE COURT:  Why don't we take it as separate

12  questions.

13          MR. ROSENBAUM:  Okay.

14  Q.  What is the difference between --

15  A.  It is an MRI view.  It's a magnetic resonance scan view of

16  the walls of the heart to measure their viability and their

17  functionality.  How -- it's one way of looking at the heart as

18  a pump.

19  Q.  And that was done?

20  A.  That was subsequently done, yes.

21  Q.  And on January 16 was he also given medication or

22  prescription?

23  A.  He was.  Three medicines were either added or adjusted,

24  four, actually.

25  Q.  And what were they?

1   A.  So he was started on Plavix.

2   Q.  What is Plavix?

3   A.  It's a blood thinner.

4   Q.  Okay.

5   A.  And he was started on lipitor and he was started on or his

6   toprol dose was adjusted upward.  He was started on toprol the

7   week before by Dr. Feuerbach.

8   Q.  Okay.

9   A.  He was given it daily and told to take a daily aspirin.

10  Q.  Okay.  And in the bottom it says something else, right,

11  "east" "something" "river"?

12  A.  Yeah.  We were trying -- we were probably calling around to

13  see where we could get his cardiac MRI done.  That's my

14  secretary's handwriting.

15  Q.  When did you see him -- did you see any results of the

16  cardiac MRI?  Was that done on January 29, 2009?

17  A.  It's not in these papers that you handed me so you have

18  to --

19  Q.  Let me just check.  I am sorry.  May I approach, your

20  Honor?

21          THE COURT:  You may.

22  A.  Yeah, I am sorry.  Yep, got it.  So we had a cardiac MRI on

23  January 29th.

24  Q.  And can you -- were there any findings -- without going

25  through all the findings, were there any findings that were

1    significant during that as a result of that test?

2              MR. MYATT:  Objection, your Honor.

3    A.  Cardiac MRI.

4              THE COURT:  One second.  I am sorry.  Overruled.  Let

5    me just ask, do you use the phrase "significant finding" from

6    time to time in your practice?

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.  How do you understand that, what do

9    you understand that phrase to mean?

10             THE WITNESS:  Something for which someone should take

11   note.

12             THE COURT:  Okay.  You may proceed.

13             MR. ROSENBAUM:  Thank you.

14   Q.  Did you find any significant findings in the cardiac

15   magnetic resonance?

16   A.  The cardiac MRI confirmed what the catheterization showed

17   that he had a, you know a marked decrease in his, what's called

18   his left ventricular ejection fraction.  His heart as a pump

19   was not normal.

20   Q.  Would that be associated with a person's anxiety?

21             THE COURT:  Why don't you ask him, perhaps, we can

22   sort of cut to the chase, did you ever reach an understanding

23   or come to a view as to any cause or contributing factor to

24   this condition?

25             THE WITNESS:  Yes.

1          THE COURT:  Okay.  Why don't you describe that.

2          THE WITNESS:  Okay.  So the cardiac catheterization

3     did not show enough of a blockage of the coronary vessels that

4     would give that type of a decrease in one's ejection fraction.

5     So in consultation with Dr. Feuerbach and Dr. Bergman who is

6     the doctor that did the cardiac catheterization, we came to the

7     conclusion that this was stress induced.

8     Q.  Could you please go to February 2, 2009.

9          THE COURT:  How much more are is there?  I am assuming

10    we'd gotten the bulk of the testimony.  It's in the record.

11    They have been admitted into evidence.  I want you to go

12    through what you need to but I don't think that we need to go

13    through every single day.

14         MR. ROSENBAUM:  I am not, judge, really.  I am trying

15    to skip over the test and go to the result but there are some

16    other appointments he had with the client.

17         THE COURT:  But does he have to go through every

18    single one of them?proceed as quickly as possible because we

19    want to get to the causal relationship, if any, and I think we

20    just talked about.

21    BY MR. ROSENBAUM:

22    Q.  On February 2nd what does that read?

23    A.  So when I received -- February 2nd is a letter that I wrote

24    to Dr. Bergman who, again, is the doctor that performed the

25    catheterization.  And I write here, dear, Dr. Bergman, please

1    review this cardiac MRI done on a mutual patient, Matt Mazer.

2    And I sign my name.  And I said please call me at your

3    convenience.  So I would have faxed him the MRI report.

4    Q.  Okay.  Let's go back to February 23.  Did you see the

5    doctor?

6    A.  Let's go forward to February.

7    Q.  February --

8    A.  So I saw Mr. Mazer in my office on February 23.

9    Q.  And can you read --

10   A.  Says, no chest pain.  Here for follow-up.  I examined him.

11   His blood pressure was now normal, 120 over 80.  His pulse was

12   160 over 880.  I write in my own handwriting, all the medicines

13   that he is on that I mentioned earlier.  And I checked his

14   blood work, his cholesterol, his blood count and his liver

15   function tests.

16   Q.  Go on as quickly as I can.  Did there come a time where you

17   came to a diagnosis of what the issue is with reference to his

18   heart?

19   A.  We -- yes, we called it takotsubo.

20   Q.  You want to spell it?

21   A.  T-A-K-O-T-S-U-B-O.

22   Q.  What is takotsubo?

23   A.  It's under -- the way it's described is that under enormous

24   stress or emotional strain the heart is a pump, can basically

25   stop working efficiently.

1   Q.  And was it your opinion that this takotsubo was caused by a

2   stressed patient, Matt Mazer?

3   A.  I am sorry.  I don't understand that question.

4   Q.  Was Mr. Mazer under stress when you saw him?

5            MR. MYATT:  Objection, your Honor.

6            THE COURT:  Was it your understanding that he is under

7   stress?

8            THE WITNESS:  Yes.

9   Q.  And was that the cause of this diagnosis?

10           MR. MYATT:  Objection, your Honor.

11           THE COURT:  Is it your view as a treating physician

12  for Mr. Mazer that this stress that you understood he was under

13  was one of the causes or a distributing factor to his

14  condition?

15           THE WITNESS:  Yes.

16  Q.  What is your opinion?

17  A.  Yes.

18  Q.  It was?

19  A.  Yes.

20  Q.  When did the first signs of stress surface based upon your

21  records?

22           MR. MYATT:  Objection.

23           THE COURT:  Overruled.

24  Q.  Would that have been on December 22nd?

25  A.  Yes.

1   Q.  Prior to December 22nd, 2008, was there any record that he

2   had which indicated stress from your prior treatments of him?

3   A.  No.

4   Q.  How many years did you treat Mr. Mazer?  How many years was

5   he your patient?

6   A.  Up until 2008 roughly 13, 14 years.

7           THE COURT:  Had you acted as his regular internist?

8           THE WITNESS:  Yes.

9           THE COURT:  So while you were an infectious disease

10  doctor, you also acted as an internist from time to time?

11          THE WITNESS:  That's the bulk of my practice now, yes.

12  Q.  Doctor, can you go to June 12, 2009?

13  A.  Yes.

14          THE COURT:  June 1st?

15          MR. ROSENBAUM:  I have June 12.

16          THE COURT:  Okay.

17  BY MR. ROSENBAUM:

18  Q.  Could you please read that?

19  A.  Right shoulder pain, question mark, bursitis for two or

20  three days, banged head last night in bathroom.

21  Q.  Nothing resolved about this.  It's not anything that is

22  part of the diagnosis with reference to the heart, correct?  I

23  couldn't read your writing.

24  A.  Yes.  No.  It's totally separate.

25  Q.  I want to go back for a moment with very few questions

1    going back to the very first time you saw him on December 22,

2    '08.  Did he complain of neck pain at that point, your first

3    visit.

4    A.  I didn't write it down.  I don't remember.

5    Q.  But you saw marks on his neck.  You said did.  Do you know

6    whether or not you told him or suggested to him to wear a neck

7    brace at that time?

8    A.  You know I don't remember.

9    Q.  Okay.  Would it be, if he did wear a neck brace --

10            THE COURT:  Sustained, if he doesn't remember.

11   BY MR. ROSENBAUM:

12   Q.  Do you have an opinion as to whether or not the incident of

13   the December 18th incident was the cause of the stress that he

14   suffered?

15            MR. MYATT:  Objection, your Honor.

16            THE COURT:  Overruled.

17   A.  Yes.

18   Q.  What is your opinion?

19   A.  That it was.

20   Q.  And that caused stress which ultimately turned into this

21   diagnosis of takotsubo?

22   A.  Yes, correct.

23            MR. ROSENBAUM:  No further questions.

24            THE COURT:  All right.  Thank.

25            You.  Okay.  Mr. Myatt.

1        MR. ROSENBAUM:  Your Honor, I am sorry.  I must ask a

2   question.

3        THE COURT:  No.  No.  He hasn't started yet.  Go

4   ahead.

5   BY MR. ROSENBAUM:

6   Q.  Did you examine his hands, whether or not there were any

7   bruises on his hands back on December 22, 2008?

8        MR. MYATT:  Objection, your Honor.

9        THE COURT:  Overruled.  He's got his notes.  He can

10  check his notes or his memory.

11  A.  Well, I put down -- again, I put down in my handwriting

12  what are all the pertinent findings.  So if there had been

13  bruises on his hands I would have written that down.

14  Q.  You did not write any bruises to his hands?

15  A.  Correct.

16        THE COURT:  All right.  Mr. Myatt, you may proceed.

17  CROSS-EXAMINATION

18  BY MR. MYATT:

19  Q.  Dr. Lombardi, I apologize for retreading some ground a

20  little bit here but what problem did Mr. Mazer report to your

21  office on December 22 regarding?

22  A.  Fight with babysitter.  Says she grabbed him, rolling

23  around floor, no loss of consciousness, notes pain in and

24  around neck from being grabbed, no ER.

25  Q.  So he complained about pain in his neck.  That was his

C66AAFRA6                    Dr. Lombardi - Cross

1   complaint?  I mean you read his history but his complaint was

2   pain in the neck?

3   A.  Yes.

4   Q.  Would bruising of his hand have been relevant to the pain

5   in his neck?  That is significant finding in determining what

6   was the cause of his neck pain?

7   A.  Well, only in the sitting of the story.

8   Q.  Is that a yes or no?

9           MR. ROSENBAUM:  He's asked and answered.

10          THE COURT:  Overruled.  You can answer it again.

11          THE WITNESS:  Could you repeat the question?

12  Q.  Was it a significant factor in determining diagnosis

13  Mr. Mazer's neck pain?

14          THE COURT:  I'm not actually sure I understand the

15  question.  Is the question whether or not an examination of the

16  hands would have been relevant to the complaint for which the

17  patient came to your office?  Is that the question?

18          MR. MYATT:  It's better question than I was asking,

19  your Honor.

20          THE WITNESS:  I am sorry.  I blanked this for a

21  second.  I am sorry.

22          THE COURT:  If when Mr. Mazer came to your office and

23  gave the history that you've just described, the complaint you

24  just described, what relevance would an examination of hands

25  have to that or could it or did it have?

1              THE WITNESS:  Well, the first thing I write in my note

2    is fight with babysitter, exclamation point.  So that's not an

3    everyday occurrence.  People come in with neck pain of all

4    different stripes and flavors but you know that doesn't happen

5    very often.  So when he told me that I am sure I just got him

6    undressed, put him in a gown and examined him.

7    Q.  You are sure you did or you didn't?

8    A.  No.  I am sure I did.

9    Q.  And at that visit, the December 22nd visit he did not raise

10   any cardiac issues, correct?

11   A.  That's correct.

12             MR. MYATT:  Your Honor, may I approach?

13             THE COURT:  Yes.

14   BY MR. MYATT:

15   Q.  Dr. Lombardi, I am handing you a binder of exhibits which

16   are actually excerpts of your records.

17             MR. MYATT:  Your Honor, it's the same documents.

18             THE COURT:  Okay.  Let's try to move it right along,

19   okay.  Eliminate some of the empty spaces.

20             MR. MYATT:  I will do my best, your Honor.

21             THE COURT:  All right.

22   BY MR. MYATT:

23   Q.  Dr. Lombardi, could I ask you to direct your attention to

24   Tab Two of the binder which is, the first page is, actually, a

25   blood count, chemistry count, second page which are notes from

1  1/8/2009?

2         THE COURT:  Let's not plan our examination right now.

3  Go on to your next point and then they'll find what you need

4  but go ahead.

5         (Continued on next page)

1   BY MR. MYATT:

2   Q.  Dr. Lombardi, you ran some stress tests; you talked about

3   those with Mr. Rosenbaum?

4   A.  Yes.

5   Q.  Do you recall being deposed in connection with this case;

6   Mr. Rosenbaum mentioned it in the beginning of his examination

7   of you?  Do you recall there being a deposition in the case?

8   A.  Yes.  It was last week.

9   Q.  When you arrived at my office you did meet with

10  Mr. Rosenbaum and his colleagues, is that correct?

11  A.  Briefly.

12  Q.  Briefly?

13  A.  I remember it briefly.

14  Q.  Could it have been a half hour?

15  A.  No, no.

16  Q.  The stress test --

17  A.  Is it tabbed here.

18  Q.  Can you identify the stress test result for me?

19  A.  From a document, from my memory?

20          THE COURT:  Out of the binder.  Here is the issue.  We

21  are going to need to mark the binder then as a separate

22  document.  Do you want to admit this or admit that portion.

23          MR. MYATT:  We can use plaintiff's version.

24          THE COURT:  Let's use plaintiff's version which is in

25  evidence.

1              MR. MYATT:  Sorry, defendants' version.

2              THE COURT:  Defendants' version; it's in evidence.

3              Turn to whatever page, Dr. Lombardi, that contains the

4     first of the stress tests, if there is more than one.

5     Q.  Dated January 8, 2009.

6     A.  I have my notes.

7     Q.  Do you recall being asked at your deposition whether you

8     had an opinion as to whether this stress test would have been

9     caused by an altercation between Mr. Mazer and Ms. Francois?

10             THE COURT:  The stress test.

11             MR. MYATT:  The stress test.

12             THE COURT:  Whether the stress test would have been

13    caused.

14    Q.  Whether the abnormal stress test, the abnormalities

15    identified within the stress test would have been caused by an

16    altercation between Mr. Mazer and Ms. Francois?

17             MR. ROSENBAUM:  Objection, your Honor.

18             THE COURT:  If he was asked that question at the

19    deposition, and did he give the answer.  Are you asking about,

20    did he have on January 8 or 9, whatever it is, a diagnosis at

21    that time.

22             MR. MYATT:  If he had an opinion as to whether an

23    abnormal stress test was caused by the altercation.

24             THE COURT:  Were you asking his view as of the day of

25    the deposition or as of the day of the stress test; I want to

1    be clear.

2              MR. MYATT:  I was asking as of the day of the

3    deposition.

4              THE COURT:  OK.  That encapsulates basically

5    everything else that he knew following that, that Dr. Lombardi

6    learned following that relating to the cardiac condition.

7              MR. MYATT:  Yes, your Honor.

8              THE COURT:  You are picking out one stress test.  Pose

9    a question now.  You are basically asking about whether or not

10   he had a view as to whether or not abnormal stress result could

11   have been caused by the stressful condition.

12   Q.  Do you recall my asking you, do you have an opinion as to

13   whether this abnormal stress would be caused by an altercation

14   on December 18, 2008?

15             MR. ROSENBAUM:  Page please.

16   Q.  Page 38 of your deposition, the last tab of the binder.

17   A.  You want me to read my answer.

18             MR. ROSENBAUM:  Your Honor, I don't see that to be

19   inconsistent with his testimony.

20             THE COURT:  What page.

21             MR. MYATT:  Let me ask this question.

22   Q.  Do you have an opinion as to whether the abnormal stress

23   test would have been caused by an altercation between Mr. Mazer

24   and Ms. Francois on December 18, 2008.

25   A.  You know, all the stress tests, the stress test was

1    abnormal, so I don't know what caused that.  But subsequently

2    when we performed these other tests and I saw this profound

3    decrease in his cardiac function and the absence of a low blood

4    flow state to cause that, I formed an opinion that this was due

5    to stress.

6    Q.  Dr. Lombardi, is stress the only cause of takotsubo

7    syndrome.

8              THE COURT:  Let's not make him an expert witness on

9    this.  Ask him for this particular patient were there multiple

10   factors you believe were causal in your diagnosis or not.

11             THE WITNESS:  No.

12             THE COURT:  OK.  How many factors were there that you

13   believe were contributing to the diagnosis?

14             THE WITNESS:  Just emotional, intense emotional

15   stress.

16   Q.  Did you ever put your diagnosis of takotsubo syndrome in

17   writing?

18   A.  No, I did not.

19   Q.  So if I were to flip through the medical records here,

20   there is no indication of that diagnosis, is that correct,

21   there is no statement of that diagnosis, is that correct?

22   A.  You know, I think you are right.  I have not looked all

23   that closely since then.  I don't think I wrote it down.

24   Q.  I believe this came out at least briefly in Mr. Rosenbaum's

25   direct, but Mr. Mazer does have a family history of heart

1  problems, is that correct?

2  A.  I believe that's so, yes.

3  Q.  His father had his first heart attack myocardial infarct at

4  age 49.  I am referring to, this is also recorded in the letter

5  from Dr. Feuerbach to you that you relied on in your diagnosis?

6  A.  Yes, I see that.

7  Q.  It also details additional family history of cardiac

8  issues, is that correct, in that letter?

9  A.  Yes.

10 Q.  Could I direct your attention to the notes of the office

11 visit from March 31, 2009.

12 A.  Is it in this binder?

13 Q.  It's in the binder.

14 A.  Tab 4.

15 Q.  Why don't we keep using the defendant exhibit; it's in

16 chronological order.

17          THE COURT:  What's the question.

18          MR. MYATT:  I was directing his attention to the

19 document which notes that family stress continues.

20 Q.  Is it your understanding that the stress that Mr. Mazer was

21 suffering was still from an event that happened in December

22 2008 was still ongoing in March 2009?

23 A.  I would say yes.

24 Q.  Family stress would be a reference to an altercation

25 between, a single altercation between Mr. Mazer and

1   Ms. Francois?

2           THE COURT:  Ask him what his understanding is of the

3   phrase family stress.

4   Q.  What is your understanding of the phrase family stress?

5   A.  Just details of conversations just, you know, the upset in

6   the aftermath of this.

7   Q.  As a result of that stress did you refer Mr. Mazer to any

8   other doctors?

9   A.  I did.

10  Q.  Which doctor did you refer him to?

11  A.  I referred him to a psychiatrist, Dr. Sandberg.

12  Q.  Did he visit Dr. Sandberg?

13  A.  I believe he did.

14  Q.  Do you have an understanding whether he continued to see

15  Dr. Sandberg?

16          MR. ROSENBAUM:  Objection; beyond direct.

17          THE COURT:  Overruled; if you know.

18  A.  He saw him for a period of time then he stopped.

19          THE COURT:  We will put you on the clock; 8 minutes I

20  am thinking.

21          MR. MYATT:  That's fine, your Honor.

22          THE COURT:  Talk faster or 8 minutes of silence, your

23  choice.

24          MR. MYATT:  I will do my best.

25  Q.  You don't know personally what stress factors were in

C664FRA7                    Lombardi - cross

1   Mr. Mazer's life at this time you were making this diagnosis of

2   takotsubo?

3   A.  Other than what he told me, no.

4   Q.  You don't personally know?

5   A.  I don't know what that means.

6          MR. ROSENBAUM:  Objection.

7          THE COURT:  Overruled.

8   Q.  Do you know if there were any stresses in his life other

9   than family stress as a result of the altercation between

10  Mr. Mazer and Ms. Francois?

11  A.  Not that he shared with me.

12  Q.  But do you know whether there are any?

13         THE COURT:  He said not that he shared with him; the

14  so the answer would be no.  Is that right?

15         THE WITNESS:  Yes.

16         MR. MYATT:  Your Honor, I have no further questions of

17  this witness.

18         THE COURT:  Anything, Mr. Rosenbaum.

19         MR. ROSENBAUM:  I promise, really very short.

20         THE COURT:  Two questions, within the scope of cross.

21         MR. ROSENBAUM:  Yes.

22         THE COURT:  Proceed.

23  REDIRECT EXAMINATION

24  BY MR. ROSENBAUM:

25  Q.  When the three doctors got together to diagnose his

1    condition, they knew the history of Mr. Mazer and his

2    background and his father having died at an early age?

3        THE COURT:  Sustained; you can only ask him what he

4    knows.

5        MR. ROSENBAUM:  It was included in the doctor's

6    report, the family history.

7        THE COURT:  Don't ask him what did Feuerbach find.

8    A.  In Dr. Feuerbach's consultation letter, he references the

9    family history.

10   Q.  You and he had the family history of Mr. Mazer's family

11   including the untimely death of his father?

12   A.  Yes.

13   Q.  Notwithstanding all these issues which may cause heart

14   conditions, isn't it a fact that you still diagnosed him with

15   this condition as a result of the stress, is that correct,

16   knowing his background, everything like that?

17   A.  That's correct.

18   Q.  His background, medical background, you took into

19   consideration in your discussions with the doctor and still

20   came to the same conclusion, is that correct?

21   A.  Yes.

22   Q.  Did you tell Mr. Mazer on his either first visit or the

23   very few visits thereafter that he had a very serious heart

24   condition that might cause his death?

25       MR. MYATT:  Objection, your Honor.

1              MR. ROSENBAUM:  We're talking about stress now, your

2       Honor.

3              THE COURT:  I'm working through the hearsay problem.

4       Hold on.  Overruled.  You may proceed.  Do you have the

5       question in mind.

6              THE WITNESS:  Could you ask it again.

7              THE COURT:  Did you tell Mr. Mazer on his that first

8       visit or very few visits thereafter that he had a very serious

9       heart condition that might cause his death?

10      A.  It wouldn't have been at that first visit; it would have

11      been when these reports started coming in.  I didn't write it

12      in my chart but I can tell from my records that in a phone

13      conversation, I must have sent him to Dr. Sandberg, the

14      psychiatrist.

15      Q.  Do you know whether or not that possibility of dying, if it

16      was conveyed to his wife we don't know at this point, would

17      that be a family stress?

18             THE COURT:  Sustained.

19             MR. ROSENBAUM:  OK.

20             THE COURT:  Nothing further.

21             You may step down.  Thank you very much.

22             THE WITNESS:  May I leave.

23             THE COURT:  Yes.

24             MS. TREPELKOVA:  Can we hand up what has been marked

25      as Exhibit c.

1              THE COURT:  Yes.

2              (Witness excused)

3              THE COURT:  Let's resume with Ms. Sylvia Alexander.

4              Ms. Alexander, we are going to continue with any

5    direct examination Mr. Rosenbaum has if he has any.

6              MR. ROSENBAUM:  Briefly; I won't be even bring my

7    book.

8              THE COURT:  Very short on direct then some cross.

9     SYLVIA  ALEXANDER, resumed.

10   DIRECT EXAMINATION

11   BY MR. ROSENBAUM:

12   Q.  When you started to work for the Mazers, was Mr. Mazer

13   wearing a neck brace?

14   A.  Yes.

15   Q.  How long was he wearing that neck brace?

16   A.  For quite a while.

17   Q.  More than a week, more than 2 weeks?

18   A.  Yes.

19             MR. ROSENBAUM:  Thank you.

20             THE COURT:  Ms. Lavery.

21   CROSS EXAMINATION

22   BY MS. LAVERY:

23   Q.  Good afternoon.  You testified earlier about some

24   statements that Ms. Francois made to you about the evening of

25   December 18, 2008, correct?

1    A.  Correct.

2    Q.  You were not at the Mazer apartment the evening of December

3    18, 2008?

4    A.  No.

5    Q.  The Mazer family, Mr. Mazer and Ms. Shade, they are your

6    employers, correct?

7    A.  Now, yes.

8    Q.  They pay you an income currently?

9    A.  Yes.

10   Q.  Have you ever spoken to Mr. Mazer about this case?

11   A.  No.

12   Q.  Do you see Mr. Mazer five days a week?

13   A.  Excuse me?

14   Q.  Do you see Mr. Mazer generally five days out of the week?

15   A.  No.

16   Q.  How many days out of the week do you see Mr. Mazer?

17   A.  Maybe one, two, sometime I wouldn't see him for the whole

18   week if he's out of the country.

19   Q.  If he's traveling?

20   A.  Yes.

21   Q.  Have you spoken to Ms. Shade about the case?

22   A.  No.

23   Q.  How many days a week do you normally see Ms. Shade?

24   A.  Accordingly, if Mr. Matthew's out of the country then I

25   will see Sheryl, so five days a week, if not I will see her

1  less; they both to travel different locations.

2  Q.  How many times have you met with defendants' lawyers about

3  this case?

4  A.  Twice.

5  Q.  For how long each time did you meet with them?

6  A.  I wasn't checking.

7         THE COURT:  I want to remind the jury that it's quite

8  typical to meet with counsel prior to a case; it would be

9  unusual not to.

10  Q.  When was the first time you met with defendants' lawyers

11  about this case?

12  A.  On Tuesday.

13  Q.  When was the second time?

14  A.  Today.

15  Q.  You testified earlier that you became friends with

16  Ms. Francois when you were in college, correct?

17  A.  Yes.

18  Q.  That means you were friends with her for several decades,

19  right?

20  A.  Yes.

21  Q.  You also testified earlier that you believed Ms. Francois

22  is a liar?

23  A.  Yes.

24  Q.  You remained friends for several decades with someone you

25  believed to be a liar?

1    A.   The only time really that besides she lying to me, I have

2    witnesses, but it has nothing to do with me, OK, but I have

3    witnesses.

4    Q.   Earlier when you were talking about what Ms. Francois told

5    you about the events of December 18, 2008, you said you had no

6    knowledge from Ms. Francois of the physical aspects of the

7    fight, correct?

8    A.   Yes.

9    Q.   But you also said you were told Mr. Mazer slapped the phone

10   out of Ms. Francois' hand -- sorry -- you also testified --

11              MR. ROSENBAUM:  Objection; misleading.

12              THE COURT:  She is about to correct herself.

13   Q.   You also testified that Ms. Francois slapped the phone out

14   of Mr. Mazer's hand, correct?

15   A.   No.

16   Q.   What did you testify?

17   A.   I said that Patricia was fighting Mr. Mazer to get the

18   phone out of his hand.  I never said slapped.

19   Q.   Wouldn't that be a physical aspect of the fight that you

20   heard about?

21   A.   I don't know.

22   Q.   Did you not understand?

23              MR. ROSENBAUM:  Objection?

24              THE COURT:  Overruled.

25   Q.   One more question.  Did you not understand what the

1   questions meant when they said physical aspects of the fight?

2            MR. ROSENBAUM:  Argumentative.

3            THE COURT:  Sustained.  I don't actually understand

4   the question.

5   Q.  Did Ms. Francois ever tell you that Mr. Mazer got angry on

6   the night of December 18, 2008?

7   A.  No.

8            MS. LAVERY:  No further questions, your Honor.

9            THE COURT:  Thank you.

10           Ms. Alexander, you may step down.

11           (Witness excused)

12           THE COURT:  Will defense call their next witness.

13           MS. TREPELKOVA:  The defense calls Matthew Mazer.

14           THE COURT:  Mr. Rosenbaum you may proceed or Ms.

15   Trepelkova.  Mr. Rosenbaum.

16    MATTHEW CHARLES MAZER,

17        a Defendant herein,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MR. ROSENBAUM:

21   Q.  I am going to ask you a series of questions.  I will do my

22   best to make it clear.  If you don't understand it, please tell

23   me, I will do the best I can, I will change the question to

24   make it understandable for you.  OK?

25   A.  Yes, sir.

1    Q.  I know you are nervous.  Relax, take a deep breath.  I am

2    not a doctor, but.  When were you born?

3    A.  July 6, 1951.

4    Q.  Where were you born?

5    A.  Lenox Hill Hospital in New York.

6    Q.  I am going to go into your background for a bit.  The early

7    years of your life, where did you live, the first 15 years?

8    A.  A combination of West End Avenue and 73rd Street, New

9    Rochelle, and eventually Scarsdale, Westchester.

10   Q.  The first 15 years?

11   A.  The first 15 years I lived in, I think, 763 West End

12   Avenue, then we moved to Westchester.

13   Q.  When you say we, who is that?

14   A.  That would be my father Abraham Lincoln Mazer, my mother

15   Alma Mazer, and my younger sister Melanie Mazer.

16   Q.  Where did you attend high school?

17   A.  Scarsdale High School.

18   Q.  After high school where did you go to school?

19   A.  UCLA.

20   Q.  Do you recall the years you went to UCLA?

21   A.  1968 to 1973.

22   Q.  Did you major in any program?

23   A.  Political science.

24   Q.  Was that your interest?

25   A.  Yes, sir.

1  Q.  What does political science encompass?

2  A.  It's often called political economy.  It could be a wide

3  variety of disciplines, including everything from how opinions

4  are formed, how policy is created, to the nuts and bolts of

5  electoral politics which was my specialty.

6  Q.  Did you continue your education after UCLA?

7  A.  No, sir.

8  Q.  Did you start to work?

9  A.  Yes.

10  Q.  Were you working when you went to UCLA?

11  A.  I was doing two things, while I attended UCLA, yes, I

12  worked every day for the Associated Students of UCLA.

13  Q.  What is that?

14  A.  Associated Students of UCLA then was a relatively small

15  company and now is a huge company that manages and administers

16  all student services, food services, parking, a wide variety of

17  quasi governmental, NGO activities of the University of

18  California.

19  Q.  Slow down.  When you graduated from UCLA did you get a job?

20  A.  I did not graduate from UCLA.

21  Q.  How many years did you spend there?

22  A.  I enrolled in the fall of 1968 and I completed my time at

23  UCLA in the spring of 1973.

24  Q.  You almost graduated but just didn't get there?

25  A.  Due to family circumstances I did not graduate from UCLA.

1    Q.  Would you like to share with the jury what those family

2    circumstances were?

3              MR. MYATT:  Objection.

4              THE COURT:  It's a little irrelevant we are getting to

5    know him; he can give a little background.

6    A.  I spent much of my time while at UCLA doing field study and

7    actual field work in politics, some of which I got credit, some

8    of which I did not, notably some democratic political

9    campaigns.  I was then working for the university as well in

10   1973, and applying, I believe successfully applying to a public

11   policy program at the University of California Berkeley at the

12   School of Public Policy because I had a job offer to be an

13   assistant to the president of the University of California,

14   which would have handled both my matriculation and my master's

15   degree in public policy.

16             That said, I was very active and employed by the

17   university in public policy, in mostly student issues and

18   co-governance.  In March 1973, my father had a heart attack

19   while running a 10,000 feet of elevation while running an

20   international Boy Scout mission.

21             THE COURT:  I think that's, Mr. Rosenbaum, probably

22   enough.  Bring it forward to the present.

23   A.  I went into my family business because my father was sick

24   and had a diagnosis that he would live perhaps two years.

25             MR. ROSENBAUM:  We will go to the years --

1          THE COURT:  He had a baby and hired Ms. Francois.

2          MR. ROSENBAUM:  You may hope.

3          THE COURT:  Get him close.  We are not going through

4    too much of the whole courtship, etc., etc.  He had a child,

5    hired a nanny.

6          MR. ROSENBAUM:  You do it, judge.

7          THE COURT:  Keep it as relevant as possible.  Bring it

8    forward.

9    BY MR. ROSENBAUM:

10   Q.  Did you partake in any program with reference to children's

11   in Harlem at a period of time?

12         THE COURT:  No.  Sustained.  No.  You know the rule of

13   evidence on this.  We can have a sidebar if you want to talk

14   about it.

15         MR. ROSENBAUM:  I have to.

16         THE COURT:  The jury will disregard the last question.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1               (At the sidebar)

2               THE COURT:  You can't use a specific instance of good

3      conduct.

4               MR. ROSENBAUM:  It's not good conduct.

5               THE COURT:  What you are going for I think is that he

6      is not a racist by showing that specific instance of working

7      for Harlem children, that is not relevant.  What's relevant is

8      his recollection of what happened on the night of December 18

9      and the wage-and-hour claim.

10              MR. ROSENBAUM:  I would never have brought it in.

11     What was the organization.

12              MS. TREPELKOVA:  I don't remember.

13              MR. ROSENBAUM:  I don't remember the name.  He

14     actually developed, as I understand it, a program for children

15     who lived in Harlem.

16              MS. TREPELKOVA:  Rehabilitation for people in prison.

17              THE COURT:  How is that relevant.

18              MR. ROSENBAUM:  Because --

19              THE COURT:  I understand the intention but you can't

20     do it.

21              MR. ROSENBAUM:  They brought it out on the direct

22     case.  She spoke about being called a black SOB.

23              THE COURT:  He is going to presumably, we had

24     Ms. Sylvia Alexander speak about her version, he will speak

25     about his version of events.  You can ask him had he ever used

1   such comments like that to anybody.  Can't condition go through

2   the history of public charitable work for different

3   demographics of population.

4           MR. ROSENBAUM:  If the court will remember, early on

5   in the case I said this matter has been taken out of the court

6   system and into the public.

7           THE COURT:  I recall that.

8           MR. ROSENBAUM:  They put the issue of racism in this

9   case.  They did it yesterday.  They did it today.

10          THE COURT:  You are going to ask him about those

11  comments.  I assume he will say vehemently whatever.

12          MR. ROSENBAUM:  Why can't I ask him.

13          THE COURT:  Not about a Harlem program he does for

14  kids of convicts.  It's completely irrelevant to the issues in

15  the case.  He will be on the stand tomorrow.  I will think

16  about it overnight.  I will consider it overnight.

17          MR. ROSENBAUM:  He actually was proactive in

18  democratic parties with respect to people running for office

19  who had issues of racism and he lived his life, he actually had

20  films made with reference to these things.

21          THE COURT:  My issue is that there is a federal rule

22  of evidence which I am sure you are familiar with that does not

23  allow you to show specific instances of good conduct to prove

24  that bad conduct didn't occur.  You just can't do it.

25          MR. ROSENBAUM:  But it's an allegation that he was a

1    racist.  That's the allegation.

2              THE COURT:  There's an allegation he used specific

3    words.

4              MR. ROSENBAUM:  That's racism.

5              THE COURT:  I will see if I can find anything

6    supportive of your position.  Right now leave this topic, bring

7    it up to the wage-and-hour claim and tomorrow you can

8    backtrack.  OK.  Let's bring it to the present.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court)

2    BY MR. ROSENBAUM:

3    Q.  Mr. Mazer, can you please tell the jury prior to let's say

4    2000 to 2008, whether or not you were employed and what kind of

5    work you did?

6    A.  Yes, I was employed.

7    Q.  Tell the jury please.

8    A.  During those years I worked on animated films for children.

9    Q.  What did you do, worked on, what did you do?

10   A.  Developed and produced sequels for animated films for

11   children on which I worked prior to 2000, produced touring

12   shows for children based on PBS, well-known PBS children's

13   properties, mostly for children between ages 3 and 6, did that,

14   worked for a company in which I was a principal and then was an

15   executive of a Canadian company that held certain rights to

16   certain children shows, both animated, live, and televised

17   where we developed yet additional children's programming for

18   the PBS market and for the live touring children's show market.

19           Then while continuing to do that and run those tours,

20   I started in the documentary film business, a business that I

21   had not been in before even though I had been involved in

22   studio films, and I spent from roughly 2004 to 2008 in that

23   endeavor, producing two genres of film, one about a series that

24   I am in the middle about the Holocaust.

25           THE COURT:  Let's not go into the content.

1   A.  And I also started a business that involves, that's active

2   in New York State, that --

3            THE COURT:  Let's not go into the content.  There is

4   an issue we are going to resolve.  Let's not go into the

5   content of what the issue may or may not be.  Your counsel can

6   come back to this.  Move on to the next question.

7   Q.  Are you married?

8   A.  Yes, sir.

9   Q.  Is Sheryl your wife?

10  A.  Yes, Sheryl Shade is my wife.

11  Q.  When were you married?

12  A.  November 16, 1997.

13  Q.  Better remember that date.

14  A.  I had to study for that, yes.

15  Q.  Is there a child of that marriage?

16  A.  Yes, sir.

17  Q.  What's the child's name?

18  A.  Shade Meryl Lee Mazer.

19  Q.  When was Sheryl born?

20  A.  September 14, 2000.

21  Q.  How old were you when Sheryl Shade was born?

22  A.  49.

23  Q.  I am not going to ask how old your wife was.

24  A.  Younger than 49, much younger than me.

25  Q.  What was the year the child was born?

1    A.  2000.

2    Q.  Did your job require you to leave the home or the state for

3    periods of time?

4    A.  Yes.

5    Q.  Was Mrs. Mazer also employed?

6    A.  Yes.

7    Q.  What type of work did she do in 2000?

8    A.  In 2000.

9          THE COURT:  Go to when the child was born.

10   Q.  That's when the child was born; 2000, 2001.

11   A.  She represents, represented then Olympic athletes and

12   documentary filmmakers and NGO, a variety of institutions and

13   their work.

14   Q.  Olympic athletes?

15   A.  Athletes, she's best qualified to discuss that, athletes

16   who participate in the Olympics for the United States.

17   Q.  When Shade was born, did she also travel after the child

18   was born or did she have a job?

19   A.  Yes.

20   Q.  So both of you were working at that time?

21   A.  Yes.

22   Q.  When the child was born did you have a nurse to take care

23   of her?

24   A.  Yes, sir.

25   Q.  What was that nurse's name?

1    A.  Judith Johnson Pitts.

2    Q.  How long did she work for you?

3    A.  I believe she worked for us from the time we left New York

4    Hospital until sometime in April of 2002.

5    Q.  What was her job?

6    A.  She started out as a baby nurse and then became a

7    babysitter, caregiver for the child that she had begun with as

8    a baby nurse.

9    Q.  When did Shade, if you remember these dates, when did she

10   start either preschool or what's earlier than preschool,

11   nursery school?

12   A.  Well without commenting on how things work here in New

13   York, Shade was in schools and programs I think starting at one

14   at Central Synagog, I think it might have been the 2s program.

15   Then she started at Rodeph Sholom in their preK, nursery or

16   preK program.  Between Central Synagog and Rodeph Sholom, she

17   started when she was 2 and she was going to programs for much

18   of the day when she was 3 and 4.  They had different names, 2s,

19   3s, nursery, preK.  Before you get to 1st grade you're in

20   school for 5 years it seems.

21   Q.  What were some of Shade's interests after school?

22   A.  At what point in time?

23   Q.  The earliest please.

24   A.  I think, I believe her earliest interests were the moon,

25   and then she progressed to public television and ballet, dance,

1  little kid dance kind of stuff.

2  Q.  Did she take dance classes after school?

3  A.  When she was little she would take children's music.  My

4  wife would be the expert on this.  My direct recollection is

5  she would take some kind of mommy and me class and a music

6  class and they would give a little girls, that's what they're

7  called, little girls dance class.

8  Q.  As the years went on did she still continue taking classes?

9  A.  Yes, sir.

10  Q.  Dance classes?

11  A.  Yes, sir.

12  Q.  As of now as, of this period of time, is she still taking

13  dance classes?

14          MR. MYATT:  Objection.

15          THE COURT:  Overruled.

16  A.  She took some kind of ongoing Thursday and Saturday dance

17  programs for many years, eventually that interest was subsumed

18  to gymnastics at which sequentially over the years took more

19  and more time.  Now she is, she also took Chinese for kids at

20  school and chess and flute lessons and she now is in gymnastics

21  and flute and something else at school, I think, glee club, I

22  think, and Sundays she goes to ballet to hone her skills.  She

23  loves it.

24  Q.  Do you know Patrice Francois, the plaintiff?

25  A.  I know Patricia Francois, yes.

1    Q.  Was it you or your wife that arranged the programs for the

2    calendar for Ms. Francois?

3    A.  It would be my wife Sheryl Shade.

4    Q.  Was it you or your wife that had agreements with her with

5    respect to pay?

6    A.  It would be my wife.

7    Q.  Was it you or her that designated the hours that she would

8    work?

9    A.  It would be my wife.

10   Q.  Was it you or your wife that would give her the calendar

11   when there may be times that you would go away for vacation,

12   things of that nature?

13   A.  Repeat that question.

14   Q.  Was it you or your wife that gave her the program or the

15   calendar of dates you would be on vacation or away from New

16   York?

17   A.  It would be --

18            MR. MYATT:  Objection.

19            THE COURT:  Overruled?

20   A.  Regarding communicating those activities and intentions to

21   Patricia Francois, it would be my wife, sir.

22   Q.  Would it be your wife that Ms. Francois would speak to with

23   respect to reports of what the child did during the day?

24   A.  In terms of, could you just repeat that, I missed something

25   there.

1    Q.  When the child would come home with Ms. Francois but before

2    the child would leave with Ms. Francois for the day, was it

3    your wife that gave her the direction to report to your wife or

4    to report to you?

5    A.  Those instructions would generally be communicated by my

6    wife with the exception if she was out of town, I would be the

7    messenger for those instructions.

8    Q.  I don't want you to interpret these questions that you had

9    no part in rearing the child.  I just want to note a

10   relationship between Ms. Francois and her duties.

11   A.  Understood.

12          MR. MYATT:  Objection.

13          THE COURT:  Overruled; it's a statement more than

14   anything else.  Let it go.

15   Q.  The times that you were home with your daughter, which is

16   most probably on the weekends?

17   A.  I am home with our daughter on evenings and weekends, yes.

18   Q.  Where was your office located; did you have an office in

19   New York?

20   A.  Yes, sir.

21   Q.  From year 2005 to 2008 was your office located in about the

22   same location?

23   A.  Yes, sir.

24   Q.  Where was that location?

25   A.  40th Street and Fifth Avenue.

1  Q.  How far is that from your home?

2  A.  23 blocks, 2 subway stops.

3  Q.  You apparently must have walked back and forth?

4  A.  Yes, I have walked back and forth.  I know how long it

5  takes to get to take the 2 subway stops.

6  Q.  What was your usual hours of work between the years, I will

7  go each year, 2004, your usual hours of work when you were in

8  New York?

9  A.  After taking, after one of us would take our child to

10  school, I would go to the office by about 8:30, 9:00.

11  Q.  Before you or your wife left when your child was in school,

12  you would take her to school or your wife would take her to

13  school in the morning?

14  A.  One of us always did, yes.

15  Q.  What time was she taken to school in the morning?

16  A.  Our school generally starts between and I have to consult

17  the calendar, my recollection is it starts sometime, depending

18  on the age of the child, between 8 or 8:30.  When they are very

19  young, 8:30, all of a sudden it's 8:15.  Pretty soon they get

20  all the kids are showing up at 8:00; perhaps even in

21  kindergarten, it's an 8:00 call.

22  Q.  How would you get to school, take a bus or taxi?

23  A.  I would take the subway or the in beginning we would take B

24  or C from 59th Street 2 stops, I believe, 2 stops I think, then

25  we would now, once she moved to the 79th Street building, I

1  think in first grade, first or second grade, I think first

2  grade, it's 2 stops on the number 1, 66, 72, 79, 3 stops on the

3  number 1.

4  Q.  How long did it take by train to go to the new school?

5  A.  The Rodeph Sholom has 2 buildings, one on 83rd Street

6  between Central Park West and Amsterdam, and Columbus, then

7  when kids transit from the lower school to the elementary

8  school, from the early childhood division to the elementary

9  school, they go to a building at 79th Street and Amsterdam.

10 Q.  Was there much difference?

11 A.  No.

12 Q.  Generally, how long did it take you to take Shade to

13 school?

14 A.  We'd leave the house about 20 minutes of 8 and we'd be

15 there at 8:00.

16 Q.  20 minutes?

17 A.  Yes, with a fair wind 15, on a bad day 25.

18 Q.  Please.

19 A.  Yes.

20 Q.  On a bad day anywhere from 20 minutes to what, how long did

21 it take?

22 A.  On the subway?

23 Q.  I don't care how you go.

24 A.  Subway or cab, 20 minutes, 20.

25 Q.  Worst scenario?

1   A.  25.

2   Q.  After you took the child to school, would you go to your

3   office?

4   A.  Often I would come home, pick up my briefcase, put on my

5   tie, then go to the office.

6   Q.  What time did you usually arrive at the office?

7   A.  9:00, 9:30.

8   Q.  What time would you leave the office, ordinarily leave the

9   office?

10  A.  6.

11  Q.  Where did you go generally speaking from the office?

12  A.  Home.

13  Q.  From years 2006 to 2008, what was the average time you

14  would get to home when you worked in New York?

15  A.  The average time to leave the office?

16  Q.  No, the time you got home between years 2006 and 2008 when

17  you left the office?

18  A.  Sometime between 6 and 7 if I stopped along the way to go

19  grocery shopping, pick up drying cleaning, any other errands.

20  Q.  Would 7:00 be the latest you would come in?

21  A.  On recollection, generally when I was in New York,

22  generally 7:00 would be about the latest.

23  Q.  When your wife was in New York, where was her office

24  located?

25  A.  Initially at 250 West 57th Street.

1   Q.  How far is that from your building where you live?

2   A.  From the first building we lived in during Ms. Francois'

3   tenure, that would be on the same block.

4   Q.  Less than 5 minutes to get home?

5   A.  It would be certainly less than 5 minutes to walk from 57th

6   around the corner to 56th, yes, sir.

7   Q.  Did she change her office location of her office?

8   A.  Yes, sir.

9   Q.  When did she do that?

10  A.  Sometime in 2003, late 2003 or, she would know, 2004, she

11  changed her office location.

12  Q.  Where was the office.

13  A.  She was at 40th and Fifth as well.

14  Q.  Was that near where your office was?

15  A.  It was continuous to mine, yes.

16  Q.  It would take her about the same time to get home, is that

17  correct?

18  A.  Yes, sir.

19  Q.  When you were both in New York at the same time, both

20  working at the same time, did you have an arrangement with your

21  wife if one was go to work later, the other one would go home

22  earlier?

23  A.  Yes, sir.

24  Q.  What was that arrangement?

25  A.  The effort was to always try to get home no later than 7.

1   It became for one or both of us, it became an article of faith,

2   for several reasons.

3   Q.  Can you give us some of those reasons.

4   A.  First, to be home with our child; second, because that was

5   the, I think that was both the express and implied commitment

6   to Ms. Francois, that one of us would be home by, in general,

7   we would be home by 7.

8   Q.  When you came home, not your wife, yourself, if Ms.

9   Francois was there, would she stay with you for a while or

10  would she leave?

11  A.  Repeat that question.

12  Q.  When you would come home at about 6:00, whatever time it

13  is, we would she stay on or would she leave?

14          THE COURT:  I think he said by 7; you just said 6.

15  Q.  6 or 7, whenever you came home?

16          THE COURT:  Whatever time he arrived home.

17  A.  By whatever time I would arrive, whether that would be 6 or

18  7 or in between, Ms. Francois would soon upon my arrival be

19  gathering her things and saying good night to Shade, saying

20  good night to me, and leaving.

21          THE COURT:  Mr. Rosenbaum, you have two minutes.  I

22  want to make sure you don't go over.

23          MR. ROSENBAUM:  I would rather stop.

24          THE COURT:  If you are at a logical breaking point,

25  let's break for the evening two minutes early.

1          Ladies and gentlemen, we will resume tomorrow morning

2      at 9:30.  Just to give you a sense where we are, we obviously

3      have the testimony Mr. Mazer.  We will hear, this can change,

4      we have maybe 4 more witnesses after that, just to give you a

5      sense of where we are in terms of scope.  It's hard to predict

6      how long things will go on.  I am trying to move it along.

7          Please, again, don't talk to anybody about this case.

8      The same cautionary notes I said before.  Don't talk to each

9      other.  Don't talk to anybody outside of the courthouse.  Don't

10     Google anything or anybody relating to this case in any way.

11     Keep an open mind.  There is still more evidence to come in.

12         See you tomorrow morning promptly at 9:30.

13         Thank you very much.

14         (Jury leaves courtroom)

15         THE COURT:  I want to make sure we are clear about the

16     rule of evidence to which I am referring.  I want to invite

17     counsel to make whatever submissions they would like or we can

18     do it orally first thing in the morning on essentially the

19     issue of the associational and other activities in which

20     Mr. Mazer might have engaged which I presume he did engage

21     which would be proffered for the purpose of showing a lack of

22     racism or something of that nature.

23         The rules of evidence provide, as you know, not

24     keeping this out just to keep it out, as you know, under 404,

25     there are some pretty significant limitations about what kinds

1    of evidence can be used to show character, also Rule 608.  See

2    what kinds of cases you can come up with on either side of the

3    question that would help with this.  In particular, there must

4    be case where these particular factual circumstances have been

5    directly raised.  This can't be the first time that this is

6    being raised when somebody has alleged something very similar

7    to this, even in a different cause of action.

8            Let's see what you guys can come up with.  Depending

9    on the outcome of that, we will allow you to circle back to

10   that testimony with Mr. Mazer or we will leave it.  All right.

11   I do want to make sure we do this on a reasoned basis.  If

12   there is something you folks can show me, I want to invite you

13   show it to me.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  We need to I think address that right

2    because it's her health condition.  Why don't we take that up

3    here at sidebar.

4          MS. TREPELKOVA:  Can I just bring up one point?

5          THE COURT:  Sure.

6          MS. TREPELKOVA:  We plan to introduce subpoena the

7    phone records from Mrs.~Shades' cellphone on the night in

8    question.  We are trying to get a custodian of records to come

9    in.  They'd originally confirmed.

10          THE COURT:  Can't you guys just stipulate?

11          MS. TREPELKOVA:  That's what I was going to say.

12          THE COURT:  Ms. Trepelkova, is this just to say that

13   there was a phone call made during the time of the incident?

14          MS. TREPELKOVA:  Several phone calls but, yes.

15          THE COURT:  And you've got a phone record which shows

16   that there was a phone call received or made from a particular

17   cellphone line which Mrs.~Shade will identify as her cellphone?

18          MS. TREPELKOVA:  Yes.

19          THE COURT:  Can't we stipulate to these without

20   calling in somebody from Verizon or something else?  I have to

21   say, I have had custodian of records in here but on phone

22   records but it always seemed seems like a waste of time.  Is

23   there any doubt as to the authenticity of these phone records?

24   Do you believe they have been fiddled with in some way?  Are

25   they askew on the page?

C66AAFRA8

1         MR. MYATT: I believe, your Honor, that the phone

2    records that we received in response to the subpoena that

3    defendant served are not the complete production which makes it

4    a little bit difficult to address this.

5         THE COURT: Do you have phone records for December 18,

6    2008 for the between the hours of six and nine p.m?

7         MR. MYATT: Yes.

8         MS. TREPELKOVA: I wasn't planning to produce the

9    entire because they respond not for a specific date but for all

10   the records that they have for a particular billing cycle.  So,

11   yes, I am only planning to introduce that portion which

12   December 18, 2008.

13        THE COURT: That's one page?

14        MS. TREPELKOVA: I think it's two pages.

15        THE COURT: You are going to do the whole day of

16   December 18th?

17        MS. TREPELKOVA: It breaks off at a bad place so it's

18   two pages.

19        THE COURT: Okay.  That's fine.  Have you produced

20   those documents to Mr. Myatt and his colleague?

21        MS. TREPELKOVA: To the plaintiffs, yes.

22        THE COURT: Is there any reason to doubt the

23   authenticity of the document that you are relating to December

24   18?  In other words, as you know phone records come where

25   they're in time order, in sequence order in my experience.

1    However, you may have a different experience.  And so if you've

2    been given the phone records for the hours of say six to nine

3    p.m. that ought to be the phone record for the hours of six to

4    nine p.m.

5              MR. MYATT:  Your Honor, would it be possible for us to

6    spend a few moments and address this first thing in the

7    morning?

8              THE COURT:  But I want you guys to stipulate to this.

9    How are they going to know --

10             MS. TREPELKOVA:  I've issued a trial subpoena.

11             THE COURT:  We are going to waste somebody's time.

12   Hold on.  Are there any records relating to December 18, 2008

13   that have you not produced either the morning or the late at

14   night?

15             MS. TREPELKOVA:  Absolutely, not.

16             THE COURT:  What else do you want, Mr. Myatt?  Can I

17   see them?

18             MS. TREPELKOVA:  It's Exhibit F in our trial binder if

19   you have that in front of you.

20             THE COURT:  I am trying to eliminate unnecessary time

21   that we're going to spend on things.  Hold on.

22             (Pause)

23             THE COURT:  Okay.  And Ms. Mazer's phone was the

24   917-544-8298 line?

25             MS. TREPELKOVA:  Yes.

C66AAFRA8

1           THE COURT:  All right.  These were received on May

2       23rd.  All right.  If you folks have any reason to doubt the

3       authenticity, there's also a hearsay exception I could let it

4       in under that.

5           MR. MYATT:  Your Honor, two things.  One, I am curious

6       that there's actually a signed notarized version of the

7       authenticity statement which is blank.

8           MS. TREPELKOVA:  Is this is exactly the e-mail time

9       sensitive -- only logged up to an hour of when they send an

10      e-mail.  I'm trying to get a signed copy as well.

11          THE COURT:  Here is what I don't want to do.  We are

12      in a -- we are looking for the truth.  What I don't want to do

13      is create an issue if an issue does not exist over a formality,

14      all right.  So what's your call, Ms. Rearden?  Why don't you

15      confer with Mr. Myatt for two seconds and agree not to call the

16      custodian of records.

17          MR. MYATT:  Your Honor, all I would ask is if we could

18      get the first seven pages.  I, truthfully, I have no particular

19      reason --

20          THE COURT:  Give him the first seven pages.

21          MS. TREPELKOVA:  I think -- e-mail those pages over

22      but I'll check my office.

23          MR. MYATT:  I just want to have a complete record

24      before I agree to --

25          THE COURT:  There is not many more time.  This is it

1   because we're either going to call the witness tomorrow.  We

2   can't like hold this one overnight because there is a human

3   being that's going to have to show up here and cool her heels

4   for six hours while Mr. Mazer is examined and cross-examined.

5   If you are going to insist, I am encouraging --

6           MS. TREPELKOVA:  Those seven pages.

7           THE COURT:  Hold on.  I am doing this know.  I am

8   insisting as strongly as I know how to suggest to you that

9   these look authentic to me.  I can't see a reason to take up

10  somebody's time.

11          MS. REARDEN:  We hear that, judge.  And we are going

12  to look at these seven pages tonight.  We will let the

13  defendants know this evening what you are position is.

14          THE COURT:  In the next hour and a half.

15          MS. REARDEN:  Fine.

16          THE COURT:  Okay all right.  Can you e-mail them the

17  other seven pages?

18          MS. TREPELKOVA:  Yes.

19          THE COURT:  Okay.  I think the likelihood of a

20  custodian of records having to be called is unlikely but you

21  tell her in the next hour and a half.

22          MR. MYATT:  Your Honor, I will tell her within five

23  minutes of receiving those seven pages.

24          THE COURT:  All right.  Is there anything else?

25          (Continued on next page)

1          (Sidebar)

2          MS. REARDEN:  Your Honor, two points relating to

3     health issue.  First, where we left off is that Dr. Kalinsky

4     has been traveling.  We were, pursuant to the Court's

5     instruction, to look for somebody who might be able to speak to

6     this issue.  There is a nurse named Debra who works with Dr.

7     Kalinsky who Ms. Francois knows.  And whether she feels

8     competent to address this question, she will tell us.  I'm

9     hopeful.  But I was hoping the Court might be willing to

10    facilitate a call with her tomorrow.

11         THE COURT:  Here is the preliminary question before we

12    get to any of this.  Does your client take the position that

13    her memory issue is related to her chemotherapy?  If the answer

14    is "no", then we'll proceed from there and we don't have to

15    jump through those hoops.  If the answer is "maybe yes" you

16    should tell her that I don't know what the consequences of that

17    are there could be some serious, I don't know we can, have to

18    think about it.

19         MS. REARDEN:  I am not sure if this addresses the

20    question but if we agree now that we will not argue or even

21    suggest to the jury that any memory lapses on the stand relate

22    in any way to any medical condition, does that help?

23         THE COURT:  Yes, it does.  Because then what we have

24    is a situation where she's not going to try to say that she can

25    explain her memory lapses as a result of the chemotherapy.

C66AAFRA8

1    That I think helps you guys because it all comes down to her

2    credibility.  Maybe she just forgot from one hour to the next

3    and you can make of that whatever you want.

4         And what I would suggest is if after conferring with

5    her client they're ready to make that representation -- my

6    personal recommendation but I will leave it up to you -- it is

7    that we leave that issue alone.  I think there were two

8    straight comments yesterday balanced by a comment about

9    fibroids today which is not necessarily a cancerous condition

10   at all.  I think it's up in the air and I think that having an

11   instruction that is not related to chemo almost makes it worse.

12        MR. ROSENBAUM:  I agree with one aspect of it that the

13   stipulation should be read to the jury to clear the matter that

14   there was no issue with.

15        THE COURT:  No medical condition.  We wouldn't mention

16   what the word was.

17        MR. ROSENBAUM:  There is no medical condition that

18   would render her from being --

19        MS. REARDEN:  Your Honor, I see a distinction here.

20   What I was saying was that we would not make my argument, any

21   suggestion any implication that any memory lapse had to do with

22   the medical condition.  I think it's different for to us

23   stipulate that any memory lapse had nothing do with any medical

24   condition because I'm not a neurologist.  I don't know if a

25   neurologist or expert of any kind could get into someone's head

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   and say --

2           THE COURT:  The stipulation could be as follows and

3   could be put into the instructions somehow that the jury has

4   heard testimony which has been struck and on several topics one

5   of them had to do with a medical condition.  And I'd put it in

6   the context of stricken testimony.  We could do it that way,

7   perhaps.  The jury should be aware that the plaintiff is not

8   asserting that there is any medical condition that plays a role

9   in her -- that has caused any memory loss.  And the jury

10  will -- we can work that in.  But it doesn't have to be terms

11  of standing up and sort of read a stipulation but we can do it

12  as an instruction.  The defendants can take a stab if you would

13  like to at drafting what you'd like or I can take a stab at

14  something and you can consider it and then we can all revise it

15  as we can either work off of your pen or our pen.

16          MR. ROSENBAUM:  I would defer to the usual questions

17  when they do an allocution of pleading guilty that you take

18  anything which prevents you having, anything that prevents you

19  that you don't understand what's going on today.  You would

20  equate that not in those words but a stipulation would read --

21          THE COURT:  The instruction.

22          MR. ROSENBAUM:  The instructs would read that there

23  was nothing that the defendant, nothing that the plaintiff, no

24  medical issue that the plaintiff has in any way has

25  personally -- ability to recall.

C66AAFRA8

1          THE COURT:  The plaintiff is not asserting -- the way

2     we have to word it.  I tell you why because she has which is we

3     don't really know.  You folks, the defendants are best served

4     right now by being able to make all the hay you want out of the

5     lack of memory between one moment and the next, okay.  And so

6     what we want to do is to say not asserting as opposed to

7     factual statement which would require I think medical

8     confirmation.

9          MS. TREPELKOVA:  I think the problem that George is

10    having is that she did testify on the stand that she has a

11    medical condition and that affects her memory.

12         THE COURT:  It was actually unclear when she said it

13    whether she's talking about the incident itself or when she

14    gave actually that particular line when she said I had an

15    incident which effected my memory was unclear because at the

16    time I didn't catch what was going on.

17         MR. ROSENBAUM:  She used the word "chemotherapy".

18         THE COURT:  I gave a suggestion instruction.  Here is

19    the one thing we are not going to do.  We're not going to have

20    a mistrial over this issue no matter what happens.  So we've

21    got to find a way out of this issue.  We're too far down the

22    road on this.  So why don't you folks then if you can confer

23    perhaps, on the way out about this.  But I think I am happy to

24    take a stab at drafting up something, some language and I'm the

25    one who offered to put it in cause I think that that's not

C66AAFRA8

1  unfair.  I think that it's a fair request on your part given

2  that things would have slipped in.

3          MS. REARDEN:  Your Honor, I think the plaintiff is not

4  asserting that language would get us there.

5          THE COURT:  Let me just do this.  Let me suggest to

6  you folks, let me take a stab at drafting something.  You look

7  at it and tell me whether or not you are comfortable with or

8  whether or not you want to tweak the words or whether or not

9  you think something else needs to be done.

10         MR. ROSENBAUM:  Fair enough.

11         THE COURT:  I would assume, Ms. Rearden, that based

12 upon this, that unless you tell me otherwise, that your client

13 is, that we are going to go down this path.

14         MS. REARDEN:  Yes.

15         THE COURT:  So plaintiff is not asserting.  And let me

16 just -- what I will do is I will figure out where in the

17 instructions I would put it and enter the words I would use and

18 you can tell me, Ms. Trepelkova and Mr. Rosenbaum, what you

19 think about that.

20         MR. ROSENBAUM:  Are you going to get permission from

21 your client that there is no issue about --

22         MS. REARDEN:  No.  We are not saying as a factual

23 matter that there is no issue.  What we are saying is that we

24 are not making an argument.

25         THE COURT:  You are the one, Mr. Rosenbaum, who said

1    that you knew that with chemo there isn't memory issues.  So I

2    think you are the only one with any personal knowledge in this

3    regard.

4         MR. ROSENBAUM:  What happened with my wife is it

5    didn't occur.

6         THE COURT:  None of us have a reason to believe that

7    there is a medical connection.  What we're trying to do is

8    balance two things.  One, the slipping out of the word twice

9    the word "chemo".  And two, a marked series of memory lapses

10   during her testimony.  I don't know that there's necessarily a

11   connection but I want to make sure the defendants are not

12   prejudiced by somebody drawing an inference.  I don't know if

13   we need to ourselves create an inference.

14        MR. ROSENBAUM:  They put the word "chemo" in we have

15   an issue of emotional issue.  This poor lady has chemo.  This

16   is looking to resolve -- his father is gone and buried.  It's

17   not an issue here.

18        THE COURT:  Well, now we're arguing about the fact

19   that it came in.  The words slipped out.  I did not, I will

20   tell you, assess her demeanor as trying to slip them in.  I

21   think they just came out in response to questions.  That was my

22   impression of the witness' demeanor at the time.  They're out.

23   I struck them without using the word again myself intentionally

24   so.  And now we're going to fix it.

25        MR. ROSENBAUM:  I'll a make every effort --

1          THE COURT:  We are not going to have a mistrial on it.

2     So either make an effort and find this wording or some

3     alternative wording and if we can't ultimately agree then I'll

4     rule but I am hoping that we can agree.  I have enough rulings

5     over objections as it is.

6          MR. ROSENBAUM:  I will try, your Honor.  But I find

7     when the Court gives the jury instructions -- it has nothing to

8     do with this Court at all -- but after a while they're falling

9     asleep and everything rolls into one thing and they always

10    invariably come back, Could you please read the jury

11    instructions again?

12         THE COURT:  But I actually will give the jurors a copy

13    of the instructions to take back in the room with them.  And I

14    will tell them that at the beginning so that they don't have to

15    sit there and take a lot of notes.  They can, nonetheless, they

16    often do still have questions about tell me more.  It is not

17    quite explained about "X".  But they will have the instructions

18    with them in exactly the scripted form that I read them.

19         MR. ROSENBAUM:  If we get the wording the Court gives

20    it in the instructions to the jury, the Court advise us how you

21    are going to incorporate?

22         THE COURT:  Yeah.  My plan would be to give you

23    exactly the wording and exactly where it's going to go.  An

24    then you can tell me whether it should go in its own spot I

25    think would be a mistake.

1          MR. ROSENBAUM:  Depends on the wording.  I may want to

2     go.  I may want to emphasize it.

3          THE COURT:  Sufficient and to the day.  Let me draft

4     something up and propose it.

5          MS. REARDEN:  That you, judge.

6          THE COURT:  I think we are done for this evening.  So,

7     again, I invite you to come back with any cases on this other

8     issue that we've got relating to Mr. Mazer's associational

9     activity.  That is we can resolve that in the right way.  You

10    want to be sure that I have, if there is an evidentiary basis

11    to allow it in, I want to make sure that I've got it.  And if

12    there's an evidentiary basis to keep it out, which I believe

13    there is an that's been my position thus far, then I want to,

14    you can support that too.

15         Now I changed my ruling on the photographs because I

16    was shown a Second Circuit case and confirmed there are

17    additional cases along the same lines but I am open to case law

18    citations.

19         MR. ROSENBAUM:  Thank you, your Honor.

20         THE COURT:  Okay.  So --

21         MS. REARDEN:  Your Honor, what would be most helpful,

22    written submissions or come prepared to argue the case law?

23         THE COURT:  I tell you the truth what I really like is

24    to hand me the cases with the things underlined or highlighted.

25    Maybe you can come five minutes early.  My deputy will come out

1    ten minutes early, grab them from you folks.  I'll take a look

2    at them.  I'll come out and I'll tell you what my impression

3    is.  And then you folks can address that orally but the easiest

4    thing is not any kind of letters or you can make whatever

5    submission you want but I really just need the cases.

6              MS. REARDEN:  Thank you, your Honor.

7              THE COURT:  Is there anything else?

8              MS. REARDEN:  I don't think so.

9              THE COURT:  Okay.  All right.  Thank you.  We are

10   adjourned for the evening.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C66AAFRA8

1           (In Open Court)

2           All right.  Everyone, we are adjourned for the

3  evening.  We will resume tomorrow morning with the lawyers and

4  anyone else who wants to be here at nine and at 9:30 with the

5  jury.

6           (Adjourned to Thursday, June 7, 2012 at 9 nine a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                              Page

3    MICHAEL LEE HERTZBERG

4    Direct By Ms. Rearden  . . . . . . . . . . 468

5    Cross By Mr. Rosenbaum . . . . . . . . . . 479

6    Redirect By Ms. Rearden  . . . . . . . . . 497

7    KAREN WUTTKE

8    Direct By Mr. Myatt . . . . . . . . . . . 499

9    Cross By Mr. Rosenbaum . . . . . . . . . . 516

10   PANAGIOTIS STEVE GOVAS

11   Direct By Ms. Trepelkova . . . . . . . . . 540

12   Cross By Ms. Gupta . . . . . . . . . . . . 547

13   ULISE GONZALEZ

14   Direct By Ms. Trepelkova . . . . . . . . . 550

15   Cross By Mr. Myatt . . . . . . . . . . . . 569

16   Redirect By Ms. Trepelkova . . . . . . . . 577

17   SYLVIA LINDSAY ALEXANDER

18   Direct By Mr. Rosenbaum  . . . . . . . . . 591

19   DR. GEORGE V. LOMBARDI

20   Direct By Mr. Rosenbaum  . . . . . . . . . 625

21   Cross By Mr. Myatt . . . . . . . . . . . . 653

22   Redirect By Mr. Rosenbaum  . . . . . . . . 663

23   SYLVIA  ALEXANDER

24   Direct By Mr. Rosenbaum  . . . . . . . . . 666

25   Cross By Ms. Lavery . . . . . . . . . . . 666

INDEX OF EXAMINATION

Examination of:                              Page

MATTHEW CHARLES MAZER

Direct By Mr. Rosenbaum  . . . . . . . . . . . 670

PLAINTIFF EXHIBITS

Exhibit No.                                  Received

  8    . . . . . . . . . . . . . . . . . . 504

  9    . . . . . . . . . . . . . . . . . . 514

DEFENDANT EXHIBITS

Exhibit No.                                  Received

  B    . . . . . . . . . . . . . . . . . . 553

  C    . . . . . . . . . . . . . . . . . . 632